LITTLER MENDELSON, P.C.
One Newark Center – 8th Floor
Newark, New Jersey 07102
*Attorneys for Defendants*
 *Salisbury Bank and Trust Company and Salisbury Bancorp, Inc.*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM GUNNAR TRUITT,<br><br>     Plaintiff,<br><br> -against-<br><br>SALISBURY BANK AND TRUST COMPANY;<br>AND SALISBURY BANCORP, INC.,<br><br>     Defendants. | Civil Action No.: 7:18-cv-08386-NSR-PED<br><br>**DECLARATION OF JENNIFER I.<br>FISCHER IN SUPPORT OF<br>DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT** |

**JENNIFER I. FISCHER**, of full age, hereby declares pursuant to 28 U.S.C. § 1746:

1. I am an attorney-at-law admitted to practice before this Court and an Associate at the law firm of Littler Mendelson, P.C., attorneys for Defendants Salisbury Bank and Trust Company and Salisbury Bancorp, Inc. (together, "Defendants") in the above-captioned matter. I submit this Certification in support of Defendants' motion for summary judgment.

2. Attached as **Exhibit A** is a true and correct copy of the Verified Complaint in this action, dated August 21, 2018.

3. Collectively attached as **Exhibit B** are true and exact copies of the relevant pages from the transcript of the deposition of Plaintiff William Gunnar Truitt ("Plaintiff"), conducted on June 27, 2019.

4.      Collectively attached as **Exhibit C** are true and exact copies of the relevant pages from the transcript of Kevin Cantele's deposition, conducted on July 16, 2019.

5.      Collectively attached as **Exhibit D** are true and exact copies of the relevant pages from the transcript of Spring Burke's deposition, conducted on July 22, 2019.

6.      Collectively attached as **Exhibit E** are true and exact copies of the relevant pages from the transcript of Douglas Cahill's deposition, conducted on July 22, 2019.

7.      Collectively attached as **Exhibit F** are true and exact copies of the relevant pages from the transcript of Art Bassin's deposition, conducted on July 24, 2019.

8.      Collectively attached as **Exhibit G** are true and exact copies of the relevant pages from the transcript of Richard Cantele's deposition, conducted on July 29, 2019.

9.      Attached as **Exhibit H** is a true and correct copy of email correspondence to Sara Murphy from Linda King.  (Ex. D-9 to Plaintiff's Deposition).

10.     Attached as **Exhibit I** is a true and correct copy of Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories, dated January 25, 2019.

11.     Collectively attached as **Exhibit J** is a true and exact copy of the relevant pages of Plaintiff's Offer of employment to work as a Mortgage Lending Officer Trainee, dated January 29, 2018. (Ex. D-4 to Plaintiff's Deposition).

12.     Collectively attached as **Exhibit K** is a true and exact copy of Plaintiff's Notice and Acknowledgement of Pay Rate and Payday. (Ex. D-7 to Plaintiff's Deposition).

13.     Attached as **Exhibit L** is a true and correct copy of a development plan detailing Plaintiff's timeline for the completion of his training program, dated February 2018. (Ex. D-5 to Plaintiff's Deposition).

14.     Attached as **Exhibit M** is a true and correct copy of Plaintiff's job description for a Mortgage Originator Trainee position, dated March 2016. (Ex. D-11 to Plaintiff's Deposition).

15.     Attached as **Exhibit N** is a true and correct copy of Plaintiff's Resume. (Ex. D-3 to Plaintiff's Deposition).

16.     Attached as **Exhibit O** is a true and correct copy of Plaintiff's resignation email/letter to Amy Raymond and Andrea MacArthur, dated May 1, 2018. (Ex. D-23 to Plaintiff's Deposition).

17.     Attached as **Exhibit P** is a true and correct copy of Plaintiff's resignation email correspondence to Douglas Cahill, dated May 1, 2018. (Ex. D-24 to Plaintiff's Deposition).

18.     Attached as **Exhibit Q** is a true and correct copy of email correspondence, dated March 12, 2018, approving Plaintiff's outside employment as a Dutchess County Legislator.

19.     Attached as **Exhibit R** is a true and correct copy of email correspondence to the EntireBank from Douglas Cahill, dated May 18, 2018, announcing Plaintiff's resignation.

20.     Attached as **Exhibit S** is a true and correct copy of email correspondence to Douglas Cahill, Amy Raymond, and Andrea MacArthur from the Plaintiff with an attachment of letters Plaintiff drafted regarding his candidacy in the November 2018 elections in New York State as well as the State Assembly calendar, and the NYS Legislative Ethics Commission standards of conduct relating to outside employment or business activity, dated April 16, 2018. (Ex. D-20 to Plaintiff's Deposition).

21.    Attached as **Exhibit T** is a true and correct copy of The New York Times article regarding "Why N.Y. Lawmakers Think They Deserve a $50,000 Raise," dated December 9, 2018.

22.    Attached as **Exhibit U** are true and correct copies of various memos to the HR/Compensation Committee from Douglas Cahill, dated May 31, 2013, June 27, 2014, June 26, 2015, June 24, 2016, April 28, 2017, May 25, 2018 detailing various employees' requests for outside activities/employment and volunteerism spreadsheet for 2011 through the present.

23.    Attached as **Exhibit V** are true and exact copies of the relevant pages from the Salisbury Bank Employee Handbook, dated January, 2018, including Plaintiff's signed Acknowledgement of the same.  (Exs. D-12 and D-13 to Plaintiff's Deposition).

24.    Attached as **Exhibit W** are true and exact copies of the relevant pages from the Salisbury Bank Code of Ethics, dated November 27, 2017, including Plaintiff's signed Acknowledgement of the same.  (Exs. D-14, D-15 and D-16 to Plaintiff's Deposition).

Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.


By: _/s/ Jennifer I. Fischer_____

Dated:  December 13, 2019

Jennifer I. Fischer

# EXHIBIT
# A

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

McCULLOUGH GINSBERG
MONTANO & PARTNERS LLP
122 E 42nd Street, Suite 3505
New York, NY 10168
Tel: (646) 435-0300
tmccullough@mgpllp.com
*Attorneys for Plaintiff*

Coughlan Law Offices, LLP
P.O. Box 72, 22 Hutton St.
Rhinecliff, NY 12574
Tel: (845) 802-6684
coughlanlawoffices@gmail.com
*Co-counsel for Plaintiff*

RECEIVED

AUG 2 4 2018

BY: B. Bruno
2:45 pm

SUPREME COURT OF THE STATE
OF NEW YORK
DUTCHESS COUNTY
-------------------------------------------------------x

William Gunnar Truitt,

                              Plaintiff,

vs.

Salisbury Bank and Trust Company; and
Salisbury Bancorp, Inc.,

                              Defendants.

-------------------------------------------------------x

**SUMMONS AND VERIFIED COMPLAINT**

Index No: _____

August 21, 2018

Plaintiff Designates Dutchess County as the
Place of Trial and Requests Trial by Jury

The Basis of Venue is Place of Employment, the
Locus of the Tort, and Domicile of the Plaintiff



DEFENDANT'S
EXHIBIT

7

SX 6/27/19

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

**TO THE ABOVE NAMED DEFENDANTS:**

You hereby summoned to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on Plaintiff's Attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York). In the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
        August 21, 2018

McCULLOUGH GINSBERG
MONTANO & PARTNERS LLP
122 E 42nd Street, Suite 3505
New York, NY 10168
Tel: (646) 435-0300
tmccullough@mgpllp.com
*Attorneys for Plaintiff*
By:

Ted McCullough

2

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM   INDEX NO. 2018-52675
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 08/23/2018

## PRELIMINARY STATEMENT

Plaintiff William Gunnar Truitt ("Mr. Truitt") brings this suit against Salisbury Bank and Trust Company ("Bank") and Salisbury Bancorp, Inc. (collectively "Defendants"), for violating New York Labor Law by retaliating against Mr. Truitt and wrongfully terminating his employment due to Mr. Truitt's political activities.

Mr. Truitt is and has been an elected official in Dutchess County since 2015, which was disclosed to and known by the Bank at the time of his hiring in February 2018. Less than three months into Mr. Truitt's rapidly-progressing employment with the Bank, Mr. Truitt announced his intention to continue his political service by running for New York State Assembly District 106 on Facebook. Mr. Truitt was endorsed for that Office by the Republican Parties for Dutchess and Columbia counties (which comprise District 106).

Almost immediately after Mr. Truitt announced his intention to run for District 106, Mr. Truitt was callously terminated by the Bank solely and exclusively because of the Bank's ties to Mr. Truitt's incumbent Democratic opponent for District 106 in flagrant violation of New York Labor Law Section 201-d. As a result of Defendants' willful and unlawful conduct, Mr. Truitt is entitled to an award of damages in an amount to be determined at trial and attorneys' fees.

## THE PARTIES AND JURISDICTION

1.     The Bank Defendant is a bank and trust company with a branch office for the transition of business located at 11 Garden Street, Poughkeepsie, NY 12601. Mr. Truitt was hired by the Bank in February of 2018 to work out of the Bank's Poughkeepsie office, and within the jurisdictional confines of this Court.

2.     The Bank is incorporated in the state of Connecticut with headquarters in Lakeville, CT.

3

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM

NYSCEF DOC. NO. 1

INDEX NO. 2018-52675

RECEIVED NYSCEF: 08/23/2018

3.     This Court has jurisdiction over the present controversy in that Defendants are conducting businesses in the State of New York.

4.     Venue in this Court is proper because the actions complained of herein were committed within the jurisdictional confines of the State of New York and County of Dutchess and/or because Defendants are conducting business in Dutchess County, New York.

5.     Upon information and belief, Salisbury Bancorp, Inc. is a publicly traded company (NASDAQ: SAL) incorporated in the state of Connecticut with headquarters in Lakeville, Connecticut and is the parent company of the Bank.

6.     Upon information and belief, Salisbury Bancorp, Inc. controls and is responsible for the conduct of the Bank.

7.     Mr. Truitt is a resident of Dutchess County and lives in Hyde Park, New York.

8.     Mr. Truitt is a 2017 honors graduate of Marist College, where he obtained a B.S. in Business Administration with a concentration in finance.

9.     Mr. Truitt was elected to the County Legislature of Dutchess County in 2015, while he was still attending college.

10.    Mr. Truitt was elected as a Republican representing the 7th District in the Dutchess County Legislature.

11.    In 2017, the voters in Dutchess County reelected Mr. Truitt to the 7th District in the Dutchess County Legislature.

12.    Commencing at or around February 26, 2018 and until the date of his termination, Mr. Truitt was employed by the Bank for the purpose of originating mortgage loans.

13.    Mr. Truitt was eligible to participate in Defendants' incentive compensation program.

4

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

14.     Mr. Truitt was at all times relevant herein up until the date of his termination an employee of Bank within the meaning of the relevant provisions of New York Labor Law.

## FACTUAL BACKGROUND

15.     The Bank offered Mr. Truitt a position in finance in late January of 2018 knowing that Mr. Truitt already had a part-time job as an elected Dutchess County Legislator.  When Mr. Truitt started his employment with the Bank in February of 2018, the Bank was well aware that Mr. Truitt had a part-time job as a Dutchess County Legislator.

16.     Upon Mr. Truitt's graduation from Marist College with honors in 2017, the Bank was swift in hiring Mr. Truitt.

17.     Mr. Truitt's basic compensation structure entailed a base salary plus benefits and the bulk of his compensation was to be commission-based.  The commission portion of Mr. Truitt's compensation was to be based on the amount of residential and commercial loans that he originated in the state of New York.  Mr. Truitt was informed that the other two loan originators employed by the Bank were compensated in excess of $150,000 per year and that Mr. Truitt could reasonably expect similar compensation.

18.     While employed by the Bank, Mr. Truitt progressed through the Bank's mortgage origination training much faster than average.  The Bank was so confident in Mr. Truitt's skills and training that the Bank sponsored him for and provided him with a Nationwide Mortgage Licensing System identification number.

19.     Thereafter, the Bank approved Mr. Truitt meeting his first potential lending client in Newburgh, New York.  Two executives of the Bank attended that meeting by phone and, at the

5

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

end of the meeting, provided laudatory feedback to Mr. Truitt regarding his performance with the prospective client.

20.     At the time Mr. Truitt was hired, he was a 22-year old man with an honors degree, a lucrative position at a reputable financial institution, and already a two-term elected official in Dutchess County. The Bank changed that in a heartbeat after learning that Mr. Truitt had decided to run for a New York citizen legislature position that is currently held by a Democratic politician with strong connections to the Bank's Board of Directors.

21.     Mr. Truitt formally started his employment with the Bank on or around February 26, 2018. Mr. Truitt reported to Douglas Cahill (Vice President, Director of Human Resources) and Amy Raymond (Senior Vice President Retail Lending and Commercial Operations). Mr. Truitt was also trained by Maria Seeley in the Poughkeepsie office.

22.     Mr. Truitt had a dual report to Amy Raymond and Assistant Vice President Andrea MacArthur.

23.     In a Facebook post on or around April 12, 2018, Mr. Truitt announced his campaign for the office of New York State Assembly District 106, a part-time citizen legislature position.[1] At this time, Mr. Truitt was still unaware of the strong connections between Bank's Board of Directors and the incumbent Democratic Assemblymember for District 106.

24.     Approximately one day later, on Friday the 13th, Mr. Truitt was asked to attend an unscheduled meeting wherein Douglas Cahill and Amy Raymond informed him that they were aware of his candidacy for New York State Assembly District 106 and concerned about the possibility of him holding that office. Mr. Cahill and Ms. Raymond told Mr. Truitt to submit a

---

[1] New York State Assemblymembers frequently hold full-time outside employment. Regarding the State Assembly, New York's Governor Andrew Cuomo has stated "part-time legislators" are "the design of the system," noting that "[t]he thought is it's better to not have a full-time legislators." NY State of Politics, http://www.nystateofpolitics.com/2013/07/cuomo-dislcosure-provides-for-significant-information/ (last visited Aug. 20, 2018).

6

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM

NYSCEF DOC. NO. 1

INDEX NO. 2018-52675

RECEIVED NYSCEF: 08/23/2018

written explanation of the position he was running for and whether it would impact his ability to commit himself to the Bank. Mr. Truitt submitted the requested letter the following Monday.

25.     Approximately two weeks after Mr. Truitt submitted that letter describing the part-time citizen legislature position he was running for, he was informed that Mr. Cahill was coming to Poughkeepsie to discuss the letter with him. During that meeting, Mr. Cahill stated he had recently communicated with Arthur Bassin (a/k/a Art Bassin), a member of the Bank's Board of Directors.

26.     Specifically, Mr. Cahill indicated that Mr. Bassin was not comfortable with Mr. Truitt running for District 106.

27.     Mr. Cahill then told Mr. Truitt that he needed to make a choice between his employment with the Bank and campaign for District 106. Without more, that manufactured ultimatum was a violation of New York Labor Law.

28.     Mr. Truitt then politely asked to meet with the CEO of the Bank, Richard Cantele, who is also a member of the Bank's Board of Directors. That meeting took place in Connecticut on or around April 30, 2018 and lasted approximately 30 minutes. During that meeting, Mr. Cantele indicated that he had also been in communication with Board of Directors member Arthur Bassin, and that Mr. Bassin was not comfortable with Mr. Truitt being both a candidate for District 106 and an employee of the Bank. After that meeting, Mr. Truitt again met with Douglas Cahill, and informed Mr. Cahill that he was still running for District 106, at which point Mr. Cahill terminated Mr. Truitt's employment. These actions by Mr. Cahill, Ms. Raymond, Mr. Cantele, Mr. Bassin, and the Bank violated New York Labor Law.

29.     Arthur Bassin is a Democrat who resides in Columbia County, New York. In addition to serving on the Bank's Board of Directors, Mr. Bassin is the elected Democratic Town Supervisor

7

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM

NYSCEF DOC. NO. 1

INDEX NO. 2018-52675

RECEIVED NYSCEF: 08/23/2018

for Ancram, New York. Mr. Bassin is also a long-time political and financial supporter of Didi Barrett (Dianne Dewitt Barrett), the three-term incumbent Democratic New York Assemblymember for District 106 — the same district for which Mr. Truitt had recently announced his Republican candidacy. Like Mr. Bassin, Ms. Barrett is a Democrat and homeowner in Columbia County. Although the Bank did not disclose it to Mr. Truitt, Mr. Bassin has endorsed Ms. Barrett's candidacies and made contributions to funds such as "Friends of DiDi Barrett for Assembly." Mr. Bassin has also personally contributed several thousand dollars specifically to Ms. Barrett's Democratic campaign for District 106.

30.     Mr. Truitt's run for public office was the one and only reason provided for the termination of his employment. Any retroactive claim by Defendants in this litigation that Mr. Truitt was terminated for any reason other than his political activity would be pretextual, especially in view of the fact that multiple members of the Bank's Board of Directors have personally and specifically contributed to Ms. Barrett's Democratic campaign for New York State Assembly District 106.

31.     Mr. Truitt has been severely and unfairly damaged by the actions of the Bank. By the Bank's own reckoning, Mr. Truitt has lost a position worth over $150,000 per year plus benefits. Mr. Truitt's professional reputation has been prejudiced by the Bank and he will forever have to explain in job interviews why he was terminated from his first position after college by a reputable bank in under three months.

32.     In addition to unlawfully terminating Mr. Truitt, the Bank has undermined Mr. Truitt's political campaign for the District 106 State Assembly race because it was well aware that Mr. Truitt's ability to effectively run for office would become much more difficult if he were stripped of his income and consumed with a search for new employment instead of being a junior

8

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

executive at a reputable bank. If elected as a New York State Assemblymember, Mr. Truitt would be paid approximately $80,000 per year for his part-time service to the state while accruing time towards a New York State pension.

33.    The unfair actions of the Bank were calculated to prevent Mr. Truitt from receiving those benefits, interfere with Mr. Truitt's Republican campaign for District 106, and protect the incumbent Democratic Assemblymember for District 106.

34.    As a result of the Bank's abrupt and illegal termination of Mr. Truitt's employment, Mr. Truitt was and continues to be damaged through loss of compensation (including past and future wages), benefits, commissions, earned and unused paid time off, and damage to his professional reputation, all of which has caused him extreme mental languish.

35.    Upon information and belief, subsequent to Mr. Truitt's termination from the Bank, the Bank caused a false and misleading email to be sent to Bank employees indicating that Mr. Truitt had chosen to leave his employment to pursue a career in politics. In fact, Mr. Truitt had done everything that he could to maintain his employment with the Bank including presenting the Bank with a written copy of the New York State Legislative Ethics Commission Advisory Opinion regarding Assemblymembers' ability to hold outside employment as well as a schedule for the Assembly demonstrating that his potential Assemblymember role would not interfere with his responsibilities to the Bank.

36.    Using personal non-Bank communication devices, a number of Bank employees reached out to Mr. Truitt after his termination to express their shock and dismay that their employer, the Bank, would act so unfairly to Mr. Truitt because of his political activity.

9

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM

NYSCEF DOC. NO. 1

INDEX NO. 2018-52675

RECEIVED NYSCEF: 08/23/2018

## NEW YORK LABOR LAW

37.     The Bank's actions against Mr. Truitt unambiguously violate New York Labor Law Section 201-d, which states:

> [I]t shall be unlawful for any employer . . . to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of . . . an individual's political activities. . . .

38.     That statute also includes "running for public office" in its definition of "Political activities." N.Y. Lab. Law § 201-d(1)(a).

## COUNT I

39.     Plaintiff realleges and incorporates by reference all previous paragraphs, including the preliminary statement, as if set forth herein.

40.     The Bank's actions in response to Mr. Truitt's Republican campaign for New York State Assembly District 106 are violative of New York Labor Law Section 201.

41.     In sum, Mr. Truitt was fired because of his Republican campaign for New York State Assembly District 106, and that retaliation is categorically prohibited by the State of New York.

## PRAYER FOR RELIEF

Plaintiff respectfully petitions the Court for the following relief:

1.     A judgment that Defendants are liable for each Count in this complaint.

2.     A judgment that Defendants violated N.Y. Lab. Law § 201-d by discriminating against Mr. Truitt and terminating his employment.

10

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM   INDEX NO. 2018-52675
NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 08/23/2018

3.   Injunctive relief including a Court Order that the Bank issue a letter of recommendation on Mr. Truitt's behalf to mitigate the damage to Mr. Truitt's future employment opportunities.

4.   Monetary damages to Mr. Truitt for his loss of past and future income, commissions, benefits, and other potential compensation.

5.   Compensation for the damage done by the Bank to Mr. Truitt's professional reputation and future earning potential.

6.   Compensation for the damage done by the Bank to Mr. Truitt's political campaign.

7.   Compensation for the mental anguish caused by Mr. Truitt's abrupt and unfair termination by the Bank.

8.   Punitive damages in an amount to be determined by the Jury.

9.   Costs of action incurred herein, including expert fees.

10.   Attorneys' fees, including fees pursuant to New York Labor statutes.

11.   Pre-judgment and post-judgment interest, as provided by law.

12.   Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

11

FILED: DUTCHESS COUNTY CLERK 08/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

Dated: New York, New York
August 21, 2018

Respectfully Submitted,

Ted McCullough
Robert B. Lower
**MCCULLOUGH GINSBERG
MONTANO & PARTNERS LLP**
122 East 42nd Street, Suite 3505
New York, New York 10168
Phone: (646) 747-4677
Facsimile: (646) 349-2217
tmccullough@mgpllp.com
rlower@mgpllp.com
*Attorneys for Plaintiff*

James Coughlan
Coughlan Law Offices, LLP
P.O. Box 72, 22 Hutton St.
Rhinecliff, NY 12574
Phone: (845) 802-6684
coughlanlawoffices@gmail.com
*Co-counsel for Plaintiff*

12

FILED: DUTCHESS COUNTY CLERK   8/22/2018 02:29 PM
NYSCEF DOC. NO. 1

INDEX NO. 2018-52675
RECEIVED NYSCEF: 08/23/2018

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

STATE OF NEW YORK )
                    )
COUNTY OF DUTCHESS )

## VERIFICATION

Before me, the undersigned notary public, personally appeared WILLIAM GUNNAR TRUITT, known to me as the person whose name is subscribed below, and being first duly sworn, deposes and states as follows:

That Affiant has reviewed the foregoing VERIFIED COMPLAINT and knows the contents thereof to be true to Affiant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, Affiant believes those matters to be true.

The undersigned affirms that the foregoing statements are true under penalties of perjury.

William Gunnar Truitt

Subscribed and sworn to before me
this ___ day of August, 2018.

_____
Notary Public

JAMES L COUGHLAN
NOTARY PUBLIC STATE OF NY
N 02 CO6359072
QUALIFIED IN DUTCHESS COUNTY
COMMISSION EXPIRES MAY 30 2021

13

# EXHIBIT B

Page 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF DUTCHESS COUNTY

----------------------------------------X

WILLIAM GUNNAR TRUITT,

                    Plaintiff,

        -against-
SALISBURY BANK and TRUST COMPANY; and
SALISBURY BANCORP, INC.,

                    Defendants.

----------------------------------------X

                         June 27, 2019
                         9:42 a.m.

    EXAMINATION BEFORE TRIAL of WILLIAM GUNNAR
TRUITT, a Plaintiff herein, taken by the
respective parties, pursuant to Court Order,
held at the offices of McCullough Ginsberg
Montano & Partners, 122 East 42nd Street, Suite
3505, New York, New York, before Shechinah
Jackson, a Notary Public for and within the
State of New York.



Page 30

W. TRUITT

1

2      A.   It expires at the end of the year
3  December 31st.
4      Q.   December 31, 2019?
5      A.   My second term.
6      Q.   Did you advise Salisbury Bank that you
7  were going to continue to seek reelection in
8  the Dutchess County legislature during your
9  interview process past December 2019 if
10  reelected?
11          MR. LOWER:   Objection.
12     A.   Can you say that again, rephrase.
13     Q.   Your current term expires in December
14  of 2019, correct?
15     A.   That's correct yes.
16     Q.   Did you advise Salisbury Bank that you
17  were going to seek reelection?
18     A.   To the Dutchess County legislature?
19     Q.   Yes, at the time of your interview?
20     A.   I don't recall what was said in the
21  interview exactly.  I just remember saying I
22  was going to continue to hold the position.
23     Q.   To your knowledge, did Salisbury Bank
24  know that you were elected as a Republican
25  legislator?



Page 31

1                         W. TRUITT

2          A.   To my knowledge, yes.

3               MR. LOWER:  Objection to form.

4          Q.   Did you interview for a position for

5     Salisbury Bank?

6          A.   I did.

7          Q.   With whom did you interview?

8          A.   If I remember correctly, it was

9     Mr. Doug Cahill, Sandy Ramon and I believe Ms.

10    Andrea MacArthur was in the room as well.

11         Q.   Do you know Doug Cahill's political

12    affiliation?

13              MR. LOWER:  Objection to form.

14         A.   I do not.

15         Q.   Do you know Amy Raymond's political

16    affiliation?

17              MR. LOWER:  Objection to form.

18         A.   I do not.

19         Q.   Do you know Andrea MacArthur's

20    political affiliation?

21              MR. LOWER:  Same objection.

22         A.   I do not.

23         Q.   Do you know Rick Cantele's political

24    affiliation?

25              MR. LOWER:  Same objection.



Page 32

1                              W. TRUITT
2          Q.   Do you know Shelly Hum's political
3     affiliation?
4               MR. LOWER:   Same objection, and
5            these will just carry.
6          A.   I do not.
7          Q.   Okay.   On that interview I believe we
8     already discussed that you spoke about your
9     role as a Dutchess County legislator, correct?
10         A.   Correct.
11         Q.   Did you advise Salisbury Bank
12    approximately how many hours a week you spent
13    in performing your duties in that role?
14         A.   I believe I did.
15         Q.   Do you recall how many hours a week
16    you told them?
17         A.   No.
18         Q.   To the best of your knowledge, how
19    many hours a week do you spend in your role as
20    a Dutchess County legislator?
21         A.   Generally it depends week by week.
22         Q.   In an average week, can you give me an
23    estimated number of hours?
24         A.   I guess between, or in the vicinity of
25    15 hours a week.



Page 33

1                          W. TRUITT

2        Q.   Okay.  How many meetings a month does

3    the Dutchess County legislature hold?

4        A.   That again depends.

5        Q.   Can you clarify?

6             MR. LOWER:  Objection to form.

7        A.   There are generally three meetings at

8    the minimum:  A caucus; a set of committee

9    meetings and a board meeting.

10       Q.   Are each of these meetings held in the

11   evening?

12       A.   Yes.

13       Q.   So you would be able to work full time

14   at Salisbury and still continue with your

15   legislative duties at night, correct?

16       A.   Correct.

17       Q.   So on average you would say three

18   meetings per month, correct?

19       A.   Correct.

20       Q.   On average, 15 hours a month spent in

21   your role as a Dutchess County legislator?

22            MR. LOWER:  Objection,

23        mischaracterizing.

24       A.   That's in a week, you said for a

25   month.



1                          W. TRUITT

2     agreement, to the best of your knowledge?

3          A.   I would have to look through what I

4     produce, but I'm unsure.

5          Q.   You never received a $2,500 per month

6     draw on commissions, correct?

7          A.   Correct.

8          Q.   You were never a 100 percent

9     commissioned employee, correct?

10         A.   I was not.

11         Q.   Until your separation from the bank,

12    you were getting paychecks that were paying you

13    $16.83 per hour, correct?

14         A.   And if there was overtime I guess the

15    overtime rate, yes, correct.

16         Q.   Okay.   To the best of your knowledge,

17    there were no commission payments ever made

18    from the bank on your behalf?

19         A.   I don't believe so.

20              (Whereupon, E-mail Bates stamped D58

21          was marked as Defendants' Exhibit 9 for

22          Identification.)

23              (Whereupon, E-mail Bates stamped D65

24          was marked as Defendants' Exhibit 10 for

25          Identification.)



1                           W. TRUITT

2     Valley?

3         A.   I did not.  I did, of course, I was

4     working with Spring and Kevin and I was able to

5     see the work that they were doing already in

6     the Hudson Valley which I was going to expand

7     upon that.

8         Q.   Do you know how long Spring Burke has

9     been in the mortgage origination business?

10              MR. LOWER:  Objection to form.

11        A.   I do not.

12        Q.   Do you know how long Kevin Cantele has

13    been working in the mortgage origination

14    business?

15              MR. LOWER:  Same objection.

16        A.   Same answer, I'm not sure.

17        Q.   When did you decide to run for the New

18    York State legislature?

19              MR. LOWER:  Objection to form.

20        A.   So I was approached by various people

21    in the community, knowing that there wasn't a

22    Republican candidate yet for the seat at points

23    in March.  It was something that I thought

24    might be a good fit for me, and it was

25    something I was interested in pursuing being



Page 80

1                               W. TRUITT

2      that it was brought to attention.

3          Q.   Did you go to anybody at Salisbury

4      Bank and advise them that you were considering

5      running for office?

6               MR. LOWER:   Objection to form.

7          A.   I hadn't firmly made a decision on

8      what I was doing, and that's why I didn't

9      approach anyone in March.

10         Q.   In a Facebook post on or around

11     April 12, 2018, you announced your campaign for

12     district 106; is that correct?

13         A.   Yes, that's correct.

14         Q.   Prior to making the Facebook

15     announcement, did you advise anyone at

16     Salisbury Bank that you were running for the

17     state legislature?

18               MR. LOWER:   Objection to form.

19         A.   No.

20         Q.   As you alleged in your complaint in

21     paragraph 24, one day later you were asked to

22     attend a meeting with Doug Cahill and Amy

23     Ramond regarding your candidacy; is that

24     correct?

25         A.   That's correct.



Page 81

1                    W. TRUITT

2      Q.   Do you know how Salisbury Bank found

3   out you were running for office?

4           MR. LOWER:   Objection to form.

5      A.   I'm unsure.

6      Q.   But they came to you and told you that

7   they were aware of your candidacy, correct,

8   before you ever advised them?

9      A.   That is correct.

10     Q.   At the meeting on Friday, April 13th,

11  do you recall who was present?

12     A.   For the meeting?

13     Q.   Yes.

14          MR. LOWER:   What paragraph number?

15          THE WITNESS:   24.

16     Q.   At an April 13th meeting, which you

17  state in paragraph 24 occurred, who was at the

18  meeting?

19     A.   Yeah.   I remember I was sitting at my

20  desk, and I believe I was called or Amy Raymond

21  approached me and said that her and Doug wanted

22  to speak to me up at the conference room, and

23  so I went up there and that is who I spoke to.

24     Q.   How did the conversation begin?

25     A.   It started, I think it was Doug who



```
 1                        W. TRUITT
 2   initiated the conversation.  He said or he
 3   asked do you have any interest in new
 4   information, or something along those lines any
 5   news, or whatever, and that's how it started.
 6        Q.   What was your response to that?
 7        A.   Well, first I was taken by surprise I
 8   didn't even put 2 and 2.  I didn't realize.  I
 9   had no idea what this was about.
10             So I said I don't know why and then
11   they said, well, we hear that you're running
12   for something -- and this was paraphrasing,
13   this is what I recall.
14             They brought up they had seen a post
15   on Facebook, and then I explained to them I was
16   endorsed by the Dutchess County Republican
17   Committee to run two days before, and this in
18   no way made me an official candidate or
19   anything.  It just meant that I was a person
20   that they recommended should be the candidate.
21        Q.   Okay.  Did you advise whether or not
22   you would accept the nomination if voted upon?
23   I want to know how exactly it works.
24             MR. LOWER:  Objection to form.
25        Q.   Let me rephrase.  You were endorsed by
```



Page 85

```
 1                    W. TRUITT
 2   candidate for said office.
 3          And so it wasn't until July when the
 4   petitions were submitted to the board of
 5   elections was when I became a candidate; so in
 6   mid-July was when I became an actual candidate
 7   on the ballot.
 8       Q.  Okay.  But you had announced that you
 9   were running for the district 106 position and
10   you made that public in or around March,
11   correct?
12          MR. LOWER:  Objection to form.
13       A.  April was when I made the first post
14   to my recollection, where I made the page
15   public, yes.
16       Q.  So you had a private page?
17          MR. LOWER:  Objection.
18          (Whereupon, Public Facebook was
19          marked as Defendants' Exhibit 19 for
20          Identification.)
21       Q.  I have marked as Exhibit 19 your "Will
22   Truitt for New York State Assembly Public"
23   Facebook page.
24          You don't have to go through all 129
25   pages, but do you recognize this document as
```



Page 86

1                          W. TRUITT

2     your Facebook page?

3          A.   Just looking at the front page, I

4     recognize the front page; so I'm assuming I

5     recognize the rest of it as well.

6          Q.   We can go through some specific

7     things, but if you turn to page 129, which is

8     the very last page, you will see that you --

9     I'm sorry, let me add one question -- did you

10    control this Facebook page personally or did

11    anyone else post on it?

12         A.   So I had a consultant of mine which

13    was also a manager on the page.

14         Q.   What was that consultant's name?

15         A.   Ross, R-O-S-S, Hardisty,

16    H-A-R-D-I-S-T-Y.

17         Q.   He was a manager of the page?

18         A.   He had some sort of access so that he

19    could post.

20         Q.   Turning back to page 129, it says:

21    "Will Truitt for New York State Assembly,

22    updated their cover photo on March 14, 2018."

23              Did you do this?

24         A.   I believe that was me.

25         Q.   So you at least had decided to seek



Page 88

W. TRUITT

1
2     announce that you were seeking the endorsement
3     of the Republican committees to run for office
4     in district 106?
5                 MR. LOWER:  Objection to form.  You
6            said 2016.  I will pretend it's 2018,
7            because that's what I think you meant.
8         Q.  Do you need me to restate?
9         A.  No, I got it.  Around April 12th I did
10    announce it.  I don't know that I announced I
11    was running as a Republican though on my page
12    at the time.
13        Q.  But whether or not you announced it by
14    April 12, 2018, you had decided to officially
15    run and seek the Republican endorsements in
16    Dutchess and Columbia County, correct?
17        A.  Correct.
18        Q.  Now going back to your meeting on
19    April 13th, in response to your telling Doug
20    and Amy Raymond that you were seeking office,
21    what else was discussed in that meeting?
22        A.  I don't recall too much that was
23    discussed just that they had asked me to please
24    provide them with a letter of explanation as to
25    what it was I was running for, and just



MAGNA ›
LEGAL SERVICES

Page 89

1                          W. TRUITT

2     something of the lines of that.  So that

3     weekend I did because that was a Friday, so I

4     wrote it up over the weekend.

5          Q.  Mr. Truitt, is the document that has

6     been marked Exhibit 20, beginning with Bates

7     stamp D109, the e-mail that you sent to Doug

8     Cahill and Amy Raymond that you just testified

9     to?

10             (Whereupon, E-mail D109 through 115

11         was marked as Defendants' Exhibit 20 for

12         Identification.)

13         MR. LOWER:  Objection to form.  This

14         document seems to have perhaps

15         inadvertently included the last page,

16         Bates stamp 116.

17         MS. SORIN:  Yes.  So the letter

18         contains the Bates stamped pages D109 to

19         D115.

20         A.  I'm going to take a look real quick

21    pages 109 through 115, yes.

22         Q.  Did you draft this document?

23         A.  Yes.

24         Q.  To the best of your knowledge is this

25    document accurate?



Page 90

1                          W. TRUITT

2        A.   Correct.

3        Q.   You note that the state assembly

4   enters session in January and concludes in June

5   of each year, correct?

6        A.   Yes.   To the best of my knowledge,

7   yes.

8        Q.   So if you were elected to the

9   assembly, you would be required to be in Albany

10  at the state capital building while the

11  assembly is in session, correct?

12            MR. LOWER:   Objection to form.

13       Q.   When the legislature is in session you

14  would have to be in Albany, correct, if you

15  were elected?

16       A.   You were supposed to be, yes.

17       Q.   You attached to the letter the New

18  York State legislature session calendar for

19  January to June 2018; is that correct?

20       A.   That's correct.

21       Q.   Each of these dates that are

22  highlighted are dates that the assembly is in

23  session and you would be in Albany, if elected?

24            MR. LOWER:   Objection to form.

25       A.   Work permitting, yes.



Page 93

1                    W. TRUITT

2          MR. LOWER:  Objection to form.

3       Mischaracterization, and approaching

4       harassing of the witness.

5       A.  Again, I don't think I can answer a

6   hypothetical right now.  And I think, frankly,

7   it's irrelevant at this time being that I

8   didn't win the assembly and I made it clear it

9   was a very, very long shot for me to even win

10  in the first place.

11      Q.  But if elected you are going to have

12  to spend 60 days in Albany, correct, according

13  to the legislative calendar?

14      A.  According to the legislative calendar

15  there are 60 days where you are in session and

16  some run an hour or many run an hour, two hours

17  at the most.

18      Q.  Okay.  How far is the Albany state

19  capital from Newburgh, New York where the

20  Riverside Bank is located?

21      A.  I would say approximately an hour and

22  15 minutes.

23      Q.  Okay.  So would you acknowledge that

24  approximately three hours would be a commute

25  time that would be required each and every day?



Page 94

1                          W. TRUITT
2              MR. LOWER:  Objection to form.
3         Mischaracterization of the testimony.
4         A.  I think it totally depends on what the
5    day was.
6         Q.  Do you know how many miles the Albany
7    state capital is from the Newburgh branch?
8         A.  Not off the top of my head.
9         Q.  Would you stay overnight in Albany
10   when the legislature was in session or would
11   you be commuting to your home in Hyde Park?
12             MR. LOWER:  Observation
13        hypothetical.
14        A.  Again, that totally depends.  It is a
15   hypothetical, it's depending on.
16             MR. LOWER:  I'm okay with that.
17        Q.  Okay.  Is it your testimony you didn't
18   really know exactly how much time you would be
19   required to spend in Albany or with respect to
20   your role in the state legislature, if elected?
21             MR. LOWER:  Objection to form.
22        A.  Again, I was never an assemblyman and
23   so I wasn't entirely positive of what the times
24   would be.  I went based off of people who
25   worked in the assembly and asked them of their



Page 112

                                W. TRUITT

1

2       Q.  Did they mention why Art Bassin was

3   uncomfortable with this?

4       A.  They had mentioned that he is an

5   elected official himself, and he didn't think

6   it was plausible or he didn't feel comfortable

7   about this.

8       Q.  Did they say anything else with

9   respect to Art Bassin?

10      A.  Not that I can recall.

11      Q.  Now, we will move to Exhibit 24, Bates

12  stamp D103.  Do you recognize this e-mail sent

13  from your personal g-mail account to Doug

14  Cahill on May 1, 2018?

15          MR. LOWER:  I'm going to lodge an

16      objection.  I think we might have an

17      extra page on here.

18          (Whereupon, an off-the-record

19      discussion was held at this time.)

20      A.  Okay.  Yes, I recognize this.

21      Q.  You recognize this document.  Is it an

22  accurate recollection that you had -- I'm

23  sorry, let me rephrase.

24          Did you send this e-mail?

25      A.  Yes, I sent this e-mail.



Page 114

1                          W. TRUITT

2              is two e-mails stapled together, which

3              are the same e-mails.  And I don't think

4              there is any dispute, if that will help.

5         A.   They appear to be the same yes.

6         Q.   Even before potentially being elected

7    to the state legislature, you had to campaign

8    in an effort to get elected; is that correct?

9         A.   Correct.

10        Q.   Tell me what your typical day looked

11   like campaigning.

12        A.   Campaigning is entirely up to the

13   candidate.  And it is generally what I do when

14   I have down time or off time, I will go door to

15   door and meet the constituents and my neighbors

16   and the people that live in the district.

17             That's what I did for county

18   legislator, and it will be no different for

19   State Assembly and that's the majority of what

20   the campaign is.

21        Q.   Did you knock on constituents' doors

22   each day -- each day since you publicly

23   announced that you were running for office in

24   April 2018 until the election?

25        A.   Not every day.  Only on days that



1                              W. TRUITT

2      than that, if needed.

3          Q.   Are you still employed there?

4          A.   Yes.

5          Q.   Do you recall the date that you

6      started at Bridgeview Excavation?

7          A.   I believe it was towards late May.

8          Q.   May of 2018?

9          A.   Yes, somewhere in there.

10         Q.   What is your hourly wage rate?

11         A.   It's $18 an hour.

12         Q.   Has that been your rate of pay since

13     the beginning of your employment?

14         A.   Yes.

15         Q.   So from May 2018 until the present,

16     you've been employed working 40 hours a week

17     for $18 an hour; is that correct?

18              MR. LOWER:   Objection to form.

19         A.   Yes.   For the most part.   Yeah, I've

20     been employed by them this entire time.

21         Q.   And you've been working 40 hours a

22     week?

23              MR. LOWER:   Objection to form.

24         A.   Yes.

25         Q.   Have you been working 40 hours every



Page 140

1                          W. TRUITT

2    week?

3              MR. LOWER:  Same objection to form.

4        Q.  You can answer.

5        A.  Most weeks, yes.

6        Q.  During your campaign were you also

7    working 40 hours per week?

8        A.  Through the end of July, I was working

9    40 hours per week.  Being that they're family

10   friends, they had suggested that I focus on my

11   campaign in the final few months there, leading

12   up to the election.

13       Q.  I'm sorry, you said beginning in July

14   you were no longer working full time.  Do you

15   recall, was it the beginning of July or the end

16   of July?

17       A.  The end of July somewhere in the

18   vicinity of August 1st.

19       Q.  So from the end of July to

20   November 6th, yes, that's Election Day --

21       A.  Yes.

22       Q.  -- early November, the date of the

23   election, were you working at all for

24   Bridgeview Excavation?

25       A.  I don't believe I went into work any



Page 141

                          W. TRUITT
1
2    of those days.  I was still county legislator
3    though.
4         Q.  After the election you picked up the
5    40 hours a week again; is that correct?
6         A.  A few weeks later, yes, after the
7    election, yes.
8         Q.  Do you recall when you started working
9    again?
10        A.  In December.
11        Q.  Did you take a vacation?
12        A.  I didn't take -- what do you mean, did
13   I go somewhere?
14        Q.  What did you do from November 6th or
15   Election Day to December; did you take some
16   time off?
17             MR. LOWER:  Objection to form.
18        A.  Yes.  It was a tough time and I was
19   gathering myself and seeking other employment
20   opportunities, until my friend had asked me if
21   I wanted to come back to work at his office.
22        Q.  Do you have copies of each of your pay
23   records from May 2018 to the present from
24   Bridgeview Excavation?
25        A.  Electronically, I believe.  I know we



# EXHIBIT C

Page 1

1                          KEVIN CANTELE

2              IN THE UNITED STATES DISTRICT COURT

3              FOR THE SOUTHERN DISTRICT OF NEW YORK

4

5    WILLIAM GUNNAR TRUITT

6                    Plaintiff

7    vs.                          INDEX NUMBER:

8    SALISBURY BANK AND TRUST       7:18-CV-08386

9    COMPANY; AND SALISBURY

10   BANCORP, INC.,

11                   Defendants

12   _____/

13

14

15           The deposition of KEVIN CANTELE was held on

16   Tuesday, July 16th, 2019, commencing at 10:07 a.m., at

17   the Law Offices of McCullough Ginsberg Montano &

18   Partners LLP, 122 E 42nd Street, #3505, New York, New

19   York 10168, before R. Dwayne Harrison, Notary Public.

20

21

22

23   Job No: 164594

24

25   REPORTED BY:  R. Dwayne Harrison [via telephone]

1                    KEVIN CANTELE

2          Is that all right?

3     A     Yes.

4     Q     Regarding breaks, everybody including

5  Dwayne is welcomed to just saying that they want to

6  take a break at any time.  Absolutely no sweat at all.

7          Another preliminary question:  Have you

8  taken any medications?

9     A     No.

10    Q     Are you currently taking any medications

11 that may affect your memory or ability to testify

12 accurately here today?

13    A     No.

14    Q     Is there any other reason why you might not

15 be able to testify accurately here today?

16    A     No.

17    Q     Hopefully, to save a little bit of time

18 today, technically there's multiple entities in this

19 litigation, Salisbury Bancorp Bank, Salisbury Bank and

20 Trust Company.  Riverside, another entity that's

21 affiliated with Salisbury.

22          So is it okay with you if we use the term

23 Salisbury to refer to all of those things?

24    A     Yes.

25    Q     Can you describe your role at Salisbury?

Page 6

1                          KEVIN CANTELE

2       A       I am a residential loan originator.  I lot

3   of different duties in that role, my primary duty being

4   meeting with clients at their convenience and trying to

5   fit their needs for a residential loan.

6       Q       And I'm just going to back up a little bit.

7               Where did you go to school?

8       A       College?

9       Q       Yeah.  We don't need to go further than

10  that.

11      A       Gettysburg College.

12      Q       And when did you start and finish there?

13      A       I started in 2009 and graduated in 2013.

14      Q       And what major or majors did you leave

15  with?

16      A       I was business management.

17      Q       How did you do at Gettysburg?

18      A       I did well.

19      Q       Great.  Honors or anything like that?

20      A       Not at the end, but through the course

21  there was -- I did receive honors.

22      Q       As I understand it, you started at

23  Salisbury as some type of mortgage loan origination

24  trainee.  Actually, I believe you did some kind of

25  internship perhaps too.  So maybe I'll let you take the

# EXHIBIT D

Page 1

1

2                UNITED STATES DISTRICT COURT

3                SOUTHERN DISTRICT OF NEW YORK

4      ------------------------------)

5      WILLIAM GUNNAR TRUITT,

6                     Plaintiff,          Case No.

7                vs.                      7:18-cv-08386-NSR

8      SALISBURY BANK and TRUST
       COMPANY; and SALISBURY
9      BANCORP, INC.,

10                    Defendants.

11     ------------------------------)

12

13

14              DEPOSITION OF SPRING BURKE

15                 New York, New York

16                  July 22, 2019

17

18

19

20

21

22

23     Reported by: BONNIE PRUSZYNSKI, RMR, RPR, CLR

24     JOB NO: 164776

25

Page 14

1                          S. Burke

2       Q.     And does that describe your title

3    today?

4       A.     And that's my title today, correct.

5       Q.     Oh, that's easy enough.

6              We definitely don't need to go

7    before 2010, but with respect to the most

8    recent two positions, so mortgage advisor and

9    then the VP, is the VP in addition to the --

10   are you still a mortgage advisor?

11      A.     Yes.

12      Q.     Okay.  Could you give me a brief

13   summary of your duties in your original

14   mortgage advisor position in 2010?

15      A.     Well, they are exactly the way that

16   they are now.

17      Q.     Okay.

18      A.     So that didn't change, just the

19   title changed.

20      Q.     Could you give me a quick -- for a

21   non-finance guy, a quick summary of your

22   duties as a mortgage advisor?

23      A.     Absolutely.  So, we counsel

24   potential customers and also current

25   customers that are looking to either purchase

Page 15

1                                S. Burke

2    a home, refinance their home, construction

3    loans, or construction mortgages, land loans,

4    and so either do this in person or we talk

5    over the phone a lot of times.

6              What will happen is -- they might

7    not, but sometimes they would go out directly

8    to the website, and then we get leads that

9    way, where we would then call and make an

10   appointment or visit, or conference call or

11   whatnot.

12             Then we work with our mortgage team

13   to -- once we initiate the loan, to -- to

14   have them start processing it for us and

15   telling us what else we will need from the

16   customer, that type of thing, until we get up

17   to the closing piece of it.

18             With a first-time home buyer, we --

19   a lot of times it takes a much longer period

20   of time, too, because you sit down one on one

21   or, you know, depending on how many are --

22   you know, co-borrower, borrower, whatnot, for

23   about an hour-and-a-half, because it's so

24   involved with owning your first home.

25             The other big piece of it is

1                          S. Burke

2    building relationships with realtors and

3    attorneys and CPAs, and building their trust,

4    which -- which is something that is very

5    important that you keep in contact with them,

6    not only, you know, by visiting their

7    offices, but by going to -- they have

8    different realtor meetings, so we would all

9    get together.

10          Also, a part is, they would ask

11   you -- ask me to do, you know, some kind

12   of -- be there for any questions at a

13   luncheon, and with attorneys, going to

14   closings, and, you know, thanking your

15   customer for that.

16          But it's a big relationship

17   building piece of it, and so, that's how

18   we -- and we do get some referrals from, of

19   course, walk-ins.  You want to make sure you

20   go to the various branches and really know

21   your staff and they trust you to be able to,

22   you know, call, and make sure that they are

23   informed on different, you know, pieces of

24   what to look for, and you have someone that

25   comes in, you know, what you might -- if they

1                         S. Burke

2   say, oh, well, I'm going to look at -- I know

3   I'm going way off on -- I'm going to look at

4   a home, then they can so, oh, well, we have a

5   mortgage advisor here that will be able to

6   help you.

7       Q.    We will put you in touch with

8   Spring.

9       A.    Exactly.

10          And our motto is that we are

11  available, you know, 24/7, so our business

12  cards have our cell phone number and

13  everything on that.

14      Q.    Of the leads that you -- that you

15  typically deal with, we will say like this

16  year and last year, are most of those initial

17  discussions over the phone with prospective

18  buyers?

19      A.    They -- well, it all depends, but

20  because we do have the referral source, too,

21  of, you know, the in-house people, meaning

22  employees, sorry, but a lot of times it's

23  either that or you get an e-mail, knowing

24  that they went out to the site and they want

25  to potentially chat.

Page 18

S. Burke

The referrals that we get from the realtors and attorneys, typically you have to provide, just like I would have to provide three names for any realtor that I am going to send business to or have them chat with, or attorneys, and we have a rolling list that we use, and insurance companies.  They provide three names of banks, so, we have to be available as quickly as possible to call them back, because if you are not on it, to call immediately, they are going to go to the next bank, because we have a lot of local banks in our area.  We all play nice in the sandbox, and we all provide very good service.

So, if you are not the one that gets that first call right away, that you can, you know, start that relationship with them, and explain, you know, about the bank and whatnot, so --

Q.    That makes sense.  I mean, you are only one-third of the competition, and if you don't follow up on a lead quickly, then your chances of retaining them and, from a

Page 19

1                           S. Burke

2    personal perspective, I guess, getting

3    commission --

4         A.    Exactly.

5         Q.    -- will ameliorate pretty quickly.

6              Does Salisbury have like a target

7    response time that they expect you to respond

8    to leads?

9         A.    Typically, yeah.  Definitely by the

10   end of the day, whether it be e-mail or phone

11   calls, or asking someone else, you know, to

12   possibly -- like if I know that I am not

13   going to be available, I can say, you know,

14   can Kevin -- I'm going to ask that Kevin meet

15   with you or something like that.

16        Q.    If you have an appointment or

17   something, you probably ask that something be

18   diverted to another MLO if you anticipate

19   non-availability for some period of time.

20        A.    Right.  Some period of time,

21   um-hum.

22        Q.    So that was -- that will save me

23   the need to ask a number of questions, I

24   think, which is good.

25              So we were -- we just went back and

# EXHIBIT E

Page 1

```
 1                      D. Cahill

 2              UNITED STATES DISTRICT COURT

 3              SOUTHERN DISTRICT OF NEW YORK

 4    ---------------------------------------------------x

 5    WILLIAM GUNNAR TRUITT,

 6                    Plaintiff,   Case No.

 7                    vs.         7:18-cv-08386-NSR

 8    SALISBURY BANK and TRUST

 9    COMPANY; and SALISBURY

10    BANCORP, INC.,

11                    Defendants.

12    --------------------------------)

13

14

15              DEPOSITION OF DOUGLAS CAHILL

16                   New York, New York

17                    July 22, 2019

18

19

20

21

22

23    Reported by: BONNIE PRUSZYNSKI, RMR, RPR, CLR

24    JOB NO: 164776

25
```

Page 49

1                    D. Cahill

2      Q.    Okay.  That was -- and I will just

3  ask it just so it's on the record.

4           Have you ever discussed Mr. Truitt

5  with Mr. Bassin?

6      A.    No.

7      Q.    Have you ever discussed Mr. Truitt

8  with any other member of the Salisbury

9  HR/Compensation Committee?

10     A.    No.  I'm sorry.  I guess the

11 context of the question, was that prior to?

12 Actually, since then as well, but I have not,

13 but, are you asking prior to his -- his

14 leaving?

15     Q.    I have no time limit on that one,

16 and I could reask it if you want.

17     A.    No.  Even after, I have not, but I

18 just wanted to be sure.

19     Q.    Okay.  That's fine.  I appreciate

20 the clarification.

21           I keep adding one more question on

22 to this memo.  We are still on P-32.  At the

23 very bottom, did you write two paragraphs

24 about Mr. Truitt?  That's a rhetorical

25 question, I guess.  You said you wrote the

Page 50

```
 1                      D. Cahill
 2   memorandum.
 3        A.     Correct.
 4             MS. SORIN:  I'm just going to
 5        object.  There was no question asked.
 6             MR. LOWER:  No problem.
 7        Q.     And in your last paragraph, we will
 8   just say your last sentence of the whole
 9   memorandum, you wrote, "Management is
10   currently reviewing whether a conflict of
11   interest exists with the State Assembly
12   campaign and position."
13             And of course you were referring to
14   Mr. Truitt's State Assembly campaign; is that
15   correct?
16        A.     And the position, correct.
17        Q.     And his position as a Salisbury
18   employee?
19        A.     No.  The position of State
20   Assemblyman and what that would entail.
21        Q.     With respect to your contention
22   that management is currently reviewing
23   whether a conflict of interest exists, what
24   did management conclude?
25        A.     We concluded that there was a
```

1                    D. Cahill

2    conflict.

3        Q.    And what was the conflict?

4        A.    The time that he would be away from

5    the job, anywhere from two to four days per

6    week, six months of the year.

7        Q.    Did Mr. Truitt tell you he would be

8    away for two to four days per week for six

9    months of the year, I believe is what you

10   said?

11       A.    Yes.

12       Q.    When did he tell you that?

13       A.    When we asked him to give us an

14   update on the parameters of that role.  And

15   he gave us a schedule for the Assembly

16   position.

17       Q.    And that's the communication that

18   you referred to just a moment ago; right?

19             MS. SORIN:  Object to the form.

20       Q.    Just for context, I'm trying to

21   figure out, is that a conversation or an

22   e-mail?  So, I will just rephrase this

23   question.

24             How did Mr. Truitt tell you that he

25   would be away for two to four days per week

1                         D. Cahill

2    for six months, which is what you told me, I

3    believe?

4        A.     In an e-mail to us with an

5    attachment, which included the State Assembly

6    schedule.

7                (Exhibit P-33, D-000070-073 marked

8         for identification, as of this date.)

9        Q.    I am handing you what I have marked

10   P-33, which appears to be a letter you sent

11   Mr. Truitt, an offer letter, and you can let

12   me know whenever you are ready to discuss.

13               (Pause.)

14       A.     Okay.

15       Q.     Is it accurate for me to describe

16   this as an offer letter from Salisbury to

17   Mr. Truitt?

18       A.     Yes.

19       Q.     And it looks like you wrote it, and

20   it's -- it was sent on or around January 29,

21   2018; is that correct?

22       A.     Yes.

23       Q.     And I will also just let the record

24   reflect that P-33, the document we are

25   discussing, has a Bates range of D-000070

1                    D. Cahill

2   characterization?

3       A.    Yes.

4       Q.    And what did you let Will know was

5   clear -- was a unanimous management decision?

6       A.    That his request for outside

7   employment was denied.

8       Q.    And which request for outside

9   employment are you referring to, just to

10   be --

11       A.    The New York Assembly.

12       Q.    And how did you communicate that to

13   Mr. Truitt?

14       A.    That morning verbally.

15       Q.    During your meeting; right?  I

16   mean --

17       A.    Yeah.

18       Q.    And what specifically did you say

19   to Mr. Truitt, just in case your answer was

20   not a full description of what you told

21   Mr. Truitt that morning during your meeting?

22       A.    Essentially, I told him that we

23   discussed the materials that he sent and

24   determined that that much time away from that

25   role was a conflict of interest for the bank,

Page 80

1                          D. Cahill

2    and we were not comfortable with him making

3    that decision, to run for the Assembly and

4    potentially be away from the bank anywhere

5    from two to four days a week for six months

6    of the year, essentially 60 days that it's in

7    session.

8         Q.    Did Mr. Truitt -- strike that.

9               When you indicated it was a

10   unanimous management decision, what members

11   of management were involved in that decision?

12        A.    To the best of my recollection, it

13   was myself, Amy Raymond, and Rick Cantele.  I

14   don't recall if Dick Kelly was involved in

15   that decision, although Amy did report to

16   Dick at the time.

17        Q.    Yourself, Ms. Raymond, and Richard

18   Cantele?  That's what you recall?

19        A.    We were the ones that reviewed the

20   documents and determined that it just wasn't

21   going to be a fit.

22        Q.    Do you know if Mr. Truitt was even

23   slated to be on the ballot for any election

24   at the time of his termination?

25        A.    I don't understand what you mean.

1                         D. Cahill

2     employment?

3          A.     That means that he can leave for

4     any reason and find other employment, or we

5     can ask him to leave for any reason.

6          Q.     And did you tell Mr. Truitt he

7     would need to leave if he continued his

8     campaign for New York State Assembly?

9          A.     At that point, I told him that he

10    needed to make a decision on whether he was

11    going to run or not and let us know by, I

12    believe that Tuesday.

13              He had asked during that meeting if

14    he could meet with Rick Cantele on that

15    Monday, but I wasn't here.  He wanted to make

16    one last plea, one last case, thinking that

17    Rick was the primary decision maker.

18              But I wanted him to know that it

19    wasn't just Rick, it was myself, who manages

20    the handbook and the policies, his manager,

21    and Rick as well.

22         Q.     So, is it your testimony that you

23    did not tell Mr. Truitt he would need to

24    choose between his job at Salisbury and his

25    campaign for New York State Assembly?

1                    D. Cahill

2   Facebook announcement?

3       A.    Yes.

4       Q.    Starting at that point, when was

5   the first time that you discussed Mr. Truitt

6   with Rick Cantele?

7       A.    I guess can you rephrase that?

8       Q.    Yeah, sure.

9              So, the first meeting that you had

10  with Mr. Truitt about his campaign was around

11  April 12, 2018.  Does that sound; correct?

12      A.    Sounds correct.

13      Q.    After the date of that meeting,

14  when did you first discuss Mr. Truitt's

15  campaign with the CEO?

16      A.    He knew it before me.

17      Q.    Okay.  How did he -- how did he

18  learn?

19      A.    Shelly Humeston.

20      Q.    So Ms. Humeston told --

21      A.    Saw, or it was forwarded to her on

22  Facebook, I think, and she let Rick know, and

23  Rick had asked me and Amy to meet with Will

24  to find out what the parameters are.

25              Apparently, Shelly knew the time

D. Cahill

1

2   commitment at least, the significance of that

3   role, and we needed to find out whether or

4   not it was going to be a conflict.

5        Q.    And Rick asked yourself and

6   Ms. Raymond to get more information from

7   Mr. Truitt about his campaign; is that

8   correct?

9        A.    Yes.

10       Q.    And after that meeting with

11  Mr. Truitt, what did you report back to the

12  CEO, Rick Cantele?

13       A.    Directly after the meeting, I let

14  him know that we asked Will to send us

15  information and parameters on the role and

16  what it entailed and a memo requesting that

17  he can be considered for outside employment,

18  and that he did.  And that was the one thing

19  we had looked at.

20       Q.    Yes.

21            For the record, do you have a P

22  number for what you --

23       A.    P-36.

24       Q.    That's what I had, too.  I just

25  wanted to make sure.

1                           D. Cahill

2    Massachusetts, unless you have an employee

3    living or working in Mass., there is no

4    reason for Salisbury to talk to them.

5        A.    There shouldn't be.

6        Q.    Are you aware of Will receiving any

7    kind of written warning prior to the end of

8    his Salisbury employment?

9        A.    I'm not.

10       Q.    Do you know if any other Salisbury

11   employee has engaged in political activity?

12       A.    Yes.

13             MS. SORIN:  Object to the form.

14             You can answer, if you understand.

15       A.    Yes, we are aware of people that

16   have run for office, local office.

17       Q.    How many?

18       A.    I am one.

19       Q.    Okay.

20       A.    I ran for the Republican nomination

21   for the Board of Education in the Town of

22   Sharon.

23       Q.    Sharon, you said?

24       A.    Sharon, Connecticut.

25       Q.    And that would probably be the

1                        D. Cahill

2    hospital that we discussed earlier?

3        A.    No.

4        Q.    No?

5        A.    At Salisbury Bank.

6        Q.    No, no.  The Town of --

7        A.    Oh, Sharon.  Yes, Sharon Hospital

8    is in the Town of Sharon, correct.

9        Q.    Just getting my geography...

10            And when did you run for that

11   office?

12       A.    Seven years ago.

13       Q.    Did you submit a written outside

14   employment application?

15       A.    No.  I went to Rick and requested,

16   probably in an e-mail, but initially a

17   meeting with him as well, to let him know

18   that I have been asked to run, but it's a

19   volunteer position.  It's after hours.  We

20   meet at 6:30 on Monday nights once a month,

21   and it's considered community service.  At

22   the time, it was just for the board, the

23   Board of Ed.

24       Q.    Oh.  So, just the board had to file

25   outside employment requests?

Page 137

1                          D. Cahill

2                  (Discussion held off the record.)

3    BY MR. LOWER:

4          Q.    I will probably be clarifying a

5    couple of points.  I think earlier, at least

6    I got the understanding that the individuals

7    that were involved with the end of

8    Mr. Truitt's Salisbury employment were

9    yourself, Ms. Raymond, and Ms. -- and Rick

10   Cantele, CEO.  Is that an accurate summary?

11         A.    It's not.  We were involved in the

12   decision not to -- not to approve the outside

13   employment request.

14         Q.    Okay.

15         A.    Which essentially was his bid for

16   running for the Assembly, because it paid

17   80,000.

18         Q.    Right.  And that -- those --

19   yourself, Ms. Raymond, and the CEO were the

20   individuals involved in the decision

21   regarding approving or denying Mr. Truitt's

22   potential outside employment; is that

23   correct?

24         A.    Yes, that would be correct.

25         Q.    How was the decision regarding that

# EXHIBIT F

Page 1

```
 1                    A. BASSIN

 2          UNITED STATES DISTRICT COURT

 3          SOUTHERN DISTRICT OF NEW YORK

 4    -------------------------------------x
      WILLIAM GUNNAR TRUITT,
 5
                  Plaintiff,
 6                                  Case No.
            vs.                     7:18-cv-08386-NSR
 7
      SALISBURY BANK and TRUST COMPANY; AND
 8    SALISBURY BANCORP, INC.,

 9                Defendant.
      -------------------------------------x
10

11           DEPOSITION OF ART BASSIN

12              New York, New York

13              July 24, 2019

14

15

16

17

18

19

20

21

22

23    Reported by:

24    KATHY S. KLEPFER, RMR, RPR, CRR, CLR

25    JOB NO. 164777
```

1              A. BASSIN

2    on my -- whatever I have looked at last.

3        A.    Right.

4        Q.    How would you describe your

5    relationship with Ms. Barrett?

6        A.    I support her politically.  I send

7    money to her campaigns, and I talk with her from

8    time to time about political issues.  And that's

9    about it.  We don't socialize.  We're not

10   friends in the sense that we have dinner with

11   each other or, you know, spend any time with

12   each other outside the political arena.

13       Q.    And you yourself are a politician of

14   at least some sorts, correct?

15       A.    I am a town supervisor in the Town of

16   Ancram, yes.

17       Q.    And --

18       A.    And also a member of the Columbia

19   County Board of Supervisors, by the way.

20   Because town supervisors in Columbia County are

21   a member of the county legislature the way it's

22   set up.

23       Q.    And you indicated that you don't

24   interact much with her outside of the political

25   arena, correct?

Page 33

1                     A. BASSIN

2       Q.     Did you receive this memorandum from

3  Doug Cahill?

4       A.     No, I don't ever remember seeing this.

5  I say that because when I was notified of the

6  lawsuit, it was the very first time I ever heard

7  the name William Truitt; and if I had seen this,

8  I would have remembered the name.

9       Q.     So this memorandum doesn't look

10 familiar to you?

11      A.     No, I've never seen it.

12      Q.     It is your duty as the chair of the

13 HR/Comp committee to pay attention to any

14 memoranda that are provided to you, correct?

15      A.     Yes.

16      Q.     And you have honored those duties,

17 correct?

18      A.     I do as much as I can.

19      Q.     And within that vein, you review

20 memoranda that are provided to the HR/Comp

21 Committee in a timely manner, correct?

22      A.     I do.

23      Q.     And to the extent that they're sent

24 before the meetings, you review them before the

25 meetings, correct?

Page 35

1                    A. BASSIN

2    the name Truitt would have -- you know, I would

3    have made the connection after the lawsuit was

4    filed in September.

5       Q.    Uh-huh.

6       A.    But when I heard about the lawsuit, I

7    said, who's Will Truitt?  Never heard the name

8    before.

9       Q.    Got it.

10      A.    So it's inconceivable to me that I

11   would have seen this and not remembered, when

12   the lawsuit came in September, that this young

13   fella had come before the committee in this

14   form.

15           So I have to assume either this wasn't

16   presented to us or I wasn't there, one way or

17   the other.

18      Q.    Okay.  Well, I'm not going to ask you

19   if it looks like a true and authentic copy of --

20      A.    It could be.  I don't think you guys

21   made it up.

22      Q.    Well, it came from the bank.  I

23   certainly didn't make it up, but...

24      A.    Yep.  I guess the guy to talk to about

25   this would have been Doug Cahill to ask him if

Page 58

1                         A. BASSIN

2     the management's recommendation.

3         Q.    It seems that the HR/Comp Committee

4     must have at least some basis to voice an

5     opinion on outside employment if it's --

6         A.    The Board of Directors and the

7     committee don't manage the bank.  You know, we

8     have responsibilities for setting direction, for

9     setting policy, for setting strategy, for making

10    sure policies are implemented and are followed,

11    but we don't get into the weeds.

12              You know, if -- in the specific case

13    of these outside employment things, the

14    management team reviews those situations and

15    brings to the Board's attention that situation

16    and says here's what's going on and we don't

17    think these are problems, but we think this is a

18    problem and have advised the employee to that

19    extent.  And then the Board says, okay, that

20    sounds fine to us.  The committee says that

21    sounds fine to us.

22              We don't actually do the review of

23    what your outside activities are.  We rely on

24    management to do that, and if they present a

25    plausible, logical, articulate and well-reasoned

Page 59

1                         A. BASSIN

2    case for why they support it or don't, we say

3    that sounds good.  That's how it works.

4       Q.    And --

5       A.    And by the way, that never came up,

6    and Mr. Truitt was never presented to the

7    Committee in that context that I can remember.

8              Goes back to that memo that I don't

9    remember seeing.  You've got to get to the

10   bottom of that, which is with Doug, just saying,

11   you know, what the situation was there.

12      Q.    I did ask Doug about that memo, which

13   is why it has an earlier P number --

14      A.    Uh-huh.

15      Q.    -- than the others, and I don't have

16   his transcript in front of me, but he did seem

17   to indicate that it was an accurate copy of the

18   memo he prepared for the HR/Comp Committee.  But

19   I will gladly continue looking into it to try

20   and get to the bottom of it.

21      A.    I can reconfirm that I've never seen

22   it, and as I said earlier, if I had seen it, it

23   would have resonated when the lawsuit popped up

24   in September when my first reaction was, who's

25   Will Truitt?  I had never heard of him.

Page 60

```
1                      A. BASSIN

2      Q.    Got it.

3            You've clearly indicated that Mr.

4   Truitt's name, you have no recollection of that

5   being brought to your attention --

6      A.    Correct.

7      Q.    -- at all?

8      A.    Prior to the lawsuit.

9      Q.    Prior to the lawsuit.

10           And my next question is regarding what

11  information regarding Mr. Truitt, even if it

12  didn't involve his name, was provided to the

13  Board or the HR/Comp Committee?

14     A.    Nothing that I remember.

15     Q.    And just for the sake of extra clarity

16  on the record, I'm referring to Mr. Truitt's

17  campaign for New York State Assembly, District

18  106.

19     A.    Right.  I was not even aware he was

20  running.  I don't think it ever came up at the

21  Board or at the committee.

22     Q.    In April of 2018, do you know who the

23  Assembly member is who held New York State

24  Assembly, District 106?

25     A.    I don't know the member, but I assume
```

# EXHIBIT G

Page 1

1

2               UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF NEW YORK

3

    WILLIAM GUNNAR TRUITT,

4                        Plaintiff,

                                    Case No.

5           -against-              7:18-cv-08386-NSR

6   SALISBURY BANK and TRUST COMPANY;

    and SALIBURY BANCORP, INC.,

7                        Defendants.

    --------------------------------x

8

9           DEPOSITION OF RICHARD CANTELE

10              New York, New York

11            MONDAY, JULY 29, 2019

12                10:00 a.m.

13

14

15

16

17

18

19

20

21

22  Job No: 165208

23  Reported by: David Levy, CCR, RPR, CLR

24

25

Page 26

```
1              Cantele
2       A.  Correct.
3       Q.  And you were starting a train of
4   thought when you said, "You know, he came into the
5   meeting, with some" -- a certain type of
6   understanding that I did not get from you, is that
7   correct?
8       A.  I guess it was my feeling at the time
9   that he was -- he wanted to state his case about
10  his ability to do both jobs when we had already
11  communicated to him previously that we, in our
12  judgement, we didn't think he could fulfill the
13  role of residential mortgage originator that we
14  were looking to fill in the Riverside division.
15      So that he, I think that he had, you
16  know, from prior meetings, he had, I think,
17  understood probably that he, there was a decision
18  to make on his part.
19      Q.  When you say "a decision to make on his
20  part," what do you mean by that?
21      A.  Well again, we were concerned, given
22  what we understood the requirements of this job to
23  be, that in our judgement, based on our knowledge
24  and experience, which, in that room, there was a
25  lot of it with Doug and Amy and myself, we were
```

Page 27

```
1   concerned that he wouldn't be able to fulfill the
2   role we were looking to fill and provide the level
3   of service necessary to be a successful
4   originator.
5       Q.  And to cut to the chase, I think that
6   when you said Mr. Truitt understood there was a
7   decision to make on his part, I think you were
8   referring to the fact that Salisbury told him he
9   needed to choose between his campaign and his job
10  at Salisbury.
11          MS. SORIN:  Object to the form.
12  Mischaracterized prior testimony.
13      Q.  Is that correct?
14      A.  No.  Could you say that again?
15      Q.  Sure.  When you mentioned Mr. Truitt's
16  understanding that there was a decision to make on
17  his part, were you referring to the fact that
18  Salisbury told him he needed to make a decision
19  between his job, meaning keeping his job, and his
20  campaign for New York State Assembly?
21      A.  I think he had to make a decision as
22  to which job he was most interested in.
23      Q.  And I appreciate that.  But my question
24  is, did Salisbury tell Mr. Truitt that he needed to
```

Page 28

```
1              Cantele
2   make a decision between keeping his job at
3   Salisbury and continuing with his campaign for New
4   York State Assembly?
5       A.  Who do you mean by "Salisbury"?
6       Q.  Well, I'm intentionally not using
7   names, because I naturally don't have as much of an
8   understanding as to your day-to-day --
9       A.  I don't think I told him that, if
10  that's what you're asking me.
11      Q.  And that's fine.  I'm intentionally not
12  using your name because I'm not trying to corner
13  you here.  But my understanding is that Mr. Truitt
14  was told he needed to decide between continuing his
15  campaign for New York State Assembly and keeping
16  his job.
17      Are you --
18      A.  I don't think it was character --
19          MS. SORIN:  Let him finish the
20  question.
21          THE WITNESS:  I'm sorry.
22          MS. SORIN:  And give me a second to
23  place an objection on the record.
24          THE WITNESS:  Sorry.
25      Can you restate your question?
```

Page 29

```
1              Cantele
2          MR. LOWER:  Yes.
3          MS. SORIN:  Thank you.
4       Q.  My understanding is that Mr. Truitt was
5   told he needed to decide between keeping his job at
6   Salisbury and continuing his campaign for New York
7   State Assembly.
8       Are you contesting the accuracy of that
9   assertion?
10          MS. SORIN:  Objection.  Asked and
11  answered.
12      Q.  As a general matter, you still do get
13  to answer the question unless Lindsay tells you not
14  to.
15      A.  Okay.  I think that it is wrong to say
16  we -- the "continuing the campaign" part is not
17  accurate, I don't believe.  I did not say that.  I
18  think we were concerned, and we relayed our
19  concerns, regarding his ability to fulfill the
20  role the bank was looking for in the Riverside
21  division, and take this other job which required
22  him to be out of the bank for at least sixty days
23  a year.  And common sense would say, given this
24  job, that there would be campaigning to be done.
25      Q.  Do you have any personal knowledge of
```

Page 38

Cantele

A.   Correct.

Q.   And that was the one that lasted about twenty minutes, you mentioned earlier?

A.   Correct.

Q.   In this e-mail that I've marked P-53, Doug said, "I'll send an update when I return."

Do you know if you ever received an update?

A.   I do not.

Q.   When I asked earlier about any work flow Salisbury might have for evaluating outside employment, you indicated there was a form that's circulated about once a year, and that you were consulted with any concerns that Doug might have regarding those forms, is that correct?

A.   That is correct.

Q.   Aside from yourself and Doug, is any other individual with Salisbury part of the process for evaluating outside employment?

A.   Generally no.  However, there might be occasion to meet with that individual's supervisor to talk about it more, depending on what it was.

Q.   So is it your position that Salisbury's board of directors has nothing to do with

---

Page 39

Cantele

evaluating outside employment of Salisbury employees?

A.   So they do not evaluate.  But a report does go to. I believe it's the HR comp. committee once a year.  So it's a report, not an evaluation. Management evaluates it.

Q.   When you say management evaluates it, is this the same "our" that you referenced earlier? I'm sorry. so whose management were you referring to earlier?  That's all I'm asking you.

A.   Well, Doug, myself, and potentially that individual's manager or supervisor.

Q.   Is it your position that the board of directors or any of its committees do not participate in management's evaluation of outside employment?

A.   That's correct.  That is my position.

Q.   Then why are outside employment reports provided to the board of directors or any of the committees on the board of directors?

A.   Transparency.

Q.   And I'm handing you what I've marked P-54 which is another single-page e-mail chain with a Bates number D-0000379.  You can let me know when

---

Page 40

Cantele

you're ready to discuss.

EXH      (Plaintiff Exhibit 54, e-mail chain
         Bates numbered D-0000379, marked for
         identification, as of this date.)
         (Witness perusing document.)

A.   Okay, I'm ready.

Q.   It looks like the first e-mail was March 12, 2018 at 8:19 a.m. from a Shelly Humeston to Douglas K.L., cc'ing yourself, does that seem correct?

A.   That seems correct.

Q.   And Ms. Humeston is a VP at Salisbury, correct?

A.   Senior vice-president.

Q.   I'm sorry, I did the same thing for Ms. Raymond.  And in Ms. Humeston's e-mail she said, "I think Will's employment should be approved by the board due to his position as a Dutchess County Legislator.  I believe he is currently serving a two-year term.  I thought we discussed this previously, but you may disagree and feel it is not necessary."

Did I read that correctly?

A.   Yes.

---

Page 41

Cantele

Q.   When Ms. Humeston refers to "Will's employment," do you understand that to refer to William Truitt?

A.   Yes.

Q.   And at the end of the day here, Ms. Humeston is saying that she thinks his Dutchess County Legislator position should be approved by the board.

Is that a fair characterization?

A.   That is what it says, yes.

Q.   But your position is that the board does not approve outside employment; is that correct?

A.   They do not approve it on an individual basis.  I think what's being referred to here is, they receive an agenda and they approve the documents generally presented to them in a meeting.

Q.   Just to, I think I know what you're referring to, but when you say "they," and "the documents," and now I'm looking back at this e-mail, perhaps would be referring to the HR comp. committee receiving an outside employment report?

MS. SORIN:  Object to the form.

---

Page 42

Cantele

1
2  You can answer if you understand.
3      A.   I would be referring to the HR comp.
4  committee.
5      Q.   And with respect to the documents that
6  you mentioned, would the outside employment report
7  be one of the documents to which you were
8  referring?
9      A.   Yes, they approve reports presented to
10  them.
11      Q.   Okay.  Is that the case for all reports
12  presented to that committee?
13      A.   Yes.  And can I say with all
14  certainty, we don't miss something, but generally
15  they approve all the reports as part of the
16  agenda.
17      Q.   Is that done orally, during an
18  in-person meeting of the HR comp. committee, or do
19  they sign to state their approval?
20      A.   It would be orally.
21      Q.   And is that recorded in any way, the HR
22  comp. committee's approval of reports that are
23  presented to them?
24      A.   The minutes are recorded.  I mean,
25  there are minutes taken which are recorded.  I

Page 43

Cantele

1
2  would -- without looking at it, from a style
3  standpoint, I believe somebody would say, "Make a
4  motion to approve the reports."  So I'm not sure
5  I'm answering your question.  But --
6      Q.   No, that's just -- I think you did.
7      A.   Okay.
8      Q.   When you say the minutes are recorded,
9  are HR comp. committee meetings, how are they
10  recorded?  Are they, is that audio-recorded?
11      A.   No.  We have an individual that would
12  record the minutes.
13      Q.   Would that be Ms. Humeston?
14      A.   Yes.
15      Q.   And she, when you say "record the
16  minutes," just for a prospective jury's standpoint,
17  that kind of just means writing down what was said
18  and by whom in a meeting, is that --
19      A.   Yes.  And who made a motion, who
20  seconded it, that sort of thing, yes.
21      Q.   Okay.  Do you receive copies of those
22  minutes from HR comp. committee meetings?
23      A.   Those minutes are then -- would be
24  then include -- minutes from all the committee
25  meetings are then included in the board package

Page 44

Cantele

1
2  each month.  So as a board member, yes, I would
3  receive those.
4      Q.   And obviously, those are circulated
5  after all these meetings occur, correct?
6      A.   They are circulated as part of the
7  board meeting package, so they are included in
8  that, yes.  Yes, after the meeting, yes.
9      Q.   Do you attend HR comp. committee
10  meetings?
11      A.   I do.
12      Q.   Are you on the HR comp. committee?
13      A.   I am not.
14      Q.   Why do you attend HR comp. committee
15  meetings?
16      A.   A variety of -- so I'm a nonvoting
17  member of the meetings, but I provide information
18  to the board, I answer questions for the board, I
19  make compensation recommendations -- sorry, let
20  me -- I'll still finish --
21      Q.   Yes.
22      A.   -- I make compensation recommendations
23  to the board.  I excuse myself whenever there's
24  any discussion on my compensation, or any vote on
25  my compensation.

Page 45

Cantele

1
2      Q.   And I was asking about a committee
3  specifically.  You mentioned the board.  I think
4  we're both talking about the same thing, though.  I
5  mean, you were describing why you attend HR comp.
6  committee meetings?
7      A.   Compensation recommendation to the HR
8  comp. committee, yes.  I said "board."  I
9  apologize.
10      Q.   No, that's fine.  And I don't know if
11  it's by definition, but all the committees are one
12  hundred percent board members anyway, correct?
13      A.   That is correct.
14      Q.   And I'm still looking at this P-54
15  e-mail that I handed you.  Mr. Cahill in an e-mail
16  to Ms. Humeston and yourself, the last e-mail in
17  this chain, and Doug says, "I plan on bringing the
18  outside employment report to the HR comp. committee
19  in April and will include Will."
20          Did I read that correctly?
21      A.   Yes.
22      Q.   And did Mr. Cahill bring the outside
23  employment report to the HR comp. committee in
24  April of 2018?
25      A.   I'm not sure.  I'm not even sure we

Page 70

Cantele

1
2  You can answer.
3  THE WITNESS: Let me just reread your
4  question.
5  (A pause in the proceedings.)
6  A.  So we disagreed that he could complete
7  had requirements of the Salisbury job and take on
8  his outside employment that required a significant
9  amount of time and effort on his behalf. We
10  communicated that to him. Ultimately, it was his
11  decision.
12  Q.  Was Mr. Truitt told he needed to make a
13  decision between running for office and his
14  employment with the bank?
15  A.  By me?
16  Q.  Do you have any knowledge of anyone
17  telling that to Mr. Truitt?
18  A.  I don't remember specifically. There
19  was no ultimatum, I would say, that I gave him.
20  He had reached his conclusion on his own, based on
21  us telling him that we didn't think he could do
22  both jobs and be successful at the Salisbury job.
23  Q.  Did you tell him you didn't think he
24  could do both, or that he would not be allowed to
25  do both?

Page 71

Cantele

1
2  A.  I don't recall.
3  EXH  (Plaintiff Exhibit 57, e-mail chain
4  Bates numbered D-0000438, marked for
5  identification, as of this date.)
6  Q.  Mr. Cantele, I'm now handing you what
7  I'm marking P-57, which is yet another single-page
8  e-mail chain, this one bearing a Bates number
9  D-0000438. Just let me know when you're ready to
10  discuss.
11  (Handing document to witness.)
12  (A pause in the proceedings.)
13  A.  Okay.
14  Q.  And the first e-mail in this chain
15  doesn't include you. It appears to be Mr. Truitt
16  asking Mr. Cahill if he can meet with you. Does
17  that sound right to you, is that a fair
18  characterization?
19  A.  Yes, it is.
20  Q.  And Mr. Cahill then forwards
21  Mr. Truitt's request right along to you. Of
22  course, Mr. Truitt's no longer on this discussion
23  between yourself and Mr. Cahill, but in the 11:16
24  a.m. e-mail to you from Mr. Cahill, would you agree
25  that Mr. Cahill is describing a meeting that he had

Page 72

Cantele

1
2  with Mr. Truitt?
3  MS. SORIN: Objection, calls for
4  speculation.
5  You can answer if you know.
6  A.  I believe so.
7  Q.  And just to -- my recollection of our
8  discussion this morning was that, aside from a
9  hallway meet-and-greet, you didn't really interact
10  with Mr. Truitt outside of a short period leading
11  up to the end of his employment, is that correct?
12  A.  That's correct.
13  Q.  And these meetings that occurred
14  between Will and Doug and yourself and Will at the
15  very end of April, those were regarding his
16  campaign for New York State Assembly, correct?
17  A.  They were about his request for
18  outside employment which happened to be
19  Assembly -- whatever the Assembly position for the
20  State of New York.
21  Q.  Was Mr. Truitt asked to fill out one of
22  those outside employment forms at any point?
23  A.  I don't know.
24  Q.  Jumping back to P-57 here, this e-mail
25  to yourself from Mr. Cahill, you'd agree that

Page 73

Cantele

1
2  Mr. Cahill's talking about his meeting with
3  Mr. Truitt, correct?
4  MS. SORIN: Objection, calls for
5  speculation.
6  A.  I would think that's what he was
7  talking about, yes.
8  Q.  Okay. In the second paragraph,
9  Mr. Cahill says, referring to the meeting on
10  Monday, in the second paragraph, Mr. Cahill says,
11  "During our meeting, I let him know clearly that
12  this was a unanimous management decision, not yours
13  alone."
14  Did I read that correctly?
15  A.  Yes.
16  Q.  What was the unanimous management
17  decision that was made?
18  A.  I'm inferring a little bit because
19  Doug wrote that. But it would be the decision
20  that Doug and Amy and I made that Will would be
21  unable to fulfill his position as a residential
22  originator given the responsibilities as we knew
23  them to be relative to the Assembly position in
24  New York.
25  Q.  And would you also agree that this

Page 114

Cantele

1  policies besides the two that we're talking about.
2  That's what I understood your question to be.
3      Q.   No, no.  Actually, your answer could
4  have been right either way, so I'm glad we're
5  clarifying.  I should have asked a better question.
6      But can you, the way you phrased your
7  answer, it sounds like you won't be able to recite
8  every single one cold.
9      A.   That is correct.
10     Q.   Okay.  Could you recite the ones that
11 come to mind, these additional policies, aside from
12 the two we've been discussing?
13     A.   So there's probably 75 policies.
14     Q.   Okay.
15     A.   These are long policies.  There's a
16 liability policy, there's a BOLI policy, there's
17 an IT usage policy, password protection policy.  I
18 mean, I -- I can give you a list of all the
19 policies and you can have at it.
20     Q.   One way I probably could have asked a
21 better question is, I guess, you know, in this
22 employee handbook there's more than one policy.  I
23 should have made it clear that I'm not talking
24 about every specific rule, of which there might be

Page 115

Cantele

1  hundreds in this handbook.
2      A.   Okay.
3      Q.   It sounds like there's lots of
4  documents, some of which you just recited, each of
5  which has a ton of different rules about specific
6  aspects of the work Salisbury does.
7      A.   Okay, fair.
8      Q.   Is that fair?  Okay.  Are you aware of
9  any documents that describe Salisbury policies
10 regarding discrimination that do not already appear
11 in the Code of Ethics or employee handbook?
12     A.   I don't believe so off the top of my
13 head.
14     Q.   As I'm sure you can tell, what I'm
15 getting at is, are there other Salisbury policies
16 written down that relate to this case?  That's
17 ultimately my question.
18     MS. SORIN:  I object to the form.
19     MR. LOWER:  That's fine.
20     A.   I don't think so.
21     Q.   Thanks.  Do you know what types of
22 training Salisbury employees receive regarding
23 discrimination, or antidiscrimination is probably a
24 better way to put it?

Page 116

Cantele

1      A.   I do not.
2      Q.   Do you know if Salisbury provides any
3  training regarding disciplinary action?
4      A.   So all disciplinary action, our
5  managers work with Doug in HR.  So he would coach
6  them and train them as each particular situation
7  occurs.
8      Q.   Similar question, do you know if
9  Salisbury provides any training regarding the use
10 of progressive discipline?
11     A.   I think my answer is the same.
12     Q.   In that Doug --
13     A.   Doug would work with the supervisor.
14     Q.   On an as-needed basis?
15     A.   Yes.
16     Q.   Are you aware of any instance in which
17 Salisbury used progressive discipline with
18 Mr. Truitt?
19     A.   I am not aware.
20     Q.   To save a little time, I mean, is it
21 your testimony that Mr. Truitt was not disciplined
22 by Salisbury for any of his political activities?
23     MS. SORIN:  I'll object to the form.
24     You can answer.

Page 117

Cantele

1      MR. LOWER:  That's not a trick one.
2  You can read it or I could reask it if
3  you'll like.
4      A.   Let me be sure I --
5      Q.   Yes.
6      (A pause in the proceedings.)
7      A.   It is my testimony that Mr. Truitt was
8  not disciplined for any of his political
9  activities.
10     Q.   I just thought that would save us five
11 minutes of questions.  Who told Mr. Truitt that he
12 needed to choose between his job at Salisbury and
13 his political campaign?
14     MS. SORIN:  Object to the form.
15 Misstates prior testimony.
16     MR. LOWER:  And I wasn't implying that
17 the witness said that.
18     MS. SORIN:  Object to the form.
19     A.   I don't believe that Mr. Truitt was
20 told that he had to choose between his job at
21 Salisbury and his political campaign.  I think it
22 was -- it was his outside employment that was the
23 issue.  But really, the form of that outside
24 employment didn't matter.  It was the time

Cantele

1
2 commitment necessary, time commitment outside the
3 bank necessary for that second job that we
4 believed was going to impede his ability to do
5 his -- to complete his full-time responsibilities
6 at Salisbury.
7        MR. LOWER:  Move to strike the
8 nonresponsive portions.
9        MS. SORIN:  Objection.
10 MO    MR. LOWER:  And I'll just move to
11 strike the entire answer as nonresponsive.
12        MS. SORIN:  Same objection.
13     Q.   Are there any Salisbury policies that
14 prohibit employees from engaging in political
15 activity?
16        MS. SORIN:  Object to the form.
17 You can answer.
18     A.   I don't believe there are.
19        MR. LOWER:  And the basis for the form
20 objection?
21        MS. SORIN:  Same one regarding the
22 term "political activity."
23        MR. LOWER:  Well, you gave me two
24 different --
25        MS. SORIN:  Both.  It's vague, and it

Cantele

1
2 calls for a legal conclusion.  He provided
3 you the answer.
4     Q.   I think I already asked you, you
5 confirmed that it looks like a true and accurate
6 copy in general of the employee manned book, that
7 P-4.
8     A.   That's correct.
9        MR. LOWER:  We can go off the record
10 for a second.
11        (Discussion off the record.)
12        (Recess taken.)
13 EXAMINATION (Cont'd.)
14 BY MR. LOWER:
15     Q.   All right, Mr. Cantele, before I even
16 ask the question, I guess the question is going to
17 be, who have you spoken with regarding Will's
18 allegations?
19        And before you answer, I just want to
20 make it very clear that I'm not seeking any
21 privileged information here.  Lindsay is welcome to
22 add on to my privilege curve that I'm setting up
23 here, but of course you probably talked to Lindsay
24 ethically.  That's not what I'm asking you about.
25 I could ask, but I don't.  That would need

Cantele

1
2 attorneys' names at this juncture and, you know, if
3 Lindsay told you to ask some other law firm or
4 someone some question that she told you to do, you
5 don't need to tell me that, either.
6        This is a, natural really, when a
7 company gets sued, people talk within the company,
8 and on their own initiative, and that's the type of
9 thing that I'm asking him.  So although Ms. Sorin
10 is of course welcome to add anything before you
11 start any answer, the question was, whom have you
12 spoken with regarding Will's allegations in this
13 case?
14        MS. SORIN:  And yes, just the one
15 thing that I want to add is that, as the
16 Litigation Control Group, any communications
17 that you've had with with other Salisbury
18 employees at the direction of counsel or
19 regarding correspondence that you've had
20 with me, those communications, or legal
21 strategy, for example, those are also
22 privileged communications.
23     A.   I guess I'm still not clear.  Maybe
24 less clear now.  So --
25     Q.   Well, I'm just asking for names, first.

Cantele

1
2 I don't care what was said for starters, and then
3 can we go there.  And I'm not even asking for
4 lawyer names.
5        MS. SORIN:  That's fine.
6     Q.   I think that might help us save a
7 little time.  I don't --
8        MS. SORIN:  Ask for clarification --
9 is this after the lawsuit was filed or
10 regarding the allegation?  Is that also --
11     A.   That would help.
12     Q.   That's fine.  Are you aware of any
13 instance in which Mr. Truitt alleged Salisbury any
14 improper conduct at all prior to the initiation of
15 this lawsuit?
16     A.   I'm not.
17     Q.   Okay.  Then with respect to this
18 lawsuit, whom have you spoken with regarding Will's
19 allegations?
20        MS. SORIN:  And again, I'm going to
21 note my objection as to the Litigation
22 Control Group, which would be you, Shelly
23 Humeston and Doug Cahill.  Communications
24 that you've had even amongst yourselves
25 regarding legal strategy, at the direction

Page 122

Cantele

of counsel, are privileged communications.
So I'm going to direct you not to answer any
questions regarding those communications.

A.   Communications I had with that group.
Okay.

So obviously, after the lawsuit came
about, I've talked to the -- our board about that.

Q.   The board of directors?

A.   Board of directors.  Sorry.  I -- I
think we had a general conversation with those
that were being deposed to tell them to not
destroy any information that they might have
regarding the case.

MS. SORIN:  And again if any of those
communications were at the direction of
counsel, they are privileged.

A.   Obviously my wife is aware that I'm in
New York today at a deposition.  I think -- I
think that's it.

Q.   So other deponents, I don't want to
discuss the Litigation Control Group, certainly,
your family, I don't need to discuss that.  Your
conversations with your wife, really about your
whereabouts and for --

Page 123

Cantele

A.   Right, nothing to do with the
specifics of the case.

Q.   You almost answered this one earlier.
I mean, my question is, how did you become aware of
Mr. Truitt's campaign for New York State Assembly?

A.   Shelly advised me that she had seen on
Facebook.

Q.   Okay.

A.   Shelly Humeston.

Q.   Thank you.  When we've discussed Shelly
today, that's Shelly Humeston, does that, to your
recollection, sound correct?

A.   Yes.

Q.   Doug, Mr. Doug Cahill.

A.   Yes.

Q.   I don't feel the need to run down any
more names.  The record is pretty clear.

Were you aware of New York labor law
Section 201(d) prior to Mr. Truitt's -- end of his
employment at Salisbury?

A.   No.

Q.   Have you ever previously been involved
in a wrongful termination allegation or
investigation?

Page 124

Cantele

A.   I don't believe so.

Q.   A better way to have asked that would
have been, other than this case, have you ever been
involved --

A.   I don't believe so.

Q.   Okay.  Who is Julianna Sinchek,
probably pronouncing that wrong?

A.   No, that's correct.  She is our
vice-president marketing.

Q.   Okay.  Did she have any interaction
with Mr. Truitt, to your knowledge?

A.   Not to my knowledge.  She's
responsible for a photographer taking pictures, so
if we took a picture of Will, she would have been
involved.  But other than that, not to my
knowledge.

Q.   And, I mean, this is almost entirely
duplicative, but she wasn't involved with any of
the events leading up to the end of Mr. Truitt's
employment, was she?

A.   Not to my knowledge.

Q.   Next question is, who is Amanda
Lidstone, L-i-d-s-t-o-n-e?

A.   She is our vice-president of

Page 125

Cantele

compliance.

Q.   Do you know if she had interacted with
Mr. Truitt in any way?

A.   I do not know.

Q.   What does the role VP of compliance
entail, what does Ms. Lidstone do for Salisbury?

A.   So we have a series of regulatory
compliance requirements primarily related to
consumer laws, and she is responsible for ensuring
that the bank stays in compliance with those
regulations.  She also oversees our Bank Secrecy
Act area.  I think that's -- I think that's it.

Q.   Okay.  Has she been involved in any
aspect of the end of Mr. Truitt's employment?

A.   I don't think so.

Q.   What steps does Salisbury generally
take when an employee quits or resigns?

MS. SORIN:  Object to the form.

A.   I'm not sure I understand the
question.

Q.   Sure.  I mean, I just used both the
word "quit" and "resign" --

A.   I understand that part, but I'm not
sure I understand what you mean by what steps do

# EXHIBIT H

Linda King

To: Sara Murphy
Subject: RE: New Hires!

## Welcome William



**William (Will) Truitt**
Mortgage Originator
Hire Date: February 26, 2018

Will was raised and currently lives in Hyde Park, NY.

**Education/Previous Employer:** Will is a recent graduate of Marist College where he received his Bachelor's Degree in Business Finance with a minor in Accounting and Economics.

**Fun Facts:** Will has a strong passion for both sports and politics. He is an avid fan of the New York Mets, New England Patriots and the Boston Celtics!

**Volunteerism/Community Involvement:** Will serves as the youngest elected county official in the State of New York as a Legislator in Dutchess County. He represents approximately 15,000 people who call the Town of Hyde Park and the Town of Poughkeepsie home.

**What made you want to work for Salisbury Bank and Trust?** "My goal is to have a long, successful career in banking and finance. Many friends and colleagues strongly recommended Salisbury Bank and Trust. I am excited to help our bank grow in New York State, particularly in the Hudson Valley".

**What are you most looking forward to at Salisbury Bank and Trust?** "Being a local bank that serves the community, I am greatly looking forward to helping our customers achieve their financial and housing aspirations".

Sara Murphy, Trainer Assistant
Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868

1


DEFENDANT'S
EXHIBIT
9

D-000058

# EXHIBIT
# I

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 7:18-cv-08386-NSR

WILLIAM GUNNAR TRUITT,

Plaintiff,

-against-

SALISBURY BANK AND TRUST COMPANY;
AND SALISBURY BANCORP, INC.,

Defendants.

DEFENDANTS' ANSWERS AND
OBJECTIONS TO PLAINTIFF'S
FIRST SET OF INTERROGATORIES

TO:   Ted McCullough
      Robert B. Lower
      McCullough Ginsberg Montano & Partners LLP
      122 East 42nd Street, Suite 3505
      New York, New York 10168
      Attorneys for Plaintiff

      James Coughlan
      Coughlan Law Offices, LLP
      P.O. Box 72
      22 Hutton Street
      Rhinecliff, New York 12574
      Co-counsel for Plaintiff

Defendants Salisbury Bank and Trust Company and Salisbury Bancorp, Inc. (together, "Salisbury Bank" or "Defendants"), by their attorneys, Littler Mendelson, P.C., pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the applicable Local Civil Rules for the Southern District of New York, hereby responds and objects to plaintiff William Gunnar Truitt's ("Plaintiff") First Set of Interrogatories as follows:

## QUALIFICATIONS AND GENERAL OBJECTIONS

1.      Defendants object to each interrogatory propounded by Plaintiff to the extent each seeks information protected by the attorney-client privilege and/or the attorney work-product doctrine. Defendants further object to each interrogatory to the extent it seeks to impose

obligations on it beyond those required by applicable court rules.  Defendants also object to each interrogatory to the extent each purports to require identification or production of documents prepared as a result of the institution of this lawsuit or in anticipation of litigation.

2.      The inadvertent production of any information, documents or material protected by the attorney-client, attorney work product, or any other privilege, will not waive Defendants' right to assert such privilege.  Defendants also retain the right to retrieve information, documents or material inadvertently produced, including copies thereof, if any, which are deemed to be protected by any such privilege.

3.      Defendants object to each interrogatory insofar as it seeks information beyond the temporal scope of discovery appropriate to this case, on the grounds that such interrogatories are overly broad and unduly burdensome and do not seek information that is either relevant to this case or reasonably calculated to lead to the discovery of relevant information.

4.      Defendants object to the interrogatories to the extent that they purport to require the disclosure of information that is not within the possession, custody or control of Defendants themselves.

5.      Defendants' failure to object on a particular ground or grounds shall not be construed as a waiver of their right to object on any additional ground or grounds.

6.      The answers set forth herein are made without prejudice to, and without waiving, the following:

    a.      Defendants' right to object on the grounds of competency, privilege, relevancy, materiality, or any other proper ground, to the use of any information which may hereinafter be provided or produced in response to Plaintiff's interrogatories, for any purpose, in whole or in part, in any subsequent step or proceeding in this action or any other action.

2

b.   Defendants' right to object on any and all grounds at any time to other discovery procedures involving or relating to the subject matter of Plaintiff's interrogatories herein answered.

c.   Defendants' right to provide, at any time, supplements, additions, revisions, corrections, or clarifications with respect to any of the information provided, or the answers or objections made, in response to Plaintiff's interrogatories.

## SPECIFIC OBJECTIONS AND ANSWERS TO INTERROGATORIES

**Interrogatory No. 1:**

For each Salisbury employee who has supported a political campaign of Didi Barrett or political office held by Didi Barrett, identify the employee and describe each type of support they provided. This includes financial and non-financial support.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is overly broad, vague as to the term "supported," unduly burdensome and not proportional to the needs of the case in that it does not have any temporal limitation, nor limit the inquiry to Salisbury employees involved in any discussions regarding whether Plaintiff would be able to fulfill his full-time job duties while campaigning for and/or as a member of the New York State Assembly and would potentially require Defendants to interview every employee. Additionally, Defendants object to this interrogatory on the grounds that it requires the disclosure of confidential and personal information that concerns individuals who are not parties to this action. Defendants further object to this interrogatory on the grounds that it purports to require the disclosure of information that is not within the possession, custody or control of Defendants themselves and to which Plaintiff has equal access. Subject to and without waiving information, no Salisbury employee involved in any discussions regarding whether Plaintiff would be able to fulfill his full-time job duties while campaigning for and/or as a member of the New York State Assembly, including Doug Cahill, Rick Cantele, Richard Kelly, Andrea McArthur or Amy Raymond, has provided financial support to a political campaign or political office held by Didi Barrett nor have these employees volunteered time to campaign or work on behalf of Ms. Barrett.

**Interrogatory No. 2:**

Identify each individual who provided information or assistance in responding to Mr. Truitt's December 27, 2018 Discovery Requests.

**ANSWER:**

See the Certification Page below.

**Interrogatory No. 3:**

For each Salisbury employee who has held a public office, list each office held.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is overly broad, vague as to the term "public office," unduly burdensome and not proportional to the needs of the case in that it does not have any temporal limitation and would potentially require Defendants to interview

every employee.

## Interrogatory No. 4:

Identify outside counsel that Salisbury consulted with concerning the end of Mr. Truitt's Salisbury employment or Mr. Truitt's run for a political office.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it seeks communications or draft reports prepared in anticipation of litigation and/or which are protected from disclosure pursuant to the attorney-client privilege and/or attorney work product doctrine. Subject to and without waiving any objections, Defendants state: none.

## Interrogatory No. 5:

Identify all persons with knowledge concerning the end of Mr. Truitt's Salisbury employment or Defendants' contention that Mr. Truitt resigned from Salisbury.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is vague as to the term "concerning the end of Mr. Truitt's Salisbury employment" and to the extent that it seeks communications or draft reports prepared in anticipation of litigation and/or which are protected from disclosure pursuant to the attorney-client privilege and/or attorney work product doctrine. Subject to and without waiving any objection, Defendants state: Doug Cahill, Rick Cantele, Richard Kelly, Andrea McArthur or Amy Raymond. Further, Rick Cantele – without identifying Mr. Truitt – had reported to the Board at a regularly scheduled meeting on April 27, 2018 that an employee had announced his campaign to run for New York State Assembly. Management had determined that this position pays approximately $80,000 per year and required significant time in Albany. Cantele further advised that management intended to speak with the employee and advise him that this would be a conflict of interest and he must make a decision whether to run for office or to continue employment with the Bank. Defendants also refer Plaintiff to document bates stamped D-000118, previously produced in response to the Southern District's Pilot Protocol.

## Interrogatory No. 6:

Identify every person with knowledge of the decision to hire Mr. Truitt.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is unduly burdensome and not proportional to the needs of the case in that it does not have any temporal limitation, and would potentially require Defendants to interview every employee. Subject to and without

waiving any objections, Defendants state: Doug Cahill, Rick Cantele, Richard Kelly, Andrea McArthur or Amy Raymond were each involved in the decision to hire Mr. Truitt.

**Interrogatory No. 7:**

Identify every person with knowledge regarding the termination of Mr. Truitt's employment.

**ANSWER:**

Defendants object to this interrogatory on the grounds that Plaintiff's employment was not terminated. Rather, he chose to voluntarily resign from his position. Subject to and without waiving any objection, Defendants refer Plaintiff to their answer to Interrogatory No. 5.

**Interrogatory No. 8:**

Identify and describe the role of each email service provider used by Salisbury (whether internal or external).

**ANSWER:**

Defendants object to this interrogatory as not being within the permissible scope of discovery under Rule 26(b)(1), which is limited to that which is "relevant to any party's claim or defense and proportional to the needs of the case[.]" Information regarding Defendants' "email service provider" is not relevant to either party's claim or defense in this matter and thus exceeds the scope of permissible discovery. Since the information is entirely irrelevant, providing discovery of such irrelevant information is not proportional to the needs of the case because it is of no value whatsoever in resolving any of the parties' disputes. Defendants further object that the phrases "role" and "email service provider" are vague and incomprehensible in this context and therefore Defendants do not understand the interrogatory. Defendants further object on the basis that Rule 26(g)(1)(B) requires that requests are not "interposed for an improper purpose" nor "unreasonable nor unduly burdensome." Plaintiff's request for information about Defendants' "email service provider" is so clearly irrelevant to any party's claim or defense that the request is therefore a violation of Rule 26(g)(1)(B). Defendants further object to the request for information about its "email service provider" because it seeks "discovery about discovery" to simply validate discovery efforts, which has been routinely rejected by courts as improper. *See, e.g., Freedman v. Weatherford Int'l*, 2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014) (plaintiff's request for "discovery on discovery" denied for failure to provide adequate factual basis for finding that defendant's original discovery production was deficient); *Orillaneda v. French Culinary Inst.*, 2011 U.S. Dist. LEXIS 105793, at *27 (S.D.N.Y. Sept. 19, 2011) (finding plaintiff was not entitled to conduct "discovery that is solely relevant to the sufficiency of the adversary's document production"); *In re Honeywell Int'l., Inc. Sec. Litig.*, 230 F.R.D. 293 (S.D.N.Y. 2003) (denying plaintiffs' motion to compel seeking information concerning defendants' document retention, preservation, search and collection procedures); *Watkins v. HireRight*, No. 3:13-cv-01432 (S.D. Cal. Nov. 18, 2013) (denying plaintiff's motion to compel production of Rule 30(b)(6) witness on the topics of how defendant's systems operate and efforts

6

to preserve electronic data, because plaintiff was "not entitled to independently assess the adequacy of defendant's preservation[,]" nor was plaintiff entitled to deposition on the "structure of the [defendant's] computer system"); *Koninklijke Philips N.V. v. Hunt Control Sys., Inc.*, 2014 WL 1494517, at *4 (D.N.J. Apr. 16, 2014) (granting motion for protective order against deposition of IT witness where the moving party failed to show a "material deficiency" in the responding party's ediscovery process, noting that the party's "alleged dissatisfaction with the results of [the] production" was at best "speculative and suggestive"); *Miller v. York Risk Services Group*, 2014 WL 1456349 (D. Ariz. April 15, 2014) ("Plaintiffs contend that starting with discovery of the manner and means of how Defendant stores ESI will allow them to tailor requests in the future. The court's view is that starting discovery with such an inquiry puts the cart before the horse and likely will increase, rather than decrease, discovery disputes.") Furthermore, to the extent this interrogatory is directed at Defendant's litigation hold notices and procedures, Defendants also object that this interrogatory seeks privileged information related to litigation hold notices and processes, which have been uniformly held to be privileged work product that is not discoverable as a matter of course. *See, e.g., Muro v. Target Corp.*, 250 F.R.D. 350 (N.D. Ill. 2007) (affirming Magistrate's ruling that defendant's litigation hold notices are both privileged and attorney work-product); *Turner v. Resort Condos. Int'l*, 2006 U.S. Dist. LEXIS 48561 (S.D. Ind. 2006) (affirming denial of plaintiff's motion to compel discovery of defendant's litigation hold, inter alia on "well founded" objection that litigation holds are privileged); *Gibson v. Ford Motor Co.*, 510 F. Supp. 2d 1116 (N.D. Ga. 2007) (ruling that litigation holds are not discoverable, because "[n]ot only is the document likely to constitute attorney work-product, but its compelled production could dissuade other businesses from issuing such instructions in the event of litigation"). Further, Defendants object on the grounds that the information sought by the request is more appropriately addressed during meet and conferral sessions between counsel pursuant to Fed. R. Civ. P. 26(f). Defendants suggest that Plaintiff's counsel identify a date on which counsel may again meet and confer. Defendants further request that Plaintiff withdraw this interrogatory.


## Interrogatory No. 9:

Identify the total revenues and gross profits of Salisbury for 2017 and 2018.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is premature, overly broad and seeks information which is not proportional to the needs of the case. Defendants further object to this interrogatory on the grounds that Plaintiff has equal access. Subject to and without waiving any objection, Defendants refer Plaintiff to the website http://investor.salisburybank.com/.

7

**Interrogatory No. 10:**

Identify every Salisbury employee who resigned from 2015 to present.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it is overly broad and seeks information which is not proportional to the needs of the case because it is not reasonably limited in time and calls for information outside the scope of Plaintiff's employment with Salisbury Bank. Defendants further object to this interrogatory on the grounds that it requires the disclosure of confidential and personal information that concerns individuals who are not parties to this action. Based upon these objections, Defendants will not identify every Salisbury the employee who resigned from 2015 to the present, as this interrogatory is not relevant to the needs of the case. We invite opposing counsel to meet and confer on a limited scope to be agreed upon by the parties.

**Interrogatory No. 11:**

Identify each insurance carrier of Defendants whose policies would cover any part of the claims made by Mr. Truitt in the Complaint.

**ANSWER:**

Defendants maintain an insurance policy with Everest National Insurance Company, obtained through ABA Insurance Services, which partially covers the claims alleged by Plaintiff.

**Interrogatory No. 12:**

Identify any insurance carriers that were put on notice of Mr. Truitt's claim.

**ANSWER:**

See Defendants Answer to Interrogatory No. 11.

**Interrogatory No. 13:**

For any insurance carriers and/or insurance policies identified in response to Interrogatory Number 11 or 12, identify the per occurrence and aggregate policy limits of those policies.

**ANSWER:**

Defendants object to this request on the grounds that it is overly broad, unduly burdensome, and seeks information which is not proportional to the needs of the case in that it does not limit the subject matter of the inquiry to the parties' claims and defenses as required by

8

Fed. R. Civ. P 26(b)(1). Subject to and without waiving any objection, see the Declarations Page to Salisbury's Directors & Officers Liability Policy, to be produced in response to Plaintiff's Request for the Productions of documents.

## Interrogatory No. 14:

Identify any Salisbury employee who was aware of the contents of New York Labor Law Section 201-d when Mr. Truitt was terminated.

**ANSWER:**

Defendants object to this interrogatory on the grounds that it requires a legal conclusion.

## Interrogatory No. 15:

Identify the primary user and type of each electronic device that has been identified as a potential source of information relevant to this litigation.

**ANSWER:**

Defendants object to this interrogatory as not being within the permissible scope of discovery under Rule 26(b)(1), which is limited to that which is "relevant to any party's claim or defense and proportional to the needs of the case[.]" Information regarding "the primary use and type of each electronic device that has been identified as a potential source of information" for this matter is wholly irrelevant to either party's claim or defense. Since the information is entirely irrelevant, providing discovery of such irrelevant information is not proportional to the needs of the case because it is of no value whatsoever in resolving any of the parties' disputes. The term "device" as used herein is undefined, vague, and ambiguous and for this reason alone Defendants cannot respond to the interrogatory. Defendants further object on the basis that Rule 26(g)(1)(B) requires that requests are not "interposed for an improper purpose" nor "unreasonable nor unduly burdensome." Plaintiff's request for information about Defendants' "devices" is so clearly irrelevant to any party's claim or defense that the request is therefore a violation of Rule 26(g)(1)(B). Defendants also object to the interrogatory because it seeks "discovery about discovery" to simply validate discovery efforts, which has been routinely rejected by courts as improper. *See, e.g., Freedman v. Weatherford Int'l*, 2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014) (plaintiff's request for "discovery on discovery" denied for failure to provide adequate factual basis for finding that defendant's original discovery production was deficient); *Koninklijke Philips N.V. v. Hunt Control Sys., Inc.*, 2014 WL 1494517, at *4 (D.N.J. Apr. 16, 2014) (granting motion for protective order against deposition of IT witness where the moving party failed to show a "material deficiency" in the responding party's ediscovery process, noting that the party's "alleged dissatisfaction with the results of [the] production" was at best "speculative and suggestive"); *Brewer v. BNSF Railway Co.*, 2018 WL 882812 (D. Mont. Feb. 14, 2018 (upholding magistrate's denial of motion for discovery regarding defendant's capability to search for, preserve, and produce ESI because it was not proportionate to the needs

of the case as there was no demonstrated deficiency in defendant's production); *Larsen v. Coldwell Banker Real Estate Corp.*, 2012 WL 359466 (C.D. Cal. Feb. 2, 2012) (denying a request for a witness to answer questions under oath regarding its ESI preservation, collection, and processing.); *Orillaneda v. French Culinary Inst.*, 2011 U.S. Dist. LEXIS 105793, at *27 (S.D.N.Y. Sept. 19, 2011) (finding plaintiff was not entitled to conduct "discovery that is solely relevant to the sufficiency of the adversary's document production"); *Hubbard v. Potter*, 247 F.R.D. 27, 31 (D.D.C. 2008) (denying request for discovery on discovery about defendant's "process of preserving, locating and producing documents" because such "meta-discovery" would create a situation where "discovery would never end"); *Watkins v. HireRight*, No. 3:13-cv-01432 (S.D. Cal. Nov. 18, 2013) (denying plaintiff's motion to compel production of Rule 30(b)(6) witness on the topics of how defendant's systems operate and efforts to preserve electronic data). Further, Defendants object on the grounds that the information sought by the request is more appropriately addressed during meet and conferral sessions between counsel pursuant to Fed. R. Civ. P. 26(f). Defendants suggest that Plaintiff's counsel identify a date on which counsel may again meet and confer. Defendants further request that Plaintiff withdraw this Interrogatory.

## Interrogatory No. 16:

For each device identified in response to Interrogatory Number 15, state how and when it was preserved.

ANSWER:

Defendants object to this interrogatory as not being within the permissible scope of discovery under Rule 26(b)(1), which is limited to that which is "relevant to any party's claim or defense and proportional to the needs of the case[.]" Information concerning how a "device" is "preserved" is not relevant to either party's claim or defense. Since the information is entirely irrelevant, providing discovery of such irrelevant information is not proportional to the needs of the case because it is of no value whatsoever in resolving any of the parties' disputes. The term "device" as used herein is undefined, vague, and ambiguous and for this reason alone Defendants cannot respond to the interrogatory. Defendants further object on the basis that Rule 26(g)(1)(B) requires that interrogatories are not "interposed for an improper purpose" nor "unreasonable nor unduly burdensome." The interrogatory seeks information so clearly irrelevant to either party's claim or defense that is a violation of Rule 26(g)(1)(B). Defendants also object to the demand for information concerning Defendant's preservation of information and litigation hold because it seeks privileged work product and/or attorney-client communications. Defendants further object to the demand for information concerning "preserv[ation]", because courts have repeatedly affirmed that a responding party is best situated to determine which procedures, methodologies, and technologies are appropriate for preserving, searching and producing its own ESI. *See, Ford Motor Co. v. Edgewood Properties, Inc.*, 257 F.R.D. 418, 427 (D.N.J. 2009) ("The Sedona Principles wisely state that it is, in fact, the producing party who is in the best position to determine the method by which they will collect documents. . . . absent an agreement or timely objection, the choice is clearly within the producing party's sound discretion."), citing *The Sedona Conference Best Practices Commentary on the Use of Search and Information Retrieval Methods in E-Discovery*, 8 Sedona Conf. J. 189, 204 (2007); *Little Hocking Water Assn., Inc. v. E.I. DuPont de Nemours & Co.*, No. 2:09-cv-1081, 2013 WL 608154, at *9 (S.D.

10

Ohio Feb. 19, 2013) (producing party, "is in the best position to identify . . . potentially responsive information"); *Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 628 (D. Colo. 2007) ("in the typical case, '[r]esponding parties are best situated to evaluate the procedures, methodologies, and technologies appropriate for preserving and producing their own electronic data and documents.'"). Defendants also object to the interrogatory because it seeks "discovery about discovery" to simply validate discovery efforts, which has been routinely rejected by courts as improper. *See, e.g., Freedman v. Weatherford Int'l*, 2014 WL 4547039 (S.D.N.Y. Sept. 12, 2014) (plaintiff's request for "discovery on discovery" denied for failure to provide adequate factual basis for finding that defendant's original discovery production was deficient); *Orillaneda v. French Culinary Inst.*, 2011 U.S. Dist. LEXIS 105793, at *27 (S.D.N.Y. Sept. 19, 2011) (finding plaintiff was not entitled to conduct "discovery that is solely relevant to the sufficiency of the adversary's document production" – including about the defendant's search procedures and/or whether defendant's search efforts were "adequate"); *In re Honeywell Int'l., Inc. Sec. Litig.*, 230 F.R.D. 293 (S.D.N.Y. 2003) (denying plaintiffs' motion to compel seeking information concerning defendants' document retention, preservation, search and collection procedures); *Steuben Foods, Inc. v. Country Gourmet Foods, L.L.C.*, 2011 U.S. Dist. LEXIS 43145, at **19-20 (W.D.N.Y. Apr. 21, 2011) ("[G]iven that [Defendant] has failed to establish that Plaintiff destroyed any relevant evidence even in the absence of a written litigation hold, [Defendants'] request for sanctions based on spoliation is unwarranted. Nor will the court grant [Defendants'] alternative request to conduct discovery directed to Plaintiff's document preservation actions in this case. Given the lack of colorable factual basis for [Defendant's] spoliation motion, such request amounts to one seeking to initiate a 'fishing expedition' based on mere speculation."); *Koninklijke Philips N.V. v. Hunt Control Sys., Inc.*, 2014 WL 1494517, at *4 (D.N.J. Apr. 16, 2014) (granting motion for protective order against deposition of IT witness where the moving party failed to show a "material deficiency" in the responding party's ediscovery process, noting that the party's "alleged dissatisfaction with the results of [the] production" was at best "speculative and suggestive"); *Brewer v. BNSF Railway Co.*, 2018 WL 882812 (D. Mont. Feb. 14, 2018) (upholding magistrate's denial of motion for discovery regarding defendant's capability to search for, preserve, and produce ESI because it was not proportionate to the needs of the case as there was no demonstrated deficiency in defendant's production); *Larsen v. Coldwell Banker Real Estate Corp.*, 2012 WL 359466 (C.D. Cal. Feb. 2, 2012) (denying a request for a witness to answer questions under oath regarding its ESI preservation, collection, and processing because plaintiff had not shown any bad faith in defendant's production"); *John B. v. Goetz*, 531 F.3d 448, 460 (6th Cir. 2008) ("mere skepticism that an opposing party has not produced all relevant information is not sufficient to warrant drastic electronic discovery measures."); *Hubbard v. Potter*, 247 F.R.D. 27, 31 (D.D.C. 2008) (denying request for discovery on discovery about defendant's "process of preserving, locating and producing documents" because plaintiff's claims that "the production made is so paltry that there must be more" and/or "speculation that there is more," that the court characterized as "chasing the theoretical possibility that additional documents exist," does not justify such "meta-discovery" and, if allowed, would create a situation where "discovery would never end"); *Scotts Co., L.L.C. v. Liberty Mut. Ins. Co.*, 2007 WL 1723509, at *2 (S.D. Ohio June 12, 2007) (denying motion for discovery on discovery based upon "mere suspicion" and "speculation" that defendant was withholding electronically stored information, instructing that such "means to guarantee compliance" should never be ordered absent a "strong showing that the responding party has somehow defaulted in [its self-executing discovery] obligation[s]"); *Hanan v. Corso*, 1998 U.S. Dist. LEXIS 11877, at *24 (D.D.C. Apr. 24, 1998) (denying discovery request by plaintiff seeking information about defendant's "efforts to respond to [plaintiff's] requests for

production in this case," and declaring that it would be "foolhardy" to order such discovery about discovery without any clear showing that the defendant failed to comply with its discovery obligations because there is "no authority for the proposition that the Federal Rules of Civil Procedure contemplate that discovery is itself a fit subject for discovery"); *Watkins v. HireRight*, No. 3:13-cv-01432 (S.D. Cal. Nov. 18, 2013) (denying plaintiff's motion to compel production of Rule 30(b)(6) witness on the topics of how defendant's systems operate and efforts to preserve electronic data, because plaintiff was "not entitled to independently assess the adequacy of defendant's preservation[,]" nor was plaintiff entitled to deposition on the "structure of the [defendant's] computer system"); *Miller v. York Risk Services Group*, 2014 WL 1456349 (D. Ariz. April 15, 2014) ("Plaintiffs contend that starting with discovery of the manner and means of how Defendant stores ESI will allow them to tailor requests in the future. The court's view is that starting discovery with such an inquiry puts the cart before the horse and likely will increase, rather than decrease, discovery disputes. Instead of beginning with a deposition that address nothing but process, discovery should start with inquiries that seek substantive information."). Furthermore, this Request is directed at Defendant's litigation hold notices and procedures, which have been uniformly held to be privileged work product that is not discoverable as a matter of course. *See, e.g., Muro v. Target Corp.*, 250 F.R.D. 350 (N.D. Ill. 2007) (affirming Magistrate's ruling that defendant's litigation hold notices are both privileged and attorney work-product); *Turner v. Resort Condos. Int'l*, 2006 U.S. Dist. LEXIS 48561 (S.D. Ind. 2006) (affirming denial of plaintiff's motion to compel discovery of defendant's litigation hold, *inter alia* on "well founded" objection that litigation holds are privileged); *Gibson v. Ford Motor Co.*, 510 F. Supp. 2d 1116 (N.D. Ga. 2007) (ruling that litigation holds are not discoverable, because "[n]ot only is the document likely to constitute attorney work-product, but its compelled production could dissuade other businesses from issuing such instructions in the event of litigation"). Further, Defendants object on the grounds that the information sought by the request is more appropriately addressed during meet and conferral sessions between counsel pursuant to Fed. R. Civ. P. 26(f). Defendants suggest that Plaintiff's counsel identify a date on which counsel may again meet and confer. Defendants further request that Plaintiff withdraw this Interrogatory.

As to the Objections:

**LITTLER MENDELSON, P.C.**
Attorneys for Defendants

By:_____
Lindsay M. Sorin
LITTLER MENDELSON, P.C.
One Newark Center, 8th Floor
Newark, New Jersey 07102
973.848.4700
lsorin@littler.com

Dated:  January 25, 2019

## CERTIFICATION

I hereby certify under penalty of perjury that:

I have read the foregoing answers to Interrogatories and they are true, accurate and complete, and all documents submitted are originals or true copies of the original documents in my possession or control, and are based upon a review of documents, records, and information available to me and/or other employees and agents of Salisbury Bank and Trust Company and Salisbury Bancorp, Inc.

I hereby certify that the copies of the reports annexed hereto provided by proposed expert witnesses are exact copies of the entire report provided by them; that the existence of other reports of said experts, either written or oral, are unknown to me, and if such become later unknown or unavailable, I shall serve them promptly on the propounding party.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: 1/25/19

BY: Douglas A. Cahill
Vice President, Director of
Human Resources

## CERTIFICATION OF SERVICE

I hereby certify under penalty of perjury that on this date I caused the original of the foregoing Defendants' Answers and Objections to Plaintiff's First Set of Interrogatories to be served on Plaintiff via email and regular mail to the following:

Ted McCullough
Robert B. Lower
McCullough Ginsberg Montano & Partners LLP
122 East 42nd Street, Suite 3505
New York, New York 10168
Attorneys for Plaintiff

James Coughlan
Coughlan Law Offices, LLP
P.O. Box 72
22 Hutton Street
Rhinecliff, New York 12574
Co-counsel for Plaintiff

_____
Lindsay M. Sorin

Dated: January 25, 2019

FIRMWIDE:161642008.2 099759.1001

14

# EXHIBIT J

PERSONAL AND CONFIDENTIAL

January 29, 2018

William Truitt
12 Wright Avenue
Hyde Park, NY  12538

Dear Will:

In accordance with your application for employment and subsequent interviews, I'm pleased to confirm the offer of employment made to you.

Salisbury Bank & Trust Company is an "at will" employer which means that your employment is not for a fixed term.  You or the Company, at any time and for any reasons, may decide to terminate the employment relationship.

You will be employed as a Mortgage Lending Officer Trainee in our Residential Lending Department.  Your pay will be $16.83 per hour based upon a 40 hour work week, and you will be classified as a full-time hourly employee during the training period.

In addition, we have a wide array of benefits which are available the first of the month following 60 days of employment including life insurance, short and long term disability insurance, dental insurance, medical insurance, paid holidays, ESOP program and a 401-K plan.  Salisbury Bank provides a paid time off (PTO) program that accrues 6.46 hours of PTO per pay period, with an annual accrual of 21 days.

The Mortgage Lending Officer Trainee position provides a development plan which will be outlined to you in an additional document upon your hire date.  In general, you'll be eligible to receive salary considerations, based on performance.  In 2018, you will be eligible to participate in the bank-wide incentive compensation program.

This letter contains the complete terms of our offer of employment to you and any prior oral or written representations which are not contained in this letter are invalid.

Will, I'm looking forward to your start day of Monday, February 26, and welcome you to Salisbury Bank and Trust Company.  Please report to our Lakeville Office on 5 Bissell Street at 9:00 a.m. and ask for Linda King.  I'm pleased to have you on our team.

Cordially,

Doug Cahill
VP, Human Resources
dcahill@salisburybank.com
860-453-3460

☑    I accept the employment offer as set forth.

☐    I decline the employment offer as set forth.

Signature



DEFENDANT'S
EXHIBIT

D-000068

# EXHIBIT K



Print Form

Notice and Acknowledgement of Pay Rate and Payday
Under Section 195.1 of the New York State Labor Law
Notice for Hourly Rate Employees

**1. Employer Information**

Name:   Salisbury Bank & Trust Co.

Doing Business As (DBA) Name(s):

FEIN (optional): 06-0521260

Physical Address:   5 Bissell Street
Lakeville, CT  06039

Mailing Address:   PO Box 1868
Lakeville, CT  06039

Phone: 860.435.9801

**3. Employee's rate of pay:**
$  16.83    per hour

**4. Allowances taken:**
☑ None
☐ Tips _____ per hour
☐ Meals _____ per meal
☐ Lodging _____
☐ Other _____

**5. Regular payday:** Bi-weekly Friday

**6. Pay is:**
☐ Weekly
☑ Bi-weekly
☐ Other

**7. Overtime Pay Rate:**
$ 25.25    per hour (This must be at least 1½
times the worker's regular rate with few
exceptions.)

**8. Employee Acknowledgement:**

On this day I have been notified of my pay rate,
overtime rate (if eligible), allowances, and
designated pay day on the date given below. I
told my employer what my primary language is:

Check one:
☑ I have been given this pay notice in English
because it is my primary language.
☐ My primary language is _____ . I
have been given this pay notice in English only,
because the Department of Labor does not yet
offer a pay notice form in my primary language.

William G. Truitt
Print Employee Name

_William D. Levitt_
Employee Signature

2-26-2018
Date

Linda C. King, Human Resources
Preparer's Name and Title

The employee must receive a signed copy of
this form. The employer must keep the original
for 6 years.

**2. Notice given:**
☑ At hiring
☐ On or before February 1st
☐ Before a change in pay rate(s),
allowances claimed or payday

LS 54 (03/11)

D-000086

# EXHIBIT L

Mortgage Originator Trainee – Will Truitt

- Reports to Andrea MacArthur, Mortgage Lending Manager

Timeline:

- February 2018
    - ○ $35,000 – base salary on hire
    - ○ <u>Mortgage Originations Trainee</u>
    - ○ 2-3 days each week - works in Residential Credit Underwriting Department
    - ○ 2-3 days each week – works with Residential Processors

- September 2018
    - ○ Base salary consideration after 6 months of training:
        - ▪ $2,500 per month draw on commissions
    - ○ Works with COI's and internal staff developing relationships in Dutchess, Ulster and Orange Counties

- January 2019
    - ○ Compensation consideration:
        - ▪ 100% commissioned
    - ○ <u>Mortgage Loan Officer</u>



DEFENDANT'S EXHIBIT 5

# EXHIBIT M

SALISBURY BANK & TRUST COMPANY
*JOB DESCRIPTION*

## MORTGAGE ADVISOR TRAINEE

| | | | |
|---|---|---|---|
| *Department:* | Mortgage Origination | | |
| *Reports To:* | AVP Retail Lending | *Date:* | March 2016 |
| *Status:* | Non-Exempt | | |
| *Grade:* | 5 | | |

### OVERVIEW:

Under the general supervision of the Vice President, Mortgage Origination will learn how to develop, negotiate and service residential loan and account business, and generate and maintain an effective client and referral base. Will understand how to service consumer loan and commercial requests as needed, generally but not limited to those that relate to residential account relationships. Performs all duties in conformance with established Bank policies, strategies and procedures. Conforms to all Salisbury Bank Standards of Excellence, Mission Statement and Vision.

### PRIMARY ACCOUNTABILITIES AND RESPONSIBILITIES:

Performs any functions necessary, within the scope of authority and expertise, to provide the highest level of customer service and responsiveness to the financial needs of individuals, families, businesses, organizations and stockholders served by the Bank.

1. During the course of the initial training program, this position will work in assigned departments throughout the Bank, developing a balanced understanding of the Residential Lending, and other essential Bank departments as well. Departmental training will occur in, but not be limited to:

   a. Commercial Credit
   b. Consumer Credit
   c. Mortgage Origination
   d. Loan Servicing
   e. Trust and Retail

   Incumbent will be responsible to understand the products, services and functions of assigned departments, assist with any projects, create a positive work experience, and will report indirectly to those departmental managers.

2. Trainee will be assigned a minimum of two (2) projects as determined by management. Projects will be assigned periodically, and have a start and finish date. Projects may be research papers, efficiency studies, sales promotions, or similar.



DEFENDANT'S EXHIBIT

D-000078

Mortgage Origination Trainee
Job Description – continued

3. Incumbent will be responsible to understand and successfully develop a series of lending skills, to include but are not limited to, Quality Communications, Customer Service, Sales, Computer Application, Underwriting, and Lending. Additionally, there may be required reading assigned. During the first year, Trainee will attend CFT programs (i.e. Understanding Tax Returns). During the second year, Trainee may be required to become a Certified Mortgage Planning Specialist.

4. During the training period, the incumbent will be focused on understanding and developing the following competencies:

    a. Originating residential portfolio and secondary market loans. Meeting with applicants and collecting documentation and required information. Negotiating structure, pricing and terms of loan – along with developing effective client communication skills.

    b. Developing and maintaining a network of real estate brokers, builders, and attorneys for referrals. Provide them with mortgage marketing materials via fax and personal visits on a weekly basis. Actively participate in other marketing programs as needed.

    c. Making loan recommendations for approval as required under bank policy. Closing and/or attending closings for residential loans and mortgages.

    d. Servicing existing banking relationships as Account Officer. Ensuring receipt of updated financial statements, following up on customer needs, providing advice and visits customer sites as needed.

    e. Gain working knowledge of the mortgage lending industry and interest rate environment.

    f. Monitoring existing portfolio and recommending appropriate action on credit quality rating, problem loan recognition and remedial management. Performing assigned collection duties.

5. Trainee must show a pro-active leadership style, contribute to the team dynamic, and represent the Residential Mortgage Department in a positive way.

6. Promotes the best interest of the Bank whenever and wherever possible.

7. Performs all duties in accordance with prescribed regulatory compliance guidelines.

D-000079

Mortgage Origination Trainee
Job Description – continued

## OTHER ACCOUNTABILITIES AND RESPONSIBILITIES:

1. Performs related business development and account management functions as may be required to ensure the ongoing maintenance and profitability of the loan portfolio.
2. Assists Vice President, Mortgage Originations in other matters as may be assigned or requested.
3. Adhere to the Bank's Core Values and Moments of Truth.

The above is a description of the ordinary duties of the position. It should be expected that from time to time other duties both related and unrelated to the above may be assigned, and therefore, required.

## SOX COMPLIANCE:

1. Comply with all SOX policies and procedures.
2. Assist managers with day-to-day compliance with internal and external controls.
3. Report any changes in internal controls over financial reporting to department manager or Executive Officer as they occur; ensure process flows and procedures are kept current with the practices of the department.

## POSITION REQUIREMENTS:

Associate's degree or its equivalent in course work and training specializing in lending, credit or related subjects. Understanding of the lending markets. Excellent communication, negotiation, organization and analytical skills. Able to use a variety of office equipment including a computer terminal.

## QUALIFICATIONS:

To perform this job successfully, an individual must be able to perform each essential duty satisfactorily. The requirements listed above are representative of the knowledge, skill, and/or ability required. Any physical demands or work conditions described here are representative of those that must be met by an employee to successfully perform the essential functions of this job. Reasonable accommodations may be made to enable individuals with disabilities to perform the essential functions.

## SUPERVISORY SCOPE:
None

## LENDING AUTHORITY:
See Loan Policy

*William J. Pruitt*

D-000080

# EXHIBIT N

# WILLIAM G. TRUITT

WILLIAM.G.TRUITT@GMAIL.COM - (845) 337-2896
12 WRIGHT AVENUE
HYDE PARK, NEW YORK 12538

## PERSONAL STATEMENT

I aspire to become a highly educated national leader so that I may strengthen the American economy and make the American people more prosperous. As an exceptionally motivated finance graduate with recognized leadership, I am seeking to obtain a full-time position in Finance/Accounting that will further expand upon my leadership skills and provide me the opportunity to be a member of a dedicated team.

## EDUCATION

Marist College, Poughkeepsie, NY
**Bachelor of Science in Business Administration, Concentration in Finance**
Minors: Economics & Accounting
GPA: 3.42/4.00, *Cum Laude*

## ELECTED OFFICE

I am currently serving a two-year term (2016-2017) in the Dutchess County Legislature as the youngest Legislator in New York State. My aim is to reform spending in Dutchess County in order to cut costs and eliminate deficits that have placed excessive burden upon taxpayers and businesses. In November of 2017, I was re-elected to a second two-year term with 60% of the vote.

## LEADERSHIP POSITIONS AND HONORS

### MEMBERSHIPS/HONORS:
- 2017 Hudson Valley Forty Under 40, Mover and Shaker Award Honoree
- Member of the Public Works and Capital Projects Committee for Dutchess County
- Vice-Chairman of the Public Safety Committee for Dutchess County
- Liaison to Dutchess Community College for the Dutchess County Legislature
- Accepted into National Society of Leadership and Success
  - Appointed as Executive Board Member (2013-2015)
- Member of Toastmasters International
  - Elected Vice President of Membership of Toastmasters International (2014-2015)
- Hudson Valley Scholarship Recipient
- National Engaged Leader Award (National Society of Leadership and Success)
- Stephen and Linda Saland Scholarship Recipient

### LEADERSHIP SEMINARS:
- Alumni of New York's American Legion Boy's State
- Alumni of Hugh O'Brien Youth Leadership at RPI
- Emerging Leaders Program Certificate

### COMMUNITY INVOLVEMENT:
- Appointed Team Leader for Congressman Chris Gibson's re-election in the 19th Congressional District in NY
- Appointed to two-year term as a committee member for Dutchess County Youth Board and Coordinating Council, assisting at-risk youth
- Served as a manager on the 'Jobs for NY' PAC campaign team in 2014

## WORK EXPERIENCE

County Executive Marc Molinaro's Office, Poughkeepsie, NY
Assistant (November 2013 – August 2014)
- Aided the County Executive through public relations and attending events as a representative
- Performed economic research for the budget office
- Gained insight on the inner-workings of County Government

CVS Pharmacy f/k/a Molloy's Pharmacy, Hyde Park, NY



DEFENDANT'S
EXHIBIT
3

Customer Representative/ Cashier (August 2010 – May 2015)
* Supervised staff and trained new employees

Marist College Post Office, Poughkeepsie, NY
Student Worker (March 2015 – May 2017)
* Actively worked on a team of full-time staff and students to ensure timely delivery of mail and packages
* Balanced class time with my work schedule in order to maximize workload efficiency

Dutchess County Legislature, Dutchess County, NY
Legislator (January 2016 – Present)
* Representative of 15,000 residents from the Town of Hyde Park and the Town of Poughkeepsie
* Serve as a lawmaker to improve the fiscal condition of the County, as well as improve critical services for County residents
* Maintain constant connection with constituents through active social media interactions as well as in-person visits and immediate responses to email/phone inquiries

RELEVANT COURSEWORK
Finance Courses:
  o BUS 382 – Legal Foundations of Business
  o BUS 420 – Investment Analysis
  o BUS 421 – Corporate Finance
  o BUS 427 – Investment Practicum – Fixed Income
Accounting Courses:
  o ACCT 330 – Financial Statement Analysis
  o ACCT 203 – Financial Accounting
  o ACCT 204 – Managerial Accounting
Economics Courses:
  o ECON 303 – Intermediate Microeconomic Theory
  o ECON 422 – Financial Markets and Institutions
  o ECON 432 – International Financial Policies and Issues

FOCUS ON IMPROVEMENT
As an ambitious millennial, a motivated student and an accountable elected official, I constantly seek for ways to improve. Whether it be taking on a new role in an organization, seeking out guidance from my colleagues and superiors or investing myself in a project, I dedicate myself to learning and growing.

HUDSON VALLEY PATTERN FOR PROGRESS
* Graduate of the 2016-2017 Pattern Fellows' Program, an innovative leadership program aimed at providing a more intimate knowledge of the region while exploring regional approaches to current local issues
* Worked closely on a team of leaders from across the Hudson Valley in a project related to economic and environmental sustainability

D-000010

# EXHIBIT

# O

Linda King

| | |
|---|---|
| **From:** | Douglas Cahill |
| **Sent:** | Tuesday, May 01, 2018 2:36 PM |
| **To:** | Linda King |
| **Subject:** | FW: [External] [***Possible SPAM: 03.80] Update |

FYI

Sent with Good (www.good.com)

**From:** Amy Raymond
**Sent:** Tuesday, May 01, 2018 1:21:04 PM
**To:** Douglas Cahill; Rick Cantele; Dick Kelly
**Subject:** FW: [External] [***Possible SPAM: 03.80] Update

FYI

**From:** William Truitt [mailto:william.g.truitt@gmail.com]
**Sent:** Tuesday, May 01, 2018 1:02 PM
**To:** Andrea MacArthur; Amy Raymond
**Subject:** [External] [***Possible SPAM: 03.80] Update

Hi Amy and Andrea,

I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele yesterday, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November.

Both Doug and Rick reiterated to me that the main concern is that, if elected, I would not have the necessary time it takes to be a successful originator and grow our brand in New York. I understand the concern, but disagree with this sentiment entirely. I am absolutely certain that I would be able to fully commit myself to the bank and far surpass any goals that would be set for me. When it comes to work ethic and competitive spirit, I have always been and always will be someone who strives to do the best I can in every role I hold (I actually even had it on my mind that I wanted to win "Rookie of the Year" next year for the bank). I was truly excited to begin originating and helping us expand in New York State and adding many new customers to our books.

This past weekend, I thought deeply to myself about the possibility of holding off on running for the Assembly. But at the end of the day, it is a once in a lifetime opportunity that my community is asking me to pursue. If I were to give it up, I would truly regret looking back thinking "what if?". The chance to be the youngest Assemblyman since Teddy Roosevelt is one that I can't give up on.

I cannot thank the both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with. As Rick told me, if I am not successful in November's election, he hopes that I will consider coming back to the bank to possibly fill the same residential role or maybe even another role in commercial lending.

1



DEFENDANT'S
EXHIBIT
23
6/27/19

D-000020

With all my best regards,
Will Truitt

D-000021

## Update

**William Truitt** <william g truitt@gmail com>
To bhidalahe@ata bank t
Hi Amy and Andrea,

I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele yesterday, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November

Both Doug and Rick reiterated to me that the main concern is that if elected I would not have the necessary time it takes to be a successful originator and grow our brand in New York. I understand the concern, but disagree with this sentiment entirely. I am absolutely certain that I would be able to fully commit myself to the bank and far surpass any goals that I would be set for me. When it comes to work ethic and competitive spirit, I have always been and always will be someone who strives to do the best. I can in every role I hold if actually even had it on my mind that I wanted to win "Rookie of the Year" next year for the bank) I was truly excited to begin originating and helping us expand in New York State and adding many new customers to our books

This past weekend, I thought deeply to myself about the possibility of holding off on running for the Assembly. But at the end of the day it is a once in a lifetime opportunity that my community is asking me to pursue. If I were to give it up, I would truly regret looking back thinking "what if?" The chance to be the youngest Assemblyman since Teddy Roosevelt is one that I can't give up on.

I cannot thank me both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with. As Rick told me, if I am not successful in November's election, he hopes that I will consider coming back to the bank to possibly fill the same residential role or maybe even another role in commercial lending.

With all my best regards
William CONFIDENTIAL

# EXHIBIT P

**Douglas Cahill**

| | |
|---|---|
| From: | William Truitt <william.g.truitt@gmail.com> |
| Sent: | Tuesday, May 01, 2018 1:44 PM |
| To: | Douglas Cahill |
| Subject: | [External] Decision |

Hi Doug,

After sitting down and speaking with Rick yesterday, I informed him that I will continue with my bid for the New York State Assembly. We had a nice conversation, and I told him the same thoughts that I had expressed to you during our meeting; I know that if given the chance, I would be able to prove myself that I can be a very successful originator in NYS even if elected to the State Assembly.

He told me that there is a lot of uncertainty that comes along with this for the bank, and I both understand and respect that. He suggested we consider these next 6 months as a "time-out" period, and that he hopes I will consider applying with Salisbury again in November if I am unsuccessful in my election.

I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in NY history is one I cannot give up, nor can I let down my community who has asked me to run.

I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday.

I have a few items that I need to return, including a laptop, a key-fab and a Poughkeepsie parking garage badge. Let me know how you would like me to return those in to you, and I will bring them as soon as possible.

All the Best,
Will Truitt



DEFENDANT'S EXHIBIT

1

D-000103

## Decision

**William Truitt** <william.truitt@gmail.com>

to brucelsu...

Hi Doug

After sitting down and speaking with Rick yesterday I informed him that I will continue with my bid for the New York State Assembly. We had a nice conversation, and I told him the same thoughts that I had expressed to you during our meeting. I know that if given the chance I would be able to prove myself that I can be a very successful originator in NYS even if elected to the State Assembly.

He told me that there is a lot of uncertainty that comes along with this for the bank, and, both understand and respect that. He suggested we consider these next 6 months as a "time out" period and that he hopes I will consider applying with Salisbury again in November if I am unsuccessful in my election.

I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to be the youngest State Assemblyman in NY history is one I cannot give up, nor can I let down my community who has asked me to run.

I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday.

I have a few items that I need to return including a laptop, a key-fob and a Poughkeepsie parking garage badge. Let me know how you would like me to return those in to you, and I will bring them as soon as possible.

All the best,
Will Truitt

CONFIDENTIAL

P000011

# EXHIBIT Q

Message

| | |
|---|---|
| **From:** | Douglas Cahill [DCahill@salisburybank.com] |
| **Sent:** | 3/12/2018 11:59:11 AM |
| **To:** | Shelly Humeston [SHumeston@salisburybank.com] |
| **CC:** | Rick Cantele [RCantele@salisburybank.com] |
| **Subject:** | RE: Reminder |

I plan on bringing the "outside employment report" to the HR/Comp Committee in April, and will include Will.   Should Will's be done separately and earlier?

Doug Cahill, PHR, SHRM-CP
Vice President, Human Resources
**Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868**
**TEL 860.453.3460 • FAX 860.435.5106 • dcahill@salisburybank.com**



**From:** Shelly Humeston
**Sent:** Monday, March 12, 2018 8:19 AM
**To:** Douglas Cahill
**Cc:** Rick Cantele
**Subject:** Reminder

I think Will's employment should be approved by the Board due to his position as Dutchess County Legislator – I believe he is currently serving a two year term.  I thought we discussed this previously but you may disagree and feel it is not necessary.

**Shelly L. Humeston, Senior Vice President and Secretary**
**Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868 • EXT 3432**
**TEL 860.453.3432 • FAX 860.435.0631 • shumeston@salisburybank.com**

# EXHIBIT R

## Douglas Cahill

| | |
|---|---|
| **From:** | Douglas Cahill |
| **Sent:** | Friday, May 18, 2018 5:22 PM |
| **To:** | EntireBank |
| **Subject:** | Staff Updates |

I'm pleased to announce the following:

- Underline James Kelly has accepted the Portfolio Manager position in the Riverside Division, Commercial Lending Department. James started with the Bank in November 2016, and has been working as a Commercial Credit Analyst. James will transition to his new role over the next few weeks.
- Nicole Darling will be changing from her full time Teller position in Sharon to part time Teller, as she pursues a career in nursing.
- Samantha Woodward has accepted a full time Teller position in our Sheffield Branch. Samantha lives in New Marlborough, MA and has 10 years' experience as a Teller/CSR in Albany. Samantha will start on Tuesday, May 29.

Please help me wish Nicole and James the best in their new roles, and welcome Samantha to Salisbury Bank!

I'm sorry to announce the following resignations:

- Lynn Formel has submitted her resignation from her Customer Associate role in Great Barrington. Lynn started with the Bank in July 2010, and has been working as a Teller from Lakeville to Great Barrington. Lynn's last day will be Friday, May 25.
- Will Truitt has decided to pursue his political ambitions and has resigned his Mortgage Originations position in our Riverside Division. His last day was Monday, April 30.
- Monica Linton (Teller in Sharon) is relocating to another State and decided to resign effective Friday, May 11.
- Natosha Meines (Teller in Lakeville) has resigned from her position effective Wednesday, May 23.

Please help me wish Lynn, Will and Monica all the best in their future endeavors!

Doug Cahill, PHR, SHRM-CP
Vice President, Human Resources
Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868
TEL 860.453.3460 • FAX 860.435.5106 • dcahill@salisburybank.com

STOP

D-000118

# EXHIBIT S

**Douglas Cahill**

| | |
|---|---|
| From: | William Truitt |
| Sent: | Monday, April 16, 2018 11:56 AM |
| To: | Douglas Cahill; Amy Raymond |
| Cc: | Andrea MacArthur |
| Subject: | Letter of Notice |
| Attachments: | Will Truitt - Letter.pdf |

Good Morning Doug and Amy!

I have attached to this email a copy of a letter I drafted to each of you regarding my candidacy in this November's elections in New York State. I hope this clears everything up. Please let me know if there is anything else further I can provide.

Hope you both have a nice time on your vacations!

Best Regards,
Will



1

D-000109

Attn: Mr. Douglas Cahill, Ms. Amy Raymond

Doug & Amy,

I write this letter to serve as notice that I am on the path to becoming a candidate for New York State's 106th State Assembly District on Election Day this November. The district consists of twenty municipalities, nine of which are located in Dutchess County and eleven of which are located in Columbia County. (It is important to note that I am not officially on the ballot as a candidate until petitions are filed with the State Board of Elections in July).

It was in mid-March of this year that I was approached by several colleagues and many neighbors who asked that I consider entering as a candidate for the State Assembly. After deep and thoughtful consideration, I made the decision to pursue the nomination last week at the Dutchess County Republican Committee Convention, where I was one of multiple candidates being considered. It was the evening of Tuesday, April 10th where I was officially endorsed, and publicly announced my candidacy immediately following.

The New York State Assembly is a part-time legislature made up of citizen legislators, many of whom hold outside employment in addition to their position as members of this elected body. The State Assembly enters session in January and concludes in June of each year, and is held in Albany at the State Capitol Building. In regards to the scheduling of sessions, I have included with this letter the New York State Legislative Session Calendar for 2018 as an example of the frequency of meetings. Monday sessions begin in the mid-afternoon, while sessions held on other days begin in the late morning.

In my decision making, I considered most prominently what the effects of winning in November would have on my schedule in 2019 and beyond. If becoming a State Assemblyman were to change my ability to dedicate myself and my work to Salisbury Bank and our customers, I absolutely would not have entered this election as a candidate. In speaking with numerous state elected officials and other experienced individuals that are familiar with working in the State Assembly, it was made very clear that I will be able to maintain full-time work and be very successful in my role as a Mortgage Loan Originator with our bank while serving as Assemblyman.

Working in our mortgage department these past two months has solidified one assumption of mine: that my lifelong career will be in finance. Throughout my time thus far at Salisbury Bank & Trust, I have gained a tremendous understanding of the mortgage market as well as a strong idea for what the position of Mortgage Loan Originator entails. Each and every day that I have been in training, whether it be in processing, underwriting, or originating, I have truly enjoyed learning the details and intricacies of the work that our department performs. I know that this role will be one that I will enjoy very much, and it is a role that I will take great pride in succeeding in. I am tremendously excited to begin originating in the near future, and know that there is much room for growth for our bank in the Hudson Valley and New York State as a whole.

In regards to ethics and ensuring that there are no conflicts of interest, I have also attached with this letter a link to New York State's "Standards of Conduct Relating to Outside Employment or Business Activity". As it states: "It is not intended to prohibit citizen-legislators from having outside interests which result in financial gain, but only to prohibit financial gains made at the expense of the public trust". It is very common for assemblymembers and other part-time elected officials to work in other professions full-time, similar to my current circumstances as a County Legislator. Working in the Assembly and for Salisbury Bank definitively provides no conflict of interest in and of itself.

To that note, there is no more important asset to an originator or an elected official than a good, strong reputation, and I will continue to serve our customers and the community with the utmost of integrity and respect.

Currently serving in the Dutchess County Legislature, I dedicate on average between 15-20 hours each week toward attending Legislative Meetings as well as assisting constituents of mine. If elected to the New York State Assembly, I will no longer hold the position of County Legislator, and will thus shift that time toward my duties at Salisbury Bank & Trust along with the Assembly.

At the end of the day, I am an incredibly motivated and ambitious person, and will always work my hardest to be the best at what I do. My drive and my hunger to succeed will certainly help me to thrive in this position as a Mortgage Loan Originator.

All the Best,

Will Truitt




# New York State Legislative Session Calendar
## January — June 2018

The New York State legislative session calendar establishes a schedule for the 2018 legislative session and provides dates important to the legislative process. The session calendar is intended to afford Members flexibility in conducting legislative business in Albany and planning activities within their home districts. The session calendar will foster orderly and timely consideration of legislation. Unforeseen events may require modification of the session calendar.

## JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

## FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 |   |   |   |

## MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

## APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

## MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

## JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| January 3 | 2018 Legislative Session convenes | February 19 | Presidents' Day |
| January 8 | Start of sessions | April 1 | Beginning of new Fiscal Year |
| January 15 | Martin Luther King, Jr. Day | May 28 | Memorial Day |
| January 16 | Final Day for Submission of Executive Budget | | |

 Indicates session day

D-000112



# NYS Legislative Ethics Commission

ABOUT     FORMS & INSTRUCTIONS     ADVICE & GUIDANCE     DOCUMENTS

BYLAWS, RULES, & STATUTES

*Home » Standards of conduct relating to outside employment or business activity*

## Standards of conduct relating to outside employment or business activity

*The Legislative Ethics Commission has approved generic advice on the topic listed below. The guidance offered is general in nature and the Commission's response to individual questions may vary according to the facts of each particular request. You are strongly advised to consult Commission staff or your counsel's office for advice pertaining to your individual situation.*

### GENERIC ADVICE

*The following advice pertaining to outside employment and business activity was approved by the Commission in*

### CONTACT US

Members and Staff can contact our office:

Monday - Friday
8:30am to 5:00pm
Senate Ext. 2142
Assembly Ext. 5218

### FILE A COMPLAINT

Instructions for filing a formal complaint with the Joint Commission on Public Ethics

Go to Instructions

D-000113

*response to a request for an advisory opinion from a member of the legislature. The same advice would apply to employees who are engaged in outside business activity.*

The general rule in Public Officers Law § 74 (2) is intended to guard against substantial conflicts of interest between a member's outside activities and his official duties. It is not intended to prohibit citizen-legislators from having outside interests which result in financial gain, but only to prohibit financial gains made at the expense of the public trust.

If a member's outside interest will be affected by an official act on his part, the test to be applied is whether any impact on his outside interest which results from his sponsorship or voting on state legislation is similar to that realized by other members of the business, profession, occupation or group affected. If so, he may sponsor or vote on such legislation.

### ADDITIONAL CONCERNS

*The Commission has cautioned members and employees who are engaged in outside employment or business activity to be mindful of and adhere to the prohibitions in Public Officers Law § 73.*

Under Public Officers Law § 73 (7) (a), a member or employee of the legislature is prohibited from making an appearance or rendering service before a state agency on certain matters for compensation. The rule of Public Officers Law § 73 (12) also prohibits her from orally communicating, whether for compensation or not, with a state agency, officer or employee with regard to the merits of any matter listed under Public Officers Law § 73 (7) (a). The member or employee is advised to keep her role as a representative of a private corporation separate and distinct from her role as a public official or employee.

A legislator is cautioned not to sponsor or vote on any legislation that would result in a different impact on her company from other affected companies in the same business. Members and employees are also reminded that

D-000114

outside employment and income must be disclosed on your annual statement of financial disclosure.

## EXCEPTIONS

Previous opinions issued by the Legislative Ethics Committee have observed that <u>Public Officers Law § 73 (10)</u> specifically authorizes the appearance before state agencies or in the court of claims by other members of the firm as long as the member of the legislature does not share in the net revenues from the appearance. They also have noted that while <u>Public Officers Law § 73 (12)</u> prohibits oral communication with a state agency, with or without compensation, by a member or employee of the legislature as to the merits of a matter listed in <u>Public Officers Law §73 (7) (a)</u>, it does not prohibit communications in writing which create a formal record of the transaction for consideration as to the merits.

## ADDITIONAL CONCERNS PERTAINING TO EMPLOYEES

<u>Legislative Law §66-a</u> prohibits a legislative employee who is engaged in outside employment or business activity from, directly or indirectly, promoting or opposing the passage of legislation outside the scope of his state legislative employment. Employees are also advised to check with their counsel's office to see whether there are any additional prohibitions in the rules adopted by the Senate or Assembly pertaining to outside employment.

NYS LEGISLATIVE ETHICS COMMISSION

Alfred E. Smith Building, Suite 1431
Albany, New York
Mailing Address
Legislative Office Building
Box 75
Albany, NY 12247
(518) 432-7837 or 7838



New York State Assembly

www.nyassembly.gov



New York State Senate

www.nysenate.gov

D-000115

# EXHIBIT T

Case 7:18-cv-08386-NSR-PED   Document 47-1   Filed 01/28/20   Page 135 of 167

# The New York Times

**NEWS ANALYSIS**

# Why N.Y. Lawmakers Think They Deserve a $50,000 Raise

A special committee has recommended a $50,000 raise by 2021, coupled with a cap on outside income.

 **By** Jesse McKinley

Dec. 9, 2018

*[What you need to know to start the day:* Get New York Today in your inbox.*]*

Considering Albany's rotten reputation, the idea of giving New York's 213 elected lawmakers a raise is a tough sell. On Thursday, they took a giant step toward that goal when a four-person commission recommended that lawmakers get a hefty raise: a $30,500 rise next year, bringing their base pay to $110,000. Two more raises of $10,000 per year will follow in 2020 and 2021.

Albany's elected officials currently make $79,500 a year, before various perks and stipends, a salary that hasn't budged in nearly 20 years, when Gov. George E. Pataki approved a salary increase in exchange for the creation of charter schools in the state. That was in 1998.

If adopted — the commission is set to issue a final report by Monday — the state's lawmakers would be on pace to receive the largest base salaries of any state's elected officials, surpassing California.

In exchange, the lawmakers will see restrictions on legislative stipends and outside income.

Case 7:18-cv-08386-NSR-PED    Document 47-1    Filed 01/28/20    Page 136 of 167

Albany's legislators have been agitating for a raise for years, including in 2016 when an earlier commission (Albany loves a good commission) effectively shot down a pay increase after representatives of Gov. Andrew M. Cuomo balked at backing one.

This time around, lawmakers seem poised to get the six-figure salary they feel they so richly deserve. Here's a primer on the parameters of that battle for more pay.

## Why has the pay raise been such a heavy lift?

The concept of lawmakers giving themselves more money always comes with baggage, but in the case of Albany, it is made even more difficult by two factors, neither of which is completely fair but both of which are potent arguments.

The first is the Capitol's well-established reputation for sleaze: When Mr. Cuomo ran for governor in 2010, he campaigned heavily on a promise to address corruption and bring real ethics reform. Despite that vow, Mr. Cuomo has presided over a series of corruption scandals, including inside the governor's inner circle, as well as more sordid reports of sexual harassment, groping and other ugly behavior.

And while those accused make up a tiny fraction of the State Senate and Assembly, their transgressions have helped tarnish Albany's public reputation and make it very difficult to justify a raise.

The second factor comes down to a single phrase that torments lawmakers in many negotiations: part time. The State Legislature meets only part of the year (January to June) and thus is labeled part time, like a teenage pizza shop employee or a Little League umpire. Lawmakers say the part-time designation is inaccurate considering the regular work they do back in their districts; many also note that they travel back and forth to Albany from hundreds of miles away, in often inclement weather, to do the people's business.

Still, New York lawmakers currently make more than their counterparts in every state but California and Pennsylvania.

## So what made the difference this time?

Case 7:18-cv-08386-NSR-PED    Document 47-1    Filed 01/28/20    Page 137 of 167

For all the objections from editorial boards, there seemed to be real consensus in many quarters that $79,500 was too low, particularly for the dozens of legislators who hail from New York City and its expensive suburbs.

Faced with the same economic realities, the New York City Council voted itself a whopping $36,000 raise in 2016, bringing its base pay to $148,500. (Not surprisingly several state lawmakers have subsequently decided to abandon Albany to become City Council members.)

The City Council only got its raise after embracing restrictions on outside income and an end to extra pay for committee work, a pay-padding tradition known as "lulus," shorthand for payment in lieu of salary.

The compensation commission closely followed the Council model: It voted to curtail lawmakers' outside income to 15 percent of their salary, and it moved to eliminate the lulus, which range from $9,000 to $34,000 a year. Those stipends have historically been used by the ruling party to reward its members, often for very little effort. Many committee meetings in Albany are ill-attended affairs, with most members missing, and agendas that involve little more than rubber-stamping bills headed for the legislative chambers.

## What do you mean by outside income? Like lawn work?

No. Many of the state's lawmakers hold second jobs, ranging from predictable professions like lawyering to careers offering financial advice and funeral services. (Death and taxes, indeed.)

Some lawmakers more than double their current legislative salaries through outside work; if outside income were to be capped at 15 percent, the pay-raise changes could actually cost some legislators money.

Outside jobs have also led to ethical and legal problems, including accusations of conflicts of interest and other criminal activity, most famously in the case of the former Assembly speaker, Sheldon Silver. In 2015, Mr. Silver was arrested and charged with federal corruption charges related to nearly $4 million in payoffs. The schemes involved Mr. Silver arranging grants and taking official actions in exchange for fees to Mr. Silver through two law firms he was associated with. He was convicted of the charges for a second time in May, and is awaiting sentencing.

Case 7:18-cv-08386-NSR-PED   Document 47-1   Filed 01/28/20   Page 138 of 167

## How did the commission decide?

The four members of the commission are all numbers guys: the New York City comptroller, Scott M. Stringer; the state comptroller, Thomas DiNapoli; and two former comptrollers, William Thompson Jr. and H. Carl McCall. They have the power, thanks to a law passed as part of last year's budget, to authorize a raise, with no additional legislative action. Bans on income or other measures, however, may require additional bills to be passed.

The panel also recommended a salary increase for the governor, bringing his pay to $250,000 by 2021; that would make Mr. Cuomo the highest-paid governor in the country. That recommendation is not binding and would need to be approved by a joint resolution of the Senate and Assembly.

After emerging from a closed-door executive session meeting on Thursday afternoon, the commissioners announced the framework of their recommendations. Mr. Thompson said the two decades of frozen salaries was unfair and "not the right thing."

Even so, Mr. McCall recognized that the public would have to be convinced that the Legislature truly deserved a pay increase. "There's no question that, over time, the Legislature has not always lived up to its full opportunities to convince the public that it is a hard-working, conscientious, honest organization," he said.

## How did they come up with the number?

It had been a long time since a raise, and groups like the New York Public Interest Research Group had estimated that simply giving the lawmakers an increase based on the Consumer Price Index would increase legislative salaries to a little more than $122,000. The actual recommendation of $130,000, by 2021, would bring lawmakers up to par with the current mean salary of economists in the state, according to the State Department of Labor.

And while that might seem like a lot to pay for part-time work — though lawmakers say that is a million-dollar misnomer — even those devoted to better government say it is time for a raise.

"No one should go more than 20 years without a pay increase," said Blair Horner, the executive director of Nypirg, before the recommendation was announced.

Case 7:18-cv-08386-NSR-PED   Document 47-1   Filed 01/28/20   Page 139 of 167

Mr. Horner noted that the state still needed better ethics laws, urging the commission to take up a "comprehensive package of corruption-busting measures," including increased oversight of state contracts, hiring a new ethics watchdog, lowering campaign contribution limits and eliminating the so-called L.L.C. loophole, which allows limited liability companies to pour almost unlimited funds into campaigns.

"If there's going to be a change in compensation," Mr. Horner said, "it's got to be based on cleaning out the stables in Albany."

# EXHIBIT U

CONFIDENTIAL

# Memo

**To:**  HR/Compensation Committee

**From:**  Doug Cahill, Director of Human Resources

**Date:**  May 31, 2013

**Re:**  Outside Employment Survey

---

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by our CEO and Director of HR, and we find no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;

2. Will it involve the possibility of adverse publicity to the Corporation;

3. Is it with a competitor, supplier or customer;

4. Does it imply sponsorship by the Corporation; and

5. Does it involve serving as a director, officer, manager or consultant.

| 2012-13 Outside Employment & Volunteerism Report | | | | |
|---|---|---|---|---|
| **Employee** | **Officer Y/N** | **Outside Employ Y/N** | **Employer Name** | **Nature of Duties** |
| Farnum, Georgann | Y | Y | Egremont Election Polls | Pollster |
| Golden, Al | Y | Y | Rick's Wine & Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning, LLC | Pilot |

1

D-000190

**CONFIDENTIAL**

# Memo

**To:**    HR/Compensation Committee

**From:**  Doug Cahill, Vice President, Human Resources

**Date:**  June 27, 2014

**Re:**    Outside Employment Survey

---

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by our CEO and Director of HR, and we find no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1.  Will it interfere with work assignments or performance;

2.  Will it involve the possibility of adverse publicity to the Corporation;

3.  Is it with a competitor, supplier or customer;

4.  Does it imply sponsorship by the Corporation; and

5.  Does it involve serving as a director, officer, manager or consultant.

| 2013-14 Outside Employment & Volunteerism Report | | | | |
|---|---|---|---|---|
| **Employee** | **Officer Y/N** | **Outside Employ Y/N** | **Employer Name** | **Nature of Duties** |
| Farnum, Georgann | Y | Y | Egremont Election Polls | Pollster |
| Golden, Al | Y | Y | Rick's Wine & Spirits | Clerk |

1

D-000191

**CONFIDENTIAL**

# Memo

**To:**   HR/Compensation Committee

**From:**   Doug Cahill, Vice President, Human Resources

**Date:**   June 26, 2015

**Re:**   Outside Employment Survey

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by our CEO and Vice President of HR, and we find no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;

2. Will it involve the possibility of adverse publicity to the Corporation;

3. Is it with a competitor, supplier or customer;

4. Does it imply sponsorship by the Corporation; and

5. Does it involve serving as a director, officer, manager or consultant.

| 2014-15 Outside Employment Report | | | | |
|---|---|---|---|---|
| Employee | Officer Y/N | Outside Employ Y/N | Employer Name | Nature of Duties |
| Cullip, Jason | Y | Y | DevilTechs, LLC | IT Consult |
| Cullip, Jason | Y | Y | PeachMac Digital | *IT Consult |
| Golden, Al | Y | Y | Rick's Wine and Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning | Pilot |

*Ended relationship 10/14

1

D-000192

**CONFIDENTIAL**

<u>MEMORANDUM</u>

TO:          HR/Compensation Committee

FROM:     Doug Cahill, Vice President, Human Resources

DATE:     June 24, 2016

RE:          Outside Employment Survey

---

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by our CEO and Vice President of HR, and we find no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1.  Will it interfere with work assignments or performance;

2.  Will it involve the possibility of adverse publicity to the Corporation;

3.  Is it with a competitor, supplier or customer;

4.  Does it imply sponsorship by the Corporation; and

5.  Does it involve serving as a director, officer, manager or consultant.

| 2015-16 Outside Employment Report | | | | |
|---|---|---|---|---|
| Employee | Officer Y/N | Outside Employ Y/N | Employer Name | Nature of Duties |
| Bowerman, Maurice | Y | Y | Bowerman Financial | Insurance Brokerage |
| Downey, Kim | Y | Y | Eckert Fine Art | Bookkeeper |
| Golden, Al | Y | Y | Rick's Wine and Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning | Pilot |

1

# CONFIDENTIAL

## MEMORANDUM

TO:        HR/Compensation Committee

FROM:      Doug Cahill, Vice President, Human Resources

DATE:      April 28, 2017

RE:        Outside Employment Survey

---

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank.  This report has been reviewed by our CEO and Vice President of HR, and we find no conflicts of interest.  It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1.  Will it interfere with work assignments or performance;

2.  Will it involve the possibility of adverse publicity to the Corporation;

3.  Is it with a competitor, supplier or customer;

4.  Does it imply sponsorship by the Corporation; and

5.  Does it involve serving as a director, officer, manager or consultant.

| 2016-17 Outside Employment Report | | | | |
|---|---|---|---|---|
| Employee | Officer Y/N | Outside Employ Y/N | Employer Name | Nature of Duties |
| Bowerman, Maurice | Y | Y | Bowerman Financial | Insurance Brokerage |
| Cullip, Jason | Y | Y | DevilTechs, LLC | IT Consultant |
| Downey, Kim | Y | Y | Eckert Fine Art | Bookkeeper |
| Golden, Al | Y | Y | Rick's Wine and Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning | Pilot |

1

# CONFIDENTIAL

## MEMORANDUM

TO:      HR/Compensation Committee

FROM:      Doug Cahill, Vice President, Human Resources

DATE:      May 25, 2018

RE:      Outside Employment Survey

_____

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by their Executive Manager, our CEO, and VP, Human Resources, and we see no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;
2. Will it involve the possibility of adverse publicity to the Corporation;
3. Is it with a competitor, supplier or customer;
4. Does it imply sponsorship by the Corporation; and
5. Does it involve serving as a director, officer, manager or consultant.

| 2017-18 Outside Employment Report | | | | |
|---|---|---|---|---|
| Employee | Officer Y/N | Outside Employ Y/N | Employer Name | Nature of Duties |
| Bowerman, Maurice | Y | Y | Bowerman Financial | Insurance Brokerage |
| Cullip, Jason | Y | Y | DevilTechs, LLC | IT Consultant |
| Downey, Kim | Y | Y | Eckert Fine Art | Bookkeeper |
| Golden, Al | Y | Y | Rick's Wine & Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning | Pilot |

1

| Assignee | Did you engage in community volunteerism | Please enter the organization name. | Please enter the start date. | Please enter the estimated number of hours you volunteered for this organization during the | Please describe the nature of the duties you performed: |
|---|---|---|---|---|---|
| Covino, Taryn | Yes | Red Cross | 3/24/2018 | 1 | Donate blood |
| Jordan, Michael | Yes | Millerton Leons Club | 1/1/2019 | 2 | Meet and work with the local community. |
| Chiles, Brittany | Yes | Habitat for Humanity | 7/23/2018 | 3 | Helped families with low income complete various projects / renovations in and around the home. |
| Burchell, Jeff | Yes | American Heart Association | 1/1/2018 | 5 | Help raise money and awareness |
| Lynde, Marykim | Yes | St. Peter's Church | 9/9/2018 | 6 | Assist in various Parish events |
| Willburn, David | Yes | Falls Village Housing Trust | 12/6/2018 | 6 | Member of Board of Directors. Monthly meetings, plus follow up assignments as required. |
| Curtis, Stacey | Yes | Northwest CT Chamber of Commerce | 1/1/2018 | 7 | |
| Medina, Noemi | Yes | North East Community Center and Women Support Services | | 7 | |
| LaPlante, Michele | Yes | Riga Meadows | 9/15/2018 | 8 | Fence Judging. Volunteered for the Murphy Open hosted by the Tristate Chamber of Commerce. Helped with registering players, helped with |
| Martin, Bianca | Yes | Tristate Chamber of Commerce | 5/21/2018 | 8 | the raffle portion, serving and making sure guests enjoyed their time. |
| Cantella, Richard | Yes | St Marian of Tours Parish | | 10 | Member of Finance Committee |
| Casillo, Anthony | Yes | Habitat for Humanity of Greater newburgh | 1/1/2018 | 10 | Golf Committee - Fundraising for annual golf event |
| Clinton, Todd | Yes | Vassar College Haiti Project | | 10 | Auction Event and Takedown the next day |
| Haifa, Eric | Yes | Rotary | 1/2/2018 | 10 | Attend weekly meetings |
| Lutz, Jessica | Yes | UME Basketball | 1/4/2018 | 10 | Helped coach the little kids instruction on Friday afternoons. |
| Mallett, Lenore | Yes | Salisbury Cental School | 8/1/2018 | 10 | January, February, December. |
| Beckwith, Amanda | Yes | Relay for Life | 6/22/2018 | 12 | Fundraising for Relay for Life |
| Greco, Peter | Yes | Knights of Columbus | 1/1/2018 | 12 | |
| Hogan, Michael | Yes | Alzheimers Association | 1/1/2018 | 15 | Assistance with various events and fundraisers leading up to Longest day involvement. Includes sharing the Alzheimer's vision and working to raise funds for the foundation. Also includes a full volunteerism day for the longest Day walk to end Alzheimer's. |
| Kerrick-Kronz, Abbigale | Yes | food share | 6/1/2018 | 15 | distributing food to those in need in the community of rocky Hill while assisting the local churches |
| Dagnell, Terrie | Yes | Hope Church | 12/7/2018 | 16 | Helped out with a program called Bethlehem Nights which is a live nativity open to the public. |
| Devoti, Cathy | Yes | Our Lady of the Valley Catholic church | 1/1/2018 | 17 | I am a CCD teacher at my church on Sundays. The children are 3rd to 4th grade. |
| Carringer, Haylee | Yes | Sharon Historical Society | 6/1/2019 | 20 | Volunteered with the Sharon Historical Society to prepare for the Great Attic Classic. |
| Cook, Dayna | Yes | PTA | 1/1/2018 | 20 | |
| Cook, Jeff | Yes | Town Of Amenia | 4/14/2018 | 20 | Coach T-Ball, practices during the week, game on Saturday mornings passing out candy to kids selling raffle tickets |
| Hassler, Miranda | Yes | Winsted Fire Department | | 20 | |
| Rubino, Todd | Yes | Rondout Youth Soccer Program, Rondout Valley Food Pantry | 9/4/2018 | 20 | handing out flyers |
| Serino, Cristina | Yes | Girl Scouts of the hudson Valley | 1/1/2008 | 20 | |
| Woods, Darliyn | Yes | TOWN OF CORNWALL, CT | 1/1/2018 | 20 | Board of Finance Alternate |
| Buffalo, Glynda | Yes | For The Millerton's lion club | 3/16/2006 | 24 | Putting Flag's out for all Flag Holidays. |
| Garevoy, Amanda | Yes | Community Health Programs | 1/1/2018 | 29 | I serve on the Community Health Programs Childrens Attic committee. CHP provides health services to low to low to moderate families in the tri state area. The committee serves to support a sale that raises funds for CHP and local families and allows |
| Anderson, Jennifer | Yes | Board of Ed - Sharon | 11/1/2017 | 30 | families to sell children's and maternity clothing. The sale also is open to the public where they can obtain affordable clothing. |
| Davies, John | Yes | Community Foundation of Orange and Sullivan | 1/1/2018 | 30 | Board Member |
| Essex, Steven | Yes | PLAN of CT | 6/30/2012 | 30 | Board of Directors, Investment Committee Chair - completed second three year term in June 2018. Voted and accepted |
| King, Alyssa | Yes | Falls Village Volunteer Fire Department Ladies Auxiliary | 5/3/2004 | 30 | position on the Advisory Committee in June 2018 for ongoing involvement. |
| Wilson, Heidi | Yes | The Canaan Child Care Center | 1/1/2018 | 30 | Supporting the fire department and doing fundraisers. |
| Wiseman, Robert | Yes | Town of Kinderhook, NY | 3/1/2019 | 30 | Am a member of the BAR (Board of Assessment Review) for the town of Kinderhook. We review the tax assessments and listen to residents who think their assessment is too high. We decide if the resident's tax assessment should be adjusted. |
| Humerston, Shelly | Yes | Everybody Wins | 1/4/2018 | 32 | Reading program at Sharon Center School - 1 hour per week for 8 months of the year. Have been Involved in this program for 20 years. |
| Conklin, Colleen | Yes | Sharon Center School - School Savings Program | 10/10/2027 | 36 | |
| Farnum, Georgann | Yes | Egremont Volunteer Fire Department | 1/1/2018 | 40 | Volunteer to provide fire & ems protection as St Ct Certified FRI and EMT |
| Golden, Alton | Yes | Sharon Fire & EMS | 8/13/1997 | 40 | President ...Currently serving on the Board of Directors as |

CONFIDENTIAL

D-001111

| Name | Response | Organization | Date | No. | Description |
|---|---|---|---|---|---|
| Harnish, Denise | Yes | Fairview Hospital | 6/1/2016 | 40 | I am on the Fairview Hospital Gala committee which raises money for various hospital equipment. I run the Ad Journal committee which reaches out to local businesses to participate in placing an ad or contribution to the hospital. |
| Moore, Stephen | Yes | Noble Horizons | 1/1/2018 | 40 | activities, recreation and auxiliary functions |
| Trott, John | Yes | InFlight, Inc | 11/6/2017 | 40 | Member of BOD, BOD Treasurer. Sew quilts for charitable causes - hospitals, women's shelters, cancer clinics, veterans... Sew and fill Christmas stockings for active military members overseas |
| Wilson, Ellen | Yes | Bantam Quilter | 9/1/2003 | 40 | |
| Andrizone, Lorraine | Yes | St Columba Church | 9/12/2018 | 42 | I teach religious education. I also am a greeter at the 9 o'clock mass |
| Higgins, Adam | Yes | Housatonic Youth Serivce Bureau | 1/1/2018 | 42 | Board Treasurer, monthly meetings, fundraising events |
| Bowerman, Maurice | Yes | Northern Columbia County Pop Warner Fooball Association | 1/1/2018 | 50 | Board Member / Fund Raising and community awareness. |
| Brocco, Bonnie | Yes | Arts Mid Hudson, American Heart Associations, DC Regional Ch | 1/1/2018 | 50 | |
| Heacox, Lynn | Yes | Sharon Day Care | 6/15/2003 | 50 | Working on budget, events and race |
| Peterson, Jennifer | Yes | Sharon Congregation Church | 1/4/2019 | 60 | Co Chair on the Christian Ed Board |
| Wright, David | Yes | Red Hook Rotary Club | 1/1/2018 | 72 | Club member -- weekly meetings. I organize the Red Hook Rotary Apple Blossom Day community day and I assist on multiple other committees and participate in other community services on Saturdays and evenings. |
| Downey, Kimberly | Yes | Salisbury Youth Hockey | 5/1/2015 | 75 | Board Treasurer |
| Brill, Charles | Yes | Slate Chemical Firehouse & Auxiliary | 11/2/2005 | 80 | Help with community activities and fundraising events. Attend training and meetings. Serve as treasurer for Auxiliary portion Annual Food Drive at Christmas for local Food Pantry and Pet Shelter. Board of Director, Grant Committee, Nominating Committee, & Chair of their Phon-A-Thon. |
| Gilligan, Aidan | Yes | The Eagle Fund (Southern Berkshire Regional School District E | 1/1/2016 | 80 | |
| King, Linda | Yes | Canaan Child Care Center | 1/1/1994 | 80 | President of Canaan Child Care Center. Attend Monthly Board and School Readiness meetings as well as sign checks on a weekly basis. |
| Edlstone, Amanda | Yes | Housatonic Child Care Center | 9/15/2009 | 80 | I am the Vice President of the Board of Directors. I attend monthly Board meetings, assist with updating Policies, arrange and |
| Moir, Alida | Yes | Rhinebeck Soccer League, Northern Dutchess Daycare | 1/1/2015 | 80 | volunteer for fundraisers. |
| Palmer, Diane | Yes | Ephraim Kirby Chapter #75 Order of the Eastern Star | 1/1/2017 | 80 | I am a member of this chapter of Eastern Star in Litchfield and have been for the last two years. I forgot to report this last year. I also sit on the scholarship committee for the chapter to assist in determining what applicants will receive our scholarship awards. The chapter meets twice a month for regular meetings as well as additional times for special events. |
| Stapf, Jean | Yes | Pine Plains School District | 8/23/2017 | 80 | School Board Member |
| Messina, Samantha | Yes | ARC Cheer | 9/8/2018 | 96 | I am the head cheerleading coach I organize the dances, and I train the girls |
| Bauer, Kathleen | Yes | East Fishkill Rotary Club | 6/7/1990 | 100 | Past President. Club Secretary. Record keeping and fundraising activities. John Jay High School Rotarian Liaison to Interact Club. |
| Burke, Spring | Yes | Southern Berkshire Chamber of Commerce | 1/1/2016 | 100 | A Board Member and the Treasurer. Chairperson of the Finance Committee and go to various Obligations for the Chamber. |
| Haggerty, Jessica | Yes | Lions Club (Amenia) | 1/1/2017 | 100 | Lion of Cheer |
| Kelly, Dick | Yes | Wyantenuck Country Club | 1/1/2018 | 100 | President of Board of Governors |
| Long, Jamie | Yes | High O'Brien Youth Leadership Organization (HOBY) | 1/2/2018 | 100 | - Recruit High School students for the 2018 HOBY state seminar - Facilitate a group of 15 students as they are introduced to HOBY, and serve as a mentor as they are given the tools to serve their communities through leadership - Volunteer alongside othe |
| Myers, Ronald | Yes | Ulster County Boys and Girls Club | 1/1/2018 | 100 | Member of the Board of Directors for the Saugerties Unit. |
| Stanyon, Daniel | Yes | Berkshire County Estate Planning Council | 1/1/2016 | 100 | Secretary of the Board with title Clerk. Attending meetings, draft minutes, review & plan budget, consult on creating the program, maintain records, main contact for event rsvp. |
| Fisch, Randi | Yes | Fishkill Rotary | 1/3/2018 | 104 | Organized fund raisers to give back to the community - board member |
| Binchak, Julianna | Yes | New England Financial Marketing Association (NEFMA) | 1/1/2018 | 104 | - member of the programming committee (coordinating events, speakers, topics of relevance) |
| Cahill, Doug | Yes | Sharon Board of Education | 1/1/2019 | 120 | Board Member (Chair) |
| Gregory, Julie | Yes | Center of Compassion | 1/1/2014 | 120 | |
| Sorlie, John | Yes | New Paltz Regional Chamber of Commerce, Nubbian Directions and the AKA Sorority | 1/1/2018 | 130 | |
| MacArthur, Andrea | Yes | St. John's Lutheran Church | 1/1/2012 | 140 | |
| Storts, Lynne | Yes | Jehovah's Witnesses | 1/4/2000 | 160 | Conducted/attended bible studies. Cleared the Kingdom Hall/Wrecked flower beds. Assisted people by driving them to Dr. appointments, the pharmacy/grocery store/etc. |
| Callinan, Jerry | Yes | Canaan Fire Company | | 170 | Five Police LT, Junior Advisor, Exterior Fire Fighter. |

CONFIDENTIAL

D-001112

| Name | | Organization | Date | Hours / Description |
|---|---|---|---|---|
| Foley, Robin | Yes | North Canaan Fire Company | 12/6/2012 | 175 Treasurer - collect income, pay bills, provide starting cash for fundraising events, board meetings, monthly meetings, processed state paperwork, renew licenses, annual budget, work fundraising events, special meetings. Exterior Fire Fighter (Assist with all fire response requirements that do not involve direct contact with fire / smoke or hazmat materials) Fire Police - Direct Traffic as needed for events / accidents Fall Festival Committee Chair Person - Communications Committee Member Computer Committee Member |
| Culligy, Jason | Yes | Warren Volunteer Fire Company | 1/1/2018 | 180 |
| Lorz, Darrel | Yes | Canaan Fire Company | 9/1/1999 | 220 Fire Fighter / Audit Committee member |
| Diamond, Ryan | Yes | Housatonic Valley Regional High School Varsity Hockey Coaching | 11/1/2017 | 300 coach during the 2017-2018 Heavy Hockey Season. Approximately 20 hours per week between Thanksgiving and March 15th. |
| Sprague, Erik | Yes | Watchtower Educational Center | 4/15/2017 | 600 Logistical/driving students of a missionary school to and from the airport and other locations. |
| Decker, Tara | Yes | Northwest Triad | 3/1/2011 | |
| Peters, Hanah | Yes | little guild | | |

**CONFIDENTIAL**

D-001113

# EXHIBIT V

Information regarding customer accounts and dealings with Salisbury Bank must be kept strictly confidential at all times and information shared within the bank should be limited only to those persons whose duties require and permit them access. Confidential information should never be discussed outside the normal course of business. Employees must have a Business Reason for inquiring or adjusting any customer account, to include other employee accounts. Activity is monitored on a regular basis. Confidentiality violations will not be tolerated and will be subject to discipline, up to and including discharge.

For further information, please see our Customer Records Confidentiality Policy under E-Forms/Policies/Customer Records Confidentiality Policy.

## BANK BRIBERY ACT

The Bank Bribery Amendment Act of 1985 prohibits any representative (employee, officer, trustee, director, agent, or attorney) of a bank from soliciting for themselves or for a third party (other than for Salisbury Bank itself) anything of value from anyone in return for any business, service or confidential information of the bank. It also prohibits the representative from accepting anything of value (other than bona fide salary, wages, and fees) from anyone in connection with the business of Salisbury Bank, either before or after a transaction is discussed or consummated. The policy further provides that should a representative receive something of excess value or is approached by someone offering a service or benefit of excess value, that the item(s) will be returned or reduced and the incident reported to the President. In view of the foregoing, it is our policy that no Salisbury Bank representative shall accept anything of value from a customer or vendor other than:

- Gifts of a reasonable value based on a family or personal relationship where that relationship is the obvious motivating factor for the gift.
- Meals, refreshments, entertainment, accommodations, or travel arrangements, all of a reasonable value, provided they are in the course of a meeting or occasion, the purpose of which is to hold bona fide business discussions or to foster better business relations, and provided that the expense would be paid for by Salisbury Bank if not paid for by another party.
- Advertising or promotional material of reasonable value, such as pens, pencils, note pads, key chains, calendars and similar items.
- Gifts with a value of less than $50 related to commonly recognized events, such as promotion, religious holiday, wedding, or retirement.
- Discounts or rebates on merchandise or services that do not exceed those available to other customers of the merchant.
- Awards for recognition of service or accomplishment from civic, charitable, educational or religious organizations.
- Other circumstances approved in writing on a case-by-case basis where something of value is accepted in connection with Salisbury Bank's business. For this exception to apply, the approval must be based on a full written disclosure of all the relevant facts and be consistent with this policy.

## OUTSIDE ACTIVITIES / EMPLOYMENT

Salisbury Bank supports our local community in many ways and encourages employees to participate in community activities. If you wish to accept a position, with or without compensation, with a governmental agency, a for-profit or a not-for-profit organization, either as a stockholder, director, officer, sole proprietor, partner, or employee, you need to first notify the Human Resource Administrator or the President. Any potential problems may be discussed with you and the request will be reviewed to see if any conflict of interest would exist. If a conflict exists, this outside appointment or employment will not be allowed. Please remember that your first professional responsibility is to the position you have accepted here at Salisbury Bank. Salisbury Bank does not object to your accepting outside work as long as it does not (a) interfere with your regular work hours (or necessary overtime); (b) affect the efficient performance of your regular duties; (c) cause you to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest.

## PERSONAL AND FINANCIAL MATTERS

Salisbury Bank employees are expected to conduct their financial affairs in a prudent manner. The personal indebtedness of an employee must be maintained within reasonable bounds of the employee's ability to pay. All obligations should be repaid in strict accordance to the contractual terms of the debt. Late payments are not acceptable, and unresolved or multiple past due payments for a loan with Salisbury Bank my result in disciplinary action, up to and including termination of employment.

37

D-000159

Salisbury Bank and Trust Company

**Employee Handbook Acknowledgement Form:**

The Employee Handbook describes important information about Salisbury Bank and Trust Company, and I understand that I should consult with the Human Resources Department regarding any questions not answered in this manual. I also understand that this manual is the property of Salisbury Bank and Trust, and can be located in the Bank's public drive, under P:\Global-RO\Employee Handbooks

I understand that this Employee Handbook outlines Salisbury Bank and Trust's employment policies and procedures. I acknowledge that this manual does not create contractual obligations, but is merely intended as a guideline of what I can expect as an employee, and what Salisbury Bank and Trust expects of me.

Furthermore, I understand that this manual is not a contract of employment. I acknowledge that I have received the manual or have access to it on Salisbury Bank's Intranet, and it is my responsibility to refer to the on-line copy as the most updated version, and that all preceding manuals are void. As a condition of my employment, it is my responsibility to read, maintain awareness of current policies and procedures, and comply with the policies contained in this manual and any revisions made to it or any of the Company policies.

I acknowledge that my employment with the company is terminable "at-will," which I understand to mean that I, or the Company, may terminate the employment relationship at any time, for any legal reason, with or without cause, with or without notice.

_William G. Truitt_ (signature)
Employee's Signature

_2/26/18_
Date

_William G. Truitt_
Employee's Name
(Type or Print)

_Linda Chung_
Witness' Name
(Type or Print)

_2-26-2018_
Date

Revised 01/2016

50


DEFENDANT'S
EXHIBIT
13
taobler
10/27/19

D-000101

# EXHIBIT W

# Code of Ethics and Conflicts of Interest Policy



SALISBURY BANK

enriching.

## SALISBURY BANCORP, INC.,
## SALISBURY BANK AND TRUST COMPANY, AND
## SUBSIDIARIES

Board Adopted:
Last Revision:
Board Approved:
Individual Responsible:

August 26, 2005
November 27, 2017
November 27, 2017
Richard J. Cantele, Jr.
President and CEO


DEFENDANT'S
EXHIBIT
14
6/27/19

D-000173

Salisbury Bancorp, Inc. (the "Holding Company"), Salisbury Bank and Trust Company (the "Bank"), and subsidiaries of the Bank (herein referred to collectively as the "Corporation") are institutions of public trust that are dependent upon public confidence. Inherent in that trust is the Corporation's responsibility not only to preserve and safeguard public confidence but also to strengthen and renew such confidence. The reputation and soundness of the Corporation is dependent on its commitment to avoid conflicts of interest. It is imperative that each member of the Board of Directors, Officer and Employee of the Corporation act with integrity at all times, conduct themselves in a professional manner, and comply with all rules, regulations and policies of the Corporation. In addition, all directors, officers and employees have an obligation to the Corporation to ensure that their outside activities, interests and personal affairs are not in conflict with the Corporation's interests or reflect negatively upon the Corporation's reputation in the community. It is to this end that this Code of Ethics and Conflicts of Interest Policy ("Policy") was adopted. This Policy also serves as the Holding Company's "Code of Ethics" for purposes of Section 406 of the Sarbanes-Oxley Act of 2002 and the regulations of the Securities and Exchange Commission promulgated pursuant thereto.

## STATEMENT OF BOARD POLICY

No one associated with the Corporation, whether as a director, officer or employee, should use their position, directly or indirectly, for private gain, to advance personal interests or to obtain favors or benefits for themselves, their families or related interests, or any other entity. Each such person must manage their personal and business affairs so as to avoid situations that might lead to conflict of interest or the appearance of a conflict of interest involving the Corporation. Compliance with this Policy is required of all such persons.

The purpose of this Policy is to ensure that business dealings and transactions between the Corporation and its directors, officers, employees, and principal shareholders are conducted in an arms-length fashion.

The nature of the banking industry requires that each director, officer and employee of the Corporation meet high standards of integrity and ethical conduct. These rules are based upon laws and fiduciary duties which are derived from common sense principles. However, they are extremely important and should be reviewed regularly. Please remember that the following should be considered to be guidelines and as such, cannot address every potential issue. If you should have a question concerning a specific proposed transaction, discuss it first with the Chief Executive Officer or a member of Executive Management.

## CONFLICTS OF INTEREST

All directors, officers, and employees ("insiders") are responsible for dealing fairly with the Corporation in business transactions and ensuring that their personal interests do not bias the Corporation's decisions. Insiders must ensure that their own business and personal relationships with the Corporation, customers, suppliers, and government officials and agencies, as well as their relationships with fellow insiders, are always at arms-length. Insiders must also ensure that they do not take any business opportunity that properly belongs to the Corporation. Even the appearance of abuse in insider dealings can adversely affect both the Corporation and the individual. The law does not prohibit an insider from doing business with the Corporation; in fact, many insiders are very important customers. Insiders must ensure, however, that neither they nor others abuse their position to benefit personally at the Corporation's expense and they should take appropriate precautions in structuring their business and personal ties to the Corporation to avoid even the appearance of a conflict of interest.

2

D-000174

Insiders must not put their personal or business interests or those of others above the interests of the Corporation. Thus, insiders must be fair in their dealings with the Corporation, and personal interests must not be allowed to bias decisions. Insiders must not take advantage of potential "corporate opportunities," such as business enterprises, properties, or new products that they learn of as a result of their position or that are in the Corporation's "line of business."

Insiders must disclose fully to the Board any personal interest they may have in matters affecting the Corporation and ensure that any transactions involving these interests are determined by disinterested Directors to be fair to the Corporation.

PERSONAL CONDUCT

Each director, officer, and employee is expected to maintain the highest ethical standards in their personal and professional dealings. The Corporation will not tolerate any illegal discrimination or harassment of any kind.

Directors, officers and employees of the Corporation are expected to accept certain responsibilities, adhere to acceptable business principles in matters of personal conduct, and exhibit a high degree of personal integrity at all times. This not only involves respect for the rights of others, but also demands that with respect to business and personal matters, such persons refrain from any behavior that might be harmful to the Corporation, or that might be viewed unfavorably by current or potential customers or with respect to the public.

PERSONAL FINANCES

Each director, officer, and employee should maintain his or her personal finances in a prudent, businesslike manner. Checking accounts for directors, officers, employees, and principal shareholders are to be handled in a professional manner. Deposits may not bear a greater rate of interest than that paid to the general public. In accordance with 12 CFR 215.4(e) of Regulation O, the Bank may not pay an overdraft of a director of the Bank, or of an executive officer of the Bank or of an affiliate of the Bank, on an account at the Bank, unless either:

- The payment of funds is made in accordance with a written, preauthorized, interest-bearing extension of credit plan that specifies a method of repayment, or a written, preauthorized transfer of funds from another account of the account holder at the Bank.

- The payment is of an inadvertent overdraft on an account in an aggregate amount of $1,000 or less, provided the account is not overdrawn for more than five business days, and the Bank charges the director or executive officer the same fee charged to any other customer of the Bank in similar circumstances.

The following activities are prohibited:

1. Borrowing from other staff members;

2. Borrowing from the Corporation's customers other than those that are lending institutions;

3. Borrowing from the Holding Company or borrowing at preferential rates from the Bank because of your position. Remember that any Bank loans to directors,

D-000175

executive officers, and principal shareholders must be on the same terms and conditions as those offered to the general public; and

4. Borrowing from the Corporation or any other institution, on terms or conditions (or through a process) which would violate any applicable law, rule or regulation, or which would be contrary to the policies of the Corporation.

The Policy of the Corporation and banking laws impose various restrictions on certain "insider" loan transactions. Please refer to the Bank's *Insider Lending Policy*.

<u>BUSINESS DEALINGS</u>

In addition to lending transactions, any dealings between the Corporation and directors, executive officers, principal shareholders and related interests of such persons, including transactions between the Corporation and the immediate family of (spouses, children, parents, grandparents, siblings and step-relatives or any person sharing your household), the Corporation's insiders ("related interests"), must constitute arms-length transactions.

<u>The following insider transactions are prohibited:</u>

1. A transaction or business dealing which is not intended for the benefit of the Corporation but is merely an accommodation for the insider's benefit;

2. A transaction that is not made on terms and under circumstances which are substantially the same or as favorable as those prevailing at the time for comparable business dealings with persons not covered by the Policy; or

3. A transaction that is an investment in real estate, either directly or indirectly, whether in the form of an equity interest, partnership, joint venture, or any other form, if the Corporation, in substance, has virtually the same risks and potential rewards as an investor in the borrower's investment in real estate.

With regard to use of the Corporation's property and personnel, the Boards have taken the position that all supplies, copy services, postage meter and support personnel are for the Corporation's business and should not be used for personal needs. Any questions or areas of confusion regarding this Policy should be addressed to the Chief Executive Officer.

Conflicts of interest between directors, officers, employees, and principal shareholders of the Corporation and customers of the Corporation (or their related interests) shall be avoided at all times. Conflicts of interest include, but are not limited to, compensation from or investments in customers of the Corporation or their related interests. Similarly, the unauthorized use of privileged information constitutes a conflict of interest. Any director, officer, employee, or principal shareholder contemplating a transaction that may involve a conflict of interest must obtain the proper approval of the Board of Directors of the Holding Company or the Bank, respectively. Any such approval shall not be deemed a waiver of this provision of this Policy.

<u>The following activities are prohibited:</u>

1. A direct or indirect financial interest including joint ventures or directorship in or with a supplier, customer or appropriate prospective customer without prior disclosure to and prior approval from the appropriate Board of Directors.

4

D-000176

2. Receiving preferential treatment from customers of the Corporation because of your position with the Corporation.

3. Selling or leasing goods or services to the Corporation without prior disclosure and approval by a majority of disinterested directors. In addition, the terms and conditions of transactions must be not less favorable than those offered to others.

4. Receiving discounts on personal purchases from suppliers or customers because of business relationships with the Corporation.

5. Giving preferential treatment to a customer, supplier or prospective customer because of any favor, gratuity or outside business relationship with such customer, supplier or prospective customer.

Actual conflicts of interest and any known potential conflicts of interest must be disclosed to the appropriate Board of Directors, including those arising due to business or personal relationships with customers, suppliers, business associates, or competitors of the Corporation.

## CONFIDENTIALITY AND SAFEGUARDING CONFIDENTIAL INFORMATION

All non-public information about the Corporation should be considered confidential information. Additionally, information obtained in the course of evaluating a loan application, servicing a loan and other information including financial, personal and other information on customers, suppliers, prospective customers, employees or applicants is strictly confidential and must not be used or disclosed for any reason other than the intended purpose for such information. Use of such information to further your own business interests should be scrupulously avoided. In addition, such information may not be shared or made available to individuals outside the Corporation unless required by law.

All customer information is considered private and privileged, and is to be used solely for the purpose of providing customers with legitimate business services. Employees are prohibited from inquiring on customer accounts (this includes employee accounts) for any reason other than an approved and legitimate business inquiry. Failure to meet privacy responsibilities may be cause for disciplinary action, up to and including termination of employment.

Use of material inside information in your own investments can constitute a violation of federal securities laws. As long as this material inside information is not fully disclosed to the investing public, you must abstain from trading in, recommending, or discussing the securities concerned.

The obligation to preserve confidential information continues even after employment with the Corporation ends.

The stock of the Holding Company is registered pursuant to the Securities Exchange Act of 1934. Therefore, each director, officer and employee should be familiar with the basic requirements of both state and federal securities laws with regard to reporting requirements and trading in the Holding Company's stock. The requirements are summarized in the following policies adopted by the Boards of Directors of the Holding Company and the Bank: *Policies and Procedures on Confidential Information and the Avoidance of Insider Trading* and the *Policy Regarding Pre-clearance of Insider Transactions and Procedures for Officers and Directors Pursuant to Section 16 of the Securities Exchange Act of 1934, as Amended.* In general, the

5

D-000177

securities laws prohibit abuse of special insider knowledge with regard to trading in the Holding Company's stock. Accordingly, you may not take advantage of material non-public information, such as current earnings, proposed major reorganizations or other transactions which could significantly affect the value of the stock by buying, selling or recommending the stock of the Holding Company. It is advisable to review the Corporation's *Policies and Procedures on Confidential Information and the Avoidance of Insider Trading* before entering into a stock transaction.

## OUTSIDE EMPLOYMENT

With respect to an employee of the Corporation, employment is a full-time career unless otherwise provided by the appropriate Board of Directors (or in the case of a non-officer employee, as provided by executive management). The undivided interest and loyalty of employees is important to the continued success of the Corporation. Thus, employment with, or acting as consultant to, outside firms is permitted only if it is approved in advance by the appropriate Board of Directors (or in the case of a non-officer employee, executive management). In determining whether to approve such outside employment, the appropriate Board of Directors (or in the case of a non-officer employee, executive management) shall consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;

2. Will it involve the possibility of adverse publicity to the Corporation;

3. Is it with a competitor, supplier or customer;

4. Does it imply sponsorship by the Corporation; and

5. Does it involve serving as a director, officer, manager or consultant?

Any such approval shall not be deemed a waiver of this provision of this Policy.

In addition, certain affiliations by directors, officers and employees are specifically prohibited by law. Examples of such prohibitions include serving as a director, officer, and/or employee of:

1. A public utility holding company or its affiliates (16 U.S.C. §825d(b)).

2. An interstate power company (16 U.S.C. §825d(b)) or having certain specified affiliations with a registered investment company (15 U.S.C. §80a-10(c)).

3. Most unaffiliated depository institutions within the Corporation's market area, subject to certain exemptions pursuant to state and federal law.

## CONTRIBUTIONS – POLITICAL ACTIVITIES

The Corporation, as a responsible citizen, encourages contributions to worthy charitable, social and educational causes. However, due to the requirements of the working environment, employee contributions to political or charitable organizations may not be solicited on the

D-000178

Corporation's premises or during working hours without prior management approval. Directors, officers and employees shall not contribute directly or indirectly on behalf of the Corporation, time, money, service or favors to political parties, candidates or workers. The Corporation is prohibited from engaging in politics or making political contributions including the use of its facilities and/or supplies.

Any director, officer or employee who wishes to take an active role as a political candidate for any elective public office or is considered being appointed to any governmental or civic position, must discuss the details and receive prior approval from the Chief Executive Officer and appropriate Board of Directors.

## CREDIT PRACTICES

It is important that all loans be made in a prudent manner. In addition, all loans should be made in an arms-length transaction or in such a manner as will not reflect adversely on the integrity of our institution. Thus, you may not extend credit or participate in any credit extension to a customer in the following circumstances:

1. The proceeds of a loan are to be given to you or benefit you, your family, or an entity in which you have a financial or other interest;

2. The borrower, in turn, loans the proceeds of his loan to you, your family, or an entity in which you have an interest;

3. The borrower uses the proceeds of the loan to pay your debts or those of your family or an entity in which you have an interest;

4. The borrower uses the proceeds to purchase assets from you, your family or an entity in which you have an interest;

5. The loan is made on a preferential rate which has not been authorized by the Loan Committee or other appropriate authority within the Bank;

6. The loan is made to an employee of a bank regulatory agency, which has supervision over the Bank; or

7. The borrower obtains a loan from another bank on a preferential basis as part of a reciprocal arrangement pursuant to which the Bank extends credit to such other bank on a preferential basis.

Additional rules apply to loans to directors, executive officers, and principal shareholders. Please review the Bank's *Insider Lending Policy*.

## RECEIPT OF GRATUITIES

There are certain circumstances in which a director, officer, or employee of the Corporation may be offered or wish to give a gratuity or some other thing of value to a person who happens to be a customer or supplier of the Corporation or is in some other way related to the Corporation. Typical examples include situations in which the other individual is a family member or the

7

D-000179

proposed gift or service properly furthers the interest of the Corporation by facilitating business discussions in a normal and usual fashion, such as a business luncheon. However, as a general rule, neither you nor your family may solicit or accept gifts, fees, services or entertainment from customers, suppliers, or prospective customers. In order to guide your conduct, make sure that you are familiar with the Bank Bribery Act, 18 U.S.C. §215, of the Comprehensive Crime Control Act of 1984. This statute is intended to prevent payment or receipt of anything of value in support of a transaction with the Corporation or another financial institution. As a general rule, the Corporation's directors, officers, employees, agents or attorneys are prohibited from soliciting for themselves or for a third party (other than the Corporation) anything of value from anyone in return for any business, service or confidential information of the Corporation, and from accepting anything of value (other than bona fide salary, wages and fees referred to in 12 U.S.C. 215(c)) from anyone in connection with the business of the Corporation either before or after a transaction is discussed or consummated. Accordingly, you should be mindful that in instances in which a benefit is given or received relating to a banking transaction, there is a possibility of violating the law and the Corporation's Policy.

The following are intended to guide your conduct:

1. Benefits of a nominal value ($100.00 or less), which are clearly unconnected with any transaction with the Corporation may be accepted from customers, suppliers, or prospective customers by the Corporation's directors, officers, or employees.

2. Tangible gifts or services or anything of value from customers, suppliers, or prospective customers shall not be solicited or accepted by any of the Corporation's directors, officers, or employees, for themselves or a third party, as a gift or condition in connection with any transaction of the Corporation.

3. You may receive the normal amenities which facilitate the discussion of the Corporation's business, such as a business luncheon, from a customer, supplier or prospective customer, provided the expense would be paid for by the Corporation as a reasonable business expense if not paid for by another party. However, even those should be of a nominal value.

4. You may receive a gift, service, or other thing of value from a customer, supplier, or prospective customer of the Corporation when that individual is a close family relative such as parent, child, spouse, grandparent, or grandchild, and the gift is based on that relationship.

5. As a general rule, you may not be named as a personal representative or a recipient of a bequest under a customer's will or estate. However, the Corporation recognizes circumstances in which an exception to the general rule may be appropriate, such as when your relationship with such customer is based upon a family or personal relationship existing independent of any business of the Bank or Corporation where the circumstances make it clear that it is such relationship rather than the business of the Bank or Corporation which is the motivating factor for naming you as such. Accordingly, upon learning that you will be or are named as the recipient of a bequest or legacy under a customer's will or as a personal representative of a customer's estate, you must disclose in writing such information to, and receive approval to be so named from the Chief Executive Officer (and in the case of the Chief Executive Officer, from the Board of Directors).

D-000180

6.  You may accept advertising or promotional material of nominal value, such as pens, pencils, notepads, key chains, calendar and similar items.

7.  You may accept normal and reasonable discounts, rebates, merchandise or services, which do not exceed those available to other customers.

8.  You may accept normal and reasonable civic, charitable, educational, or religious organization awards in recognition of service and accomplishments.

## LITIGATION

No suits of any kind or for any reason are to be instituted in the name of the Corporation by any officer without first fully discussing the matter with the Chief Executive Officer. This rule would not apply to attachments where quick action is necessary to protect the Corporation's position.

## EMBEZZLEMENT

Employees have a positive duty to report to management or the Audit Committee any facts relative to a suspected embezzlement or any other suspected illegal act committed by a fellow employee.

## IMPROPER INFLUENCE OVER AUDITORS

The Corporation recognizes the importance of preventing improper influence on the conduct of auditors. Accordingly, the Corporation prohibits any director, officer or employee from taking any action, or failing to take any action, to fraudulently influence, coerce, manipulate or mislead any of the Corporation's auditors during their review or audit of the Corporation's financial statements, and related books and records for the purpose of rendering the financial statements false or materially misleading. Improper influence would include, but is not limited to, directly or indirectly:  (a) offering or paying bribes or other financial incentives, including offering future employment or contracts for non-audit services; (b) providing an auditor with inaccurate or misleading accounting, financial or legal analysis, records or information; (c) threatening to cancel or canceling existing non-audit or audit engagements if the auditor objects to the proposed account; (d) seeking to have a partner removed from the audit engagements because the partner objects to the proposed accounting; (e) blackmailing; and (f) making physical threats.

## E-MAIL AND OTHER ELECTRONIC OR TELEPHONIC COMMUNICATIONS

All electronic and telephonic communication systems and all communications and information transmitted by, received from, or stored in these systems are the property of the Corporation and as such are to be used for job-related purposes. The unauthorized use of any software and business equipment, including, but not limited to, facsimiles, telecopiers, computers and copy machines for private purposes is strictly prohibited.

Employees using this equipment for personal purposes do so at their own risk.  Further, employees are not permitted to use a code, access a file, or retrieve any stored communication unless authorized to do so or unless they have received prior clearance from an authorized supervisor. All pass codes are the property of the Corporation. No employee may use a pass code or voice-mail access code that has not been issued to that employee or that is unknown to

9

D-000181

the Corporation. Moreover, improper use of the e-mail system or the Internet, i.e., spreading offensive jokes or remarks, will not be tolerated. Employees who violate this policy are subject to disciplinary action, up to and including discharge.

To ensure that the use of electronic and telephonic communications systems and business equipment is consistent with the Corporation's legitimate business interests, authorized representatives of the Corporation may monitor the use of such equipment from time to time. This may include a review of electronic messages including e-mail and voice-mail messages.

## WAIVER OF ANY PROVISION OF THIS POLICY

From time to time, the Corporation may waive some provisions of this Policy. Any waiver of this Policy for directors or executive officers of the Corporation may be made only by the Board of Directors and must be promptly disclosed as required by SEC rules and applicable stock exchange rules. Any waiver of this Policy for other employees may be made only by the Chief Executive Officer of the Corporation.

## OTHER REQUIREMENTS

This Policy is not intended to be an exhaustive statement of all potential conflicts of interest and all of the ethical requirements of directors, officers and employees of the Corporation under applicable state and federal law and regulations. If any questions arise regarding the application of the requirements of law and of this Policy to specific situations, such questions should be promptly addressed to your supervisor, the Chief Executive Officer, Chief Financial Officer or the Audit Committee.

The Chief Executive Officer and Chief Financial Officer shall be accountable to the Audit Committee and Board of Directors for assuring adherence to this Policy.

Compliance with the Policy is a condition of employment and failure to comply may be a basis for disciplinary action, termination or may result in other legal consequences.

## ADDITIONAL RULES APPLICABLE TO CHIEF EXECUTIVE OFFICER AND CHIEF FINANCIAL OFFICER OF THE CORPORATION

In addition to complying with all other parts of this Policy, if you are the Corporation's principal executive officer, principal financial officer, principal accounting officer or controller, or any person performing similar functions, you must take the following steps to ensure full, fair, accurate, timely and understandable disclosure in reports and documents that the Corporation files with or submits to the SEC and in other public communications made by the Corporation:

1. Carefully review drafts of reports and documents the Corporation is required to file with the SEC before they are filed and the Corporation's press releases or other public communications before they are released to the public, with particular focus on disclosures that each principal officer does not understand or agree with and on information known to the principal officer that is not reflected in the report, documents, press release or public communication;

2. Meet with members of executive management, division heads, accounting staff and others involved in the disclosure process to discuss their comments on the draft report, document, press release or public communication;

10

D-000182

3. Establish and maintain disclosure controls and procedures, which ensure that material information is included in each report, document, press release or public communication, in a timely fashion;

4. Consult with the Audit Committee on a regular basis to determine whether it has identified any weaknesses or concerns with respect to internal controls;

5. When relevant, confirm that neither the Corporation's internal auditors nor its independent accountants are aware of any material misstatements or omissions in the draft report or document, or have any concerns about the "Management's Discussion and Analysis of Financial Condition" section of a report or document; and

6. Bring to the attention of the Audit Committee matters that you feel could compromise the integrity of the Corporation's financial reports, disagreements on accounting matters, or violations of any part of this Policy.

## INTERNAL CONTROL OVER FINANCIAL REPORTING AND DISCLOSURE CONTROLS AND PROCEDURES

The Corporation shall maintain disclosure controls and procedures and internal control over financial reporting that collectively ensure that the information required to be disclosed by the Corporation in its periodic reports, current reports and proxy statements filed by the Corporation under the Exchange Act and the rules thereunder is:

- Recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms; and

- Accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer to allow timely decisions regarding required disclosure.

The Corporation shall maintain a system of internal control over financial reporting to ensure reliability and adequacy of its books and records and proper recording of all transactions including dispositions of assets. The Corporation has established guidelines and procedures related to the keeping of books and records that in reasonable detail accurately and fairly reflect the Corporation's transactions and dispositions of assets. The Corporation's guidelines and procedures are intended to prevent the Corporation's records from being misleading or from concealing anything that is improper.

Directors, officers and employees must strictly comply with the disclosure controls and procedures and internal control over financial reporting and must be vigilant in ensuring that the Corporation's funds or assets are not used for any unlawful or improper purpose. Directors, officers, and employees may only enter into transactions that are executed in accordance with the Corporation's specific authorization or established formalized policies and procedures.

All transactions that have been accounted for in accordance with policy will be accumulated and processed in a manner that will permit preparation of financial statements, reports and data for purposes of internal, public and regulatory reporting. Such statements, reports and data must be in a form sufficient to reflect accurately and fairly the results of transactions entered into by the Corporation and to permit proper accountability for assets.

11

D-000183

The implementation and maintenance of disclosure controls and procedures and internal controls for financial reporting that are adequate in all respects to satisfy the requirements of the Corporation, applicable law and U.S. GAAP, will be the primary responsibility of the Chief Executive Officer and Chief Financial Officer. Compliance with the provisions and requirements of these controls and procedures will be tested and evaluated by the Corporation's internal auditing department. Any failures regarding these controls or procedures should be reported to the Chief Financial Officer or the person assigned the responsibility for the internal auditing function, if any, so that deficiencies can be corrected and assurance of compliance can be maintained.

<u>POLICY REVIEW</u>

A review to examine and evaluate the adequacy and effectiveness of this Policy, as well as compliance with relevant laws, regulations, and/or best practices will be performed annually and submitted to the Board of Directors for review and approval.

12

D-000184



# Code of Ethics and Conflicts of Interest Policy



SALISBURY BANK

enriching.

### SALISBURY BANCORP, INC., SALISBURY BANK AND TRUST COMPANY, AND SUBSIDIARIES

| | |
|---|---|
| Board Adopted: | August 26, 2005 |
| Last Revision: | November 27, 2017 |
| Board Approved: | November 27, 2017 |
| Individual Responsible: | Richard J. Cantele, Jr. |
| | President and CEO |



DEFENDANT'S EXHIBIT
15
10/27/19

D-000088

 SALISBURY BANK

No profession or industry has maintained higher standards of conduct or provided greater public service than the banking industry. Banks have traditionally recognized their duty to act in a manner of public trust and confidence.

A bank's reputation for integrity is perhaps its most valuable asset and is determined by the conduct of its officers and employees. All employees must strive to avoid situations that might cause a conflict of interest between the bank, its customers, its shareholders, and ourselves. All officers and employees are expected to adhere to the following:

# CODE OF ETHICS

We will serve our customers with integrity, competence and objectivity.

We will keep customer information and customer records confidential and will release customer information only with the customer's permission.

We will not take advantage of confidential customer information for ourselves or for our associates.

We will not allow conflicts of interest which provide a competitive advantage to our associates through use of confidential information from a customer who may be in competition with our associate, without that customer's permission.

We will not disclose, sell or barter any non-personal information about our customers to anyone, except as authorized by law.

We are committed to keeping all personal information secure. Our service providers are subject to strict confidentiality, limited use and nondisclosure agreements.

We will report any violations of this Code of Ethics.

_____          2/26/18
Signature                                  Date

Salisbury Bank and Trust Company

| 5 Bissell Street | Lakeville, Connecticut | t: 860.435.9801 | |
| PO Box 1868 | 06039-1868 | f: 860.435.0631 | salisburybank.com |



DEFENDANT'S EXHIBIT 16
SS  6/27/19

D-000087