UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILLIAM GUNNAR TRUITT,

                    Plaintiff,

   -against-

SALISBURY BANK AND TRUST COMPANY;
AND SALISBURY BANCORP, INC.,

               Defendants.

Civil Action No.: 7:18-cv-08386-NSR-PED

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

LITTLER MENDELSON, P.C.
One Newark Center, 8th Floor
Newark, New Jersey 07102
(973) 848-4700

*Attorneys for Defendants*

TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ............................................................................................ 1

STATEMENT OF FACTS ................................................................................................... 3

I.      Truitt Was Hired By The Bank As A Mortgage Loan Originator Trainee. ..................... 3

III.    The Bank Has Numerous Policies Regarding Outside Employment................................ 5

IV.     Truitt Announced His Campaign for New York State Assembly Without
        Informing The Bank Or Assessing Whether It Would Conflict With His Work For
        The Bank. .................................................................................................................... 6

V.      There Is No Doubt That Truitt's Campaign And Legislative Responsibilities
        Would Conflict With And Not Allow Time For His Work Commitments And
        Requirements For The Bank. ....................................................................................... 7

VI.     Truitt's MLO Market Was A New One For The Bank And Would Require A Full
        Commitment Of His Time And Attention. ..................................................................... 8

VII.    For The Reasons Detailed Above, Truitt Was Denied An Exception To The
        Bank's Outside Employment Policy. ........................................................................... 9

VIII.   Truitt's Allegation that Arthur Bassin Engaged in a Conspiracy with Didi Barrett
        To Terminate His Employment Is False And Unsupported By Any Evidence. .............. 11

ARGUMENT .................................................................................................................... 12

I.      Standard Of Review ................................................................................................. 12

II.     Plaintiff Cannot Establish That He Was Subjected To Retaliation For Seeking
        Election To The New York State Assembly. ................................................................ 13

        A.      Plaintiff Did Not Suffer An Adverse Employment Action.................................. 14

        B.      The Bank Had Legitimate Non-Discriminatory Reasons for Its Actions. ............ 17

        C.      Plaintiff Cannot Prove that the Bank's Reasons Were a Pretext for
                Discrimination................................................................................................ 21

                1.      Bassin's Alleged Remarks are Inadmissible Hearsay........................... 21

                2.      Defendants Were Aware of Plaintiff's Political Activity At the
                        Time of Hire -the Only Change in the Political Activity was the
                        Time Commitment. ......................................................................... 23

                3.      Other Bank Employees Engage in Political Activity on the
                        Republican Ticket and Have Not Been Terminated. ........................... 24

III.    Plaintiff's Punitive Damages Claim Should Be Dismissed. ........................................ 24

CONCLUSION................................................................................................................. 25

TABLE OF AUTHORITIES

PAGE

## Cases

*Abdu-Brisson v. Delta Air Lines, Inc.*,
239 F.3d 456 (2d Cir. 2001), cert. denied, 534 US 1993 (2001) ...........................21

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................................12, 13

*B.F. Goodrich v. Betkoski*,
99 F.3d 505 (2d Cir. 1996)...................................................................................22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................12

*Cifarelli v. Village of Babylon*,
93 F.3d 47 (2d Cir. 1996)......................................................................................22

*Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*,
06 Civ. 5474, 2008 WL 857492 (S.D.N.Y. Mar. 31, 2008) ..............................22

*Deshpande v. Medisys Health Network, Inc.*,
2010 WL 1539745 ..................................................................................................24

*Dister v. Continental Group, Inc.*,
859 F.2d 1108 (2d Cir. 1988)........................................................................19, 20

*Farias v. Instructional Systems, Inc.*,
259 F.3d 91 (2d Cir. 2001).....................................................................................24

*Francis v. Runyon*,
928 F. Supp. 195 (E.D.N.Y. 1996) ......................................................................19

*Gilman v. Runyon*,
865 F. Supp. 188 (S.D.N.Y. 1994) ......................................................................19

*Grady v. Affiliated Central, Inc.*,
130 F.3d 553 (2d Cir. 1997)..................................................................................23

*Gray v. Robert Plan Corp.*,
991 F. Supp. 94 (E.D.N.Y. 1998) ................................................................19, 20

*Holcomb v. Iona Coll.*,
521 F.3d 130 (2d Cir. 2008) ..................................................................................22

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

*Hudson v. Merrill Lynch & Co., Inc.*,
    138 A.D.3d 511 ..................................................................................................13

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ...........................................................................................12

*Miller v. Praxair, Inc.*,
    408 F. App'x 408 (2d Cir. 2010), cert. denied, 131 S.Ct. 3067 (2011) ...................15

*Montana v. First Federal Sav. and Loan Ass'n of Rochester*,
    869 F.2d 100 (2d Cir. 1989)................................................................................19

*Oram v. SoulCycle LLC*,
    979 F. Supp. 2d 498 (S.D.N.Y. 2013)................................................................13

*Reyes v. Krasdale Foods, Inc.*,
    No. 12............................................................................................................12

*Shannon v. N.Y.C. Transit Auth.*,
    332 F.3d 95 (2d Cir. 2003)..................................................................................12

*Singh v. N.Y. State Dep't of Taxation & Fin.*,
    911 F. Supp. 2d 223 (W.D.N.Y. 2012) ................................................................15

*Stetson v. NYNEX Serv. Co.*,
    995 F.2d 355 (2d Cir. 1993)................................................................................16

*Watt v. N. Y Botanical Garden*,
    No. 98 Civ. 1095(BSJ), 2000 WL 193626 (S.D.N.Y. Feb. 16, 2000) ...................23

*Whidbee v. Garzarelli Food Specialties, Inc.*,
    223 F.3d 62 (2d Cir. 2000)..................................................................................16

*Ying Jing Gan v. City of New York*,
    996 F.2d 522 (2d Cir. 1993)................................................................................12

*Zuckerman v City of New York*,
    49 NY2d 557 (1980) ...........................................................................................22

**Statutes**

New York Labor Law §201(d)(a) .............................................................................1, 13

State Human Rights Law ...........................................................................................24

iii

TABLE OF AUTHORITIES
(CONTINUED)

PAGE

**Other Authorities**

Federal Rules of Civil Procedure Rule 56 ....................................................................................12

## PRELIMINARY STATEMENT

Defendants Salisbury Bank and Trust Company and Salisbury Bancorp, Inc. (together, the "Bank" or "Defendants") respectfully submit this memorandum of law in support of their Motion for Summary Judgment, seeking to dismiss the one-count Complaint ("Compl.") of Plaintiff William Gunnar Truitt ("Plaintiff" or "Truitt").

On January 29, 2018, Truitt was hired as a full-time Mortgage Lending Officer ('MLO") Trainee in the Bank's Residential Lending Department. Without notifying the Bank of his intention to run for elected office in the New York State Assembly, as is required by the Bank's policy on outside employment, on April 12, 2018, Truitt posted to Facebook that he would be campaigning for a seat in the State Assembly. Upon learning of Truitt's announcement, the Bank met with Truitt to discuss his campaign and what the job would entail if he were elected. Truitt advised that he would be required to spend to spend 2-4 days per week in Albany for more than half of the year. When the Assembly was not in session, Truitt would be campaigning, which he stated was a year-round commitment. Because the Riverside Division residential lending market, which Truitt served, was an emerging market for the Bank, the Bank told Truitt that the time commitment required by Truitt's outside employment could not be accommodated. At no time was Truitt's employment terminated; rather, on May 1, 2018, Truitt resigned from his position, deciding to focus his full energies on his campaign. The Bank wished him well and advised that, if he was not successful in the November election, he should consider coming back to the Bank.

Notwithstanding, Plaintiff herein alleges discrimination on the basis of his political activity pursuant to New York Labor Law §201(d)(a) because he was allegedly not permitted by the Bank to run for New York State Assembly – to wit, a job that requires 60 business days in legislative session in Albany each year – and work at the Bank as a full-time MLO. The

undisputed evidence and testimony shows that full-time MLOs often work 50 hours per week and that they are expected to be responsive and on-call to client needs 24/7. Contrary to his speculation (because Plaintiff never made it through his MLO training period), there is *no way* Plaintiff could campaign and perform the State Assembly job and still perform all his required duties for the Bank.

The Bank's discussions with Plaintiff about his decision to run for State Assembly were no different than the Bank would have had with him (or anyone else) had Truitt said he was going to unavailable during working hours for 2-4 days per week for a 6 month period in order to get his pilot's license or become an entrepreneur and create his own start-up company. If Truitt became a pilot or created a successful company, the law would not require an employer to allow an employee to take a time-consuming, untenable second job. Simply because Truitt is seeking a position that job happens to be in politics does not mean that Truitt is exempted from the Bank's non-discriminatory policies regarding outside employment.

The Bank has no animus against employees who hold or run for political office. The Bank hired Plaintiff, merely three months before his alleged termination, with full knowledge of his membership in the Republican caucus in the Dutchess County legislature. Other employees of the Bank also serve in political positions outside of working hours, including Doug Cahill, the Vice President of Human Resources who participated in the Bank's decision to deny Plaintiff's outside employment request. Cahill was elected to the Board of Education as a Republican in the Town of Sharon, Connecticut.[1] Hence, there is no disputed issue of material fact sufficient to

---

[1] Moreover, Plaintiff's allegation the Bank conspired to terminate his employment because of a member of the Bank's Board had previously contributed financially to his opponent in the state legislature race, is nothing but pure speculation. This Board Member, Art Bassin, who also involved in local politics as the Town Supervisor of Ancram, New York, testified that he was not involved in the Bank's decision to deny Plaintiff's request for outside employment. Plaintiff instead seeks to rely on inadmissible hearsay to lend credence to his wild theory.

withstand summary judgment. Accordingly, Defendants' summary judgment motion should be granted and Plaintiff's Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

### I.   Truitt Was Hired By The Bank As A Mortgage Loan Originator Trainee.

On January 29, 2018, the Bank made Truitt an offer of employment to work as Mortgage Lending Officer Trainee in its Residential Lending Department. *See* Defendants' Statement of Undisputed Material Facts ("SOMF") ¶ 3. Pursuant to his offer letter, Truitt was classified as a full-time hourly employee during his training period, earning $16.83 based upon a 40 hour work week. *Id.* ¶ 4. Truitt was provided 6.46 hours of paid time off per pay period, with an annual accrual of 21 days. *Id.* ¶ 5. Truitt's offer letter also defined his employment relationship with the Bank as "at will," advising that "[his] employment is not for a fixed term" and that both Truitt and the Bank may terminate the employment relationship at any time and for any reason. *Id.* ¶ 6. Truitt's first day of employment was February 26, 2018. *Id.* ¶ 7

Upon hire, the Bank provided Truitt with a development plan that detailed the timeline for the completion of his training program, which was approximately six months. *Id.* ¶ 8. The Bank also provided Truitt with a job description for a Mortgage Originator Trainee position. *Id.* ¶ 9. During the training period, Truitt would be responsible for successfully developing and understanding a series of lending and sales skills, including, but not limited to, customer services, sales, underwriting and lending. *Id.* ¶ 10.

The Bank provided Truitt with an approximate six-month training program, during which time Truitt would work 2-3 days per week with the Residential Credit Underwriting Department and the remainder of the week with the Residential processors. *Id.* ¶ 12. Should Truitt successfully complete the Bank's training program, the Bank anticipated that, in or around September 2018, Truitt would work for approximately another four (4) months with internal staff

3

and "Centers of Influence," such as real estate agents and attorneys, to develop relationships in Dutchess, Ulster and Orange Counties in New York. *Id.* ¶ 13. During this four-month secondary training period (September 2018 to January 2019), Truitt would be paid a $2,500 per month draw on future commissions. *Id.* ¶ *14.* Assuming that Truitt performed to expectations during his training period, Truitt would be promoted to a full-time position of Mortgage Loan Officer in January 2019 and, thereafter, he would be compensated based solely on commission. *Id.* ¶ 15.[2]

## II.    As With Others Employed By The Bank, The Bank Hired Truitt Knowing Of And Approving His Work On The Dutchess County Legislature.

At the time of his hire by the Bank, Truitt was a Republican member of the Dutchess County Legislature, who was elected to a second term of November 2016 through December 31, 2019.  SOMF ¶ 17. At all relevant times, the Bank was aware of Truitt's seat as a Republican in the Dutchess County Legislature and that he would continue in this role even after he became employed by the Bank. *Id.* ¶ 18. Management of the Bank approved Truitt's outside employment as a Dutchess County legislator upon hire. *Id.* ¶ 19. In an email to all Bank employees welcoming Truitt as a new hire, the Bank specifically highlighted Truitt's political activity, noting that "Will serves as the youngest elected county official in the State of New York as a Legislator in Dutchess County. He represents approximately 15,000 people who call the Town of Hyde Park and the Town of Poughkeepsie home." *Id.* ¶ 20.

According to Truitt, he spent an average of 15 hours per week on his responsibilities as a Dutchess county legislator, which included committee, caucus and board meetings, which occurred outside of regular work hours in the evenings. *Id.* ¶ 21. Like Truitt, other Salisbury employees were engaged in political activity outside of their working hours, including Doug Cahill, the Bank's Vice President of Human Resources, who ran for the Republican nomination

---

[2] Because Truitt's employment with the Bank ended on May 1, 2018, at no time during Truitt's tenure with the Bank was he paid on a commission basis, either as a draw or in full.  SOMF ¶ 16.

for the Board of Education in the Town of Sharon, Connecticut and was elected in or around 2012 and remains on the Board of Education. *Id.* ¶ 22. Cahill is also active on the Town of Sharon's Republican Committee and attended the Connecticut Republican conference in 2018 as a delegate. *Id.*

In addition to Cahill, numerous other current Bank employees serve in political office in some fashion: Darilyn Woods is an alternate member of the Board of Finance for the Town of Cornwall, Connecticut, Jennifer Anderson is a member of the Board of Education in Sharon, Connecticut, Jean Stapf is a member of the Board of Education for the Pine Plains School District in New York, and Robert Wiseman is a member of the Board of Assessment Review for the Town of Kinderhook, Connecticut. *Id.* ¶ 23. Each of these positions are volunteer positions with a time commitment of, at most, ten hours per month. *Id.* ¶ 24.

### III.   The Bank Has Numerous Policies Regarding Outside Employment.

Upon hire, Truitt was provided a copy of the Bank's Employee Handbook, which provides a provision regarding Outside Activities/Employment which provides:

> Salisbury Bank supports our local community in many ways and encourages employees to participate in community activities. If you wish to accept a position, with or without compensation, with a governmental agency, a for-profit or a not-for-profit organization, either as a stockholder, director, officer, sole proprietor partner, or employee, you need to first notify the Human Resource Administrator or the President. Any potential problems may be discussed with you and the request will be reviewed to see if any conflict of interest would exist, if a conflict exists, this outside appointment or employment will not be allowed, Please remember that your first professional responsibility is to the position you have accepted here at Salisbury Bank. Salisbury Bank does not object to your accepting outside work as long as it does not (a) interfere with your regular work hours (or necessary overtime); (b) affect the efficient performance of your regular duties; (c) cause you to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest.

SOMF ¶¶ 25-26.

The Bank also has a Code of Ethics and Conflicts of Interest Policy that Truitt received upon hire which provides provisions regarding outside employment and Contributions regarding political activities. *Id.* ¶ 27. The Bank's Code of Ethics regarding Outside Employment states:

> With respect to an employee of the Corporation, employment is a fulltime career unless otherwise provided by the appropriate Board of Directors (or in the case of a non-officer employee, as provided by executive management). The undivided interest and loyalty of employees is important to the continued success of the Corporation, Thus, employment with, or acting as consultant to, outside firms is permitted only if it is approved in advance by the appropriate Board of Directors (or in the case of a non-officer employee, executive management). In determining whether to approve such outside employment, the appropriate Board of Directors (or in the case of a non-officer employee, executive management) shall consider all relevant factors, including but not limited to the following:
>
> 1.   Will it interfere with work assignments or performance;
> 2.   Will it involve the possibility of adverse publicity to the Corporation;
> 3.   Is it with a competitor, supplier or customer;
> 4.   Does it imply sponsorship by the Corporation; and
> 5.   Does it involve serving as a director, officer, manager or consultant?

*Id.* ¶ 28. With regard to Contributions – Political Activities, the Bank's Code of Ethics states:

> Any director, officer or employee who wishes to take an active role as a political candidate for any elective public office or is considered being appointed to any governmental or civic position, must discuss the details and receive prior approval from the Chief Executive Officer and appropriate Board of Directors.

*Id.* ¶ 29.

### IV.   Truitt Announced His Campaign for New York State Assembly Without Informing The Bank Or Assessing Whether It Would Conflict With His Work For The Bank.

On April 12, 2018, Truitt announced on Facebook his campaign to run for a seat in the New York State Assembly. SOMF ¶ 30. However, Truitt had not previously notified Human Resources or his supervisor of his decision to run for office, as required by the Bank's Handbook

6

policy on Outside Activities; nor did he receive approval from the Board of Directors or President as required in the Code of Ethics. *Id.* ¶ 31. Upon learning of Truitt's announcement on Facebook, Amy Raymond, Truitt's supervisor, and Doug Cahill, Vice President of Human Resources, requested a meeting with Truitt to determine what kind of time commitment such a campaign (and subsequently job) would entail. *Id.* ¶ 32.

When asked about his Facebook post at that meeting held on April 13, 2018, Truitt said that he was meaning to tell Raymond about it, but that he did not have time because the decision and nomination happened so quickly. At this same meeting, Raymond and Cahill asked Truitt to provide them with a written explanation as to what the job would entail if he were elected. *Id.* ¶ 33. Truitt provided this letter, along with the parameters of the Assembly role. Upon receipt of the letter, management reviewed the role with respect to a potential conflict of interest and with respect to the amount of time away from the Bank that the job would require. *Id.* ¶ 34.

V.     **There Is No Doubt That Truitt's Campaign And Legislative Responsibilities Would Conflict With And Not Allow Time For His Work Commitments And Requirements For The Bank.**

Upon review of the state Assembly calendar provided by Truitt, it became clear that Truitt would be required to spend at a minimum 2-4 days per week – 60 business days – in Albany for more than half of the year. SOMF ¶ 35. Although Plaintiff alleges that there are days where the legislative sessions run "an hour, two hours at the most," he testified at his deposition that "I was never an assemblyman and so I wasn't entirely positive of what the times would be." *Id.* ¶ 37. The state capital in Albany is "approximately an hour and 15 minutes" from the Newburgh, New York branch of Riverside Bank where Plaintiff would be employed after the completion of his MLO training. *Id.* ¶ 38.

At the time of Truitt's employment with the Bank, members of the State Assembly earn a $79,500 salary. Today, members of the New York State Assembly earn $110,000 per year. *Id.* ¶

7

39. Given the salary that Plaintiff would earn as an Assemblymember, as compared to the $17,000 per year Truitt earned as a Dutchess county legislator, the Bank considered the State Assembly job as one that would require full-time work and commitment on Truitt's end to his constituents. *Id.* ¶ 40.

Truitt acknowledged that, prior to the election, he would engage in a campaign for the seat and that his campaigning would continue even after he would be elected. *Id.* ¶ 41. Truitt testified at his deposition that, despite obtaining new employment at Bridgeview Excavation in May 2018, Truitt did not work at all between the end of July 2018 and November 6, 2018, Election Day in order to focus on his campaign. *Id.* ¶ 42.

## VI.   Truitt's MLO Market Was A New One For The Bank And Would Require A Full Commitment Of His Time And Attention.

The Riverside Division residential lending market, which Truitt served as a Trainee and would be serving as a Mortgage Loan Officer ("MLO") for the Bank upon completion of his training, was an emerging market for the Bank. SOMF ¶ 43. The primary duty of a MLO relates to sales and customer services, such as soliciting and counseling customers that are looking to either purchase or refinance a home or seek to obtain a construction loan or mortgage and assist them through the processing and closing of that loan. *Id.* ¶ 44.

In this customer-facing business, where competing banks offer similar products and services, a distinguishing factor in being able to get new business and retain current customers is relationship building and customer service so an MLO must be responsive and available to their clients at their convenience, including being physically present to close on a property. *Id.* ¶ 45. Residential MLOs often work more than 50 hours per week, and there was a concern by the Bank that Truitt's job duties as an Assemblymember would not permit him to focus all of his energies to his clients at the Bank. *Id.* ¶ 46.

8

On April 26, 2018, Cahill met with Truitt and informed him that the Bank was concerned that he could not effectively fulfill the requirements and responsibilities of his future MLO position as well as the requirements and responsibilities of a State Assembly seat and, therefore, the Bank's management would not provide an exception to the Bank's policy on outside employment. *Id.* ¶ 47. Of particular concern to Rick Cantele was the fact that Truitt had been hired to serve as a MLO, upon the completion of his training, in a new market, where neither the Bank nor its Riverside Division previously had any residential lending business. It would be incumbent on Truitt to develop significant business in that region and it would be necessary for him to be present, developing relationships with local real estate agents and attorneys. *Id.* ¶ 48.

## VII.   For The Reasons Detailed Above, Truitt Was Denied An Exception To The Bank's Outside Employment Policy.

After being advised that no policy exception would be granted, Truitt requested to meet with and met with Rick Cantele, CEO of the Bank, on April 30, 2018 to request to both campaign/work in the State Assembly as an elected official and also work full time for the Bank; however, Cantele reiterated that the Bank "did not believe that Truitt would be able to fulfill his position as a residential originator given the responsibilities as we knew them to be relative to the Assembly position in New York." SOMF ¶ 49. Cantele further testified that the Bank "[was] concerned, and we relayed our concerns, regarding his ability to fulfill the role the bank was looking for in the Riverside division, and tak[ing] this other job which required him to be out of the bank for at least sixty days a year. And common sense would say, given this job, that there would be campaigning to be done." *Id.* ¶ 50.

At no time did Cahill or Cantele advise Truitt that his employment with the Bank was terminated or state that Truitt's employment would be terminated if he proceeded with his campaign. *Id.* ¶ 51. Cahill asked only that Truitt let the Bank know by Tuesday, May 1, 2018

whether he still intended to run for office understanding that the Bank did not approve his outside employment request. *Id.* ¶ 52. Although the Bank may have had to make a decision whether to terminate Truitt's employment if his campaigning interfered with his employment at the Bank or if Truitt was elected to office; however, before any decision by the Bank was made regarding Truitt's future with the Bank, on May 1, 2018, Truitt resigned. *Id.* ¶ 53.

In an email to Amy Raymond and Andrea MacArthur, Truitt states that "I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November." *Id.* ¶ 54. Truitt acknowledges in his deposition that "[b]oth Doug and Rick reiterated to me that the main concern is that, if elected, I would not have the necessary time it takes to be a successful originator and grow our brand in New York." *Id.* ¶ 55. Truitt also admits that Cantele advised if Truitt was not successful in the November election, he should consider coming back to the Bank to fill the same residential role or perhaps even another rule in the commercial lending division, evidencing the Bank's sole concern was with the time commitment associated with a state Assemblymember role. *Id.* ¶ 56. Truitt also thanked Raymond and MacArthur, writing "I cannot thank the both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with." *Id.* ¶ 57.

Also on May 1, 2018, Truitt sent an email to Doug Cahill, in which he states that "I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before

me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in New York history is one I cannot give up, nor can I let down my community who has asked me to run." *Id.* ¶ 58. Truitt also stated that "I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and willingness to meet with me yesterday." *Id.* ¶ 59.

## VIII.   Truitt's Allegation that Arthur Bassin Engaged in a Conspiracy with Didi Barrett To Terminate His Employment Is False And Unsupported By Any Evidence.

Truitt alleges that Cahill told him that Arthur Bassin, a member of the Bank's Board of Directors, was "not comfortable" with Truitt running for state assembly in District 106. SOMF ¶ 61. Truitt infers that the reason that Bassin was "not comfortable" with Truitt running for State Assembly was because he was a "long-time political and financial supporter of Didi Barrett (Dianne Dewitt Barrett), the three-term incumbent Democratic New York Assemblymember for District 106 – the same district for which Mr. Truitt had recently announced his Republican candidacy." *Id.* ¶ 62.

Truitt testified at his deposition that Cahill told him that Bassin did not think "it was plausible" to work full-time as a Mortgage Loan Originator and hold elected office in the New York State Assembly. *Id.* ¶ 63.[3] Neither Bassin nor any member of the Board of Directors (other than Rick Cantele, who as CEO sat on the Bank's Board) were involved in the Bank's decision to deny Truitt's request for outside employment. *Id.* ¶ 66.

No Salisbury employee involved in any discussions regarding whether Plaintiff would be able to fulfill his full-time job duties while campaigning for and/or as a member of the New York

---

[3] Truitt did not have personal knowledge as to why Bassin was allegedly "uncomfortable" or thought that his running for and holding public office was "not plausible," other than the fact that Bassin was an elected official himself. SOMF ¶ 64. Bassin is the Town Supervisor in the Town of Ancram, New York. *Id.* ¶ 65.

State Assembly, including Doug Cahill, Rick Cantele, Richard Kelly, Andrea MacArthur or Amy Raymond, has provided financial support to a political campaign or political office held by Didi Barrett nor have these employees volunteered time to campaign or work on behalf of Ms. Barrett. *Id.* ¶ 67. Although Bassin had made financial contributions to Ms. Barrett's campaign in prior years, he testified that he was not involved in any discussion regarding Truitt's Outside Employment request and did not know who William Truitt was, or that he was running for a seat in the State Assembly, until he received a copy of the Complaint in this lawsuit. *Id.* ¶ 68.

## ARGUMENT

### I.   Standard Of Review

A party is entitled to summary judgment when the undisputed material facts warrant judgment in its favor as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Reyes v. Krasdale Foods, Inc.*, No. 12 CV 1595 (VB), 2013 U.S. Dist. LEXIS 73985, at *10 (S.D.N.Y. May 22, 2013) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate "if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.")).

For Plaintiff's claims to survive summary judgment, he "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Instead, he must produce sufficient admissible evidence from which a reasonable fact-finder could find in her favor. *Id.*; *Ying Jing Gan v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (a party opposing summary judgment "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible"); *Shannon v. N.Y.C. Transit Auth.*, 332 F.3d 95, 99 (2d Cir. 2003)

12

("[c]onclusory allegations, conjecture, and speculation are insufficient to create a genuine issue of fact."). The non-movant must "offer concrete evidence from which a reasonable juror could return a verdict in [her] favor." *Liberty Lobby,* 477 U.S. at 256 (finding a question of material fact does not exist merely because plaintiff disagrees with the deposition testimony and documentary evidence produced by defendant). As established below, the undisputed material facts here demonstrate that Plaintiff's claim of discrimination cannot withstand summary judgment.

### II.   Plaintiff Cannot Establish That He Was Subjected To Retaliation For Seeking Election To The New York State Assembly.

New York Labor Law Section 201(d) provides that:

> [I]t shall be unlawful for any employer . . . to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of . . . an individual's political activities. . .

The statute includes "running for public office" in its definition of "Political activities." N.Y. Lab. Law §201(d)(a).

To establish a prima facie case of discrimination, Truitt must show that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered from an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Hudson v. Merrill Lynch & Co., Inc.*, 138 A.D.3d 511, 514 (1st Dep't 2016. If a plaintiff can make out such a prima facie showing, "the burden of production shifts to the employer to demonstrate that a legitimate, nondiscriminatory reason existed for its action. *Oram v. SoulCycle LLC*, 979 F. Supp. 2d 498, 511 (S.D.N.Y. 2013).

Plaintiff cannot establish a *prima facie* case of discrimination or retaliation as the Bank did not take any adverse employment action against him. The undisputed material facts here demonstrate that Plaintiff's claim of discrimination cannot withstand summary judgment. First,

there is no evidence that the Bank terminated Plaintiff's employment. Although the Bank notified Plaintiff that it would not approve Plaintiff's request for Outside Employment due to the time-commitment required by a seat in the New York State Assembly, Plaintiff resigned him employment, deciding to focus on his campaign in order to take advantage of a "once in a lifetime opportunity." *See* Declaration of Jennifer I. Fischer ("Fischer Decl."), Ex. I. Moreover, there is no record evidence that any decision made by the Bank regarding Plaintiff's employment was because of or in retaliation of Plaintiff's political activity. To the contrary, the Bank hired Plaintiff only three months earlier with full knowledge that he held public office as a Dutchess County Legislature as a Republican. The Bank's decision not to approve Plaintiff's outside employment as a New York State Assemblymember was based solely on the time that Plaintiff would have to commit away from the Bank during working hours, including the 60 business days that Plaintiff would have to be in Albany when the legislature was in session. As such, Plaintiff's Complaint should be dismissed in its entirety with prejudice.

### A.   Plaintiff Did Not Suffer An Adverse Employment Action.

As noted above, for Plaintiff to establish a *prima facie* case of discrimination, he must demonstrate that he suffered an adverse employment action.  He cannot do so because he resigned his employment with the Bank to pursue his political ambitions.  In an email drafted by Plaintiff titled "Decision," he wrote:

> I did deeply consider and weigh my options over the past weekend and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in NY history is one, I cannot give up, nor can I let down my community who has asked me to run. I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday. I have a few items that I need to return, including laptop, a key-fab and a Poughkeepsie

parking garage badge. Let me know how you would like me to return those into you, and I will bring them as soon as possible.

*See* Fischer Decl., Exs. O and P.  At no time did the Bank advise Plaintiff that his employment was terminated.  Rick Cantele, the CEO of the Bank, testified that "we disagreed that he could complete [the] requirements of the Salisbury job and take on his outside employment that required a significant amount of time and effort on his behalf. We communicated that to him. Ultimately, it was his decision." *See* Fischer Decl., Ex. G, Cantele Dep. Tr. at 70:6-11.  And while the Bank may have ultimately decided to terminate Plaintiff's employment if elected to office, or his campaigning began to interfere with his training, they "[hadn't] even gotten to that point yet." *See* Fischer Decl., Ex. E, Cahill Dep. Tr. at 91:3-7. Doug Cahill, Vice President of Human Resources, also testified that "I believe we would have had to make a decision [regarding his continued employment if his campaign for the State Assembly was successful].  It just hadn't been made at that point." *See* Fischer Decl., Ex. E, Cahill Dep. Tr. at 94:11-22. These material facts are undisputed. Accordingly, there was no adverse employment action by the Count and Plaintiff's single count Complaint of discrimination must fail as a matter of law. *See, e.g.*, *Singh v. N.Y. State Dep't of Taxation & Fin.*, 911 F. Supp. 2d 223, 234 (W.D.N.Y. 2012) (adverse employment action element is not satisfied when employment action is the result of the plaintiffs voluntary resignation) (*citing Miller v. Praxair, Inc.*, 408 F. App'x 408, 410-11 (2d Cir. 2010), cert. denied, 131 S.Ct. 3067 (2011) (granting summary judgment).

Further, although Plaintiff alleges that he was terminated because he was required to "choose" between remaining employed by the Bank or pursuing his political ambitions, this alone does not establish a constructive discharge.  The Second Circuit has established a very high standard of proof for constructive discharge claims, in which a plaintiff must show that "the employer deliberately made his working conditions so intolerable that he was forced into an

15

involuntary resignation. . . . [A] claim of constructive discharge must be dismissed as a matter of law unless the evidence is sufficient to permit a rational trier of fact to infer that the employer deliberately created working conditions that were so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993); *see also Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62 (2d Cir. 2000) (setting forth high standard for proving constructive discharge in the Second Circuit).

Here, there is no record evidence that Plaintiff himself, let alone a reasonable person in the employee's shoes, would have felt compelled to resign. To the contrary, in Plaintiff's resignation letter to Cahill, he writes: "I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday." *See* Fischer Decl., Ex. P.  He also contacted his supervisors, Amy Raymond and Andrea MacArthur upon his separation, to thank them for their mentorship.  He wrote: "I cannot thank the both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with." *See* Fischer Decl., Ex. O.

Here, Plaintiff was not compelled to resign. He did so to pursue his political ambitions, understanding that the Bank remained committed to employing him under the same terms and conditions as when he was hired. Because Plaintiff cannot establish that he was constructively discharged, his claim of discrimination must be dismissed with prejudice.

16

**B.      The Bank Had Legitimate Non-Discriminatory Reasons for Its Actions.**

Even if Plaintiff can establish a *prima facie* case of discrimination, the Bank had a legitimate, non-discriminatory business reason for denying his request to engage in outside employment. Pursuant to the Bank's Outside Employment policy, where an employee "wishes to accept a position, with or without compensation, with a governmental agency, a for-profit or a not-for-profit organization, either as a stockholder, director, officer, sole proprietor partner, or employee, he or she must first notify the Human Resource Administrator or the President." *See* Fischer Decl., Ex. V and W.  Although Plaintiff did not do this here, once the Bank learned of Plaintiff's intention to run for office, it engaged Plaintiff to see if any conflict of interest exists. Where a conflict of interest exits, this outside appointment or employment will not be allowed. *Id.*  The policy further provides that:

> [R]emember that your first professional responsibility is to the position you have accepted here at Salisbury Bank. Salisbury Bank does not object to your accepting outside work as long as it does not (a) interfere with your regular work hours (or necessary overtime); (b) affect the efficient performance of your regular duties; (c) cause you to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest.

The Bank also has a Code of Ethics and Conflicts of Interest Policy that Truitt received upon hire, which provides provisions regarding outside employment and Contributions regarding political activities. *Id.*  Specifically, the Code of Ethics states regarding Outside Employment:

> With respect to an employee of the Corporation, employment is a fulltime career unless otherwise provided by the appropriate Board of Directors (or in the case of a non-officer employee, as provided by executive management). The undivided interest and loyalty of employees is important to the continued success of the Corporation, Thus, employment with, or acting as consultant to, outside firms is permitted only if it is approved in advance by the appropriate Board of Directors (or in the case of a non-officer employee, executive management). In determining whether to approve such outside employment, the appropriate Board of Directors (or in the case of a non-officer employee, executive management) shall consider all relevant factors, including but not limited to the following:

1.     Will it interfere with work assignments or performance;
2.     Will it involve the possibility of adverse publicity to the Corporation;
3.     Is it with a competitor, supplier or customer;
4.     Does it imply sponsorship by the Corporation; and
5.     Does it involve serving as a director, officer, manager or consultant?

*See* Fischer Decl., Ex. W., p. 6 of Code of Ethics, Exhibit D-14.

The undisputed evidence demonstrates that, if elected, Plaintiff's work as a state legislator would require him to be in Albany for approximately 2-4 business days per week while in session, 60 week days in total. *See* Fischer Decl., Ex. S. Plaintiff, however, is provided only 21 days of paid time off; thus, at a minimum, his election to the New York State Assembly would interfere with his regular work hours and the performance of his job. *Id.* at Ex. J. Even before the election, Plaintiff would be spending a significant amount of time campaigning for this seat. In fact, Plaintiff took a four-month leave of absence from his current job in the months' leading up to the election (from late-July through November 6, 2018) to campaign. *See* Fischer Decl., Ex. B, Truitt Dep. Tr. at 139:5-141:7. In the Bank's judgment, this would conflict with Plaintiff's ability to perform his job duties as a trainee and subsequently a Mortgage Originator, if promoted. Moreover, given the salary that Plaintiff would earn as an Assemblymember, $79,500 per year instead of the $17,000 per year Truitt earned as a Dutchess county legislator, the Bank considered the role to one that would require full-time work and commitment on Truitt's end to his constituents. *See* Fischer Decl., Ex. T; *see also* Fischer Decl., Ex. E, Cahill Dep. Tr. at 137:4-17.

In addition, the Riverside Division residential lending market, which Truitt served, was an emerging market for the Bank. Because the Bank did not previously provide residential mortgages in this market, it would be incumbent on Truitt to develop business in that region and

it would be necessary for him to be physically present, developing relationships with local real estate agents and attorneys. The Bank was prepared to invest significant marketing resources in the Riverside Division to assist Truitt in developing a customer base. The Bank was concerned that its investment into the market would not be as successful if Truitt were not immediately responsive to the needs of his customers. *See* Declaration of Richard Cantele, ¶¶ 8-10, filed concurrently herewith.

Plaintiff's unsupported disagreement with the Bank that that he could successfully run for and hold political office while maintaining his job responsibilities at the Bank, while admittedly never having been employed previously as a mortgage originator or State Assemblyman, are not evidence of discrimination.  See *Montana v. First Federal Sav. and Loan Ass'n of Rochester*, 869 F.2d 100, 106 (2d Cir. 1989) (discrimination statutes do not permit federal courts to act as a "roving commission to review business judgments"). The Bank made the business judgment that the time commitment required of a Mortgage Loan Originator and the need for Truitt to remain available to clients did not comport with the job requirements of a Mortgage Loan Originator, which required Truitt to be in Albany for 2-4 days per week while the Assembly was in session. *See also Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988); *Gray v. Robert Plan Corp.*, 991 F. Supp. 94, 100 (E.D.N.Y. 1998); *Francis v. Runyon*, 928 F. Supp. 195, 203 (E.D.N.Y. 1996); *Gilman v. Runyon*, 865 F. Supp. 188, 193 (S.D.N.Y. 1994).

In *Dister*, the Second Circuit stated:

> To begin with, it is not the function of a fact-finder to second-guess business decisions or to question a corporation's means to achieve a legitimate goal. See Burdine, 450 U.S. at 259, 101 S.Ct. at 1097 ('The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability ....'); see also Meiri, 759 F.2d at 995. Section 510 protects employees from conduct designed to deprive them of rights created under employee benefit plans; it does not cast liability on an employer for misjudgments respecting an employee's contribution to the company. Evidence that an employer

made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons. See Graefenhain, 827 F.2d at 20 ('A business decision need not be good or even wise. It simply has to be nondiscriminatory ...'). Thus, the reasons tendered need not be well-advised, but merely truthful.

*Dister*, 859 F.2d at 1116.

District courts in New York applying the principles set forth in *Dister*, and other courts who have confronted this issue, have applied the same rule. For example, in *Gray*, the court rejected the plaintiff's invitation to second-guess his former employer's business judgment -- exactly as the plaintiff in this case wants this Court to do. The Court stated:

In evaluating an employer's actions in the context of a discrimination claim, the Court 'does not sit as a super-personnel department that reexamines an entity's business decisions.' *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986) (cited in Scaria, 117 F.3d at 655). An employer is 'not obligated to show justifiable cause for the discharge.' *Haskell v. Kaman Corp.*, 743 F.2d 113, 119 (2d Cir. 1984). Instead, '[t]he plaintiff in an ADEA case has the burden of showing that he was discharged because of age.' *Id.* 'A business decision need not be good or even wise. It simply has to be nondiscriminatory ....' *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 20 (7th Cir. 1987) (cited in Dister v. Continental Group, Inc., 859 F.2d 1108, 1116 (2d Cir. 1988)). 'Evidence that an employer made a poor business judgment in discharging an employee generally is insufficient to establish a genuine issue of fact as to the credibility of the employer's reasons.' *Dister*, 859 F.2d at 1116; *see Visco v. Community Health Plan*, 957 F. Supp. 381, 388 (N.D.N.Y. 1997) ('[A]n employer may exercise business judgment in making personnel decisions as long as they are not discriminatory.'); *Orisek v. American Inst. of Aeronautics & Astronautics*, 938 F. Supp. 185, 190 (S.D.N.Y. 1996) ('Title VII and the ADEA forbid disparate treatment on the basis of age, gender and national origin, but they may not be invoked merely to challenge the wisdom of any employer's decision.').

*Gray*, 991 F. Supp. at 100.

Accordingly, the disagreement that Plaintiff has with the Bank's business judgment, and the one it is anticipated he will raise in his opposition papers, must be rejected. Such matters are simply not relevant, and the plaintiff's business judgment cannot be substituted by this Court for that legitimate business judgment, right or wrong, exercised by the Bank when it denied his

request for outside employment based upon the time necessarily and admittedly committed to running for and holding office in the New York State Assembly.

**C.      Plaintiff Cannot Prove that the Bank's Reasons Were a Pretext for Discrimination.**

Even assuming, arguendo, that Plaintiff could establish a *prima facie* case of discrimination, Defendants are still entitled to summary judgment because Plaintiff can neither demonstrate that Defendants' articulated reasons for its actions were a pretext for discrimination nor carry his ultimate burden of adducing evidence from which a reasonable juror could conclude that the Bank constructively discharged Plaintiff's employment because of his political activity.  Even if Plaintiff were to offer evidence that the Bank's proffered reasons were false, which he cannot do, he must still present evidence that would enable a jury to conclude that discrimination against his political activity was the "real reason" for the actions at issue.

As the Second Circuit explained, once the employer has articulated non-discriminatory reason for the challenged employment actions, the presumption of discrimination vanishes and the burden shifts back to the plaintiff to come forward with evidence that the employer's proffered explanations were merely pretextual and that the actual motivations more likely than not were discriminatory. *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 469-70 (2d Cir. 2001), cert. denied, 534 US 1993 (2001).

**1.      Bassin's Alleged Remarks are Inadmissible Hearsay.**

Plaintiff's Complaint alleges a wild conspiracy between the Bank, Arthur Bassin, a member of the Board of Directors of the Bank, and Didi Barrett, the incumbent Democrat running for New York State Assembly in District 106 against Truitt. Plaintiff speculates that because Bassin has contributed financially to Barrett's campaign in prior years, it made him "uncomfortable" that a Bank employee was running against her and, as such, conspired with

21

Bank management to have his employment terminated. Complaint ¶ 28. However, the record evidence simply does not support Plaintiff's speculation. First, neither Arthur Bassin nor any member of the Board of Directors was involved in the Bank's decision to deny Truitt's request for outside employment. *Id*. ¶ 29. In fact, Bassin testified that he had never heard Truitt's name until Plaintiff filed this lawsuit. SOMF ¶¶ 67-68. Plaintiff has no personal knowledge or evidence of any facts to dispute this.

Plaintiff alleges only that Cantele and Cahill told him that Bassin was "uncomfortable" with Plaintiff's run for office. Plaintiff then infers that Bassin's alleged discomfort with Plaintiff's run was because he was a Republican and running against Barrett. *Id.* ¶ 60. Nothing in the record, however, supports Plaintiff's conclusory and self-serving position that he was uncomfortable because of his political party affiliation and his opponent. *Zuckerman v City of New York*, 49 NY2d 557, 562 (1980) ("[M]ere conclusions, expressions of hope or unsubstantiated allegations or assertions are insufficient."). It is as likely a scenario that he was uncomfortable with the time commitment the position would require. Plaintiff's allegations are pure speculation and, therefore, may not support Plaintiff's claims in this matter. *See Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008)* ("[M]ere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment"); *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996).

Moreover, although Defendants dispute that Bassin made any statements regarding Truitt's run for office, even if true, it is inadmissible double hearsay and cannot be considered on a motion for summary judgment. *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 525 (2d Cir. 1996) ("When deciding a motion for summary judgment, only admissible evidence may be considered."); *Deluca v. Bank of Tokyo-Mitsubishi UFJ, Ltd.*, 06 Civ. 5474, 2008 WL 857492, at

*8 (S.D.N.Y. Mar. 31, 2008) ("inadmissible hearsay [] cannot be considered on this motion for summary judgment"). As such, given the lack of evidentiary support for Plaintiff's claims, Defendants' motion for summary judgment must be granted and Plaintiff's Complaint dismissed with prejudice.

        **2.**      **Defendants Were Aware of Plaintiff's Political Activity At the Time of Hire -the Only Change in the Political Activity was the Time Commitment.**

Even if Truitt claims that the Bank terminated his employment (and that he did not resign), Plaintiff's claims of pretext fail because Cantele and Cahill hired Plaintiff, fully aware of his political activity as a member of the Republican caucus in the Dutchess County legislature, just three months prior to his "termination." The underlying rationale for the "same actor" inference against discrimination is simple: it is nonsensical to claim that the same individual (or individuals) who hired a person in the protected class would shortly thereafter develop an aversion to members of that class. *See Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 560 (2d Cir. 1997) (noting that "in cases where the hirer and firer are the same individuals and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer"); *Watt v. N. Y Botanical Garden*, No. 98 Civ. 1095(BSJ), 2000 WL 193626, at *6 (S.D.N.Y. Feb. 16, 2000) (reasoning that it is suspect to claim that the same manager who hired a person in the protected class would shortly thereafter develop an aversion to members of that class). As such, Plaintiff cannot establish that the Bank's concerns regarding the time commitment of campaigning for and holding office as a state Assemblymember were pretext for discrimination and his Complaint must be dismissed with prejudice.

### 3. Other Bank Employees Engage in Political Activity on the Republican Ticket and Have Not Been Terminated.

Particularly fatal to Plaintiff's discrimination claim is his inability to identify any comparators, *i.e.*, other employees who engaged in political activity and were terminated as a result. *See Deshpande v. Medisys Health Network, Inc.*, 2010 WL 1539745, at* 15 (E.D.N.Y. Apr. 16, 2010) (granting summary judgment to employer on retaliation claims because of plaintiff's lack of comparators). Here, several other employees have been granted permission to engage in outside political activity by the Bank. SOMF ¶ 23. Notably, and unlike Plaintiff's request to be permitted to maintain his employment at the Bank and employment as an elected official on the New York State Assembly, these outside activities occurred outside the Bank's regular working hours. *Id.* at No. 24. And like Plaintiff's approved political activity as a Dutchess County legislator, other Bank employees have been elected to these positions on the Republican ticket, including Doug Cahill. As such, Plaintiff cannot demonstrate pretext and Defendants' motion for summary judgment should be granted.

### III. Plaintiff's Punitive Damages Claim Should Be Dismissed.

While punitive damages are available to a prevailing plaintiff under New York State Human Rights Law, such damages are appropriate only where "the employer has engaged in intentional discrimination and has done so with malice or with reckless indifference to the … protected rights of an aggrieved individual." *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 101-102 (2d Cir. 2001). (internal citations omitted). An award of punitive damages requires a showing that "a defendant not only intentionally discriminated but did so in the face of a perceived risk that these actions are prohibited by law." *Id.* at 102.

Truitt has not met the relevant standard for imposing punitive damages. He has not alleged any specific facts or provided any evidence that would show that the Bank discriminated

against him with malice or a reckless indifference to his protected rights.  Indeed, the undisputed facts demonstrate that it was Plaintiff who made the decision to leave his employment at the Bank.  Although the Bank advised that it would not grant Plaintiff's outside employment request due to the time commitment, the Bank never terminated Truitt's employment.  Plaintiff accepted employment at the Bank understanding that his role was a full time position in which he work, at a minimum 40 hours per week.  He reviewed and signed off on the Employee Handbook, in which he agreed that his "first professional responsibility is to the position [he accepted] here at Salisbury Bank." *See* Fischer Decl., Ex. V.  The Bank, in its business judgment, determined that Truitt's request to spend at least 60 days away from the office and unavailable to clients affected the efficient performance of his job duties and affected his regular work hours.  Whether Plaintiff was seeking outside employment for a position as a pilot, handyman or state assemblyperson, the considerations and determination regarding outside employment would be the same.  Accordingly, Plaintiff cannot establish that the Bank acted with malice towards him and, therefore, his claim for punitive damages should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment should be granted and the Complaint should be dismissed in its entirety.

Dated: December 13, 2019
     Newark, New Jersey

                              */s/ Jennifer I. Fischer*
                              Jennifer I. Fischer
                              Amber M. Spataro (admitted *pro hac vice*)
                              LITTLER MENDELSON, P.C.
                              One Newark Center, 8th Floor
                              Newark, New Jersey 07102
                              jfischer@littler.com

                              *Attorneys for Defendants*