LITTLER MENDELSON, P.C.
One Newark Center – 8th Floor
Newark, New Jersey 07102
*Attorneys for Defendants*
  *Salisbury Bank and Trust Company and Salisbury Bancorp, Inc.*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM GUNNAR TRUITT,<br><br>Plaintiff,<br><br>-against-<br><br>SALISBURY BANK AND TRUST COMPANY;<br>AND SALISBURY BANCORP, INC.,<br><br>Defendants. | Civil Action No.: 7:18-cv-08386-NSR-PED<br><br>**DEFENDANTS' STATEMENT OF**<br>**UNDISPUTED MATERIAL FACTS**<br>**PURSUANT TO FRCP 56.1** |

Defendants Salisbury Bank and Trust Company and Salisbury Bancorp, Inc., by their attorneys Littler Mendelson, P.C., submit this statement of undisputed material facts in support of its motion for summary judgment to dismiss the Complaint of Plaintiff William Gunnar Truitt ("Truitt" or "Plaintiff").

**Background**

1. Salisbury Bank and Trust Company is chartered as a state bank and trust company by the State of Connecticut and provides products and services to customers in Connecticut, Massachusetts and New York.

2. Salisbury Bancorp, Inc. is an independent, publicly-owned banking and financial services company that became the bank holding company for Salisbury Bank and Trust Company on August 24, 1998.[1]

---

[1] Salisbury Bancorp, Inc. and Salisbury Bank and Trust Company are referred to herein as the "Bank."

**Truitt's Employment with the Bank**

3. On January 29, 2018, the Bank made Truitt an offer of employment to work as a Mortgage Lending Officer Trainee in its Residential Lending Department. *See* Exhibit D-4 to the Deposition of Plaintiff William Gunnar Truitt ("Truitt Dep. Tr."), which is attached as **Ex. J** to the Declaration of Jennifer I. Fischer ("Fischer Decl.").

4. Pursuant to his offer letter, Truitt was classified as a full-time hourly employee during his training period, earning $16.83 based upon a 40 hour work week. *Id.*

5. Truitt was provided 6.46 hours of paid time off per pay period, with an annual accrual of 21 days. *Id.*; *see also* Fischer Decl., **Ex. K**.

6. Truitt's offer letter also defined his employment relationship with the Bank as "at will," advising that "[his] employment is not for a fixed term" and that both Truitt and the Bank may terminate the employment relationship at any time and for any reason. Fischer Decl., **Ex. J**.

7. Truitt's first day of employment was February 26, 2018. *See* Fischer Decl., **Ex. J**.

8. Upon hire, the Bank provided Truitt with a development plan that detailed the timeline for the completion of his training program, which was approximately six months. *See* Fischer Decl., **Ex. L**.

9. The Bank also provided Truitt with a job description for a Mortgage Originator Trainee position. *See* Fischer Decl., **Ex. M**.

10. During the training period, Truitt would be responsible for successfully developing and understanding a series of lending and sales skills, including, but not limited to, customer services, sales, underwriting and lending. *See* Fischer Decl., **Ex. M**.

11. The training period would be focused on developing some of the following competencies:
    a. Originating residential portfolio and secondary market loans. Meeting with applicants and collecting documentation and required information.

                Negotiating structure, pricing and terms of loan - along with developing effective client communication skills.

    b.    Developing and maintaining a network of real estate brokers, builders, and attorneys for referrals. Provide them with mortgage marketing materials via fax and personal visits on a weekly basis. Actively participate in other marketing programs as needed.

    c.    Making loan recommendations for approval as required under bank policy. Closing and/or attending closings for residential loans and mortgages.

    d.    Servicing existing banking relationships as Account Officer. Ensuring receipt of updated financial statements, following up on customer needs, providing advice and visits customer sites as needed.

    e.    Gain working knowledge of the mortgage lending industry and interest rate environment.

    f.    Monitoring existing portfolio and recommending appropriate action on credit quality rating, problem loan recognition and remedial management. Performing assigned collection duties.

*See* Fischer Decl., **Ex. M**.

    12.    The Bank provided Truitt with an approximate six-month training program, during which time Truitt would work 2-3 days per week with the Residential Credit Underwriting Department and the remainder of the week with the Residential processors. *See* Fischer Decl., **Ex. L**.

    13.    Should Truitt successfully complete the Bank's training program, the Bank anticipated that, in or around September 2018, Truitt would work for approximately another four (4) months with internal staff and "Centers of Influence," such as real estate agents and attorneys, to develop relationships in Dutchess, Ulster and Orange Counties in New York. *See* Fischer Decl., **Ex. L**.

    14.    During this four-month secondary training period (September 2018 to January 2019), Truitt would be paid a $2,500 per month draw on future commissions. *Id.* at **Ex. L**.

    15.    Assuming that Truitt performed to expectations during his training period, Truitt would be promoted to a full-time position of Mortgage Loan Officer in January 2019 and,

thereafter, he would be compensated based solely on commission. *Id.* at **Ex. L.**

16.   Because Truitt's employment with the Bank ended on May 1, 2018, at no time during Truitt's tenure with the Bank was he paid on a commission basis, either as a draw or in full. *See* Fischer Decl., **Ex. B,** Truitt Dep. Tr. at 48:5-19.

**The Bank Hired Truitt Knowing Of His Prior Political Activities (As It Had Many Others)**

17.   At the time of his hire by the Bank, Truitt was a Republican member of the Dutchess County Legislature, who was elected to a second term of November 2016 through December 31, 2019. *See* Fischer Decl., **Ex. N**; *see also* Fischer Decl., **Ex. B**, Truitt Dep. Tr. 29:16-30:5.

18.   At all relevant times, the Bank was aware of Truitt's seat as a Republican in the Dutchess County Legislature and that he would continue in this role even after he became employed by the Bank. *See* Fischer Decl., **Ex. N**; *see also* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 30:6-22; 30:23-31:2.

19.   Management of the Bank approved Truitt's outside employment as a Dutchess County legislator upon hire. *See* Fischer Decl., **Ex. Q**; *see also* Fischer Decl., **Ex. G**, Richard Cantele Dep. Tr. at 40:3-42:10.

20.   In an email to all Bank employees welcoming Truitt as a new hire, the Bank specifically highlighted Truitt's political activity, noting that "Will serves as the youngest elected county official in the State of New York as a Legislator in Dutchess County. He represents approximately 15,000 people who call the Town of Hyde Park and the Town of Poughkeepsie home." *See* Fischer Decl., **Ex. H**.

21.   According to Truitt, he spent an average of 15 hours per week on his responsibilities as a Dutchess county legislator, which included committee, caucus and board

meetings, which occurred outside of regular work hours in the evenings. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 32:11-25, 33:7-12.

22. Like Truitt, other Salisbury employees were engaged in political activity outside of their working hours, including Doug Cahill, the Bank's Vice President of Human Resources, who ran for the Republican nomination for the Board of Education in the Town of Sharon, Connecticut and was elected in or around 2012 and remains on the Board of Education. *See* Declaration of Douglas Cahill ("Cahill Decl.") at ¶ 8; *see also* Fischer Decl., **Ex. E**, Cahill Dep. Tr. at 124:10-125:14. Cahill is also active on the Town of Sharon's Republican Committee and attended the State of Connecticut Republican conference in 2018 as a delegate. Cahill Decl. at ¶ 9.

23. In addition to Cahill, numerous other current Bank employees serve in political office in some fashion: Darilyn Woods is an alternate member of the Board of Finance for the Town of Cornwall, Connecticut, Jennifer Anderson is a member of the Board of Education in Sharon, Connecticut, Jean Stapf is a member of the Board of Education for the Pine Plains School District in New York, and Robert Wiseman is a member of the Board of Assessment Review for the Town of Kinderhook, Connecticut. *See* Fischer Decl., **Ex. U**, which are memos to the HR/Compensation Committee from Douglas Cahill, dated May 31, 2013, June 27, 2014, June 26, 2015, June 24, 2016, April 28, 2017, May 25, 2018 detailing various employees' requests for outside activities/employment.

24. Each of these positions referenced in Paragraph 25 above are volunteer positions with a time commitment of, at most, ten (10) hours per month. *Id.*

**The Bank Has Numerous Policies Regarding Outside Employment.**

25. Upon hire, Truitt was provided a copy of the Bank's Employee Handbook, which

provides a provision regarding Outside Activities/Employment. *See* Fischer Decl., **Ex. V**.

26. The Bank's handbook provides:

Salisbury Bank supports our local community in many ways and encourages employees to participate in community activities. If you wish to accept a position, with or without compensation, with a governmental agency, a for-profit or a not-for-profit organization, either as a stockholder, director, officer, sole proprietor partner, or employee, you need to first notify the Human Resource Administrator or the President. Any potential problems may be discussed with you and the request will be reviewed to see if any conflict of interest would exist, if a conflict exists, this outside appointment or employment will not be allowed, Please remember that your first professional responsibility is to the position you have accepted here at Salisbury Bank. Salisbury Bank does not object to your accepting outside work as long as it does not (a) interfere with your regular work hours (or necessary overtime); (b) affect the efficient performance of your regular duties; (c) cause you to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest.

*Id.*

27. The Bank also has a Code of Ethics and Conflicts of Interest Policy that Truitt received upon hire which provides provisions regarding outside employment and Contributions regarding political activities. *See* Fischer Decl., **Ex. W**.

28. The Bank's Code of Ethics states regarding Outside Employment states:

With respect to an employee of the Corporation, employment is a fulltime career unless otherwise provided by the appropriate Board of Directors (or in the case of a non-officer employee, as provided by executive management). The undivided interest and loyalty of employees is important to the continued success of the Corporation, Thus, employment with, or acting as consultant to, outside firms is permitted only if it is approved in advance by the appropriate Board of Directors (or in the case of a non-officer employee, executive management). In determining whether to approve such outside employment, the appropriate Board of Directors (or in the case of a non-officer employee, executive management) shall consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;
2. Will it involve the possibility of adverse publicity to the Corporation;
3. Is it with a competitor, supplier or customer;
4. Does it imply sponsorship by the Corporation; and

> 5. Does it involve serving as a director, officer, manager or consultant?
>
> Any such approval shall not be deemed a waiver of this provision of this Policy.
>
> In addition, certain affiliations by directors, officers and employees are specifically prohibited by law. Examples of such prohibitions include serving as a director, officer, and/or employee of:
>
> 1. A public utility holding company or its affiliates (16 U.S.C. §825d(b)).
> 2. An interstate power company (16 U.S.C. §825d(b)) or having certain specified affiliations with a registered investment company (15 U.S.C. §80a-10(c)).
> 3. Most unaffiliated depository institutions within the Corporation's market area, subject to certain exemptions pursuant to state and federal law.

p. 6 of Code of Ethics, Exhibit D-14, Fischer Decl., **Ex. W**.

29. With regard to Contributions – Political Activities, the Bank's Code of Ethics states:

> The Corporation, as a responsible citizen, encourages contributions to worthy charitable, social and educational causes. However, due to the requirements of the working environment, employee contributions to political or charitable organizations may not be solicited on the Corporation's premises or during working hours without prior management approval. Directors, officers and employees shall not contribute directly or indirectly on behalf of the Corporation, time, money, service or favors to political parties, candidates or workers. The Corporation is prohibited from engaging in politics or making political contributions including the use of its facilities and/or supplies.
>
> Any director, officer or employee who wishes to take an active role as a political candidate for any elective public office or is considered being appointed to any governmental or civic position, must discuss the details and receive prior approval from the Chief Executive Officer and appropriate Board of Directors.

p. 6-7 of Code of Ethics, Exhibit D-14, Fischer Decl., **Ex. W**.

**Truitt's Campaign for New York State Legislature**

30. On April 12, 2018, Truitt announced on Facebook his campaign to run for a seat in the New York State Assembly. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 80:10-13.

-7-

31. However, Truitt had not previously notified Human Resources or his supervisor of his decision to run for office, as required by the Bank's Handbook policy on Outside Activities; nor did he receive approval from the Board of Directors or President as required in the Code of Ethics. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 80:79:17-80:19.

32. Upon learning of Truitt's announcement on Facebook, Amy Raymond, Truitt's supervisor, and Doug Cahill, Vice President of Human Resources, requested a meeting with Truitt to determine what kind of time commitment such a campaign (and subsequently job) would entail. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. 80:20-82:20, 85:8-86:5; 86:16-18; *see also* Fischer Decl., **Ex. E**, Cahill Dep. Tr. at 99:17-100:4.

33. When asked about his Facebook post at that meeting held on April 13, 2018, Truitt said that he was meaning to tell Raymond about it, but that he did not have time because the decision and nomination happened so quickly. At this same meeting, Raymond and Cahill asked Truitt to provide them with a written explanation as to what the job would entail if he were elected. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. 88:18-29:4; *see also* Fischer Decl., **Ex. E**, Cahill Dep. Tr. 100:10-19.

34. Truitt provided this letter, along with the parameters of the Assembly role. Upon receipt of the letter, management reviewed the role with respect to a potential conflict of interest and with respect to the amount of time away from the Bank and Bank business that the job would require. *See* Fischer Decl., **Ex. S**.

35. Upon review of the state Assembly calendar provided by Truitt, it became clear that Truitt would be required to spend *at a minimum* 2-4 days per week – 60 business days - in Albany for more than half of the year. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 89:5-90:16; *see also* Fischer Decl., **Ex. E**, Cahill Dep. Tr. 50:6-52:6.

36. For the 2018 Legislative Session, the legislature convened on January 3, 2018 and was in session on the following dates: January 8, 9, 16, 17, 22, 23, 29 and 30; February 5, 6, 12, 13, 27 and 28; March 5, 6, 7, 12, 13, 14, 15, 19, 20, 21, 22, 26, 27, 28 and 29; April 16, 17, 18, 23, 24, 25 and 30; May 1, 2, 7, 8, 9, 14, 15, 16, 22, 23, 30 and 31; and June 4, 5, 6, 7, 11, 12, 13, 14, 18, 19, 20. *See* Fischer Decl., **Ex. S**.

37. Although Plaintiff alleges that there are days where the legislative sessions run "an hour, two hours at the most," he testified at his deposition that "I was never an assemblyman and so I wasn't entirely positive of what the times would be." *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 94:17-24.

38. The state capital in Albany is "approximately an hour and 15 minutes" from the Newburgh, New York branch of Riverside Bank where Plaintiff would be employed after the completion of his MLO training. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 93:18-22.

39. At the time of Truitt's employment with the Bank, members of the State Assembly earn a $79,500 salary. Today, members of the New York State Assembly earn $110,000 per year. *See* https://www.nytimes.com/2018/12/09/nyregion/ny-state-senate-assembly-salary.html, attached as **Ex. T** to the Fischer Decl.

40. Given the salary that Plaintiff would earn as an Assemblymember, as compared to the $17,000 per year Truitt earned as a Dutchess county legislator, the Bank considered the State Assembly job as one that would require full-time work and commitment on Truitt's end to his constituents. *See* Fischer Decl., **Ex. E**, Cahill Dep. Tr. 137:4-17.

41. Truitt acknowledged that, prior to the election, he would engage in a campaign for the seat and that his campaigning would continue even after he would be elected. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 114:6-9.

42. Truitt testified at his deposition that, despite obtaining new employment at Bridgeview Excavation in May 2018, he did not work at all between the end of July 2018 and November 6, 2018, Election Day in order to focus on his campaign. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 139:5-141:7.

43. The Riverside Division residential lending market, which Truitt served as a Trainee and would be serving as a Mortgage Loan Officer ("MLO") for the Bank upon completion of his training, was an emerging market for the Bank. *See* Declaration of Richard Cantele ("Cantele Decl."), ¶ 8, filed concurrently herewith.

44. The primary duty of a MLO relates to sales and customer services, such as soliciting and counseling customers that are looking to either purchase or refinance a home or seek to obtain a construction loan or mortgage and assist them through the processing and closing of that loan. *See* Cantele Decl., ¶ 9; *see also* Fischer Decl., **Ex. D**, Spring Burke Dep. Tr. at 14:20-19:5.

45. In this customer-facing business, where competing banks offer similar products and services, a distinguishing factor in being able to get new business and retain current customers is relationship building and customer service so an MLO must be responsive and available to their clients at their convenience, including being physically present to close on a property. Cantele Decl., ¶ 9; *see also* Fischer Decl., **Ex. D**, Spring Burke Dep. Tr. at 14:20-19:5; and **Ex. C**, Kevin Cantele Dep. Tr. at 5:25-6:5.

46. Residential MLOs often work more than 50 hours per week, and there was a concern by the Bank that Truitt's job duties as an assemblymember would not permit him to focus all of his energies to his clients at the Bank. *See* Cantele Decl., ¶ 10.

47. On April 26, 2018, Cahill met with Truitt and informed him that the Bank was

concerned that he could not effectively fulfill the requirements and responsibilities of his future MLO position as well as the requirements and responsibilities of a State Assembly seat and, therefore, the Bank's management would not provide an exception to the Bank's policy on outside employment. *See* Fischer Decl., **Ex. E**, Cahill Dep. Tr. at 79:18-80:21; *see also* Fischer Decl., **Ex. G**, Richard Cantele Dep. Tr. at 117:20-118:6.

48. Of particular concern to Cantele was the fact that Truitt had been hired to serve as a MLO, upon the completion of his training, in a new market, where Salisbury Bank nor its Riverside Division previously had any residential lending business. It would be incumbent on Truitt to develop significant business in that region and it would be necessary for him to be present, developing relationships with local real estate agents and attorneys. *See* Cantele Decl., ¶ 8.

49. After being advised that no policy exception would be granted, Truitt requested to meet with and met with Richard ("Rick") Cantele, CEO of the Bank, on April 30, 2018 to request to both campaign/work in the State Assembly as an elected official and also work full time for the Bank; however, Cantele reiterated that the Bank "did not believe that Truitt would be able to fulfill his position as a residential originator given the responsibilities as we knew them to be relative to the Assembly position in New York." *See* Fischer Decl., **Ex. G**, Richard Cantele Dep. Tr. at 73:19-24.

50. Cantele further testified that the Bank "[was] concerned, and we relayed our concerns, regarding his ability to fulfill the role the bank was looking for in the Riverside division, and tak[ing] this other job which required him to be out of the bank for at least sixty days a year. And common sense would say, given this job, that there would be campaigning to be done." *Id.* at 29:15-24.

51. At no time did Cahill or Cantele advise Truitt that his employment with the Bank was terminated or state that Truitt's employment would be terminated if he proceeded with his campaign. *See* Fischer Decl., **Ex. E**, Cahill Dep. Tr. 89:6-12.

52. Cahill asked only that Truitt let the Bank know by Tuesday, May 1, 2018 whether he still intended to run for office understanding that the Bank did not approve his outside employment request. *Id.* at 89:6-12.

53. Although the Bank may have had to make a decision whether to terminate Truitt's employment if his campaigning interfered with his employment at the Bank or if Truitt was elected to office; however, before any decision by the Bank was made regarding Truitt's future with the Bank, on May 1, 2018, Truitt resigned from his position. *See* Fischer Decl., **Exs. O and P**.

54. In an email to Amy Raymond and Andrea MacArthur dated May 1, 2018, Truitt states that "I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November." *See* Fischer Decl., **Ex. O**.

55. Truitt acknowledges in his deposition that "[b]oth Doug and Rick reiterated to me that the main concern is that, if elected, I would not have the necessary time it takes to be a successful originator and grow our brand in New York." *See* Fischer Decl., **Ex. O**.

56. Truitt also admits that Cantele advised if Truitt was not successful in the November election, he should consider coming back to the Bank to fill the same residential role or perhaps even another rule in the commercial lending division, evidencing the Bank's sole concern was with the time commitment associated with a state assemblymember role. *See*

Fischer Decl., **Ex. O**.

57. Truitt also thanked Raymond and MacArthur, writing "I cannot thank the both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with." *See* Fischer Decl., **Ex. O**.

58. On that same date, Truitt also sent an email to Doug Cahill, in which he states that "I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in New York history is one I cannot give up, nor can I let down my community who has asked me to run." *See* Fischer Decl., **Ex. P**.

59. Truitt also stated in the email that "I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and willingness to meet with me yesterday." *See* Fischer Decl., **Ex. P**.

60. In closing, Truitt advised in the email that he had a company laptop, key-fob and parking garage badge that he needed to return to the Bank and asked Doug how he should return these items. *See* Fischer Decl., **Ex. O**.

**Truitt's Allegation that Arthur Bassin Engaged in a Conspiracy with Didi Barrett To Terminate His Employment.**

61. Truitt alleges that Cahill told him that Arthur Bassin, a member of the Bank's Board of Directors, was "not comfortable" with Truitt running for state assembly in District 106.

*See* Fischer Decl., **Ex. A**, Complaint ¶28.

62.     Truitt infers that the reason that Bassin was "not comfortable" with Truitt running for State Assembly was because he was a "long-time political and financial supporter of Didi Barrett (Dianne Dewitt Barrett), the three-term incumbent Democratic New York Assemblymember for District 106 – the same district for which Mr. Truitt had recently announced his Republican candidacy." *See* Fischer Decl., **Ex. A**, Complaint ¶29.

63.     Truitt testified at his deposition that Cahill told him that Bassin did not think "it was plausible" to work full-time as a Mortgage Loan Originator and hold elected office in the New York State Assembly. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 112:2-7.

64.     Truitt did not have personal knowledge as to why Bassin was allegedly "uncomfortable" or thought that his running for and holding public office was "not plausible," other than the fact that Bassin was an elected official himself. *See* Fischer Decl., **Ex. B**, Truitt Dep. Tr. at 112:8-10.

65.     Bassin is the Town Supervisor in the Town of Ancram, New York. *See* Fischer Decl., **Ex. F**, Bassin Dep. Tr. at 14:15-16.

66.     Neither Bassin nor any member of the Board of Directors (other than Rick Cantele, who as CEO sat on the Bank's Board) were involved in the Bank's decision to deny Truitt's request for outside employment. *See* Fischer Decl., **Ex. I**, Defendants' Answer to Plaintiff's First Set of Interrogatories #5; *see also* Fischer Decl., **Ex. F**, Bassin Dep. Tr. at 33:2-11, 35:6-14, 58:6-59:11, 59:21025, 60:3-21; **Ex. G**, Richard Cantele Dep. Tr. 38:24-39:18, 122:17-14; and **Ex. E**, Cahill Dep. Tr. at 49:4-20.

67.     No Salisbury employee involved in any discussions regarding whether Plaintiff would be able to fulfill his full-time job duties while campaigning for and/or as a member of the

New York State Assembly, including Doug Cahill, Rick Cantele, Richard Kelly, Andrea MacArthur or Amy Raymond, has provided financial support to a political campaign or political office held by Didi Barrett nor have these employees volunteered time to campaign or work on behalf of Ms. Barrett. *See* Fischer Decl., **Ex. I**, Defendants' Answer to Plaintiff's First Set of Interrogatories #1.

68. Although Bassin had made financial contributions to Ms. Barrett's campaign in prior years, he testified that he was not involved in any discussion regarding Truitt's Outside Employment request and did not know who William Truitt was, or that he was running for a seat in the State Assembly, until he received a copy of the Complaint in this lawsuit. *See* Fischer Decl., **Ex. I**, Defendants' Answer to Plaintiff's First Set of Interrogatories #5; *see also* Fischer Decl., **Ex. F**, Bassin Dep. Tr. at 33:2-11, 35:6-14, 58:6-59:11, 59:21025, 60:3-21.

Dated: December 13, 2019
       Newark, New Jersey

                              */s/ Jennifer I. Fischer*
                              Jennifer I. Fischer
                              Amber M. Spataro (admitted *pro hac vice*)
                              LITTLER MENDELSON, P.C.
                              One Newark Center, 8th Floor
                              Newark, New Jersey 07102
                              jfischer@littler.com

                              *Attorneys for Defendants*

4849-1076-2156.2 099759.1001