UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

WILLIAM GUNNAR TRUITT,

               Plaintiff,

      -against-

SALISBURY BANK AND TRUST COMPANY;
AND SALISBURY BANCORP, INC.,

            Defendants.

Civil Action No.: 7:18-cv-08386-NSR-PED

---

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

MCCULLOUGH GINSBERG
MONTANO & PARTNERS LLP
122 E 42nd Street, Suite 3505
New York, NY 10168
Tel: (646) 435-0300
Counsel for Plaintiff

COUGHLAN LAW OFFICES, LLP
P.O. Box 72, 22 Hutton St.
Rhinecliff, NY 12574
Tel: (845) 802-6684
Co-counsel for Plaintiff

| **TABLE OF CONTENTS** | |
|---|---|
| 1. PRELIMINARY STATEMENT | 1 |
| 2. TIMELINE | 1 |
| 3. SALISBURY FIRED MR. TRUITT FOR MERELY ANNOUNCING HIS CANDIDACY FOR A POLITICAL POSITION HE WAS NEVER OFFERED | 2 |
|    a. Salisbury Told Mr. Truitt To Choose Between His Job & His Political Activity (Undisputed) | 2 |
|    b. Mr. Truitt Wanted To Continue Working At Salisbury (Undisputed) | 2 |
|    c. Mr. Truitt's Political Activity Never Interfered With His Job At Salisbury (Undisputed) | 3 |
| 4. SALISBURY POLICIES REGARDING OUTSIDE EMPLOYMENT AND "POLITICAL ACTIVITIES" | 4 |
|    a. Salisbury Falsely Contends its Policies Prohibit Mr. Truitt's Political Activity | 4 |
|    b. Salisbury's Policies Prohibit Infringement Upon Employees' "Political Activities" | 4 |
|    c. Salisbury's MLOs Are Not On Call "24/7" | 5 |
| 5. NY STATE ASSEMBLYMEMBERS DO NOT SPEND "AT A MINIMUM 2-4 DAYS PER WEEK" IN ALBANY "FOR MORE THAN HALF OF THE YEAR." | 6 |
| 6. LAW | 7 |
|    a. Summary Judgment Standard | 7 |
|    b. Mr. Truitt's Campaign For New York Assembly Was Legal And Protected Political Activity That Occurred Outside Of Working Hours, Off Of Salisbury's Premises, And Without Use Of Salisbury's Equipment Or Other Property (All Undisputed) | 7 |
|    c. New York Labor Law § 201-d | 8 |
|    d. Constructive Discharge | 8 |
|    e. Hearsay | 9 |
| 7. MR. TRUITT HAS ESTABLISHED ALL FOUR ELEMENTS OF A PRIMA FACIE DISCRIMINATION CASE | 10 |
|    a. Mr. Truitt Is A Member Of A Protected Class (Undisputed); | 11 |
|    b. Mr. Truitt Was Performing His Job Satisfactorily (Undisputed); | 11 |
|    c. Mr. Truitt Suffered From An Adverse Employment Action; and | 12 |
|    d. The Adverse Action Occurred Under Circumstances Giving Rise To An Inference Of Discrimination | 13 |
| 8. DAMAGES | 16 |
|    a. Mr. Truitt's Damages Are Well Supported And Unrefuted | 16 |
|    b. Salisbury's Allegation Of No Damages Is Unreliable And Unsupported | 17 |
| 9. PUNITIVE DAMAGES | 17 |
|    a. Salisbury Falsified Records, Depriving Mr. Truitt Of Multiple Benefits (Undisputed) | 17 |
|    b. Pilot Non-Discrimination Example | 21 |
| 10. CONCLUSION | 21 |

| **TABLE OF AUTHORITIES** | |
|---|---|
| 1.  New York Labor Law § 201-d | 1 |
| 2.  Fed. R. Civ. P. 56(a); see also Redd v. N.Y. Div. of Parole, 678 F.3d 166, 174 (2d Cir. 2012) | 7 |
| 3.  Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000) | 7 |
| 4.  Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 162 (2d Cir. 2006) | 7 |
| 5.  Schiano v. Quality Payroll Sys., 445 F.3d 597, 603 (2d Cir. 2006) | 7 |
| 6.  Shabbir v. Pakistan Int'l Airlines, No. 99 Civ. 5601, 2008 U.S. Dist. LEXIS 27957, 2008 WL 938427, at *3 (E.D.N.Y. Apr. 7, 2008) | 7 |
| 7.  Green v. Brennan, 136 S. Ct. 1769, 1777 (2016). | 8 |
| 8.  Kelly v. Metro-North C. R.R., No. 87 Civ. 5817 (JFK), 1989 U.S. Dist. LEXIS 15025, at *22 (S.D.N.Y. Dec. 18, 1989) | 9 |
| 9.  U.S. Info. Sys. v. IBEW Local Union No. 3, 2006 (S.D.N.Y. Aug. 1, 2006) | 9 |
| 10. Fed. R. Evid. 801(d)(2)(D) | 9 |
| 11. Fed. R. Evid. 805 | 10 |
| 12. U.S. Info. Sys. v. IBEW Local Union No. 3, 2006 (S.D.N.Y. Aug. 1, 2006) | 10 |
| 13. Hudson v. Merrill Lynch & Co., Inc., 138 A.D.3d 511, 514 (1st Dep't 2016) | 11 |
| 14. Farias v. Instructional Sys., 259 F.3d 91, 101 (2d Cir. 2001) | 20 |
| 15. Chauca v. Abraham, 30 N.Y.3d 325, 328, 67 N.Y.S.3d 85, 87, 89 N.E.3d 475, 477 (2017) | 20 |

## 1. PRELIMINARY STATEMENT

It is undisputed that Salisbury approached Mr. Truitt about ending his career, and not the other way around. It is also undisputed that Mr. Truitt's campaign for New York State Assembly constitutes protected political activity under New York Labor Law § 201-d which occurred outside of working hours, off Salisbury's premises, and without the use of any Salisbury equipment or property. The fact that Mr. Truitt's protected political activity is the reason he is no longer employed at Salisbury is also undisputed. For these and other reasons provided and explained below, Mr. Truitt respectfully requests that Salisbury's motion be denied in its entirely with prejudice and any further and additional relief the Court deems appropriate.

## 2. TIMELINE

The following is a brief chronology of the key events leading up to Mr. Truitt's termination.

| April 13, 2018 | Director of HR and Mr. Truitt's supervisor asks Mr. Truitt for information about his campaign. |
|---|---|
| April 16, 2018 | Mr. Truitt provides Salisbury with detailed information about his campaign for NYS Assembly and assures Salisbury it will not interfere with his work.[1] |
| April 23, 2018 | Director of HR and Mr. Truitt's supervisors congratulate Mr. Truitt on becoming an "an active MLO!" Mr. Truitt excitedly tells his mother he is "not getting fired!"[2] |
| April 27, 2018 | Salisbury Directors Bassin and Banta (both supporters of Mr. Truitt's political opponent) are informed that a Salisbury "Mortgage Originator" and "Dutchess County Legislator" recently announced "his campaign to run for NYS Assembly," in a meeting, the minutes of which state "he must make a decision whether to run for office or to continue employment with the Bank."[3] |
| April 30, 2018 | Salisbury's tells Mr. Truitt he must choose between his job and his campaign for NYS Assembly.[4] |

[1] Ex. 1, D-000109.
[2] Ex. 2, D-000107; Ex. 3, P000105 (April 23, 2018 text messages between Mr. Truitt and his mother).
[3] Ex. 4, D-001120 at *127 (April 27, 2018 Salisbury Board of Directors Meeting Minutes, first produced on August 22, 2019 only after Salisbury deponents brought these and other responsive unproduced materials to our attention during depositions). We note that Salisbury contends Mr. Truitt was not identified *by name* to Directors Bassin and Banta, a contention that we dispute and discuss *infra*.
[4] Ex. 6, MacArthur Dep. 28:12-18; Ex. 7, D-000104 (May 1, 2018 email from Mr. Truitt to his supervisors Andrea MacArthur and Amy Raymond informing them that he was "truly saddened" that Salisbury's CEO (Rick Cantele) and Director of Human Resources (Doug Cahill) had "confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November.); Ex. 8, Complaint ¶ 27; Ex. 9, R. Cantele Dep. 27:16-23.

| May 1, 2018 | Salisbury fires Mr. Truitt and falsely records the date of Mr. Truitt's termination as April 30, 2018, *i.e.*, the day before Mr. Truitt's benefits went into effect.[5] |
|---|---|

## 3. SALISBURY FIRED MR. TRUITT FOR MERELY ANNOUNCING HIS CANDIDACY FOR A POLITICAL POSITION HE WAS NEVER OFFERED

### a. Salisbury Told Mr. Truitt To Choose Between His Job & His Political Activity (Undisputed)

Salisbury's documents and witnesses have conclusively established that Salisbury instructed Mr. Truitt to choose between his job and his political campaign for New York State Assembly. Salisbury's Director of Human Resources testified that Mr. Truitt "would have to make a decision" if he "wanted to continue with his -- with his campaign for the Assembly."[6] Similarly, when we asked Andrea MacArthur, one of Mr. Truitt's supervisors, "who told Mr. Truitt that he needed to choose between his job at Salisbury and his campaign, his political campaign for New York State Assembly," she responded "That would be hearsay because I wasn't there in the room, but I had heard that it was Rick Cantele."[7]

### b. Mr. Truitt Wanted To Continue Working At Salisbury (Undisputed)

Salisbury has not disputed the fact that Mr. Truitt wanted to continue working at Salisbury or provided any evidence that would enable a jury to conclude Mr. Truitt voluntarily ended his employment at Salisbury. The May 1, 2018 email from Mr. Truitt that Salisbury remarkably refers to as a "resignation letter" is not a resignation letter. In that letter, Mr. Truitt states "I know that if given the chance, I would be able to prove myself that I can be a very successful originator in NYS even if elected to the State Assembly."[8]

---

[5] These actions are discussed and evidenced throughout this memorandum.
[6] Ex. 10, Cahill Dep. 85:16-19. Similarly, when Mr. Cahill was asked "Did you ever tell Mr. Truitt that he needed to choose between his job at Salisbury and his campaign for New York State Assembly," he responded, "I told him we needed a decision as to what he was going to do by that Tuesday," *i.e.*, May 1, 2018. *Id*. at 90:6-11.
[7] Ex. 6, MacArthur Dep. 28:12-18.
[8] Ex. 11, D-000103 (complete copy of the May 1, 2018 email that Salisbury falsely calls a resignation letter).

When one of Mr. Truitt's two supervisors, Andrea MacArthur, was asked "Did Mr. Truitt ever indicate to you that he wanted to end his Salisbury employment," she responded "No."[9]

Notably, on the same day that Salisbury falsely claims Mr. Truitt "voluntarily resigned," Mr. Truitt sent an email to both of his supervisors explaining why he was being fired and who was firing him in substantial detail.[10]  Specifically, Mr. Truitt stated:

> Hi Amy and Andrea, I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele yesterday, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November. . . . I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with.

### c.  Mr. Truitt's Political Activity Never Interfered With His Job At Salisbury (Undisputed)

It is undisputed that Mr. Truitt's political activity never interfered with his work at Salisbury, which Salisbury witnesses have confirmed.[11]  For example, when Salisbury CEO Rick Cantele was asked if he had any "knowledge of Mr. Truitt's campaigning interfering with his ability to do his job at Salisbury," Mr. Cantele, who was closely involved with Mr. Truitt's termination, responded "No."[12]  This is not an outlier.  To date, Salisbury has produced zero testimony or evidence indicating Mr. Truitt's political activity interfered with his work for Salisbury.

---

[9] Ex. 6, MacArthur Dep. 28:8-11.
[10] Ex. 7, D-000104 (May 1, 2018 email from Mr. Truitt to supervisors MacArthur and Raymond).
[11] We also note that, although false and misleading overall, ¶ 53 of Salisbury's Statement of Undisputed Material Facts also confirms Mr. Truitt's campaign never interfered with his job ("Although the Bank may have had to make a decision whether to terminate Truitt's employment *if* his campaigning interfered with his employment at the Bank or if Truitt was elected to office . . . .").
[12] Ex. 9, R. Cantele Dep. 31:21-25.

4. **SALISBURY POLICIES REGARDING OUTSIDE EMPLOYMENT AND "POLITICAL ACTIVITIES"**
   a. **Salisbury Falsely Contends its Policies Prohibit Mr. Truitt's Political Activity**

Although any policies prohibiting the protected political activity at issue in this case would be unlawful, Salisbury's policies did not even prohibit Mr. Truitt from engaging in the protected political activity at issue in this case.  The outside employment policy in Salisbury's Employee Handbook only purports to apply "[i]f you wish to *accept* a position."[13]  Salisbury's Director of Human Resources, Doug Cahill, also confirmed Salisbury's policies do not govern employees who merely apply for or interview for outside employment.  Specifically, when we asked Mr. Cahill if "it's your testimony that it violates bank policy to apply for or interview for a role outside of Salisbury without first seeking approval from Salisbury management,"  he responded "No. I wouldn't go that far to say it violates policy."[14]  Accordingly, even Salisbury agrees its policies did not require Mr. Truitt to apply for permission to apply for a role outside of Salisbury (*e.g.*, NYS Assembly).

   b. **Salisbury's Policies Prohibit Infringement Upon Employees' "Political Activities"**

Salisbury's own Employee Handbook also prohibits the discriminatory and retaliatory actions Salisbury took against Mr. Truitt.  Specifically, Salisbury's Employee Handbook states:[15]

> Nothing in this policy (or any other Bank policy) will be implemented or should be interpreted in any manner so as to prohibit or inhibit employees from engaging in any lawful activities through social media, including exercising any rights they may have to engage in protected concerted activity or political activities.

---

[13] Ex. 12, D-000123 at *159 (Salisbury Employee Handbook) (emphasis added).
[14] Ex. 10, Cahill Dep. 84:6-12.
[15] Ex. 12, D-000123 at *164 (Salisbury Employee Handbook).

Mr. Truitt reviewed the sections of the Employee Handbook regarding outside employment and social media usage prior to announcing his campaign and confirmed it would not violate Salisbury's policies.[16]

### c. Salisbury's MLOs Are Not On Call "24/7"

Salisbury's full-time Mortgage Loan Originators (MLOs) are 100% commissioned, generally need to work when their clients are not busy working, and are not required to work all business hours.[17]  Salisbury cites no evidence or testimony in support of its new and false claim that Salisbury MLOs "are expected to be responsive and on-call to client needs 24/7."[18]  The unsupported nature of that new representation, which we never had an opportunity to discuss during the depositions of Salisbury's two full-time MLOs, is established by Salisbury's own documents.  For example, another full-time Salisbury MLO recently received a "Proficient" mark in the "CUSTOMER RELATIONS" section of his formal performance review after he "improved his follow up times with leads within 24 hours or receipt," *i.e.*, Salisbury's "24/7" argument is clearly not the standard that Salisbury actually imposes.[19]  Notably, that same MLO's Performance Appraisal for the prior year stated his customer relations performance was unacceptable, noting he "need[ed] to follow up with leads *within 24 hours of receipt*."[20]

Finally, and most importantly, if Salisbury's biologically impossible "on-call . . . 24/7" argument were endorsed by a court, it would void and immunize employers from New York Labor Law § 201-d liability, because all political activities take time, § 201-d only protects "political

---

[16] Ex. 13, Truitt Declaration ¶ 8.
[17] Ex. 13, Truitt Declaration ¶ 18-19.
[18] Salisbury Br. at 2.
[19] Ex. 14, D-000981 at *983 (MLO Keven Cantele's 2017 Performance Appraisal).
[20] Ex. 15, D-000992 at *994 (MLO Keven Cantele's 2016 Performance Appraisal) (emphasis added).

activities *outside of working hours*," and accordingly, if courts allowed employers to defend themselves by claiming all hours are working hours, no political activities would be protected.

5.  **NY STATE ASSEMBLYMEMBERS DO NOT SPEND "AT A MINIMUM 2-4 DAYS PER WEEK" IN ALBANY "FOR MORE THAN HALF OF THE YEAR."**

Salisbury claims that, "Upon review of the state Assembly calendar provided by Truitt, it became clear that Truitt would be required to spend at a minimum 2-4 days per week - 60 business days – in Albany for more than half of the year."[21] Every part of that statement is false, unsupported by the testimony Salisbury cites,[22] and unsupported by the New York State Legislative Session Calendar to which Salisbury refers.[23] No reasonable jury could conclude that January 3, 2018 to June 20, 2018 is "more than half of the year," or conclude Mr. Truitt "would be required to spend at a minimum 2-4 days per week" in Albany based upon the calendar Salisbury references as its source, which includes three weeks with zero session days and one week with only one session day.[24]

Every aspect of that claim by Salisbury is also false because Mr. Truitt has never been offered or held a NYS Assembly position. Nonetheless, even if every part of that objectively false claim by Salisbury were true, NYS Assembly sessions often last no more than one to two hours, and rarely reach a half day in length.[25] We also note that Salisbury provided Mr. Truitt with "three weeks of vacation and then one week of personal time,"[26] which, had Mr. Truitt been elected, would have been more than enough time for him to attend every single Assembly session (which most Assemblymembers do not do).

---

[21] Salisbury Br. at 7.
[22] ¶ 35 of Salisbury's Statement of Undisputed Material Facts cites Ex. 16, Truitt Dep. "at 89:5-90:16" and Ex. 10, Cahill Dep. at "50:6-52:6" in support of that assertion.
[23] Ex. 1, D-000109 at *112 (2018 New York State Legislative Session Calendar).
[24] Ex. 1, D-000109 at *112 (2018 New York State Legislative Session Calendar).
[25] Ex. 13, Truitt Declaration ¶ 11.
[26] Ex. 10, Cahill Dep. 61:11-18.

**6. LAW**
    **a. Summary Judgment Standard**

        Summary judgment is only proper when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012).

        The function of the courts is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000). The role of the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

        Notably, the Second Circuit has made it clear that "an extra measure of caution is merited" when considering summary judgment in discrimination cases because "direct evidence of discriminatory intent is rare" and "often must be inferred from circumstantial evidence." *Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006).

    **b. Mr. Truitt's Campaign For New York Assembly Was Legal And Protected Political Activity That Occurred Outside Of Working Hours, Off Of Salisbury's Premises, And Without Use Of Salisbury's Equipment Or Other Property (All Undisputed)**

        "When a plaintiff submits evidence demonstrating that his termination was improperly based on his outside political activities, defendant bears the burden of coming forth with admissible evidence showing that plaintiff's political affiliations and activities did not play a substantial part in its decision." *Shabbir v. Pakistan Int'l Airlines*, No. 99 Civ. 5601, 2008 U.S. Dist. LEXIS 27957, 2008 WL 938427, at *3 (E.D.N.Y. Apr. 7, 2008) (quoting *Baker v. City of Elmira*, 271 A.D.2d

906, 707 N.Y.S.2d 513, 515 (App. Div. 2000)).  To date, Mr. Truitt's protected political activities

are the only reason Salisbury has provided for terminating Mr. Truitt's employment.

### c.  New York Labor Law § 201-d

N.Y. Labor Law § 201-d(2) provides that:

> [I]t shall be unlawful for any employer or employment agency to . .
> . discharge from employment or otherwise discriminate against an
> individual in compensation, promotion or terms, conditions or
> privilege or employment because of . . . an individual's political
> activities outside of working hours, off of the employer's premises
> and without use of the employer's equipment or other property, if
> such activities are legal.

When an individual's political activities occur outside of working hours, off of the

employer's premises, and without use of the employer's equipment or other property, which are

undisputed facts in this litigation, it becomes "unlawful" to "discharge" or "discriminate against"

such an employee for "running for public office," which is the first of three specific types of

political activities that § 201-d protects.[27]   Accordingly, this is an independent basis for both

finding a violation of § 201-d and denying the entirely of Salisbury's motion with prejudice.

### d.  Constructive Discharge

To the extent Salisbury is allowed to continue arguing Mr. Truitt was not fired, we note

that "a claim that an employer constructively discharged an employee is no different from a claim

that an employer actually discharged an employee." *Green v. Brennan*, 136 S. Ct. 1769, 1777

(2016).

---

[27] N.Y. Lab. Law § 201-d(1)(a) ("'Political activities' shall mean (i) running for public office, (ii) campaigning for a candidate for public office, or (iii) participating in fund-raising activities for the benefit of a candidate, political party or political advocacy group[.]").

The unlawful ultimatum between Mr. Truitt's job and political activity that Salisbury imposed is something the Southern District has already addressed at the summary judgment stage. "Kelly's allegation of constructive discharge is supported by evidence that she was given a choice between termination and acceptance of a less prestigious position coupled with a salary decrease. In the easy first-stage requirement of posing a *prima facie* case, Kelly has demonstrated that she was constructively discharged." *Kelly v. Metro-North C. R.R.*, No. 87 Civ. 5817 (JFK), 1989 U.S. Dist. LEXIS 15025, at \*22 (S.D.N.Y. Dec. 18, 1989). Accordingly, Salisbury's offer to fire (cf. demote) Mr. Truitt would unquestionably fulfill the requirements for a *prima facie* constructive discharge at this stage.

### e. Hearsay

Mr. Bassin's statement that he was not comfortable with Mr. Truitt being a Salisbury employee and candidate for NYS Assembly,[28] as independently relayed to Mr. Truitt by Mr. Cahill and Mr. Cantele, is not hearsay pursuant to Fed. R. Evid. 801(d)(2)(D). "Statements by a party's employees offered against the party are not hearsay so long as the statements concern a matter within the scope of employment and are made during the term of employment." *U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 (S.D.N.Y. Aug. 1, 2006). Meetings regarding Mr. Truitt's political campaign and Salisbury's decision to force Mr. Truitt to "make a decision whether to run for office or to continue employment with the Bank" were matters that Messrs. Bassin, Cantele, and Cahill's Salisbury employment or agency relationship.[29] Specifically, Messrs. Bassin, Cantele, and Cahill

---

[28] Ex. 8, Complaint ¶ 28.
[29] Ex. 4, D-001120 at \*127 (April 27, 2018 Salisbury Board of Directors Meeting Minutes listing Art Bassin, Rick Cantele as "present."). Similarly, Mr. Cahill's involvement in Salisbury's decision to make Mr. Truitt choose between his job and political activity is not in dispute. Among other evidence of Mr. Cahill's involvement discussed throughout this brief, it is undisputed that Mr. Cahill drafted Ex. 5, D-0000415, a memorandum from Mr. Cahill to Art Bassin's Human Resources and Compensation Committee regarding Mr. Truitt's "State Assembly campaign and position" at Salisbury.

were all involved with evaluating Mr. Truitt's NYS Assembly campaign specifically, and the propriety of outside employment by Salisbury employees generally, at the time of Mr. Bassin's statement.[30]

Salisbury's characterization of Mr. Bassin's statement as inadmissible double hearsay similarly cannot withstand Fed. R. Evid. 805, which "permits hearsay within hearsay to be admitted as long as each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." *U.S. Info. Sys. v. IBEW Local Union No. 3*, 2006 (S.D.N.Y. Aug. 1, 2006). Accordingly, Mr. Bassin's statement is admissible.

Furthermore, although the additional statement by both Mr. Bassin and Mr. Cahill that Mr. Truitt would not have time to be a Salisbury employee and NYS Assemblymember also would not be hearsay for the reasons stated above, that statement does not even satisfy the basic definition of hearsay set forth in Fed. R. Evid. 801(c), which defines hearsay as a "statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." We are not offering the statement by both Mr. Bassin and Mr. Cahill that Mr. Truitt would not have had time to be a Salisbury employee and a NYS Assemblymember for the truth of the matter asserted therein. In fact, Mr. Truitt always has and continues to dispute the veracity of that statement, which we are not offering to prove the truth of the matter asserted therein and are only offering for the purpose of explaining Salisbury's subsequent conduct.

## 7. MR. TRUITT HAS ESTABLISHED ALL FOUR ELEMENTS OF A PRIMA FACIE DISCRIMINATION CASE

To establish a prima facie case of discrimination, Plaintiff must show that: (1) he is a member of a protected class; (2) he was performing his job satisfactorily; (3) he suffered from an

---

[30] *Id.*

adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Hudson v. Merrill Lynch & Co., Inc.,* 138 A.D.3d 511, 514 (1ˢᵗ Dep't 2016).

### a. Mr. Truitt Is A Member Of A Protected Class (Undisputed);

The protected nature of Mr. Truitt's political activity is undisputed and discussed *supra*.

### b. Mr. Truitt Was Performing His Job Satisfactorily (Undisputed);

The fact that Mr. Truitt performed his job satisfactorily is undisputed and corroborated by both of Mr. Truitt's supervisors. It also remains undisputed that Mr. Truitt's political activity never interfered with his work. Mr. Truitt's supervisors provided positive written and oral feedback to Mr. Truitt on multiple occasions. Andrea MacArthur testified that she gave Mr. Truitt "positive feedback regarding his performance at Salisbury" approximately "five" times, and Amy Raymond described Mr. Truitt as a "personable, eager to learn, pleasant" employee whose "interactions with other employees within the department were pleasant."[31] After Mr. Truitt's first meeting with a potential homebuyer as a Salisbury MLO, Amy Raymond emailed Mr. Truitt to tell him "I thought you did a great job."[32]

Those on-the-job evaluations of Mr. Truitt's performance are in perfect alignment with the way Ms. Raymond summarized Mr. Truitt's qualifications after herself, Ms. MacArthur, and Salisbury's Director of Human Resources interviewed Mr. Truitt:[33]

> Doug sat down with will and immediately picked up on his ability to network and sales personality. He was the youngest person ever elected to the Dutchess county legislature. Hyde Park and Poughkeepsie is his current district and he is a Marist grad. Young, polished, and not afraid to network. ½ the battle for and originator

---

[31] Ex. 17, Raymond Dep. 20:23-21:7.
[32] Ex. 18, D-0000969.
[33] Ex. 19, D-000116.

and the hardest part to teach (self-motivation). . . . We also were very comfortable with his ability to learn and understanding of regulations. Self-confidence, name recognition and business contacts are important aspects of the role, and Will seems to have them all.

### c.  Mr. Truitt Suffered From An Adverse Employment Action; and

Salisbury callously terminated Mr. Truitt for engaging in political activity that was protected by New York Labor Law and Salisbury's own employment policies, as discussed and evidenced *supra*.  Furthermore, Salisbury failed to state or even suggest Mr. Truitt voluntarily resigned in any part of its Answer or the 11 defenses asserted therein, [34] and such a defense should be waived, as it would be unfairly prejudicial to allow such a material shift in Salisbury's defense strategy when Salisbury's Answer actually suggests Mr. Truitt was terminated.  Specifically, Salisbury's operative Answer states "Defendants employed Plaintiff on an at-will basis and, therefore, could terminate or change the conditions of his employment at any time, with or without prior notice."[35]

After repeatedly asking Salisbury's counsel to identify correspondence that they began characterizing as a resignation letter several months into this litigation, Salisbury finally identified D-000020, which is an email from Mr. Truitt to Andrea MacArthur on the last day of his employment.[36]  Notably, Andrea MacArthur testified under oath that she never saw a resignation letter from Mr. Truitt,[37] and no part of Mr. Truitt's email produced at D-000020 indicates an intent to resign, which further corroborates Mr. Truitt's contention that he was fired.

---

[34] Ex. 20, Answer to Complaint.
[35] Ex. 20, Answer to Complaint at 7.
[36] Ex. 21, D-000020.
[37] Ex. 6, MacArthur Dep. 28:5-7 ("Q So you didn't receive a letter of resignation? A Correct.").

**d.  The Adverse Action Occurred Under Circumstances Giving Rise To An Inference Of Discrimination**

When Mr. Truitt asked why he was being forced to choose between keeping his job and continuing his political campaign, two of the Salisbury executives who were effectuating Mr. Truitt's termination informed him that a Salisbury Director named Art Bassin was not comfortable with Mr. Truitt being an employee of the bank and candidate for *that* office (*i.e.*, the political office held by Art Bassin's friend, a politician named Didi Barrett).[38]

Salisbury was also fully aware of the fact that Mr. Bassin is an elected Democratic official in Columbia County and, upon information and belief, also knew he was a financial supporter of the NYS Assemblymember Mr. Truitt was running against at the time of Mr. Truitt's termination. Notwithstanding Salisbury's actual knowledge of this information, Salisbury allowed Mr. Bassin to engage in flagrant discrimination against Mr. Truitt's political activity and Republican run for NYS Assembly in contravention of N.Y. Labor Law § 201-d.

Those circumstances alone support an inference of discrimination, however, there are also two Salisbury documents that further corroborate and support Mr. Truitt's contention that the real reason for his termination was his protected political activity.

It is undisputed that Art Bassin is the Chairman of the Salisbury committee responsible for evaluating outside employment by Salisbury employees and a long-time financial supporter and friend of the politician Mr. Truitt was running against.  Specifically, Art Bassin is a member of Salisbury's Board of Directors and the Chairman of Salisbury's Human Resources and Compensation Committee.  Salisbury's brief states that, "In determining whether to approve . . . outside employment, the appropriate Board of Directors . . . shall consider all relevant factors."[39]

---

[38] Ex. 16, Truitt Dep. 101:21-24 (Mr. Truitt indicating Art Bassin "wasn't comfortable with this, for myself running for this position and working for the bank.").
[39] Salisbury Br. at 17.

Accordingly, the "appropriate" part of Salisbury's Board must refer to the Board's Human Resources and Compensation Committee, which evaluates outside employment, and includes Directors George Banta and Art Bassin, who are both Didi Barrett donors, among its 5-6 members.[40]

The minutes from an April 27, 2018 Salisbury Board of Directors Meeting regarding Mr. Truitt's political activity and Salisbury's plan to force Mr. Truitt to lose his job or his campaign for NYS assembly indicate that Art Bassin and George Banta were both at that meeting.[41] Although the meeting minutes do not include Mr. Truitt's name, they identify him as a "Mortgage Originator" who is "currently serving as a Dutchess County Legislator" and recently announced a "campaign to run for NYS Assembly." The section of the meeting minutes dedicated to Mr. Truitt's political activity concludes by stating "he must make a decision whether to run for office or to continue employment with the Bank."[42]

Additionally, although Mr. Cahill now claims it was never sent, it is undisputed that Mr. Cahill wrote a memorandum dated April 27, 2018 to the Human Resources and Compensation Committee that Art Bassin directs, stating "William Truitt . . . has recently informed us that he's

---

[40] Salisbury's website and document productions differ slightly in the number of members on the HR/Comp. Committee, but all sources and parties agree that Didi Barrett supporters Art Bassin and George Banta do and did sit on this Committee at all relevant times.

[41] Ex. 4, D-001120.

[42] Ex. 4, D-001120 at *127 (April 27, 2018 Salisbury Board of Directors Meeting Minutes, first produced on August 22, 2019 only after Salisbury deponents brought these and other repeatedly requested, adverse, and improperly withheld materials to our attention during depositions). We also note that we have been unable to obtain or meaningfully question Salisbury witnesses regarding various types of evidence to date. For example, one Salisbury witness informed us she was never even asked about a specific text message on her phone, despite our repeated requests to Salisbury Counsel for one specific and relevant message from her phone. Salisbury has also refused to produce or provide any information regarding missing emails regarding an April 26, 2018 meeting about Mr. Truitt's political activity, which we have repeatedly requested. That request is based in part on an April 30, 2018 email between Mr. Truitt's Salisbury supervisors Amy Raymond and Andrea MacArthur produced at D-0000796 that says "I emailed Doug [Cahill] to let us know" about an April 26, 2018 meeting Doug had with Mr. Truitt regarding Mr. Truitt's political activity. Salisbury has neither produced nor explained the reason for its failure to produce any part of that clearly relevant and repeatedly requested responsive correspondence.

running for the NY State Assembly in November."[43]  Doug Cahill authenticated that memorandum during his July 22, 2019 deposition.[44]  Interestingly, two days later, Art Bassin denied ever having seen or received that memorandum during his deposition, and further indicated he had never even heard of Mr. Truitt before this litigation.  Mr. Bassin did nonetheless confirm that he does review "memoranda that are provided to the HR/Comp Committee in a timely manner" before Board meetings.[45]  Shortly after that contradiction between Mr. Bassin and Mr. Cahill's testimony, on August 2, 2019, Salisbury's counsel informed us that Mr. Cahill wanted to "correct[]" his testimony to indicate the memorandum he wrote regarding Mr. Truitt "was never provided to the HR Compensation Committee."

Notwithstanding this remarkable compilation of evidence regarding Art Bassin's knowledge of Mr. Truitt's campaign for New York State Assembly and involvement in the decision to terminate Mr. Truitt, Salisbury continues to claim that Directors Bassin and Banta had nothing to do with Mr. Truitt's termination, and that Director Bassin had never even heard of Mr. Truitt before this litigation.  Although not required to prevail at this or any stage of this litigation, the overwhelming volume of evidence regarding Mr. Bassin's involvement in Mr. Truitt's termination corroborates the well-substantiated nature of Mr. Truitt's core allegations of discriminatory and retaliatory conduct by Salisbury.

Finally, Salisbury's flagrant falsification of Mr. Truitt's discharge date and elimination of multiple employment benefits for Mr. Truitt, discussed *infra*, provides further support for Mr. Truitt's claims of discrimination and retaliation.

---

[43] Ex. 5, D-0000415 (Memorandum from Doug Cahill to Art Bassin's HR/Comp Committee dated April 27, 2018).
[44] Ex. 10, Cahill Dep. 38:20-24 ("Q. Does P-32 [D-0000415] look like a true and accurate copy of a memorandum that you sent to HR/Compensation Committee on April 27, 2018? A. Yes.").
[45] Ex. 22, Bassin Dep. 33:19-34:1.

8.  **DAMAGES**
    a.  **Mr. Truitt's Damages Are Well Supported And Unrefuted**

A true and accurate copy of Mr. Truitt's expert report, which details the types of Mr. Truitt has and continues to endure as a direct result of his termination, is attached.[46]

Although Mr. Truitt was an active full-time MLO, Salisbury claims Mr. Truitt was a low-level employee who never completed his training, implying he would make no more than $16.83 per hour at any point in his career.  Fortunately, countless documents in Salisbury's own productions explicitly state and confirm Mr. Truitt was an active non-trainee MLO at the time of his termination.[47]  For example, Salisbury's Director of Human Resources sent an email to the "EntireBank" email distribution when Mr. Truitt was hired, introducing him as a "two-term Dutchess County Legislator" who "has accepted a Mortgage Originator position in our Riverside Division," noting Mr. Truitt "will be responsible for mortgage originations in Dutchess, Ulster and Orange Counties."[48] Salisbury's Director of Human Resources also congratulated Mr. Truitt on becoming a fully licensed and active MLO in an April 23, 2018 email to Mr. Truitt and his supervisors, which read "Hi Will – congratulations – you're now an active MLO!"[49]  Mr. Truitt responded "AWESOME!!!  ☺," and just six minutes later, Mr. Truitt sent his mother a text message that read "Looks like I'm not getting fired! They emailed me to congratulate me that I have received my mortgage license! I have my first actual client tomorrow in Newburgh."[50]  Mr. Truitt's supervisors also received the message from Mr. Cahill indicating Mr. Truitt was an active MLO, and independently responded "Awesome!!!!!" and "Great!".[51]

---

[46] Ex. 31, Expert report of Kris Kucsma dated August 30, 2019.
[47] Ex. 23, Salisbury documents identifying Mr. Truitt as a non-trainee Mortgage Loan Originator including D-000024, D-000034, D-000035, D-000036, D-000054, D-000107-108 (confirming Salisbury registered Mr. Truitt as an "Active" "MLO" with the Federal Deposit Insurance Corporation as of "4/16/2018"), and D-0000449.
[48] Ex. 24, D-000065.
[49] Ex. 2, D-000107.
[50] Ex. 3, P000105 (April 23, 2018 text messages between Mr. Truitt and his mother).
[51] Ex. 2, D-000107.

One of Mr. Truitt's supervisors also told him he "did a great job" with his client in Newburgh shortly thereafter.[52]  Accordingly, Salisbury's self-serving claims that Mr. Truitt was not an MLO lack any factual basis or credibility.

**b. Salisbury's Allegation Of No Damages Is Unreliable And Unsupported**

Salisbury's expert report includes a series of inappropriate non-economic vocational opinions and damages calculations that are based on unsupported and apparently biased assumptions, *e.g.*, that Mr. Truitt's Salisbury career would have ended by no later than 2023 in any event.  Also concerning is the biased and objectively false conclusion in Salisbury's expert report that Mr. Truitt was not entitled to or deprived of any type of benefits, discussed *supra*.  Accordingly, to the extent Salisbury's reply to this memorandum relies upon any of the calculations or ultimate conclusions set forth in its expert report, they should be excluded from consideration.

**9. PUNITIVE DAMAGES**

**a. Salisbury Falsified Records, Depriving Mr. Truitt Of Multiple Benefits (Undisputed)**

It is undisputed that Salisbury falsified Mr. Truitt's termination date in numerous records and that Salisbury's backdating of Mr. Truitt's termination prevented him from receiving multiple employment benefits.  Depicted below is one of many examples from Mr. Truitt's personnel file showing that Salisbury backdated Mr. Truitt's termination to the day before the "Effective Date" of his benefits:[53]

---

[52] Ex. 18, D-0000969.
[53] Ex. 25, D-000022, D-000024 (depicted), D-000034, D-000054, and D-0000449 (Examples of Salisbury records falsely stating that Mr. Truitt's employment ended the day before his employment benefits went into effect.).

| Select Coverage | Policy # | Coverage | Class | Plan Type | Eligibility Date | Effective Date | Termination Date |
|---|---|---|---|---|---|---|---|
| ☐ | GL159009 | Basic AD&D | 1 | Core | 4/27/2018 | 5/1/2018 | |
| ☐ | GL159009 | Basic Life | 1 | Core | 4/27/2018 | 5/1/2018 | |
| ☐ | LTD129737 | Long Term Disability | 1 | Core | 4/27/2018 | 5/1/2018 | |
| ☐ | STD166164 | Weekly Disability | 1 | Core | 4/27/2018 | 5/1/2018 | |
| ☐ | GL159009 | Basic AD&D | 2 | Core | 4/27/2018 | 5/1/2018 | 4/30/2018 |
| ☐ | GL159009 | Basic Life | 2 | Core | 4/27/2018 | 5/1/2018 | 4/30/2018 |
| ☐ | LTD129737 | Long Term Disability | 2 | Core | 4/27/2018 | 5/1/2018 | 4/30/2018 |

Specifically, although the fact that Mr. Truitt's employment ended on May 1, 2018 is no longer in dispute,[54] Salisbury falsely recorded and continued to represent the date of Mr. Truitt's termination as April 30, 2018 for more than one year, until Salisbury's witnesses declined to perjure themselves, and admitted that it was actually not until May 1, 2018 that Mr. Truitt's employment ended.[55]

It is undisputed that the effective start date for multiple of Mr. Truitt's employment benefits was May 1, 2018.[56]  To date, Salisbury has not provided any logical or benign explanation for its flagrant falsification of Mr. Truitt's termination date, which strongly suggests Salisbury's conduct was malicious, retaliatory, and discriminatory.  Similarly, Salisbury still has not retracted or corrected its false, misleading, and disparaging emails regarding the date and nature of Mr. Truitt's departure, such as an email to the entire bank indicating Mr. Truitt voluntarily "resigned his Mortgage Originations position" in order to "pursue his political ambitions."[57]

Even more concerning is the fact that Salisbury's expert economist appears to be knowingly using this falsified April 30, 2018 termination date in his calculations and in support of

---

[54] Salisbury Br. at 4.

[55] Ex. 17, Raymond Dep. 60:15-19 (Q. "it's your understanding that May 1, 2018, was the last day of Mr. Truitt's employment; is that correct?" A. "Correct."); Ex. 9, R. Cantele Dep. 101:23-102:2 (Q. "Mr. Truitt's Salisbury employment ended May 1, 2018, correct?" A. "I would say that's correct.").

[56] Ex. 23, D-000024 (list of Mr. Truitt's employment benefits with an "Effective Date" of "5/1/2018" and falsified "Termination Date" of "4/30/2018").

[57] Ex. 27, D-000018.

his contention that Mr. Truitt was not "entitled to any benefits from Salisbury at the time of his departure," even though Salisbury's expert memorialized his knowledge of the fact that Mr. Truitt's employment ended "on May 1, 2018" in his report, which acknowledges "economic loss damages in an alleged wrongful termination case should also be inclusive of any benefits the employee was eligible to receive at the time of termination."[58]  When we asked Salisbury's expert to explain why he was using different termination dates for different calculations in his report, he could not provide anything resembling a coherent answer.[59]  Finally, when we asked Salisbury's expert if any aspect of his analysis would be affected by using a May 1, 2018 termination date instead of an April 30, 2018 termination date, he responded "yeah, it might change C1 if it had been in May."[60]  C1 is a paragraph in Salisbury's expert's report in which Salisbury's expert falsely concludes Mr. Truitt "did not suffer a loss of benefits."[61]

Even if an award of punitive damages did require a showing that Salisbury "intentionally discriminated . . . in the face of a perceived risk that these actions are prohibited by law," as Salisbury claims,[62] we presume that Salisbury's Human Resources department certainly knows that it is illegal to falsify the date of an employee's termination to prevent them from receiving any type of earned compensation, such as the benefits Mr. Truitt had earned as of May 1, 2018. Furthermore, Salisbury's brief does not accurately summarize the Farias opinion, which also states "[a]s an alternative to proving that the defendant knew it was acting in violation of federal law,

---

[58] Ex. 28, 2019.09.30 Salisbury Bank's Expert Report by Donald J. Musso at 5-6, 21, and 41.
[59] Ex. 29, Musso Dep. 27:15-31:22 (denying Mr. Truitt's eligibility for benefits with no cognizable basis); 49:20-51:5 (apparently claiming Mr. Truitt's employment ended on two different dates, stating Mr. Truitt's "official date of resignation would have been April -- Monday April 30. That means on May 1 would have been his first day of separation of employment which is what I do say, so I do stand by my document.").
[60] Ex. 29, Musso Dep. 85:12-86:10.
[61] Ex. 28, September 30, 2019 Salisbury Expert Report by Donald J. Musso at 6.
[62] Salisbury Br. at 24, citing *Farias v. Instructional Systems, Inc.*, 259 F.3d 91, 101-102 (2d Cir. 2001).

egregious or outrageous acts may serve as evidence supporting an inference of the requisite evil motive." *Farias v. Instructional Sys.*, 259 F.3d 91, 101 (2d Cir. 2001).

Although we contend that Salisbury's conduct in this case is sufficient to satisfy even the punitive damages standard as stated in Salisbury's brief, we also note that the New York Court of Appeals has also addressed and characterized the *Farias* standard relied upon by Salisbury as follows:

> *Farias v Instructional Sys., Inc.* (259 F3d 91 [2d Cir 2001]) failed to engage in the analysis required for New York City Human Rights Law (City HRL) purposes; a limitation of punitive damages to circumstances where a reckless disregard for the risk of violating the City HRL has been shown is too narrow a standard; alternatives that better fulfill the uniquely broad purposes of the City HRL are available.

*Chauca v. Abraham*, 30 N.Y.3d 325, 328, 67 N.Y.S.3d 85, 87, 89 N.E.3d 475, 477 (2017)

In fact, the N.Y. Court of Appeals in *Chauca* actually notes that the "Second Circuit has, by certified question, asked us to determine the applicable standard" for punitive damages, and the *Chauca* court concluded "plaintiff is entitled to punitive damages where the wrongdoer's actions amount to willful or wanton negligence, or recklessness, or where there is 'a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.'" *Id*. at 329.

Although the conduct by Salisbury, discussed *supra*, constitutes a colorable claim for punitive damages under any of the standards proffered in this litigation, *Chauca* is the standard that should be applied in this case.   Accordingly, because Mr. Truitt has properly plead and evidenced a strong case for punitive damages under *Chauca*, Mr. Truitt's punitive claims must survive summary judgment.

### b.   Pilot Non-Discrimination Example

Salisbury closes its brief by stating that its treatment of Mr. Truitt "would be the same" if he were "seeking outside employment for a position as a pilot, handyman or state assemblyperson," and "[a]ccordingly, Plaintiff cannot establish that the Bank acted with malice towards him and, therefore, his claim for punitive damages should be dismissed."[63]  It is not very often that the veracity of self-serving hypotheticals of this type can be evaluated objectively, but this is one of those cases.  Interestingly, the ostensibly non-discriminatory Human Resources committee that Art Bassin runs for Salisbury considered this exact hypothetical less than one month after Mr. Truitt's termination.  Specifically, Mr. Bassin and his committee considered and "unanimously approved" another Salisbury employee's actual (cf. sought) outside employment as a "Pilot" on May 25, 2018.[64]   Accordingly, this constitutes yet another compelling piece of evidence that Salisbury acted maliciously and intentionally to harass and terminate Mr. Truitt.

In view of this extensive record of Salisbury's intentional and malicious discrimination and retaliation, Mr. Truitt's claims sounding in punitive damages should proceed to trial.

## 10. CONCLUSION

It remains undisputed that Mr. Truitt performed his job satisfactorily and performed all of his protected political activity outside of working hours, off of Salisbury's premises, and without use of Salisbury equipment or property.  It also remains undisputed that Mr. Truitt's political

---

[63] Salisbury Br. at 25.
[64] Ex. 26, D-001130 at *134-135 (May 25, 2018 Human Resource and Compensation Committee Minutes approving Salisbury employee Darrel Long's outside employment as a "Pilot" and listing George Banta and Chairman Art Bassin as "present").  We also further note that, in addition to Salisbury's objectively false pilot hypothetical, Salisbury also suggests its actions would have been "no different" if Mr. Truitt had "created a successful company" (Salisbury Br. at 2), however, the Minutes referenced in this footnote remarkably also indicate that Mr. Bassin's committee unanimously approved Salisbury employee Maurice Bowerman's outside employment with "Bowerman Financial" on the same day.  Public records indicate Mr. Bowerman is the CEO of Bowerman Financial. Ex. 30, Bowerman Financial, Inc. record printed from financecompanies.org on January 12, 2020.

activity never interfered with his work and did cause his employment to end.  Accordingly, because

this is precisely the type of conduct that New York Labor Law § 201-d was created to protect, we

respectfully request an Order denying Salisbury's Motion for Summary Judgment in its entirety

with prejudice and any further and additional relief the Court deems appropriate.


Respectfully submitted,

Robert B. Lower
Ted McCullough
*Attorneys for Plaintiff*
MCCULLOUGH GINSBERG
MONTANO & PARTNERS LLP
rlower@mgpllp.com
tmccullough@mgpllp.com
122 East 42nd Street, Suite 3505
New York, New York 10168
Phone: (646) 747-6895


Dated: New York, NY
       January 13, 2020