**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM GUNNAR TRUITT, | Civil Action No.: 7:18-cv-08386-NSR-PED |
| Plaintiff, | |
| -against- | **DECLARATION OF** |
| | **ROBERT B. LOWER** |
| SALISBURY BANK AND TRUST COMPANY; AND SALISBURY BANCORP, INC., | |
| Defendants. | |

**ROBERT B. LOWER** hereby declares pursuant to 28 U.S.C. § 1746:

I am an attorney-at-law admitted to practice before this Court and an Associate with the law firm of McCullough Ginsberg Montano & Partners, counsel for Plaintiff William Gunnar Truitt in the above-captioned matter. I submit this Certification with respect to each of the 31 exhibits to Plaintiff's January 13, 2020 Opposition to Salisbury Defendants' motion for summary judgment.

1.    **Exhibit 1** is a true and correct copy of an April 16, 2018 email and attachments from Mr. Truitt to Mr. Cahill and his supervisors Ms. Raymond and Ms. MacArthur produced by Salisbury from D-000109 to D-000115, said attachments comprising true and accurate copies of a letter from Mr. Truitt to Mr. Cahill and Ms. Raymond regarding Mr. Truitt's political activity, the 2018 New York State Legislative Session Calendar, and a NYS Legislative Ethics Commission publication entitled "Standards of conduct relating to outside employment or business activity."

2.    **Exhibit 2** is a true and correct copy of email chain regarding Federal MLO Registration status produced by Salisbury at D-000107.

3.    **Exhibit 3** is a true and correct copy of April 23, 2018 text messages between Mr.

Truitt and his mother, produced by Mr. Truitt at P000105.

4.      **Exhibit 4** is a true and correct copy of April 27, 2018 Salisbury Board of Directors Meeting Minutes produced by Salisbury at D-001120.

5.      **Exhibit 5** is a true and correct copy of a memorandum dated April 27, 2018 and addressed to Salisbury's Human Resources and Compensation Committee regarding Mr. Truitt which Salisbury produced at D-0000415.

6.      **Exhibit 6** are true and correct copies of referenced pages from the transcript of Andrea MacArthur's deposition taken July 1, 2019.

7.      **Exhibit 7** is a true and correct copy of email correspondence from Mr. Truitt to his supervisors dated May 1, 2018, produced by Salisbury at D-000104.

8.      **Exhibit 8** is a true and correct copy of the Verified Complaint in this action, dated August 21, 2018.

9.      **Exhibit 9** are true and correct copies of the referenced pages from the transcript of Richard Cantele's deposition taken July 29, 2019.

10.     **Exhibit 10** are true and correct copies of the referenced pages from the transcript of Douglas Cahill's deposition taken July 22, 2019.

11.     **Exhibit 11** is a true and correct copy of email correspondence from Mr. Truitt to his Salisbury supervisors on May 1, 2018, produced by Salisbury at D-000103.

12.     **Exhibit 12** is a true and correct copy of the January 2018 Salisbury Employee Handbook produced by Salisbury at D-000123.

13.     **Exhibit 13** is a true and correct copy of William Truitt's Declaration dated January 10, 2020.

14.     **Exhibit 14** is a true and correct copy of the 2017 Performance Appraisal for MLO

Keven Cantele produced by Salisbury at D-000981.

15.     **Exhibit 15** is a true and correct copy of the 2016 Performance Appraisal for MLO Keven Cantele produced by Salisbury at D-000992.

16.     **Exhibit 16** are true and correct copies of the referenced pages from the transcript of Mr. Truitt's June 27, 2019 deposition.

17.     **Exhibit 17** are true and correct copies of the referenced pages from the transcript of Amy Raymond's July 1, 2019 deposition.

18.     **Exhibit 18** is a true correct copy of Salisbury employee information and status change forms produced by Salisbury at D-000996 and D-000997.

19.     **Exhibit 19** is a true and correct copy of email correspondence between Rick Cantele and Amy Raymond produced by Salisbury at D-000116.

20.     **Exhibit 20** is a true and correct copy of Salisbury Defendants' Answer to Mr. Truitt's Complaint dated September 24, 2018.

21.     **Exhibit 21** is a true and correct copy of May 1, 2018 email correspondence from Mr. Truitt to his supervisors Andrea MacArthur and Amy Raymond produced by Salisbury at D-000020.

22.     **Exhibit 22** is a true and correct copy of the referenced pages from the transcript of Art Bassin's July 24, 2019 deposition.

23.     **Exhibit 23** comprises true and correct copies of documents produced by Salisbury at D-000024, D-000034, D-000035, D-000036, D-000054, D-000107, D-000108, and D-0000449, namely, Salisbury documents regarding Mr. Truitt's job title and the "Effective" and "Termination" dates recorded with respect to Mr. Truitt's Salisbury benefits.

24.     **Exhibit 24** is a true and correct copy a February 14, 2018 email from Douglas

Cahill to the "EntireBank," introducing Mr. Truitt as a new Salisbury hire, produced by Salisbury at D-000065.

25.     **Exhibit 25** comprises true and correct copies of documents produced by Salisbury at D-000022, D-000024, D-000034, D-000054, and D-0000449, namely, Salisbury records indicating Mr. Truitt's employment was "Terminated" or "Ended" on April 30, 2018.

26.     **Exhibit 26** is a true and correct copy of the Human Resources and Compensation Committee Minutes dated May 25, 2018 produced by Salisbury at D-001136.

27.     **Exhibit 27** is a true and correct copy of a May 18, 2018 Salisbury email from Douglas Cahill to Salisbury's "EntireBank" distribution produced by Salisbury at D-000018.

28.     **Exhibit 28** is a true and correct copy of Salisbury's Expert Report by Donald J. Musso, served via email by Salisbury's counsel on September 30, 2019.

29.     **Exhibit 29** is a true and correct copy of the referenced pages from the transcript of Salisbury expert Donald J. Musso's deposition on November 7, 2019.

30.     **Exhibit 30** is a true and correct copy of a publicly available record regarding a New York entity called BOWERMAN FINANCIAL, INC. printed from financecompanies.org on January 12, 2020.

31.     **Exhibit 31** is a true and accurate copy of Mr. Truitt's Expert Report by Kristin Kucsma dated August 30, 2019, along with an affidavit from Ms. Kucsma authenticating her report.

Dated: January 14, 2020
        New York, New York

*/Robert B. Lower/*
Robert B. Lower
McCullough Ginsberg Montano & Partners LLP
122 East 42nd Street, Suite 3505
New York, NY 10168
rlower@mgpllp.com
(646) 747-6895
*Counsel for Plaintiff*

**Douglas Cahill**

| | |
|---|---|
| **From:** | William Truitt |
| **Sent:** | Monday, April 16, 2018 11:56 AM |
| **To:** | Douglas Cahill; Amy Raymond |
| **Cc:** | Andrea MacArthur |
| **Subject:** | Letter of Notice |
| **Attachments:** | Will Truitt - Letter.pdf |

Good Morning Doug and Amy!

I have attached to this email a copy of a letter I drafted to each of you regarding my candidacy in this November's elections in New York State. I hope this clears everything up. Please let me know if there is anything else further I can provide.

Hope you both have a nice time on your vacations!

Best Regards,
Will

1

D-000109

Attn: Mr. Douglas Cahill, Ms. Amy Raymond

Doug & Amy,

I write this letter to serve as notice that I am on the path to becoming a candidate for New York State's 106th State Assembly District on Election Day this November. The district consists of twenty municipalities, nine of which are located in Dutchess County and eleven of which are located in Columbia County. (It is important to note that I am not officially on the ballot as a candidate until petitions are filed with the State Board of Elections in July).

It was in mid-March of this year that I was approached by several colleagues and many neighbors who asked that I consider entering as a candidate for the State Assembly. After deep and thoughtful consideration, I made the decision to pursue the nomination last week at the Dutchess County Republican Committee Convention, where I was one of multiple candidates being considered. It was the evening of Tuesday, April 10th where I was officially endorsed, and publicly announced my candidacy immediately following.

The New York State Assembly is a part-time legislature made up of citizen legislators, many of whom hold outside employment in addition to their position as members of this elected body. The State Assembly enters session in January and concludes in June of each year, and is held in Albany at the State Capitol Building. In regards to the scheduling of sessions, I have included with this letter the New York State Legislative Session Calendar for 2018 as an example of the frequency of meetings. Monday sessions begin in the mid-afternoon, while sessions held on other days begin in the late morning.

In my decision making, I considered most prominently what the effects of winning in November would have on my schedule in 2019 and beyond. If becoming a State Assemblyman were to change my ability to dedicate myself and my work to Salisbury Bank and our customers, I absolutely would not have entered this election as a candidate. In speaking with numerous state elected officials and other experienced individuals that are familiar with working in the State Assembly, it was made very clear that I will be able to maintain full-time work and be very successful in my role as a Mortgage Loan Originator with our bank while serving as Assemblyman.

Working in our mortgage department these past two months has solidified one assumption of mine: that my lifelong career will be in finance. Throughout my time thus far at Salisbury Bank & Trust, I have gained a tremendous understanding of the mortgage market as well as a strong idea for what the position of Mortgage Loan Originator entails. Each and every day that I have been in training, whether it be in processing, underwriting, or originating, I have truly enjoyed learning the details and intricacies of the work that our department performs. I know that this role will be one that I will enjoy very much, and it is a role that I will take great pride in succeeding in. I am tremendously excited to begin originating in the near future, and know that there is much room for growth for our bank in the Hudson Valley and New York State as a whole.

In regards to ethics and ensuring that there are no conflicts of interest, I have also attached with this letter a link to New York State's "Standards of Conduct Relating to Outside Employment or Business Activity". As it states: "It is not intended to prohibit citizen-legislators from having outside interests which result in financial gain, but only to prohibit financial gains made at the expense of the public trust". It is very common for assemblymembers and other part-time elected officials to work in other professions full-time, similar to my current circumstances as a County Legislator. Working in the Assembly and for Salisbury Bank definitively provides no conflict of interest in and of itself.

To that note, there is no more important asset to an originator or an elected official than a good, strong reputation, and I will continue to serve our customers and the community with the utmost of integrity and respect.

Currently serving in the Dutchess County Legislature, I dedicate on average between 15-20 hours each week toward attending Legislative Meetings as well as assisting constituents of mine. If elected to the New York State Assembly, I will no longer hold the position of County Legislator, and will thus shift that time toward my duties at Salisbury Bank & Trust along with the Assembly.

At the end of the day, I am an incredibly motivated and ambitious person, and will always work my hardest to be the best at what I do. My drive and my hunger to succeed will certainly help me to thrive in this position as a Mortgage Loan Originator.

All the Best,

Will Truitt



# New York State Legislative Session Calendar
## January — June 2018



The New York State legislative session calendar establishes a schedule for the 2018 legislative session and provides dates important to the legislative process. The session calendar is intended to afford Members flexibility in conducting legislative business in Albany and planning activities within their home districts. The session calendar will foster orderly and timely consideration of legislation. Unforeseen events may require modification of the session calendar.

### JANUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | 22 | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | 30 | 31 |   |   |   |

### FEBRUARY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 |   |   |   |

### MARCH

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | 6 | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 | 31 |

### APRIL

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 |   |   |   |   |   |

### MAY

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 |   |   |

### JUNE

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   |   | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| January 3 | 2018 Legislative Session convenes | February 19 | Presidents' Day |
|---|---|---|---|
| January 8 | Start of sessions | April 1 | Beginning of new Fiscal Year |
| January 15 | Martin Luther King, Jr. Day | May 28 | Memorial Day |
| January 16 | Final Day for Submission of Executive Budget |   |   |

 Indicates session day



# NYS Legislative Ethics Commission

**ABOUT**    **FORMS & INSTRUCTIONS**    **ADVICE & GUIDANCE**    **DOCUMENTS**

**BYLAWS, RULES, & STATUTES**

*Home » Standards of conduct relating to outside employment or business activity*

# Standards of conduct relating to outside employment or business activity

*The Legislative Ethics Commission has approved generic advice on the topic listed below. The guidance offered is general in nature and the Commission's response to individual questions may vary according to the facts of each particular request. You are strongly advised to consult Commission staff or your counsel's office for advice pertaining to your individual situation.*

## GENERIC ADVICE

*The following advice pertaining to outside employment and business activity was approved by the Commission in*

## CONTACT US

Members and Staff can contact our office:

Monday - Friday
8:30am to 5:00pm
Senate Ext. 2142
Assembly Ext. 5218

## FILE A COMPLAINT

Instructions for filing a formal complaint with the Joint Commission on Public Ethics

Go to Instructions

D-000113

*response to a request for an advisory opinion from a member of the legislature. The same advice would apply to employees who are engaged in outside business activity.*

The general rule in Public Officers Law § 74 (2) is intended to guard against substantial conflicts of interest between a member's outside activities and his official duties. It is not intended to prohibit citizen-legislators from having outside interests which result in financial gain, but only to prohibit financial gains made at the expense of the public trust.

If a member's outside interest will be affected by an official act on his part, the test to be applied is whether any impact on his outside interest which results from his sponsorship or voting on state legislation is similar to that realized by other members of the business, profession, occupation or group affected. If so, he may sponsor or vote on such legislation.

### ADDITIONAL CONCERNS

*The Commission has cautioned members and employees who are engaged in outside employment or business activity to be mindful of and adhere to the prohibitions in Public Officers Law § 73.*

Under Public Officers Law § 73 (7) (a), a member or employee of the legislature is prohibited from making an appearance or rendering service before a state agency on certain matters for compensation. The rule of Public Officers Law § 73 (12) also prohibits her from orally communicating, whether for compensation or not, with a state agency, officer or employee with regard to the merits of any matter listed under Public Officers Law § 73 (7) (a). The member or employee is advised to keep her role as a representative of a private corporation separate and distinct from her role as a public official or employee.

A legislator is cautioned not to sponsor or vote on any legislation that would result in a different impact on her company from other affected companies in the same business. Members and employees are also reminded that

D-000114

outside employment and income must be disclosed on your
annual statement of financial disclosure.

### EXCEPTIONS

Previous opinions issued by the Legislative Ethics Committee
have observed that <u>Public Officers Law § 73 (10)</u> specifically
authorizes the appearance before state agencies or in the
court of claims by other members of the firm as long as the
member of the legislature does not share in the net revenues
from the appearance. They also have noted that while <u>Public
Officers Law § 73 (12)</u> prohibits oral communication with a
state agency, with or without compensation, by a member or
employee of the legislature as to the merits of a matter listed
in <u>Public Officers Law §73 (7) (a)</u>, it does not prohibit
communications in writing which create a formal record of
the transaction for consideration as to the merits.

### ADDITIONAL CONCERNS PERTAINING TO EMPLOYEES

<u>Legislative Law §66-a</u> prohibits a legislative employee who is
engaged in outside employment or business activity from,
directly or indirectly, promoting or opposing the passage of
legislation outside the scope of his state legislative
employment. Employees are also advised to check with their
counsel's office to see whether there are any additional
prohibitions in the rules adopted by the Senate or Assembly
pertaining to outside employment.

NYS LEGISLATIVE ETHICS COMMISSION

Alfred E. Smith Building, Suite 1431
Albany, New York
Mailing Address
Legislative Office Building
Box 75
Albany, NY 12247
(518) 432-7837 or 7838



New York State Assembly
www.nyassembly.gov



New York State Senate
www.nysenate.gov

D-000115

**From:** Amy Raymond
**Sent:** Monday, April 23, 2018 2:14 PM
**To:** Andrea MacArthur; William Truitt
**Subject:** RE: Federal MLO Registration status has changed for William Gunnar Truitt (NMLS ID 1734370)

Great!

**From:** Andrea MacArthur
**Sent:** Monday, April 23, 2018 2:04 PM
**To:** Douglas Cahill; William Truitt
**Cc:** Amy Raymond
**Subject:** RE: Federal MLO Registration status has changed for William Gunnar Truitt (NMLS ID 1734370)

Awesome!!!!!


Andrea L. MacArthur, AVP Retail Lending Manager, NMLS 597843
**Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868**
**TEL 860.453.3531 • FAX 860.435.4005 •** amacarthur@salisburybank.com
STOP

**From:** Douglas Cahill
**Sent:** Monday, April 23, 2018 2:02 PM
**To:** William Truitt
**Cc:** Amy Raymond; Andrea MacArthur
**Subject:** FW: Federal MLO Registration status has changed for William Gunnar Truitt (NMLS ID 1734370)

Hi Will – congratulations – you're now an active MLO!

Doug Cahill, PHR, SHRM-CP
Vice President, Human Resources
**Salisbury Bank • 5 Bissell Street • PO Box 1868, Lakeville, CT 06039-1868**
**TEL 860.453.3460 • FAX 860.435.5106 •** dcahill@salisburybank.com

STOP

**From:** NMLS_Notifications@NMLSNotifications.com [mailto:NMLS_Notifications@NMLSNotifications.com]
**Sent:** Monday, April 16, 2018 10:22 AM
**To:** Douglas Cahill
**Subject:** Federal MLO Registration status has changed for William Gunnar Truitt (NMLS ID 1734370)

1

D-000107

External Email

The Federal MLO Registration status for William Gunnar Truitt (NMLS ID 1734370) has changed. See below for further details:

- **Primary Federal Regulator:** Federal Deposit Insurance Corporation
- **Current Registration Status:** Active
- **Previous Registration Status:** Pending
- **Registration Status Date:** 4/16/2018

THIS COMMUNICATION IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHICH IT IS ADDRESSED AND CONTAINS OR MAY CONTAIN INFORMATION THAT IS PRIVILEGED, CONFIDENTIAL OR EXEMPT FROM DISCLOSURE UNDER APPLICABLE LAW. If the reader of this communication is not the intended recipient (or the employee or agent responsible for delivering to the intended recipient), you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please disregard and delete this communication, and do not disseminate or retain any copy of this communication.

D-000108

April 23, 2018 text messages between William Truitt (green bubbles) and his mother (grey bubbles).



**Mon, Apr 23, 2:27 PM**

Play FTWD Killing Machine on your way home from work. And Nick's Bam Bam Bam song. Now that was when it was good.

Those were the best days

Looks like I'm not getting fired! They emailed me to congratulate me that I have received my mortgage license! I have my first actual client tomorrow in Newburgh

**Wed, Apr 25, 1:50 PM**

Fear the Walking Dead is being renewed for a 5th season!

Well that's good news. Maybe because Morgan arrived. Were they in trouble?

I don't know, I'm just happy it's got another season to go. It'll still be playing next year. That means there

## EXHIBIT A

# Salisbury Bank and Trust Company
### Minutes of the Board of Directors Meeting of
### Salisbury Bank and Trust Company and Salisbury Bancorp, Inc.
#### April 27, 2018

The meeting of the Board was held at Salisbury Bank's Bissell House Board Room, 19 Bissell Street, Lakeville, CT.

**Members present:**

Louis E. Allyn II
Charles M. Andola (by phone)
George E. Banta
Arthur J. Bassin
Richard J. Cantele, Jr.
David B. Farrell

Michael D. Gordon
Polly Diane Hoe
Nancy F. Humphreys
Holly J. Nelson
John F. Perotti
Michael A. Varet

**Also present:**

Jim Cotter, Executive Vice President, Chief Operating Officer
Peter Albero, Executive Vice President, Chief Financial Officer
Shelly L. Humeston, Senior Vice President and Secretary
Dee Harnish, Vice President, Project Management

Mark Gray, Examiner in Charge, State of CT Department of Banking
Todd Prout, Department Manager, State of CT Department of Banking
Todd Clinton, Executive Vice President, Chief Risk Officer
Amanda Lidstone, Vice President, Compliance Officer, Privacy Officer

### ITEM A – CALL TO ORDER – MICHAEL VARET

Mr. Varet called the meeting to order at 10:00 a.m.

### ITEM B – STATE OF CT DEPARTMENT OF BANKING – MARK GRAY AND TODD PROUT

Mr. Gray and Mr. Prout joined the meeting at 10:10 a.m.



Note: Pages of Ex. 4 and 26 that were not specifically cited in Plaintiff's Opposition were removed at Defendants' request.

SALISBURY BANK AND TRUST COMPANY
**Regular Board of Directors Meeting; April 27, 2018**

**Asset Quality –** ██
- NPAs to Assets – 0.57%
- Positive outlook – stable delinquencies
- Credit administration weaknesses; improving – regulatory upgrades anticipated

**Management –** ██████
- Working with lending team to improve lending function
- Working with CCO to address Credit Administration weaknesses
- Initiated a review of retail banking function

**Earnings –** ██████
- Q1 Net Income $2,015mm vs. $1,653mm budget
- Q1 EPS of $0.72 vs. $0.59 budget
- YTD ROAA 0.81% vs. budget 0.66%

**Liquidity -** ██
- Sufficient cash and credit lines available to meet anticipated funding requirements
- Funding pressure impacting margins
- Loan growth beating budget by 1% and deposit growth beating budget by 1%

**Sensitivity to Market Risk –** ██████
- Current position remains relatively neutral

**Additional:**
- 2018 Strategic Planning
  - Bob Kafafian met with the management team on April 18, 2018 and went through a process very similar to the Board session. He will analyze the results and provide 4-7 plans from which management will prepare detailed plans.
- State of CT Exam response
- Project ██████ update
  - Advised that we made it to the second round (3-4 banks in total). Most of the banks have increased their bids. Mr. Cantele indicated that he is not inclined to increase our bid as it is in line with our model and it is clear that they are not interested in our model but in getting the highest bidder. The Board unanimously agreed with Mr. Cantele.
- Mr. Cantele reported that an employee was hired as a Mortgage Originator for the Riverside Division. He was referred to us by a customer of the bank and appeared to be someone with a lot of contacts in that market area. He is currently serving as a Dutchess County Legislator and had indicated at time of hiring that he would not be seeking re-election following his term. Since that time, he has announced his campaign to run for NYS Assembly. Management has determined that this position pays approximately $80,000 per year and requires approximately 65 days per year in Albany. Management intends to speak with the employee and advise him that this would be a conflict of interest and he must make a decision whether to run for office or to continue employment with the Bank.

### ITEM H1 – NEW BUSINESS – UPCOMING MEETINGS

| | | |
|---|---|---|
| Annual Meeting of Shareholders | May 16, 2018 | Wednesday @ 4:00 PM |
| Annual Board Reorg Meeting | May 16, 2018 | Wednesday @ 5:30 PM |
| Loan Committee | May 18, 2018 | Friday @ 8:30 AM |
| ALCO/Investment Committee | May 25, 2018 | Friday @ 8:30 AM |
| HR Compensation Committee | May 25, 2018 | Friday @ 10:30 AM |
| Board of Directors | May 25, 2018 | Friday @ 11:00 AM |

### ITEM H2 – NEW BUSINESS – FEDERAL RESERVE BANK OF BOSTON OFF-SITE REVIEW – RICK CANTELE

The Board reviewed a letter dated April 24, 2018 from the Federal Reserve Bank of Boston (FRB). They conducted an off-site review of Salisbury Bancorp, Inc. based primarily on financial and other information provided to or obtained by the FRB, including the August 21, 2017 examination report by the State of Connecticut Department of Banking. ███████

**MEMORANDUM**

TO:        HR/Compensation Committee

FROM:     Doug Cahill, Vice President, Human Resources

DATE:      April 27, 2018

RE:        Outside Employment Survey

---

Per the Bank's Code of Ethics and Conflicts of Interest Policy, please review the attached Outside Employment Report for the Officers of Salisbury Bank. This report has been reviewed by their Executive Manager, our CEO, and VP, Human Resources, and we see no conflicts of interest. It is our recommendation that all listed outside employment be approved as presented.

In determining whether to approve outside employment by Officers of Salisbury Bank, the appropriate Board of Directors should consider all relevant factors, including but not limited to the following:

1. Will it interfere with work assignments or performance;
2. Will it involve the possibility of adverse publicity to the Corporation;
3. Is it with a competitor, supplier or customer;
4. Does it imply sponsorship by the Corporation; and
5. Does it involve serving as a director, officer, manager or consultant.

| 2017-18 Outside Employment Report | | | | |
| --- | --- | --- | --- | --- |
| Employee | Officer Y/N | Outside Employ Y/N | Employer Name | Nature of Duties |
| Bowerman, Maurice | Y | Y | Bowerman Financial | Insurance Brokerage |
| Cullip, Jason | Y | Y | DevilTechs, LLC | IT Consultant |
| Downey, Kim | Y | Y | Eckert Fine Art | Bookkeeper |
| Golden, Al | Y | Y | Rick's Wine & Spirits | Clerk |
| Long, Darrel | Y | Y | Spirit Ballooning | Pilot |

Of Note: William Truitt was hired 2/26/18 as a Mortgage Origination Trainee in our NY Riverside Division. He is currently serving the second year of a 2-year term in the Dutchess County Legislature. Management approved this elected position, as his training would have taken him through his term in office.

He has recently informed us that he's running for the NY State Assembly in November. Management is currently reviewing whether a conflict of interest exists with the State Assembly campaign and position.

D-0000415

Page 1

1                     A. MacArthur

2           UNITED STATES DISTRICT COURT

3           SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

4   WILLIAM GUNNAR TRUITT,

5             Plaintiff,           Case No.

                                   7:18-cv-08386-NSR

6        vs.

7   SALISBURY BANK and TRUST COMPANY; and SALISBURY

    BANCORP, INC.,

8

             Defendants.

9   -------------------------------------------------------x

10

11

12

13

14

15

16        DEPOSITION OF ANDREA MACARTHUR

17            New York, New York

18           Monday, July 1, 2019

19

20

21

22

23   Reported by:

24   THOMAS A. FERNICOLA, RPR

25   JOB NO. 163802

Page 26

```
1              A. MacArthur
2  supposed to discipline or address any
3  inappropriate conduct by an employee?
4      A    I guess I would say you would be
5  going through the chain of command.  So if I
6  felt there was somebody who was not doing what
7  they were supposed to do, I would then go to
8  my supervisor.  We would then put them on a
9  PIP, a Performance Improvement Program.  And
10 then they're given a certain amount of time to
11 correct their actions and then hopefully get
12 out of the PIP.
13     Q    Got it.
14     A    Does that answer your question?
15     Q    Yes.
16          I was going to ask a follow up.
17 Have you been in AVP or five years or was it
18 three?
19     A    Three.
20     Q    How many times have you been
21 involved in a PIP in any way, shape or form
22 with an employee?
23     A    Zero.
24     Q    So you answered my question.  There
25 wasn't a PIP for Will at any point; is that
```

Page 27

```
1              A. MacArthur
2  correct?
3      A    Correct.
4      Q    Hopefully that will be the dumbest
5  question that I ask today.
6          Do you know why Mr. Truitt was
7  fired?
8      A    I didn't know he was fired.
9      Q    That's fine.
10          What is your understanding of the
11 manner in which his employment ended?
12     A    From what I've been told, he
13 resigned.
14     Q    Do you know how?  You said from what
15 you've been told he resigned.  How were you
16 told that he communicated his resignation, if
17 at all?
18     A    I believe there was a letter of
19 resignation.  And I believe that that was with
20 Mr. Cantele.  That was his exit interview, I
21 guess you would say.
22     Q    I just want to ask for a little
23 clarification, though, because you mentioned a
24 letter and an interview.
25          So you mentioned a letter of
```

Page 28

```
1              A. MacArthur
2  resignation.  Do you know who it was sent to?
3      A    Unfortunately, I do not know who it
4  was addressed to.
5      Q    So you didn't receive a letter of
6  resignation?
7      A    Correct.
8      Q    Did Mr. Truitt ever indicate to you
9  that he wanted to end his Salisbury
10 employment?
11     A    No.
12     Q    Do you know who told Mr. Truitt that
13 he needed to choose between his job at
14 Salisbury and his campaign, his political
15 campaign for New York State Assembly?
16     A    That would be hearsay because I
17 wasn't there in the room, but I had heard that
18 it was Rick Cantele.
19     Q    Do you know if that type of
20 ultimatum is authorized anywhere in
21 Salisbury's employee handbook?
22     A    Well, I think it would fall under a
23 secondary employment for us which has to be
24 approved by HR in order to have any type of
25 secondary employment with the bank.
```

Page 29

```
1              A. MacArthur
2      Q    So there's part of the employee
3  handbook that references secondary employment?
4      A    Correct.
5      Q    Are you aware of any part of the
6  employee handbook that governs employees'
7  political activity?
8      A    No.
9      Q    I didn't like that question.
10          Are you aware of any part of the
11 employee handbook regarding political activity
12 by employees of Salisbury?
13     A    Not that I'm aware of.
14     Q    I'm just dropping some questions
15 here to save a little bit of time.  I think
16 you already gave me an idea on this one, but
17 when did you become aware of any Will's
18 campaign for New York State Assembly?
19     A    I was told that it came out on
20 Facebook.
21     Q    Who told you that?
22     A    That came from Amy Raymond, who I
23 believe heard it from Shelly Humeston.
24     Q    I do appreciate that, but I'm going
25 to ask again.  When did you become aware of
```

**From:** Amy Raymond
**Sent:** Tuesday, May 01, 2018 1:21 PM
**To:** Douglas Cahill; Rick Cantele; Dick Kelly
**Subject:** FW: [External] [***Possible SPAM: 03.80] Update

FYI

**From:** William Truitt [mailto:william.g.truitt@gmail.com]
**Sent:** Tuesday, May 01, 2018 1:02 PM
**To:** Andrea MacArthur; Amy Raymond
**Subject:** [External] [***Possible SPAM: 03.80] Update

Hi Amy and Andrea,

I am truly saddened to say that after multiple discussions with Doug Cahill and after meeting with Rick Cantele yesterday, it has been confirmed to me that my employment with Salisbury Bank will not be continued if I pursue election to the New York State Assembly this November.

Both Doug and Rick reiterated to me that the main concern is that, if elected, I would not have the necessary time it takes to be a successful originator and grow our brand in New York. I understand the concern, but disagree with this sentiment entirely. I am absolutely certain that I would be able to fully commit myself to the bank and far surpass any goals that would be set for me. When it comes to work ethic and competitive spirit, I have always been and always will be someone who strives to do the best I can in every role I hold (I actually even had it on my mind that I wanted to win "Rookie of the Year" next year for the bank). I was truly excited to begin originating and helping us expand in New York State and adding many new customers to our books.

This past weekend, I thought deeply to myself about the possibility of holding off on running for the Assembly. But at the end of the day, it is a once in a lifetime opportunity that my community is asking me to pursue. If I were to give it up, I would truly regret looking back thinking "what if?". The chance to be the youngest Assemblyman since Teddy Roosevelt is one that I can't give up on.

I cannot thank the both of you enough for all the time you both took to train me and for all the valuable information that you taught me. I truly wish this did not have to be the outcome, because I grew to really appreciate the business we do, and I enjoyed all the great people I worked with. As Rick told me, if I am not successful in November's election, he hopes that I will consider coming back to the bank to possibly fill the same residential role or maybe even another role in commercial lending.

With all my best regards,
Will Truitt

D-000104

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 22 of 115

**McCULLOUGH GINSBERG
MONTANO & PARTNERS LLP**
122 E 42nd Street, Suite 3505
New York, NY 10168
Tel: (646) 435-0300
tmccullough@mgpllp.com
*Attorneys for Plaintiff*

Coughlan Law Offices, LLP
P.O. Box 72, 22 Hutton St.
Rhinecliff, NY 12574
Tel: (845) 802-6684
coughlanlawoffices@gmail.com
*Co-counsel for Plaintiff*

**SUPREME COURT OF THE STATE
OF NEW YORK
DUTCHESS COUNTY**

-------------------------------------------------x

William Gunnar Truitt,

                        Plaintiff,

vs.

Salisbury Bank and Trust Company; and
Salisbury Bancorp, Inc.,

                        Defendants.

-------------------------------------------------x

**SUMMONS AND VERIFIED COMPLAINT**

Index No: _____

August 21, 2018

Plaintiff Designates Dutchess County as the Place of Trial and Requests Trial by Jury

The Basis of Venue is Place of Employment, the Locus of the Tort, and Domicile of the Plaintiff

**TO THE ABOVE NAMED DEFENDANTS:**

**You hereby summoned** to answer the Complaint in this action and to serve a copy of your Answer, or, if the Complaint is not served with this Summons, to serve a Notice of Appearance, on Plaintiff's Attorney within 20 days after the service of this Summons, exclusive of the day of service (or within 30 days after the service is complete if this Summons is not personally delivered to you within the State of New York). In the case of your failure to appear or answer, judgment will be taken against you by default for the relief demanded in the complaint.

Dated: New York, New York
          August 21, 2018

**McCULLOUGH GINSBERG
MONTANO & PARTNERS LLP**
122 E 42nd Street, Suite 3505
New York, NY 10168
Tel: (646) 435-0300
tmccullough@mgpllp.com
*Attorneys for Plaintiff*
By:

Ted McCullough

2

## PRELIMINARY STATEMENT

Plaintiff William Gunnar Truitt ("Mr. Truitt") brings this suit against Salisbury Bank and Trust Company ("Bank") and Salisbury Bancorp, Inc. (collectively "Defendants"), for violating New York Labor Law by retaliating against Mr. Truitt and wrongfully terminating his employment due to Mr. Truitt's political activities.

Mr. Truitt is and has been an elected official in Dutchess County since 2015, which was disclosed to and known by the Bank at the time of his hiring in February 2018. Less than three months into Mr. Truitt's rapidly-progressing employment with the Bank, Mr. Truitt announced his intention to continue his political service by running for New York State Assembly District 106 on Facebook. Mr. Truitt was endorsed for that Office by the Republican Parties for Dutchess and Columbia counties (which comprise District 106).

Almost immediately after Mr. Truitt announced his intention to run for District 106, Mr. Truitt was callously terminated by the Bank solely and exclusively because of the Bank's ties to Mr. Truitt's incumbent Democratic opponent for District 106 in flagrant violation of New York Labor Law Section 201-d. As a result of Defendants' willful and unlawful conduct, Mr. Truitt is entitled to an award of damages in an amount to be determined at trial and attorneys' fees.

## THE PARTIES AND JURISDICTION

1. The Bank Defendant is a bank and trust company with a branch office for the transition of business located at 11 Garden Street, Poughkeepsie, NY 12601. Mr. Truitt was hired by the Bank in February of 2018 to work out of the Bank's Poughkeepsie office, and within the jurisdictional confines of this Court.

2. The Bank is incorporated in the state of Connecticut with headquarters in Lakeville, CT.

3

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 25 of 115

3.      This Court has jurisdiction over the present controversy in that Defendants are conducting businesses in the State of New York.

4.      Venue in this Court is proper because the actions complained of herein were committed within the jurisdictional confines of the State of New York and County of Dutchess and/or because Defendants are conducting business in Dutchess County, New York.

5.      Upon information and belief, Salisbury Bancorp, Inc. is a publicly traded company (NASDAQ: SAL) incorporated in the state of Connecticut with headquarters in Lakeville, Connecticut and is the parent company of the Bank.

6.      Upon information and belief, Salisbury Bancorp, Inc. controls and is responsible for the conduct of the Bank.

7.      Mr. Truitt is a resident of Dutchess County and lives in Hyde Park, New York.

8.      Mr. Truitt is a 2017 honors graduate of Marist College, where he obtained a B.S. in Business Administration with a concentration in finance.

9.      Mr. Truitt was elected to the County Legislature of Dutchess County in 2015, while he was still attending college.

10.     Mr. Truitt was elected as a Republican representing the 7th District in the Dutchess County Legislature.

11.     In 2017, the voters in Dutchess County reelected Mr. Truitt to the 7th District in the Dutchess County Legislature.

12.     Commencing at or around February 26, 2018 and until the date of his termination, Mr. Truitt was employed by the Bank for the purpose of originating mortgage loans.

13.     Mr. Truitt was eligible to participate in Defendants' incentive compensation program.

4

14.     Mr. Truitt was at all times relevant herein up until the date of his termination an employee of Bank within the meaning of the relevant provisions of New York Labor Law.

## **FACTUAL BACKGROUND**

15.     The Bank offered Mr. Truitt a position in finance in late January of 2018 knowing that Mr. Truitt already had a part-time job as an elected Dutchess County Legislator.  When Mr. Truitt started his employment with the Bank in February of 2018, the Bank was well aware that Mr. Truitt had a part-time job as a Dutchess County Legislator.

16.     Upon Mr. Truitt's graduation from Marist College with honors in 2017, the Bank was swift in hiring Mr. Truitt.

17.     Mr. Truitt's basic compensation structure entailed a base salary plus benefits and the bulk of his compensation was to be commission-based.  The commission portion of Mr. Truitt's compensation was to be based on the amount of residential and commercial loans that he originated in the state of New York.  Mr. Truitt was informed that the other two loan originators employed by the Bank were compensated in excess of $150,000 per year and that Mr. Truitt could reasonably expect similar compensation.

18.     While employed by the Bank, Mr. Truitt progressed through the Bank's mortgage origination training much faster than average.  The Bank was so confident in Mr. Truitt's skills and training that the Bank sponsored him for and provided him with a Nationwide Mortgage Licensing System identification number.

19.     Thereafter, the Bank approved Mr. Truitt meeting his first potential lending client in Newburgh, New York.  Two executives of the Bank attended that meeting by phone and, at the

5

end of the meeting, provided laudatory feedback to Mr. Truitt regarding his performance with the prospective client.

20.     At the time Mr. Truitt was hired, he was a 22-year old man with an honors degree, a lucrative position at a reputable financial institution, and already a two-term elected official in Dutchess County.  The Bank changed that in a heartbeat after learning that Mr. Truitt had decided to run for a New York citizen legislature position that is currently held by a Democratic politician with strong connections to the Bank's Board of Directors.

21.     Mr. Truitt formally started his employment with the Bank on or around February 26, 2018.  Mr. Truitt reported to Douglas Cahill (Vice President, Director of Human Resources) and Amy Raymond (Senior Vice President Retail Lending and Commercial Operations).  Mr. Truitt was also trained by Maria Seeley in the Poughkeepsie office.

22.     Mr. Truitt had a dual report to Amy Raymond and Assistant Vice President Andrea MacArthur.

23.     In a Facebook post on or around April 12, 2018, Mr. Truitt announced his campaign for the office of New York State Assembly District 106, a part-time citizen legislature position.[1]  At this time, Mr. Truitt was still unaware of the strong connections between Bank's Board of Directors and the incumbent Democratic Assemblymember for District 106.

24.     Approximately one day later, on Friday the 13th, Mr. Truitt was asked to attend an unscheduled meeting wherein Douglas Cahill and Amy Raymond informed him that they were aware of his candidacy for New York State Assembly District 106 and concerned about the possibility of him holding that office.  Mr. Cahill and Ms. Raymond told Mr. Truitt to submit a

---

[1] New York State Assemblymembers frequently hold full-time outside employment.  Regarding the State Assembly, New York's Governor Andrew Cuomo has stated "part-time legislators" are "the design of the system," noting that "[t]he thought is it's better to not have a full-time legislators." NY State of Politics, http://www.nystateofpolitics.com/2013/07/cuomo-dislcosure-provides-for-significant-information/ (last visited Aug. 20, 2018).

Case 7:18-cv-08386-NSR-PED  Document 48-1  Filed 01/28/20  Page 28 of 115

written explanation of the position he was running for and whether it would impact his ability to commit himself to the Bank. Mr. Truitt submitted the requested letter the following Monday.

25. Approximately two weeks after Mr. Truitt submitted that letter describing the part-time citizen legislature position he was running for, he was informed that Mr. Cahill was coming to Poughkeepsie to discuss the letter with him. During that meeting, Mr. Cahill stated he had recently communicated with Arthur Bassin (a/k/a Art Bassin), a member of the Bank's Board of Directors.

26. Specifically, Mr. Cahill indicated that Mr. Bassin was not comfortable with Mr. Truitt running for District 106.

27. Mr. Cahill then told Mr. Truitt that he needed to make a choice between his employment with the Bank and campaign for District 106. Without more, that manufactured ultimatum was a violation of New York Labor Law.

28. Mr. Truitt then politely asked to meet with the CEO of the Bank, Richard Cantele, who is also a member of the Bank's Board of Directors. That meeting took place in Connecticut on or around April 30, 2018 and lasted approximately 30 minutes. During that meeting, Mr. Cantele indicated that he had also been in communication with Board of Directors member Arthur Bassin, and that Mr. Bassin was not comfortable with Mr. Truitt being both a candidate for District 106 and an employee of the Bank. After that meeting, Mr. Truitt again met with Douglas Cahill, and informed Mr. Cahill that he was still running for District 106, at which point Mr. Cahill terminated Mr. Truitt's employment. These actions by Mr. Cahill, Ms. Raymond, Mr. Cantele, Mr. Bassin, and the Bank violated New York Labor Law.

29. Arthur Bassin is a Democrat who resides in Columbia County, New York. In addition to serving on the Bank's Board of Directors, Mr. Bassin is the elected Democratic Town Supervisor

7

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 29 of 115

for Ancram, New York.  Mr. Bassin is also a long-time political and financial supporter of Didi Barrett (Dianne Dewitt Barrett), the three-term incumbent Democratic New York Assemblymember for District 106 — the same district for which Mr. Truitt had recently announced his Republican candidacy.  Like Mr. Bassin, Ms. Barrett is a Democrat and homeowner in Columbia County.  Although the Bank did not disclose it to Mr. Truitt, Mr. Bassin has endorsed Ms. Barrett's candidacies and made contributions to funds such as "Friends of DiDi Barrett for Assembly."  Mr. Bassin has also personally contributed several thousand dollars specifically to Ms. Barrett's Democratic campaign for District 106.

30.    Mr. Truitt's run for public office was the one and only reason provided for the termination of his employment.  Any retroactive claim by Defendants in this litigation that Mr. Truitt was terminated for any reason other than his political activity would be pretextual, especially in view of the fact that multiple members of the Bank's Board of Directors have personally and specifically contributed to Ms. Barrett's Democratic campaign for New York State Assembly District 106.

31.    Mr. Truitt has been severely and unfairly damaged by the actions of the Bank.  By the Bank's own reckoning, Mr. Truitt has lost a position worth over $150,000 per year plus benefits.  Mr. Truitt's professional reputation has been prejudiced by the Bank and he will forever have to explain in job interviews why he was terminated from his first position after college by a reputable bank in under three months.

32.    In addition to unlawfully terminating Mr. Truitt, the Bank has undermined Mr. Truitt's political campaign for the District 106 State Assembly race because it was well aware that Mr. Truitt's ability to effectively run for office would become much more difficult if he were stripped of his income and consumed with a search for new employment instead of being a junior

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 30 of 115

executive at a reputable bank. If elected as a New York State Assemblymember, Mr. Truitt would be paid approximately $80,000 per year for his part-time service to the state while accruing time towards a New York State pension.

33.     The unfair actions of the Bank were calculated to prevent Mr. Truitt from receiving those benefits, interfere with Mr. Truitt's Republican campaign for District 106, and protect the incumbent Democratic Assemblymember for District 106.

34.     As a result of the Bank's abrupt and illegal termination of Mr. Truitt's employment, Mr. Truitt was and continues to be damaged through loss of compensation (including past and future wages), benefits, commissions, earned and unused paid time off, and damage to his professional reputation, all of which has caused him extreme mental languish.

35.     Upon information and belief, subsequent to Mr. Truitt's termination from the Bank, the Bank caused a false and misleading email to be sent to Bank employees indicating that Mr. Truitt had chosen to leave his employment to pursue a career in politics. In fact, Mr. Truitt had done everything that he could to maintain his employment with the Bank including presenting the Bank with a written copy of the New York State Legislative Ethics Commission Advisory Opinion regarding Assemblymembers' ability to hold outside employment as well as a schedule for the Assembly demonstrating that his potential Assemblymember role would not interfere with his responsibilities to the Bank.

36.     Using personal non-Bank communication devices, a number of Bank employees reached out to Mr. Truitt after his termination to express their shock and dismay that their employer, the Bank, would act so unfairly to Mr. Truitt because of his political activity.

9

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 31 of 115

## NEW YORK LABOR LAW

37. The Bank's actions against Mr. Truitt unambiguously violate New York Labor Law Section 201-d, which states:

> [I]t shall be unlawful for any employer . . . to discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment because of . . . an individual's political activities. . . .

38. That statute also includes "running for public office" in its definition of "Political activities." N.Y. Lab. Law § 201-d(1)(a).

## COUNT I

39. Plaintiff realleges and incorporates by reference all previous paragraphs, including the preliminary statement, as if set forth herein.

40. The Bank's actions in response to Mr. Truitt's Republican campaign for New York State Assembly District 106 are violative of New York Labor Law Section 201.

41. In sum, Mr. Truitt was fired because of his Republican campaign for New York State Assembly District 106, and that retaliation is categorically prohibited by the State of New York.

## PRAYER FOR RELIEF

Plaintiff respectfully petitions the Court for the following relief:

1. A judgment that Defendants are liable for each Count in this complaint.

2. A judgment that Defendants violated N.Y. Lab. Law § 201-d by discriminating against Mr. Truitt and terminating his employment.

10

Case 7:18-cv-08386-NSR-PED   Document 48-1   Filed 01/28/20   Page 32 of 115

3.    Injunctive relief including a Court Order that the Bank issue a letter of recommendation on Mr. Truitt's behalf to mitigate the damage to Mr. Truitt's future employment opportunities.

4.    Monetary damages to Mr. Truitt for his loss of past and future income, commissions, benefits, and other potential compensation.

5.    Compensation for the damage done by the Bank to Mr. Truitt's professional reputation and future earning potential.

6.    Compensation for the damage done by the Bank to Mr. Truitt's political campaign.

7.    Compensation for the mental anguish caused by Mr. Truitt's abrupt and unfair termination by the Bank.

8.    Punitive damages in an amount to be determined by the Jury.

9.    Costs of action incurred herein, including expert fees.

10.   Attorneys' fees, including fees pursuant to New York Labor statutes.

11.   Pre-judgment and post-judgment interest, as provided by law.

12.   Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

11

Dated: New York, New York
August 21, 2018


Respectfully Submitted,


Ted McCullough
Robert B. Lower
**MCCULLOUGH GINSBERG
MONTANO & PARTNERS LLP**
122 East 42nd Street, Suite 3505
New York, New York 10168
Phone: (646) 747-4677
Facsimile: (646) 349-2217
tmccullough@mgpllp.com
rlower@mgpllp.com
*Attorneys for Plaintiff*

James Coughlan
Coughlan Law Offices, LLP
P.O. Box 72, 22 Hutton St.
Rhinecliff, NY 12574
Phone: (845) 802-6684
coughlanlawoffices@gmail.com
*Co-counsel for Plaintiff*

12

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

STATE OF NEW YORK )
                        )
COUNTY OF DUTCHESS )

## VERIFICATION

Before me, the undersigned notary public, personally appeared WILLIAM GUNNAR TRUITT, known to me as the person whose name is subscribed below, and being first duly sworn, deposes and states as follows:

That Affiant has reviewed the foregoing VERIFIED COMPLAINT and knows the contents thereof to be true to Affiant's own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, Affiant believes those matters to be true.

The undersigned affirms that the foregoing statements are true under penalties of perjury.

_____
William Gunnar Truitt

Subscribed and sworn to before me
this 21 day of August, 2018.

_____
Notary Public

JAMES L COUGHLAN
NOTARY PUBLIC STATE OF NY
N 02 CO6359072
QUALIFIED IN DUTCHESS COUNTY
COMMISSION EXPIRES MAY 30 2021

13

Page 1

1

2                   UNITED STATES DISTRICT COURT

                SOUTHERN DISTRICT OF NEW YORK

3

    WILLIAM GUNNAR TRUITT,

4                         Plaintiff,

                                    Case No.

5               -against-            7:18-cv-08386-NSR

6    SALISBURY BANK and TRUST COMPANY;

    and SALIBURY BANCORP, INC.,

7                         Defendants.

    --------------------------------x

8

9               DEPOSITION OF RICHARD CANTELE

10                  New York, New York

11                 MONDAY, JULY 29, 2019

12                     10:00 a.m.

13

14

15

16

17

18

19

20

21

22   Job No: 165208

23   Reported by: David Levy, CCR, RPR, CLR

24

25

Page 2

1
2
3          DEPOSITION OF RICHAR CANTELE, taken by
4    the Plaintiff, pursuant to Subpoena, at the
5    offices of Littler Mendelson, 900 Third
6    Avenue, before DAVID LEVY, CCR, RPR, CLR, a
7    Notary Public of the State of New York
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S:
3
4        McCULLOUGH GINSBERG MONTANO & PARTNERS
5        Attorneys for Plaintiff
6            122 East 42nd Street
7            New York, New York 10168
8
9        BY:  ROBERT LOWER, ESQ.
10
11
12        LITTLER MENDELSON
13        Attorneys for Defendants
14            1085 Raymond Boulevard
15            Newark, New Jersey 07102
16        BY:  LINDSAY SORIN, ESQ.
17
18
19
20
21
22
23
24
25

Page 4

1
2        IT IS HEREBY STIPULATED AND AGREED,
3    by and between counsel for the respective parties
4    hereto, that the filing, sealing and certification
5    of the within deposition shall   be and the same
6    are hereby waived;
7        IT IS FURTHER STIPULATED AND AGREED
8    that all objections, except as to the form of the
9    question, shall be reserved to the time of the
10    trial;
11        IT IS FURTHER STIPULATED AND AGREED
12    that the within deposition may be signed
13    before any Notary Public with the same force and
14    effect as if signed and sworn to  before the
15    Court.
16            -oOo-
17
18
19
20
21
22
23
24
25

Page 5

1
2    R I C H A R D   C A N T E L E , having been
3        duly sworn by the Notary Public, was
4        examined and testified as follows:
5    EXAMINATION BY
6    MR. LOWER:
7        Q.  Good morning, Mr. Cantele.
8        A.  Good morning.
9        Q.  My name is Robert Lower.  I represent
10    Mr. Truitt in this case.  And I'm going to start
11    off with some just general guidelines and a couple
12    of questions as well.  How many times have you been
13    deposed?
14        A.  This is the first.
15        Q.  And of course, you understand that this
16    is a question-and-answer format.
17        A.  I do.
18        Q.  Unless you indicate otherwise, I will
19    understand that you'll be able to answer my
20    questions with a direct answer or let me know if
21    you don't know what the answer is.
22        A.  Okay.
23        Q.  Similarly, unless you indicate
24    otherwise, I will assume that you understood my
25    questions; is that okay?

Page 26

Cantele

2  A.  Correct.
3  Q.  And you were starting a train of
4  thought when you said, "You know, he came into the
5  meeting, with some" -- a certain type of
6  understanding that I did not get from you, is that
7  correct?
8  A.  I guess it was my feeling at the time
9  that he was -- he wanted to state his case about
10  his ability to do both jobs when we had already
11  communicated to him previously that we, in our
12  judgement, we didn't think he could fulfill the
13  role of residential mortgage originator that we
14  were looking to fill in the Riverside division.
15  So that he, I think that he had, you
16  know, from prior meetings, he had, I think,
17  understood probably that he, there was a decision
18  to make on his part.
19  Q.  When you say "a decision to make on his
20  part," what do you mean by that?
21  A.  Well again, we were concerned, given
22  what we understood the requirements of this job to
23  be, that in our judgement, based on our knowledge
24  and experience, which, in that room, there was a
25  lot of it with Doug and Amy and myself, we were

Page 27

Cantele

2  concerned that he wouldn't be able to fulfill the
3  role we were looking to fill and provide the level
4  of service necessary to be a successful
5  originator.
6  Q.  And to cut to the chase, I think that
7  when you said Mr. Truitt understood there was a
8  decision to make on his part, I think you were
9  referring to the fact that Salisbury told him he
10  needed to choose between his campaign and his job
11  at Salisbury.
12  MS. SORIN:  Object to the form.
13  Mischaracterized prior testimony.
14  Q.  Is that correct?
15  A.  No.  Could you say that again?
16  Q.  Sure.  When you mentioned Mr. Truitt's
17  understanding that there was a decision to make on
18  his part, were you referring to the fact that
19  Salisbury told him he needed to make a decision
20  between his job, meaning keeping his job, and his
21  campaign for New York State Assembly?
22  A.  I think he had to make a decision as
23  to which job he was most interested in.
24  Q.  And I appreciate that.  But my question
25  is, did Salisbury tell Mr. Truitt that he needed to

Page 28

Cantele

2  make a decision between keeping his job at
3  Salisbury and continuing with his campaign for New
4  York State Assembly?
5  A.  Who do you mean by "Salisbury"?
6  Q.  Well, I'm intentionally not using
7  names, because I naturally don't have as much of an
8  understanding as to your day-to-day --
9  A.  I don't think I told him that, if
10  that's what you're asking me.
11  Q.  And that's fine.  I'm intentionally not
12  using your name because I'm not trying to corner
13  you here.  But my understanding is that Mr. Truitt
14  was told he needed to decide between continuing his
15  campaign for New York State Assembly and keeping
16  his job.
17  Are you --
18  A.  I don't think it was character --
19  MS. SORIN:  Let him finish the
20  question.
21  THE WITNESS:  I'm sorry.
22  MS. SORIN:  And give me a second to
23  place an objection on the record.
24  THE WITNESS:  Sorry.
25  Can you restate your question?

Page 29

Cantele

2  MR. LOWER:  Yes.
3  MS. SORIN:  Thank you.
4  Q.  My understanding is that Mr. Truitt was
5  told he needed to decide between keeping his job at
6  Salisbury and continuing his campaign for New York
7  State Assembly.
8  Are you contesting the accuracy of that
9  assertion?
10  MS. SORIN:  Objection.  Asked and
11  answered.
12  Q.  As a general matter, you still do get
13  to answer the question unless Lindsay tells you not
14  to.
15  A.  Okay.  I think that it is wrong to say
16  we -- the "continuing the campaign" part is not
17  accurate, I don't believe.  I did not say that.  I
18  think we were concerned, and we relayed our
19  concerns, regarding his ability to fulfill the
20  role the bank was looking for in the Riverside
21  division, and take this other job which required
22  him to be out of the bank for at least sixty days
23  a year.  And common sense would say, given this
24  job, that there would be campaigning to be done.
25  Q.  Do you have any personal knowledge of

Cantele

1
2  Mr. Truitt's campaigning interfering with his
3  ability to do his job at Salisbury?
4          MS. SORIN:  Object to the form.
5      A.   In my conversation with Will, my
6  feeling was that Will wasn't entirely sure of all
7  the requirements of this other job.  I was
8  absolutely sure he was not entirely sure of the
9  requirements of the Salisbury job.
10 MO      MR. LOWER:  I move to strike the
11 nonresponsive portions of the answer.
12         MS. SORIN:  And I state my objection
13 on the record.  It's completely responsive.
14         MR. LOWER:  Could we just get a
15 read-back on that question.
16         (Record read.)
17     Q.   And that just means that I'm asking my
18 question again.  I'm sorry.
19     A.   Okay.
20     Q.   And he can read it again --
21     A.   You're asking me the question again?
22     Q.   Yes, I am.  Sorry for not making that
23 clear.
24         MS. SORIN:  Objection, asked and
25 answered.

Cantele

1
2      A.   I'm sorry, could you ask it again?
3      Q.   Sure, I'll give Dave a break this time.
4          Do you have any personal knowledge OF
5  Mr. Truitt's campaigning interfering with his
6  ability to do his job at Salisbury.
7      A.   Campaigning up until the time that he
8  resigned?
9      Q.   And I think we both know that whether
10 or not Mr. Truitt resigned is something we're
11 probably not going to agree upon today.  So --
12         MS. SORIN:  Objection.  There's no
13 question there.
14         MR. LOWER:  That's fine.  There was
15 also not a responsive answer, again.  So I'm
16 doing my best --
17         MS. SORIN:  He asked you to clarify
18 the question.  So please clarify or respond
19 to his question before he can respond
20 accurately.
21     Q.   During the course of Mr. Truitt's
22 employment at Salisbury, do you have any personal
23 knowledge of Mr. Truitt's campaigning interfering
24 with his ability to do his job at Salisbury?
25     A.   No.

Cantele

1
2      Q.   Did you tell Mr. Truitt that the time
3  commitment required by his potential outside
4  employment could not be accommodated?
5      A.   I don't remember.
6      Q.   Another thing that we do in depositions
7  is simply verify that e-mails look like true and
8  accurate copies of what came into your in-box.
9          Are you unable to speak to that with
10 respect to P-52?  And I'm just -- because you said
11 earlier that you didn't remember seeing it before.
12 You can answer any way you like, but --
13         MS. SORIN:  Object to the form.
14     Q.   -- for the record, I'll ask, does this
15 look like a true and accurate copy of an e-mail
16 sent to you?
17     A.   Yes.
18     Q.   And earlier, I did give you an
19 opportunity to identify any quotes in this e-mail
20 that you contended were not accurate.  Did you
21 finish your answer to that question?
22     A.   I believe so.
23     Q.   And to the extent you believed any part
24 of Mr. Truitt's 1:02 p.m. e-mail was not accurate,
25 did you take any action to bring that to the

Cantele

1
2  attention of anyone else at Salisbury?
3      A.   No.
4      Q.   Do you know if anyone ever asked
5  Mr. Truitt if his campaign for New York State
6  Assembly would impair his ability to do his job at
7  Salisbury?
8      A.   I don't know.
9      Q.   When you referred to Mr. Truitt's
10 outside employment earlier, would you agree that
11 you were only referring to possible outside
12 employment in the event that Mr. Truitt won his
13 campaign and was elected to New York State
14 Assembly?
15         MS. SORIN:  Object to the form.
16     A.   That is what I was referring to, that
17 outside employment.
18     Q.   Does Salisbury have any type of
19 internal work flow or process for evaluating
20 potential outside employment by Salisbury
21 employees?
22     A.   Yes.
23     Q.   Can you describe that for me?
24     A.   So, I believe it's on an annual basis.
25 Doug Cahill sends a communication throughout the

Page 98

Cantele

1   aware of it and when we talked to him about it.
2   MO      MR. LOWER:  And I'll politely move to
3   strike the nonresponsive --
4           MS. SORIN:  Objection.  Can you ask a
5   clarifying question?
6           MR. LOWER:  And I'm going to ask the
7   same question.
8           MS. SORIN:  And Mr. Cantele, if
9   there's a question that you don't understand
10  that Mr. Lower asks, feel free to ask him to
11  rephrase or clarify so that --
12          THE WITNESS:  Okay.
13          MS. SORIN:  -- the questions may be as
14  responsive as possible.
15          THE WITNESS:  Okay.
16          MR. LOWER:  Full agreement.
17      Q.   Did anyone ever tell you that
18  Mr. Truitt's campaign for New York State Assembly
19  was impairing his ability to do his job at
20  Salisbury?
21      A.   No.
22      Q.   Do you know if anyone ever asked
23  Mr. Truitt if his campaign for New York State
24  Assembly would impair his ability TO do his job at

Page 99

Cantele

1   Salisbury?
2       A.   Can you clarify "campaign"?
3       Q.   Would "candidacy" help?
4       A.   You're asking me specifically about
5   the time frame from the announcement until the
6   election?
7       Q.   I'm limiting it to, you know, his short
8   employment with Salisbury; and basically, just, if
9   anybody at Salisbury asked Will whether his
10  campaign would Assembly would impair his ability to
11  do his job.
12      A.   I don't know.
13      Q.   With respect to P-61 and P-60, and I
14  guess I'll limit my question to P-60, the
15  termination checklist.
16          Would you agree that the termination
17  date listed on P-60 is incorrect?
18      A.   I don't have enough information to
19  answer that question.
20      Q.   Well, I believe that you testified that
21  Mr. Truitt ended his employment by submitting a
22  letter to the bank.  And you identified that letter
23  today and that letter is dated May 1; is that
24  correct?

Page 100

Cantele

1       A.   Are you talking about P-56?
2       Q.   Yes.
3       A.   So this is the letter I was referring
4   to and it is dated May 1st.  And it was to Doug.
5   Both letters are dated May 1st.  So what's your
6   question?
7           MS. SORIN:  Can you restate your
8   question?
9           MR. LOWER:  Of course.  Of course.
10      Q.   Would you agree that the April 30
11  termination date listed on P-60 is incorrect?
12          MS. SORIN:  I'm going to object to
13  form.
14          You can answer if you know.
15      A.   I don't know.
16      Q.   But today you did testify that
17  Mr. Truitt ended his employment by submitting a May
18  1, 2018 letter to the bank.  Correct?
19      A.   Correct.
20      Q.   And so how are you unaware as to what
21  the date that Mr. Truitt's employment ended is?
22          MS. SORIN:  Again, same objection,
23  asked and answered.
24      A.   That is the date of the letter.  That

Page 101

Cantele

1   is the date, I agree that is the date of this
2   letter, and -- but I don't -- I don't know without
3   better understanding it, he could have told Amy
4   and Linda King the day before.
5           MS. SORIN:  Are you speculating?
6   Don't speculate.
7           THE WITNESS:  Oh, sorry.  Okay.  I
8   apologize.  I should not speculate.
9       A.   I don't -- could you ask me again?  I
10  apologize.
11      Q.   Sure.  What was the last day of
12  Mr. Truitt's employment, how about that?
13          MS. SORIN:  I'm going to object to the
14  form.
15      Q.   We are going around the circles a bit
16  here.  We -- I think we've confirmed ad nauseam
17  that your position is that Mr. Truitt's employment
18  ended when he submitted an e-mail to the bank on
19  May 1, 2018, which you've described as a
20  resignation letter.  Is that correct?
21      A.   Yes.
22      Q.   And accordingly, Mr. Truitt's Salisbury
23  employment ended May 1, 2018, correct?
24          MS. SORIN:  Again, object to the form.

Cantele

1
2    A.   I would say that's correct.
3    Q.   And accordingly, the termination date
4  listed on P-60, which reads April 30, 2018, is not
5  correct.  Is that right?
6       MS. SORIN:  Object to the form.
7    A.   I certainly don't agree.
8    Q.   But you agree with May 1, 2018.
9    A.   Yes.
10    Q.   The last day of Mr. Truitt's
11  employment, correct?
12    A.   Correct.
13    Q.   And accordingly, you would disagree
14  that April 30, 2018, is the last day of
15  Mr. Truitt's employment; correct?
16       MS. SORIN:  Again, same objection,
17       asked and answered.
18    A.   I don't know.
19    Q.   So, I mean, I think we have a
20  relatively simple event on a quite clear date, and
21  I don't want to harp on this too much, but --
22       MS. SORIN:  Again, object to the
23       soliloquy.  And again, object to any further
24       questioning about this topic.  It's been
25       asked and answered multiple times.

Cantele

1
2    Q.   Mr. Cantele, do you think the
3  termination date listed on P-60 is accurate?
4       MS. SORIN:  Again, object to the form.
5       Asked and answered.
6    A.   I don't know.
7    Q.   But you do know when Mr. Truitt's
8  employment ended, is that correct?
9       MS. SORIN:  I'm going to object and
10       I'm going to instruct him not to answer the
11       question anymore.  It's borderline
12       harassment at this point.  You've asked him
13       the same question ten times.  He's answered
14       the question.
15    Q.   Do you know if Mr. Truitt disclosed his
16  work as a legislator when he applied to Salisbury?
17    A.   I believe he did, yes.
18    Q.   Do you know if Mr. Truitt needed to
19  have his Dutchess County Legislator position
20  approved before he was allowed to work for
21  Salisbury?
22    A.   Needed to have or was it approved?
23    Q.   I guess I'll ask both ways just to give
24  you a heads-up.
25    A.   Okay.

Cantele

1
2    Q.   Do you know if Mr. Truitt was required
3  to have his Dutchess County legislator position
4  approved before he was allowed to work at
5  Salisbury?
6    A.   I believe we were aware of his
7  Dutchess County legislator position when we hired
8  him.  Therefore, it was de facto approved.
9    Q.   Do you know if Mr. Truitt was ever
10  asked to fill out any type of outside employment
11  materials with respect to his Dutchess County
12  legislator position?
13    A.   I do not know.
14    Q.   Would you agree that Mr. Truitt's
15  campaign for New York State Assembly constitutes
16  political activity?
17       MS. SORIN:  Object to the form.
18       You can answer if you know.
19       MR. LOWER:  Can you explain the basis
20       of the objection?
21       MS. SORIN:  I'm going to object to the
22       vagueness of the question.
23       MR. LOWER:  Can you identify the
24       attributes of the question you consider
25       vague?

Cantele

1
2       MS. SORIN:  "Political activity."
3       You may answer the question.
4    A.   Would you repeat it?
5    Q.   Yes.  Would you agree that Mr. Truitt's
6  campaign for New York State Assembly constitutes
7  political activity?
8    A.   Yes.
9  RQ    MR. LOWER:  If nothing more than a
10       note to myself, I'll also be requesting
11       metadata information with respect to P-60.
12       Date metadata information specifically.
13       Those last two, no further questions on
14       those last two.
15       (A pause in the proceedings.)
16       MR. LOWER:  This is previously marked.
17    Q.   Mr. Cantele, I'm handing you a copy of
18  what's labeled employee handbook January 2018.  It
19  was previously marked P-4, and bears a Bates range
20  D-000123 through 172.
21       (Handing document to witness.)
22       MS. SORIN:  Do you have an extra copy
23       for me?
24       MR. LOWER:  Of course.
25       (Witness perusing document.)

Page 1

1                         D. Cahill

2              UNITED STATES DISTRICT COURT

3             SOUTHERN DISTRICT OF NEW YORK

4    ------------------------------------------------x

5    WILLIAM GUNNAR TRUITT,

6                     Plaintiff,  Case No.

7                     vs.         7:18-cv-08386-NSR

8    SALISBURY BANK and TRUST

9    COMPANY; and SALISBURY

10   BANCORP, INC.,

11                    Defendants.

12   ----------------------------------)

13

14

15             DEPOSITION OF DOUGLAS CAHILL

16                  New York, New York

17                   July 22, 2019

18

19

20

21

22

23   Reported by: BONNIE PRUSZYNSKI, RMR, RPR, CLR

24   JOB NO: 164776

25

Page 2

1          D. Cahill
2
3
4
5
6
7
8
9          July 22, 2019
10         1:04 P.M.
11
12
13
14         DEPOSITION OF DOUGLAS CAHILL,
15   held at the offices of  Littler Mendelson, P.C.,
16   900 Third Ave, 8th floor, New York, New York,
17   before Bonnie Pruszynski, a Registered
18   Professional Reporter, Registered Merit Reporter,
19   Certified Livenote Reporter, and Notary Public of
20   the State of New York.
21
22
23
24
25

Page 3

1
2    A P P E A R A N C E S :
3
4    MCCULLOUGH GINSBERG MONTANO & PARTNERS
5    Attorneys for the Plaintiff(s)
6       122 East 42nd Street
7       New York, NY 10168
8    BY: ROBERT LOWER, ESQ.
9
10
11   LITTLER MENDELSON
12   Attorneys for the Defendant(s)
13      1085 Raymond Boulevard
14      Newark, NJ 07102
15   BY: LINDSAY SORIN, ESQ.
16
17
18
19
20
21
22
23
24
25

Page 4

1          D. Cahill
2          (Witness sworn.)
3    DOUGLAS CAHILL,
4        called as a witness, having been first
5        duly sworn, was examined and testified
6        as follows:
7    EXAMINATION
8    BY MR. LOWER:
9        Q.   Good afternoon.  Thank you for
10   making the trek down today.
11           What neighborhood do you live in?
12       A.   Sharon, Connecticut, so it's like
13   right up in the upper northwest corner of
14   Connecticut.
15       Q.   So a Grand Central commute?  Is
16   that the --
17       A.   We take the Wassaic train, which is
18   probably 15 minutes from my house.
19       Q.   Cool.
20           Well, I have a decent little stack
21   of documents.  I will try to get you out of
22   here in a reasonable period of time.  That's
23   the best I can promise.
24           A couple of preliminary questions
25   about just the way depositions work.  The

Page 5

1          D. Cahill
2    first one:  Have you ever been deposed
3    before?
4        A.   No.
5        Q.   It's of course a question and
6    answer format.  Excuse me.  And with that
7    said, will you be able to answer my questions
8    with either a direct answer or let me know
9    that you don't know what the answer is?
10       A.   Yeah.
11       Q.   And within that vein, also, you're
12   welcome to provide a reasonable estimate, if
13   you don't know an exact date off the top of
14   your head.  I know I certainly wouldn't in
15   some instances.  All that is completely fine.
16           And as far as breaks go, I am fine
17   with anybody in the room announcing that they
18   want to take a break at any time, especially
19   you, so that's -- you can just jump in at any
20   time, let me know.  That's fine.
21           Unless you indicate otherwise, is
22   it okay for me to assume that you have
23   understood my questions?  And the same thing.
24   You can let me know if you don't understand
25   one of my questions.  I'm happy to try and

Page 38

D. Cahill

1
2    Q.   And does this look like a true and
3    accurate copy of the e-mail chain that I have
4    marked P-31?
5    A.   It does.
6         MR. LOWER:  Off the record for one
7    second.
8         (Discussion held off the record.)
9         (Exhibit P-32, D-0000415 marked for
10    identification, as of this date.)
11    BY MR. LOWER:
12    Q.   Mr. Cahill, I'm handing you a
13    one-page memorandum that I have marked P-32.
14    It has a Bates number of D-0000415.
15         And I am really just planning on a
16    true and authentic question for this one,
17    whenever you are ready.
18         (Pause.)
19    A.   Okay.
20    Q.   Does P-32 look like a true and
21    accurate copy of a memorandum that you sent
22    to HR/Compensation Committee on April 27,
23    2018?
24    A.   Yes.
25    Q.   Can you list everybody that would

Page 39

D. Cahill

1
2    have received this memo?
3    A.   As far as names go?
4    Q.   Yes.
5    A.   It was our HR/Compensation
6    Committee at the time.  It has since changed.
7    Q.   Let's start with --
8    A.   I don't think I can list everyone.
9    Q.   That's okay.  Can you list who you
10    remember being on the HR/Compensation
11    Committee?
12    A.   Well, actually, the full board
13    would have received it as well.  The
14    HR/Compensation Committee generally then
15    sends their materials to the board, I
16    believe.
17         But at the time, Art Bassin was the
18    chair.  Michael Varet.  Polly -- I don't know
19    her last name.  Yeah.  Whoever, I think
20    George Harnin.
21    Q.   What was the last name?  Harnin?
22    A.   Harnin.
23    Q.   Okay.
24    A.   I honestly don't remember everyone
25    that was on it at the time.  Nancy Humphreys

Page 40

D. Cahill

1
2    was.  Rick would have received it.
3    Q.   And you said the board of
4    directors --
5    A.   I believe that they received
6    materials from the HR compensation, but I
7    don't know that for sure.
8    Q.   And we said we would use
9    "Salisbury" generally before, and I guess now
10    I am backtracking a tiny bit.  When you say
11    "the board," you are referred to the board of
12    directors for what entity?
13    A.   Salisbury, for the
14    Salisbury/Riverside.
15    Q.   It's one board?
16    A.   It's one board.
17    Q.   Regardless of the specific name of
18    the entity?
19    A.   Yeah.
20    Q.   About how many people on the board?
21    A.   At the time, I think there were
22    about 14 or 15.
23    Q.   And today?
24    A.   I believe it's 11.
25    Q.   And regarding the changes to the

Page 41

D. Cahill

1
2    board, do you know who left the board between
3    Mr. Truitt's employment and today?
4    A.   Michael Varet.  Magee Allyn.
5    Q.   Magee?
6    A.   Magee Allyn.
7    Q.   M-A-G-E-E?
8    A.   I think it's -- he has a different
9    name, a formal name, but I don't -- I don't
10    remember what that is.  I don't deal that
11    much with the board.
12    Q.   Okay.
13    A.   So I apologize.
14    Q.   You said Magee?
15    A.   His name is Magee Allyn, and -- and
16    I don't recall who else has left.
17    Q.   That's okay.
18         Same question except to who has
19    joined board the board, and I will just ask
20    it, so it's clear.  But since Mr. Truitt's
21    Salisbury employment, who are the new members
22    to Salisbury's board of directors, if any?
23    A.   I don't think there is any.
24    Q.   Okay.  I think you said Mr. Bassin
25    was chair at the time.  Is that --

11 (Pages 38 to 41)

Page 50

```
 1              D. Cahill
 2  memorandum.
 3      A.   Correct.
 4          MS. SORIN:  I'm just going to
 5  object.  There was no question asked.
 6          MR. LOWER:  No problem.
 7      Q.   And in your last paragraph, we will
 8  just say your last sentence of the whole
 9  memorandum, you wrote, "Management is
10  currently reviewing whether a conflict of
11  interest exists with the State Assembly
12  campaign and position."
13          And of course you were referring to
14  Mr. Truitt's State Assembly campaign; is that
15  correct?
16      A.   And the position, correct.
17      Q.   And his position as a Salisbury
18  employee?
19      A.   No.  The position of State
20  Assemblyman and what that would entail.
21      Q.   With respect to your contention
22  that management is currently reviewing
23  whether a conflict of interest exists, what
24  did management conclude?
25      A.   We concluded that there was a
```

Page 51

```
 1              D. Cahill
 2  conflict.
 3      Q.   And what was the conflict?
 4      A.   The time that he would be away from
 5  the job, anywhere from two to four days per
 6  week, six months of the year.
 7      Q.   Did Mr. Truitt tell you he would be
 8  away for two to four days per week for six
 9  months of the year, I believe is what you
10  said?
11      A.   Yes.
12      Q.   When did he tell you that?
13      A.   When we asked him to give us an
14  update on the parameters of that role.  And
15  he gave us a schedule for the Assembly
16  position.
17      Q.   And that's the communication that
18  you referred to just a moment ago; right?
19          MS. SORIN:  Object to the form.
20      Q.   Just for context, I'm trying to
21  figure out, is that a conversation or an
22  e-mail?  So, I will just rephrase this
23  question.
24          How did Mr. Truitt tell you that he
25  would be away for two to four days per week
```

Page 52

```
 1              D. Cahill
 2  for six months, which is what you told me, I
 3  believe?
 4      A.   In an e-mail to us with an
 5  attachment, which included the State Assembly
 6  schedule.
 7          (Exhibit P-33, D-000070-073 marked
 8      for identification, as of this date.)
 9      Q.   I am handing you what I have marked
10  P-33, which appears to be a letter you sent
11  Mr. Truitt, an offer letter, and you can let
12  me know whenever you are ready to discuss.
13          (Pause.)
14      A.   Okay.
15      Q.   Is it accurate for me to describe
16  this as an offer letter from Salisbury to
17  Mr. Truitt?
18      A.   Yes.
19      Q.   And it looks like you wrote it, and
20  it's -- it was sent on or around January 29,
21  2018; is that correct?
22      A.   Yes.
23      Q.   And I will also just let the record
24  reflect that P-33, the document we are
25  discussing, has a Bates range of D-000070
```

Page 53

```
 1              D. Cahill
 2  through 73.
 3          MS. SORIN:  And just for the
 4      record, I want to note that only D-70 is
 5      the offer letter.  71, 72, and 73, it's
 6      not in the record yet that these were
 7      provided to him with an offer letter.
 8      The letter states that "a development
 9      plan, which will be outlined to you in an
10      additional document upon your hire date."
11          So, it's not clear in the record
12      that he received any development plan or
13      any kind of documentation that is
14      attached to this letter at the time he
15      received the offer letter.
16      Q.   And Mr. Cahill, to the extent you
17  are listening, you see that there is some --
18  I certainly agree with Ms. Sorin that these
19  extra pages of P-33 are not a letter, but
20  they are kind of outlines for development of
21  an employee.  Is that --
22          MS. SORIN:  Object to the form.
23      Q.   Mr. Cahill, with respect to the
24  second page of P-33, is this something that
25  was sent to Mr. Truitt?
```

Page 58

D. Cahill

1   the Affordable Care Act.  We couldn't have it
2   going to 91 days.
3
4       Q.   When you say "move it back," you
5   mean give it to new hires faster; right?
6       A.   Yes.
7       Q.   What --
8       A.   And honestly, I don't remember.
9   We -- the life insurance and disabilities, we
10  may have given 1st of the month after 60
11  days.  I just -- I don't recall at that time.
12  This year, we did change it, in 2019.
13      Q.   Okay.
14      A.   Fairly radically.  It's actually
15  after 30 days now.
16      Q.   Oh, okay.
17           What did the ESOP program entail?
18      A.   That's the employee stock ownership
19  plan, and you become eligible after a
20  thousand hours and one year's service.
21      Q.   For an MLO that has been at the
22  bank for, let's say a couple years, what type
23  of employee stock options do they receive?
24      A.   Not options.
25      Q.   Sorry.

Page 59

D. Cahill

1
2       A.   They are actual shares that -- and
3   it's 2 percent of your salary.
4       Q.   Okay.
5       A.   At that time.
6       Q.   And that's not in a 401(k) or
7   anything, that is shares that you could sell
8   tomorrow if you wanted to?
9       A.   No.  It's a retirement plan.  You
10  have -- you can't sell them until you leave
11  the bank.
12      Q.   Okay.
13      A.   And then only at whatever you are
14  vested.  There is a vesting period of six
15  years.
16      Q.   Okay.  Progressive, or is it -- the
17  vesting schedule, is it -- you know, for
18  example, at three years, is it 50 percent?
19      A.   It's after two years, it's
20  20 percent, and then 20 percent per year
21  after that.  So at six years, it's
22  100 percent.
23      Q.   The 401(k) plans provided for MLOs,
24  of course an employee can divert part of
25  their pay electively to their 401(k);

Page 60

D. Cahill

1
2   correct?
3       A.   Correct.
4       Q.   Does Salisbury do any matching for
5   elective 401(k) contributions?
6       A.   After the first year.  You have to
7   be with the bank for -- and it's prorated,
8   after you have worked a thousand hours.
9       Q.   Okay.
10      A.   So, if you were hired in February,
11  for example, on February of the next year, if
12  you worked a thousand hours, you would then
13  be prorated for the rest of the year, so ten
14  months out of --
15      Q.   Okay.
16      A.   Out of the year.  There is a Safe
17  Harbor contribution that does start after
18  90 days.
19      Q.   So, what is the maximum amount of
20  matching that Salisbury does for elective
21  401(k) contributions?
22      A.   At the time, 6 percent.
23      Q.   And is it correct it takes a
24  thousand hours of work or a year -- I'm
25  sorry.  How long until the 6 percent can

Page 61

D. Cahill

1
2   apply?
3       A.   After one full year, as long as the
4   employee worked a thousand hours, or more.
5       Q.   Thank you.
6           How much is the Safe Harbor
7   matching?
8       A.   At the time, 4 percent.
9       Q.   Okay.  So, it's not a massive
10  difference.
11          How does paid time off work for
12  100 percent commissioned MLOs?
13      A.   For 100 percent commissioned MLOs,
14  it doesn't.  They don't get paid for the time
15  off.  But they still have to -- they still
16  get two weeks of vacation, or in this case
17  three weeks of vacation and then one week of
18  personal time that they have to record, just
19  so we understand that they are not spending
20  more or using more vacation time than they
21  should be.
22      Q.   So, there is more strict
23  requirements for a personal week than a
24  vacation week.  Is that a fair
25  generalization?

16 (Pages 58 to 61)

Page 82

D. Cahill

1    2018?
2
3         MS. SORIN:  Object, asked and
4    answered.
5         MR. LOWER:  Was that an instruction
6    not to answer or --
7         MS. SORIN:  You can answer.
8         A.   I don't understand what the
9    difference is.
10        Q.   Okay.
11        A.   He told us clearly that he was
12   nominated, he was endorsed, and as far as I
13   was concerned at the time, I don't know that
14   there was a distinction between being on the
15   ballot or, you know, what that is.
16        Q.   Do you know if he had been endorsed
17   by -- strike that.
18        Who do you believe Mr. Truitt's
19   campaign for New York State Assembly was
20   endorsed by as of April 27, 2018?
21        MS. SORIN:  Object to the form.
22        You can answer, if you understand.
23        A.   In an earlier e-mail, middle of
24   April, he told us that he was endorsed.
25   That's all I recall.

Page 83

D. Cahill

1
2        Q.   You said middle of April; right?
3    Somewhere in the vicinity of April 15, 2018,
4    is what you are referring to; correct?
5        A.   Correct.
6        Q.   Do Salisbury employees need to seek
7    permission from Salisbury before applying for
8    a job outside of Salisbury?
9        A.   If it's going to potentially be a
10   conflict of their hours or responsibilities,
11   a conflict of interest as defined by the
12   conflict of interest policy or the handbook,
13   then yes.  And I do get a number of people
14   that e-mail me letting me know that they are
15   going to work part-time at a Cumberland Farms
16   or whatever it might be.
17        Q.   For the record, are you
18   referring -- is Cumberland Farms like a
19   grocery store?
20        A.   I'm sorry.  Yes.  Something with
21   evening hours.
22        Q.   And is it your testimony that
23   employees e-mail you to say they are
24   considering applying at a Cumberland Farms or
25   similar line of employment?

Page 84

D. Cahill

1
2        A.   In some cases, and I would say not
3    in all cases, but in some cases.
4        Q.   And it violates bank policy --
5    strike that.
6        And it's your testimony that it
7    violates bank policy to apply for or
8    interview for a role outside of Salisbury
9    without first seeking approval from Salisbury
10   management?
11        A.   No.  I wouldn't go that far to say
12   it violates policy.  I would say it's best
13   practice.  It will violate policy if we find
14   that there is a conflict in your hours
15   working, or if you are doing it for a
16   customer, or something along those lines,
17   that may just create a conflict of interest
18   or the perception of it.
19        Q.   And is it correct that you told
20   Mr. Truitt that he needed to choose between
21   his campaign for New York State Assembly and
22   his employment at Salisbury?
23        A.   I don't know if I said that.  What
24   I did tell him is that we denied his request
25   to -- for the outside employment, which would

Page 85

D. Cahill

1
2    have been significant hours and, you know, a
3    conflict for the bank, and that he had a
4    choice to make.  Salisbury Bank needed to be
5    his first choice or his first primary
6    employer.  Essentially, that's what our
7    conflict of interest policy and handbook
8    says.
9        Q.   Do -- did you give --
10        A.   If he wanted to go further, then --
11   you know, then we would have to make a
12   decision at that point.  We hadn't made it at
13   that point.
14        Q.   And I'm sorry.  When you say if he
15   wanted to go further --
16        A.   If he wanted to continue with
17   his -- with his campaign for the Assembly,
18   that at that point we would have to make a
19   decision.
20        Q.   And Mr. Truitt was terminated
21   within a week of this e-mail being sent;
22   correct?
23        MS. SORIN:  Object to the form.
24        You can answer.
25        A.   He was not terminated.  He

22 (Pages 82 to 85)

Page 86

D. Cahill

1
2  resigned.  He essentially, in a letter to --
3  resignation letter to us, said that he was
4  making a choice to run for office and focus
5  on his political career.
6       Q.   When did you receive the -- strike
7  that.
8            When did Mr. Truitt send the letter
9  that you just described?
10      A.   I think around May 1st.
11      Q.   Was that letter sent to you?
12      A.   I believe so.  I think it was sent
13  to me and to Amy, a separate one.
14      Q.   So, you mentioned a resignation
15  letter, and are you indicating that two
16  iterations of the letter were sent by
17  Mr. Truitt --
18      A.   Yes.
19      Q.   -- on May 1, 2018?
20      A.   Around May 1.
21           MS. SORIN:  Object to the form.
22  Sorry.  Object to the form.
23      A.   Around May 1.
24      Q.   And you received one letter that
25  you described as a resignation letter from

Page 87

D. Cahill

1
2  Mr. Truitt around May 1, 2018; correct?
3       A.   What I perceived as a resignation
4  letter.
5       Q.   And then another version of what
6  you described as a resignation letter from
7  Mr. Truitt was received by Amy Raymond?
8       A.   Correct.
9       Q.   Approximately May 1?
10      A.   I think that they said about the
11  same things, but --
12      Q.   And are you aware of any other
13  letter that you would describe as a
14  resignation letter from Mr. Truitt?
15      A.   No.
16      Q.   So, it's your testimony that in
17  your April 27 meeting with Mr. Truitt, you
18  told him that he would not be allowed to be a
19  candidate for New York State Assembly?
20           MS. SORIN:  Object to the form.
21  Misstates prior testimony.
22      Q.   Is that correct?
23      A.   I told him we found it to be a
24  conflict of interest.
25      Q.   And did Mr. Truitt ask whether or

Page 88

D. Cahill

1
2  not he would be allowed to continue his
3  candidacy for New York State Assembly when
4  you said that?
5       A.   I'm sorry.  What was the question
6  again?
7       Q.   When you said Mr. Truitt's campaign
8  would be a conflict of interest, did
9  Mr. Truitt ask whether or not he would be
10  allowed to continue his campaign for New York
11  State Assembly?
12      A.   I don't think so.  I told him that
13  we would need a decision, that we needed to
14  know whether or not he was going to continue
15  to run, with the bank saying that --
16  believing that it's a conflict of interest.
17      Q.   Why did you need for him to tell
18  you whether or not he was going to continue
19  to run for New York State Assembly?
20      A.   Because it's at-will employment.
21  The bank is telling him we think it's a
22  conflict of interest, we would rather he
23  didn't run, and it would -- that we believed
24  it would interfere with his current job.
25      Q.   What does that mean, it's at-will

Page 89

D. Cahill

1
2  employment?
3       A.   That means that he can leave for
4  any reason and find other employment, or we
5  can ask him to leave for any reason.
6       Q.   And did you tell Mr. Truitt he
7  would need to leave if he continued his
8  campaign for New York State Assembly?
9       A.   At that point, I told him that he
10  needed to make a decision on whether he was
11  going to run or not and let us know by, I
12  believe that Tuesday.
13           He had asked during that meeting if
14  he could meet with Rick Cantele on that
15  Monday, but I wasn't here.  He wanted to make
16  one last plea, one last case, thinking that
17  Rick was the primary decision maker.
18           But I wanted him to know that it
19  wasn't just Rick, it was myself, who manages
20  the handbook and the policies, his manager,
21  and Rick as well.
22      Q.   So, is it your testimony that you
23  did not tell Mr. Truitt he would need to
24  choose between his job at Salisbury and his
25  campaign for New York State Assembly?

23 (Pages 86 to 89)

**Douglas Cahill**

| | |
|---|---|
| **From:** | William Truitt <william.g.truitt@gmail.com> |
| **Sent:** | Tuesday, May 01, 2018 1:44 PM |
| **To:** | Douglas Cahill |
| **Subject:** | [External] Decision |

Hi Doug,

After sitting down and speaking with Rick yesterday, I informed him that I will continue with my bid for the New York State Assembly. We had a nice conversation, and I told him the same thoughts that I had expressed to you during our meeting; I know that if given the chance, I would be able to prove myself that I can be a very successful originator in NYS even if elected to the State Assembly.

He told me that there is a lot of uncertainty that comes along with this for the bank, and I both understand and respect that. He suggested we consider these next 6 months as a "time-out" period, and that he hopes I will consider applying with Salisbury again in November if I am unsuccessful in my election.

I did deeply consider and weigh my options over this past weekend, and came to the conclusion that I cannot give up on a once in a lifetime opportunity such as the one that has presented itself before me. The chance to tie Teddy Roosevelt as the youngest State Assemblyman in NY history is one I cannot give up, nor can I let down my community who has asked me to run.

I have learned a tremendous amount during my short two months at Salisbury Bank, and I truly appreciated how quickly everyone welcomed me into the family. I want to especially thank you Doug, for our initial interview and for your help along the way, and also Rick for his leadership and his willingness to meet with me yesterday.

I have a few items that I need to return, including a laptop, a key-fab and a Poughkeepsie parking garage badge. Let me know how you would like me to return those in to you, and I will bring them as soon as possible.

All the Best,
Will Truitt

1

D-000103



# Employee Handbook
# January 2018



©Salisbury Bank and Trust Company

D-000123

**TABLE OF CONTENTS**

**SECTION I:  INTRODUCTION**

    Welcome to Salisbury Bank and Trust Company    5
    History of Salisbury Bank and Trust Company    6
    Our Vision and Core Values    6

**SECTION II:  THE WAY WE WORK**

    A word about this handbook    7
    Affirmative Action and Equal Employment Opportunity    7
    Americans with Disabilities Act    8
    A word about our employee relations philosophy    8
    Work Place Harassment    9
    Categories of employment    10
    New employee orientation    10
    Immigration Reform and Control Act    10
    Employment of relatives    11
    Job posting policy    11
    Changes in employment status    11
    Re-employment of former employees    11
    Talk to us    12

**SECTION III:  YOUR PAY AND PROGRESS**

    Wage and salary program    12
    Recording your time    12
    Work hours    13
    Lunch and break periods    13
    Payday    13
    Direct deposit    13
    Overtime    13
    Payroll deductions    14
    Performance reviews    14

**SECTION IV:  EMPLOYEE BENEFITS**

    Employee benefits    14
    Holidays    14
    Paid Time Off (PTO)    15
    Attendance Standards    17
    Long Term Illness Bank (LTIB)    17
    Part-Time Illness Bank    18
    Jury Duty    19
    Military Leave    19
    Witness and Crime Victim Leave    19
    Family Violence Victim Leave    20
    Bereavement leave    20
    Medical insurance    20
    Dental insurance    20
    COBRA    21
    Section 125 Plan    21
    Disability Leave    21

D-000124

## TABLE OF CONTENTS (EMPLOYEE BENEFITS continued)

Family and Medical Leave Act                                        22
    Employee Obligation (FMLA)                   23
    Leave Entitlement (FMLA)                     25
    Maintenance of Health Benefits (FMLA)        26
    Rights Upon Return From Leave (FMLA)         26
    Fitness for Duty Certification (FMLA)        26
State and local Family and Medical Leave Laws                       26
Pregnancy Disability Leave                                          27
Other Leave (NY and MA)                                             27
Social security                                                     27
Unemployment insurance                                             28
Workers' compensation                                              28
401 (K) Qualified Retirement Plan                                   28
Education and Tuition Support                                       28
Banking services available to employees                            29
Service recognition                                                29
Customer service/Telephone etiquette                               29
Employee accounts                                                  29

## SECTION V:  ON THE JOB

Attendance and punctuality                                          30
Standards of conduct                                                30
Access to personnel files                                           30
Customer and public relations                                       31
Changes in personal data                                            31
Protecting company information                                      31
Protection of Personal Information                                  31
Code of ethics and Conflicts of Interest                            31
Confidentiality                                                     32
Bank Bribery                                                        32
Outside Activities/Employment                                       32
Personal and Financial Matters                                      33
Accounts Payable Remittance                                         33
Care of equipment                                                   33
Severe weather                                                      33
Personal telephone calls                                            33
Personal Mail                                                       33
You and Your Supervisor                                             34
Problem solving/Grievance Resolution Procedures                     34
Electronic mail monitoring                                          34
Voice mail monitoring                                               35
Internet usage                                                      35
Social Media                                                        35
Tape Recording/Cameras                                              36
Personal Appearance                                                 35
Dress Code                                                          36
Disciplinary Procedures                                             36
Termination/Discharge                                               37
Exit Interviews                                                     38
Return of Bank Property                                             38

D-000125

**SECTION VI:  SAFETY IN THE WORKPLACE**

| | |
|---|---|
| Each employee's responsibility | 39 |
| Visitors in the Workplace | 39 |
| Security | 39 |
| Disaster Situations | 39 |
| Safety Committee | 40 |
| Eating and Drinking | 40 |
| Parking | 40 |
| Driving on Bank Business | 40 |
| Workplace searches | 40 |
| Workplace violence | 41 |
| Office Maintenance | 41 |
| Smoke-free workplace | 41 |
| Concealed weapons | 41 |
| Substance abuse | 42 |

**SECTION VII:  CLOSING**

| | |
|---|---|
| Receipt of Employee Handbook | 43 |

4

D-000126

# SECTION I: INTRODUCTION

**WELCOME TO SALISBURY BANK AND TRUST COMPANY**

We are pleased to welcome you to Salisbury Bank and Trust Company. By working at Salisbury Bank, you have chosen to begin or advance your career with proven industry and community leaders. As leaders, we are committed to our most valuable asset – you, our employee. Our employees have made our achievements possible and are the key to our continued success in the future. We need to work together for our customers and must continually strive for product and service excellence. Your participation is vital to the success of Salisbury Bank and you are encouraged to offer suggestions on how to create a more effective, efficient organization and to improve the quality of our services. Our policies, practices and benefits have been designed to provide you with a challenging and rewarding work environment that will allow you to maximize your potential to succeed.

We have provided this Employee Handbook so that you may have a convenient source of information about our policies and practices, as well as the many benefits offered to you as an employee. We encourage you to read this handbook thoroughly and to address any questions to your supervisor or to our Human Resource Administrator.

This handbook is designed as a working guide for employees and supervisors. It is not the intent of this handbook to cover every employment policy or to describe in detail every employee benefit. Items within this handbook may be modified or deleted from time to time without notice and none of the information within it should be considered contractual in nature. This handbook does not guarantee employment for any specific duration. The terms of this handbook have not been and cannot be negotiated with employees. While we hope that your employment relationship with us will be long-term, your employment with Salisbury Bank is **at-will** and, as such, may be terminated by you or Salisbury Bank at any time and for any reason.

We hope that your experience with Salisbury Bank will be challenging and enjoyable. Our best wishes for a successful and rewarding career!

Sincerely,

Richard J. Cantele, Jr.
President and CEO

5

D-000127

## HISTORY OF SALISBURY BANK AND TRUST COMPANY

In 1848, at the May session of The General Assembly of Connecticut, a charter was granted to organize Salisbury Savings Society.

At that time, Lakeville was a small settlement of perhaps forty buildings and Salisbury village had about the same number of inhabitants. On October 1, 1848, Salisbury Savings Society had 126 depositors having $11,111.36 to their credit. Five percent interest had been paid to depositors for the year and the bank's operating expense was listed as $44.78.

For the first 16 years, the office of the bank was located in a one room building on Farnum Road. On May 7, 1864, the Board of Managers purchased a plot of ground for the sum of $250 to construct a building suitable for a Savings Bank and dwelling house. This is where Wagner McNeil Insurance Company is now located.

In 1874, the private banking firm of Robbins Burrall and Company was instituted and shared the same room, vault and employees with the Savings Society while keeping their books, accounts and cash entirely separate. In 1909, the private bank was incorporated as the Robbins Burrall Trust Company. In 1925, the two banks became one when the Robbins Burrall Trust Company assumed the assets and liabilities of the Salisbury Savings Society, forming the Salisbury Bank and Trust Company.

Salisbury Bank and Trust Company purchased the property it now sits on in 1969. The house that was originally here was moved, and the new bank building was erected in 1972 and opened for business in February of 1973. In 1984, a wing was added to the Main Office and in 1995, the Bissell House building was purchased, which now houses our Trust Department.

In August of 1998, Salisbury Bancorp, Inc., a banking and financial services company whose sole subsidiary is Salisbury Bank and Trust Company, announced its listing on the American Stock Exchange under the symbol "SAL". Salisbury Bank and Trust Company is chartered as a state bank and trust company by the State of Connecticut. In December 2012, the Bank changed its listing to the NASDAQ Exchange, continuing under the "SAL" symbol.

In 2004, the Bank merged with the Canaan National Bank, adding a larger presence in Canaan and a first branch in Massachusetts. In 2007 and 2010, the Bank added two branches in New York reinforcing the Bank's commitment to serving the tri-state area.

2014 added more growth to Salisbury Bank's footprint, with a third branch in Massachusetts and the merger with Riverside Bank. The Riverside Bank merger added 4 more branches along the Hudson River, from Poughkeepsie to Newburgh.

Salisbury Bank is committed to meeting the needs of the customers we serve. We accomplish this through offering the highest quality of personal service and a competitive array of business and personal banking products.

D-000128

## OUR VISION

*WE WILL TREAT EVERY CUSTOMER AS IF THEY ARE OUR ONLY CUSTOMER*

## OUR CORE VALUES

1. *SERVICE TO THE CUSTOMER ABOVE ALL ELSE.*
2. *ALWAYS DO THE RIGHT THING.*
3. *BE POSITIVE, ENTHUSIASTIC AND HAVE FUN.*
4. *NEVER BE SATISFIED.*
5. *CALL IT RIGHT.*

7

D-000129

## SECTION II: THE WAY WE WORK

### A WORD ABOUT THIS HANDBOOK

This Employee Handbook contains information about the employment policies and practices of Salisbury Bank. We expect each employee to read this handbook carefully, as it is a valuable reference for understanding your job and our company. The policies outlined in this handbook should be regarded as management guidelines only, which in a developing business will require changes from time to time. Salisbury Bank and Trust Company retains the right to make decisions involving employment as needed in order to conduct its work in a manner that is beneficial to the Bank's business interests. This Employee Handbook supersedes and replaces any and all prior Employee Handbooks and inconsistent verbal or written policy statements. Except for the policy of at-will employment, Salisbury Bank reserves the right to revise, delete and add to the provisions of this handbook. All such revisions, deletions or additions must be in writing and must be signed by the President of Salisbury Bank. No oral statements or representations can change the provisions of this Employee Handbook.

The provisions of this handbook are not intended to create contractual obligations with respect to any matter it covers. Nor is this handbook intended to create a contract guaranteeing that you will be employed for any specific time period.

*Salisbury Bank and Trust Company is an At-Will Employer. This means that regardless of any provision in this employee handbook, either you or the company may terminate the employment relationship at any time, for any lawful reason, with or without cause or notice. Nothing in this employee handbook or in any document or statement, written or oral, shall limit the right to terminate employment-at-will. No officer, employee or representative of Salisbury Bank and Trust Company is authorized to enter into an agreement – expressed or implied – with any employee for employment other than at-will.*

This Employee Handbook refers to current benefit plans maintained by Salisbury Bank. Refer to the actual plan documents and summary plan descriptions if you have specific questions regarding the benefit plans. Those documents are controlling.

This handbook is the property of Salisbury Bank and Trust Company. No part of this handbook may be reproduced or transmitted in any form by any means (including by hardcopy or electronically) for any business/commercial venture without the express written permission of the President of the Bank. The information contained in this handbook is strictly limited to use by the Bank and its employees. The disclosure of this Handbook to competitors is prohibited.

### AFFIRMATIVE ACTION POLICY AND EQUAL EMPLOYMENT OPPORTUNITY STATEMENT

Salisbury Bank is an equal opportunity employer, dedicated to a policy of nondiscrimination in employment on any basis prohibited by law. Salisbury Bank considers applicants for all positions without regard to race, color, religion, gender, national origin, age, disability, marital status, veteran status, sexual orientation, gender identity/expression, genetic characteristics or any other legally protected status, and is committed to providing equal opportunities in terms of its recruiting and hiring practices. Salisbury Bank is also committed to providing equal opportunities to its employees in all of its employment practices, including but not limited to compensation, training, transfers and promotions, and in the provision of all of its employee benefit programs. As part of its commitment to equal opportunities, Salisbury Bank also expects all of its employees to adhere to this policy of nondiscrimination. Salisbury Bank will take prompt action upon the receipt of a complaint of unlawful discrimination and will take appropriate corrective action, including disciplinary measures if necessary, to remedy any violations of this policy.

It is also the policy of Salisbury Bank to apply affirmative action to employ and advance in employment employees and applicants for employment who are qualified females, minorities, individuals with disabilities or veterans. All managerial, administrative and supervisory personnel are advised that an important part of their responsibilities for which they will be held accountable will be to apply affirmative action to such employment practices as: recruitment, hiring, compensation, benefits, transfers, promotions, discipline, leaves of absence, layoffs, terminations, Bank-sponsored training, education, tuition assistance and social and recreational programs.

Employees and applicants shall not be subjected to harassment, intimidation, threats, coercion or discrimination because they have engaged in or may engage in any of the following activities: (1) filing a complaint; (2) assisting or participating in an investigation, compliance evaluation, hearing, or any other activity related to the

D-000130

administration of the affirmative action provisions of Executive Order 11246, as amended, the Vietnam Era Veterans' Readjustment Assistance Act of 1974, as amended (VEVRAA) or any other federal, state or local law requiring equal opportunity for qualified disabled veterans, recently separated veterans, armed forces service medal veterans or other protected veterans, or related to the administration of the affirmative action provisions of the Rehabilitation Act of 1973, as amended ("Section 503"), or any other federal, state or local law requiring equal opportunity for qualified individuals with disabilities;  (3) opposing any act or practice made unlawful by Executive Order 11246, VEVRAA or Section 503 or their respective implementing regulations in this part or any other federal, state or local law requiring equal opportunity for qualified individuals with disabilities and qualified veterans; or (4) exercising any other right protected by Executive Order 11246, VEVRAA or Section 503 or their implementing regulations in this part.

In furtherance of Salisbury Bank's commitment regarding Affirmative Action and Equal Employment Opportunity, Salisbury Bank will maintain a written Affirmative Action Program which sets forth the polices, practices and procedures which Salisbury Bank will apply in order to ensure that non-discrimination and affirmative action for qualified females, minorities, individuals with disabilities and qualified veterans is accomplished. The objective of these policies and programs is to attract and promote individuals who are qualified and/or trainable for available positions by virtue of job related standards or education, training and personal qualifications.

This commitment has the full backing and support of management and the cooperation and support of all employees is expected.  Doug Cahill, Director of Human Resources, has been appointed Affirmative Action Officer. As Affirmative Action Officer, Mr. Cahill shall, among other things, annually review and examine the effectiveness of Salisbury Bank's affirmative action program and its compliance with Executive Order 11246, the VEVRAA and with Section 503.

This policy sets forth Salisbury Bank's general philosophy regarding affirmative action and equal employment opportunities.  As with all other policies in this Handbook, it does not constitute a term or provision of any express or implied contract of employment between Salisbury Bank and any individual employee or applicant, nor does it create any contractual obligations on behalf of Salisbury Bank to any individual.

**Employment of Qualified Disabled Individuals**

Salisbury Bank is committed to complying with all applicable provisions of state and federal laws protecting the rights of qualified disabled individuals.  It is Salisbury Bank's policy not to discriminate against any qualified employee or applicant with regard to any terms or conditions of employment because of such individual's disability or perceived disability so long as the employee can perform the essential functions of the job. Consistent with this policy of nondiscrimination, Salisbury Bank will provide reasonable accommodations to a qualified individual with a disability, as defined under applicable law, who has made Salisbury Bank aware of his or her disability, provided that such accommodation does not constitute an undue hardship on Salisbury Bank.

Applicants or employees with a disability who believe they need a reasonable accommodation to perform the essential functions of their job should contact the Director of Human Resources.  Upon receipt of any accommodation request, Salisbury Bank will review the precise limitations resulting from the disability and the potential reasonable accommodation(s) that might be made to enable performance of the essential functions of the job. As part of this process, an employee or applicant may be required to provide authorization for Salisbury Bank to communicate with and obtain documentation from their doctors regarding the medical condition(s) for which reasonable accommodation is sought, and may further be required to be evaluated by a doctor of Salisbury Bank's choice.  All such medical information discussed and received will be treated as confidential to the extent required and permissible by law.

## A WORD ABOUT OUR EMPLOYEE RELATIONS PHILOSOPHY

Salisbury Bank and Trust Company is committed to providing the best possible climate for maximum development and goal achievement for all employees.  Our practice is to treat each employee as an individual. We seek to develop a spirit of teamwork; individuals working together to attain a common goal.

In order to maintain an atmosphere where these goals can be accomplished, we provide a comfortable and progressive workplace. Most importantly, we have a workplace where communication is open and problems can be discussed and resolved in a mutually respectful atmosphere.  We take into account individual circumstances and the individual employee.

D-000131

We firmly believe that with direct communication, we can continue to resolve any difficulties that may arise and develop a mutually beneficial relationship.

## WORKPLACE HARASSMENT

Salisbury Bank prohibits any verbal or physical conduct by any employee that discriminates against any co-workers, customers or others associated with the Bank, on the basis of any legally protected status, or which harasses, disrupts or interferes with another's work performance or which creates an intimidating, offensive or hostile working environment, including but not limited to any form of harassment/discrimination based on race, color, religion, gender, national origin, age, disability, marital status, veteran status, genetic characteristics, gender identity/expression or sexual orientation.  Discrimination and harassment in the workplace by third parties against our employees based on any legally protected status is also prohibited.

Discrimination or harassment can take many forms. It may be, but is not limited to:  words, conduct, adverse job action, signs, jokes, pranks, intimidation, physical contact, or violence.

Salisbury Bank further prohibits sexual harassment of any employee by another employee, supervisor or third party.  Sexual harassment of third parties in the workplace by our employees is also prohibited.
Specifically, it is contrary to Salisbury Bank's policy for any employee to sexually harass another individual by:

- making unwelcome sexual conduct or requests for sexual favors a condition of an employee's continued employment; or
- using an employee's submission or rejection of such conduct as the basis for making employment decisions (e.g., promotions, raises); or
- creating a work environment in which conduct of a sexual nature substantially interferes with an individual's work performance or creates an atmosphere that is intimidating, hostile or offensive to employees.

Although not an inclusive list, the following are examples of the type of conduct prohibited by the policy against sexual harassment:

- Unwelcome sexual advances, propositions or flirtations;
- Unwelcome attention of a sexual nature such as degrading comments, suggestive or lewd remarks, propositions, jokes, tricks or noises;
- Unwanted hugs, touches, kisses or requests for sexual favors;
- The threat or suggestion that continued employment, advancement, assignment or earnings depend on whether or not the employee will submit to or tolerate harassment;
- Retaliation for complaining about sexual harassment.

Any employee who believes that they are a victim of unlawful harassment or retaliated against for complaining of harassment, should immediately request that such conduct cease.  Employees further have a responsibility to report such conduct or immediately complain to their immediate supervisor should their direct requests that the conduct cease be ignored.  If an employee is uncomfortable raising their complaint with someone to whom they report to, or if the complaint involves someone in their direct line of command, then that employee should bring a complaint to the Human Resources Department or any other management representative.

Salisbury Bank will investigate every reported incident immediately in a discreet manner. Confidentiality at the time of reporting the incident will be preserved to the maximum extent possible. In this regard, the reporting employee, the alleged harasser and any other employees aware of the incident are expected to treat this information in a confidential manner so that the investigation may be completed without violating any such individual's rights to privacy. The reporting employee and any employee participating in any investigation under this policy have Salisbury Bank's assurance that no reprisals will be taken as a result of a  harassment complaint.

Any employee determined to have committed unlawful harassment will be subject to appropriate disciplinary action, up to and including termination. Moreover, any individual who makes unwelcome advances, threatens or in any way sexually harasses another employee, supervisor or third party may be personally liable for monetary damages and/or criminal prosecution for such actions.

10

D-000132

For further information (including information about how to contact appropriate state and federal enforcement agencies to report claims of sexual harassment) please see our Sexual Harassment Policy under E-Forms/Policies/Sexual Harassment Policy or contact Doug Cahill, Sexual Harassment Officer or Shelly Humeston (VP, Administration and Corporate Secretary).

## CATEGORIES OF EMPLOYMENT

### Introductory Period

A 90-day Introductory Period exists for newly hired employees and staff promoted to a new position. During the Introductory Period, training will be intensive and your department supervisor and colleagues will help you gain the knowledge and skills you need to be successful in your position. You are encouraged to ask for assistance when you have questions and you will receive feedback on how you are doing and whether you are meeting the requirements of the position.

If your performance meets the job standards upon completion of the Introductory Period, you will become a **regular status full time, regular status full time 30, or regular status part time** employee and eligible for benefits as described in the "Employee Benefits" section of this handbook. If your performance is below the expected standards, your employment may be terminated. Please remember that employment may be terminated for any reason at any time should Salisbury Bank deem such termination appropriate, even after the Introductory Period is over. Completion of one's Introductory Period should not be construed as creating a contract or guaranteeing employment for any specific duration or as establishing a just cause termination standard. All employees are at-will employees.

**Full-time Employees** regularly work a 37.5 – 40 hour workweek.

**Full-time 30 Employees** regularly work at least 30 hours – 37.4 hours each week.

**Part-time Employees** work less than 30 hours each week.

**Seasonal Employees** perform a job for a specified time, normally on an intermittent basis.

In addition to the preceding, employees are also categorized as exempt or non-exempt.

**Exempt Employees** – Pursuant to applicable federal and state laws, exempt employees are not entitled to overtime pay, and are not subject to certain deductions to their weekly salary under Salisbury Bank's policies.

**Non-Exempt Employees** are entitled to overtime pay as required by applicable federal and state law.

Upon hire, you will be notified of your employment classification.

## NEW EMPLOYEE ORIENTATION

Upon joining our company, you were given this copy of our Employee Handbook. After reading this handbook, please sign the receipt page and return it to Human Resources. You will be asked to complete personnel, payroll and benefit forms.

The most recent version of the Employee Handbook can be found at P/Global-RO/Employee Handbooks This version of the Employee Handbook supersedes all others distributed or printed.

Your supervisor is responsible for the operations of your department. They're a good source of information about the company and your job.

## IMMIGRATION REFORM AND CONTROL ACT

In compliance with the federal Immigration Reform and Control Act of 1986 (IRCA), as amended, Salisbury Bank is committed to employing only individuals who are authorized to work in the United States.

D-000133

Each new employee, as a condition of employment, must complete the Employment Eligibility Verification Form I-9 and present documentation establishing their identity and employment eligibility.

If an employee is authorized to work in this country for a limited time period, the individual will be required to submit proof of renewed employment eligibility prior to expiration of that period to remain employed by Salisbury Bank.

## EMPLOYMENT OF RELATIVES

Salisbury Bank hires qualified candidates for each job opening and places individuals into jobs/departments in which they can make the most effective contribution. Employees' relatives will not be given special consideration but will be allowed to apply for open positions and be considered for employment. The following restrictions, however, will apply:

- No employee will be permitted to directly or indirectly supervise a relative's work.
- A promotion or transfer will not be allowed if it would result in a supervisory-subordinate relationship between relatives.
- An employee will not be permitted to handle cash items or transactions for a relative or in situations where their relative is responsible for control over those items.
- Employment of relatives will not be permitted if it creates a disruption, has a negative impact on Salisbury Bank's business environment or creates an actual or apparent conflict of interest.
- If two employees marry (or become related through marriage) they must notify the Human Resource Administrator. A determination will be made as to whether a conflict of interest exists. If a conflict exists, options will be discussed with the employees, the Human Resource Administrator and the President.

For purposes of this policy, a relative includes a spouse(same sex or opposite sex), child, parent, sibling, aunt, uncle, niece, nephew, grandparent, grandchild or corresponding in-law or step-family relation.

## JOB POSTING POLICY

We believe our employees are talented, valuable members of Salisbury Bank and we encourage career growth and development. We are committed to promoting from within the Bank when qualified employees exist and when it is in Salisbury Bank's best interest. Job postings communicate the availability of opportunities and the qualifications required. You may apply for an open position if you are qualified and have completed six (6) months of service in your current position. If the situation warrants, Salisbury Bank may, at its discretion, waive the six (6) month service requirement. However, you generally must be employed by Salisbury Bank for 90 days prior to applying and you must be at least "Fully Meeting" expectations at the time of your most recent performance appraisal. Although most open positions will be posted, it is in the Banks' full right and discretion not to post a position.

## CHANGES IN EMPLOYMENT STATUS

If you started as a part time employee and then become full time (or vice versa), you will retain your original date of hire and there will not be another Introductory Period if you retain the same position and there was no break in service. If you transfer to a new position, you will have an Introductory Period in that position; however, this period will relate only to job performance factors.

For the purpose of benefit eligibility, Salisbury Bank contract rules state that you will have to wait the eligibility period of 90 days. However, you will not have a new waiting period for benefits you are already enrolled in. Please contact you HR Administrator to discuss your individual circumstance.

## RE-EMPLOYMENT OF FORMER EMPLOYEES

Former employees of Salisbury Bank who are rehired after a break in service of 1 year or less will be allowed to retain prior service credit for each FULLY completed calendar year (Jan. 1 – Dec. 31) for purposes of calculating Paid Time Off (PTO) entitlement (see PTO section for details). Prior years of service will be credited, and benefit eligibility determined, after the completion of the initial 90-day Introductory Period. Rehired employees may also be eligible to join the 401(K) Plan in effect at the time of rehire. Please speak with the Human Resource Administrator for details.

12

D-000134

**TALK TO US**

We encourage you to bring your questions, suggestions and complaints to our attention. We will carefully consider each of these in our continuing effort to improve our operations.

If you feel you have a problem, present the situation to your supervisor so that the problem can be settled by examination and discussion of the facts. We hope that your supervisor is able to satisfactorily resolve most matters.

If you still have questions after meeting with your supervisor, or if you would like further clarification on the matter, request a meeting with the Department Manager. They will review the issues and meet with you to discuss possible solutions.

If you still have questions after meeting with the Department Manager, or if you would like further clarification on the matter, request a meeting with the Executive Vice President. They will review the issues and meet with you to discuss possible solutions. Human Resources will be involved at this stage.

Finally, if you still believe that your problem has not been fairly or fully addressed, request a meeting with the President.

Your suggestions and comments on any subject are important, and we encourage you to take every opportunity to discuss them with us. Your job will not be adversely affected in any way because you choose to use this procedure. If at any time you do not feel comfortable speaking with your supervisor or the next level of management, discuss your concern with any other member of Senior Management with whom you feel comfortable.

# SECTION III: YOUR PAY AND PROGRESS

**WAGE AND SALARY PROGRAM**

Your position, along with every other position here at Salisbury bank, has been classified based on certain job-related factors such as the specific knowledge and skills required to do the job. Each position has a range that sets the guidelines for the minimum and maximum pay for each position. These ranges are reviewed regularly to ensure equity and competitiveness as compared with other banks of similar type and size. While the ranges give us guidelines as to the minimum and maximum pay levels, your actual wage is determined by your performance on the job.

**RECORDING YOUR TIME**

Non-exempt (hourly) employees must record hours worked on the electronic time system. Enter your time card at the beginning and end of your assigned work day and when you leave and return from your meal break. Do not enter your time more than five minutes before the beginning or after the end of your assigned work day, unless instructed to do so by your supervisor. You are expected to work until the end of your assigned work day. Do not enter time of another employee under any circumstances. All employees subject to this policy are required to accurately record all time worked. For payroll purposes, the work week starts on Monday and ends on Sunday

Employees should also communicate to their supervisor the amount of Paid Time Off (PTO) used if they did not work all of the hours they were scheduled for in a week. Other non-worked hours such as holiday time, jury duty, bereavement pay, etc. must also be communicated to your supervisor.

Exempt (salaried) employees should use the electronic time system when they report to work and when they leave, and must communicate to their supervisor any PTO used, or any other non-worked (but compensated) time such as jury duty, bereavement, or holiday pay.

Exempt and Non-Exempt employees are protected from improper deductions being made. If you feel that your pay has been improperly reduced, please contact Human Resources as soon as possible.

If any employee is found falsifying records related to their own or another's time worked, both employees may be subject to disciplinary action, up to and including termination.

13

D-000135

## WORK HOURS

Each department has specific hours that have been established to provide the best service to our customers. The standard work-week requires at least 37.5 hours (excluding lunch breaks) for all full time employees. You are expected to be to work on time and remain for your entire shift, according to your established hours. You should notify your supervisor as far in advance as possible whenever you are unable to meet the required hours for that day. Approved work hours range from 7:30 a.m. to 6:30 p.m. Monday through Friday. Supervisors may schedule or approve special work outside of these ranges from time to time.

Core time is a time period judged to be essential to providing good customer service. All full time employees must be scheduled during the entire core time on any day in which they are scheduled to work. Core time is 9:00 a.m. to 4:00 p.m. Monday through Friday. It will be necessary for supervisors to be sure there is adequate staff coverage scheduled during non-core time.

## LUNCH AND BREAK PERIODS

Any non-exempt employee who works at least 6 hours a day is entitled to an unpaid 30-minute lunch break daily. Longer lunch periods of 45 minutes or 1 hour may be allowed, as scheduling and customer service needs permit. All schedules are subject to supervisor approval.

While not required, Salisbury Bank does allow employees to take one 15-minute paid break (as scheduling permits) every day if the employee works at least 4 hours per day. Breaks are a privilege, not a right and there will be occasions when business situations do not allow time for a break on any particular day. Supervisors will try to ensure employees are allowed breaks as consistently as possible; however, employees will not be paid any additional compensation if they are not able to take a break on any particular day.

## PAYDAY

You will be paid bi-weekly on Friday for the period which has ended on the previous Sunday. If a payday falls on a non-working day, employees will be paid the preceding workday.

Please review your paycheck for errors. If you find a mistake, report it to the Human Resource Administrator immediately. The Human Resource Administrator will assist you in taking the steps necessary to correct the error.

## DIRECT DEPOSIT

You have the option of receiving your pay in a payroll check or by having your pay deposited into your bank account through our direct deposit program. You may have up to 5 direct deposits of your choice.

## OVERTIME

There will be times when you will need to work overtime so that we may meet the needs of our customers. Non-exempt employees must have all overtime approved in advance by their supervisor. All non-exempt employees will be paid one and one-half times their hourly wage for actual hours worked in excess of 40 hours in a workweek, unless state law provides otherwise. Only actual hours worked count towards computing weekly overtime except when the employee is scheduled to work on Saturday following a Holiday. In this case, the employee will be paid one and one-half times their hourly wage for hours worked in excess of 40. Non-worked hours such as Paid Time Off (PTO), holidays, birthday time, jury duty, bereavement, closings due to inclement weather, etc. **do not** count toward overtime hours and will be paid at the regular wage. Exempt employees are not eligible to receive overtime pay.

If you should have any questions concerning overtime pay, please contact the Human Resource Administrator.

D-000136

## PAYROLL DEDUCTIONS

Salisbury Bank is required by law to withhold a certain portion of your pay for Federal and State income taxes and FICA (Social Security and Medicare). The amount withheld for Federal and State tax is based on what you claim on your W-4 form. Depending on the state in which you are employed and the benefits you choose, there may be additional deductions. All deductions and the amount of the deductions are listed on your pay stub. These deductions are totaled each year for you on your Form W-2, Wage and Tax Statement. You may change your withholding elections by completing a new W-4 and submitting it to the Human Resource Administrator. If, at any time, there is a change in your personal information or a discrepancy with your payroll deductions, it is your responsibility to inform the Human Resource Administrator immediately.

In the event of an inadvertent or improper pay deduction, affected employees are requested to bring the situation to the attention of Human Resources. The Company will review the situation thoroughly and make any corrections to an employee's pay deemed necessary.

## PERFORMANCE REVIEWS

Your performance is important to Salisbury Bank. Throughout your employment, your supervisor will review your work and evaluate your performance, commending your strengths as well as bringing your attention to areas where growth or improvement may be needed. During your first year, your work performance will be considered at the end of the Introductory Period, and again in writing at your 1 year employment anniversary. After that, performance will be reviewed annually by your supervisor on the anniversary of your hire (or your most recent promotion date). Employees with specific year-end goals may be evaluated in the beginning of the next year. Our performance review program provides the basis for better understanding between you and your supervisor, with respect to your job performance, potential and development with Salisbury Bank.

While satisfactory reviews are necessary for consideration of any pay raises and while performance reviews, in general, may be relied upon for other decisions relating to employment, nothing about the existence or implementation of the performance appraisal process alters the "at-will" employment relationship that exists at Salisbury Bank.

# SECTION IV:  EMPLOYEE BENEFITS

## EMPLOYEE BENEFITS

Salisbury Bank has developed a comprehensive set of employee benefit programs to supplement our employees' regular wages. Our benefits represent a hidden value of additional income to our employees.

This Employee Handbook describes the current benefit plans maintained by Salisbury Bank. Refer to the actual plan documents and summary plan descriptions if you have specific questions regarding the benefit plan. Those documents are controlling.

Salisbury Bank reserves the right to modify its benefits at any time. We will keep you informed of any changes.

## HOLIDAYS

Salisbury Bank normally observes the following Holidays during the year:

New Year's Day
Martin Luther King, Jr. Day
Presidents' Day
Memorial Day
Independence Day
Labor Day
Columbus Day
Veterans' Day
Thanksgiving Day
Christmas

If one of the above Holidays falls on Saturday, it normally is observed on the preceding Friday. If one falls on Sunday, it normally is observed on the following Monday.

D-000137

Full-time employees are eligible for paid Holidays after completing their Introductory Period. Exempt employees will receive Holiday pay in compliance with state and federal wage and hour laws.

### PAID TIME OFF (PTO)

PTO must be used when you are away from work for any reason and are unable to work your regularly scheduled hours unless the absence was due to time away for another approved and compensated reason such as jury duty, holiday, leaves of absence, etc. *Example: A full time hourly employee scheduled for 8 hours per day was out for 3 hours one afternoon (due to illness, doctor appointment, family emergency, etc.). They would be paid for 5 regular hours and 3 PTO hours for that day.*

PTO can be used as vacation time or to take care of non-medically related personal matters. PTO can further be used for any illness, injury or health condition of the employee or for their spouse, child, parent or parent-in-law or for preventative medical care for any of the same. An employee who is the victim of family or domestic violence or of sexual assault (or whose dependent child is such a victim) may also use PTO for medical care and for other reasons related to the family/domestic violence or sexual assault (such as to obtain services from a victim services organization; to relocate due to the violence and/or assault; or to participate in any civil or criminal proceedings related to the violence and/or assault).

Non-exempt employees are required to use PTO in increments of one hour or more, up to an entire work day as necessary. Supervisors will coordinate the use of PTO with you and will schedule time off in a way that will have the least impact on customer service. Exempt employees must use PTO in full or half-day increments for any reasons not related to medical issues or family/domestic violence or sexual assault.

It is the expectation that the use of PTO will be planned and approved as far in advance as possible although we realize that this is not always possible. Salisbury Bank requests that employees provide their supervisors with at least thirty (30) days' notice of the need to take PTO leave for purposes of vacation or other non-medically related personal reasons. Employees are required to make a good faith effort to provide their supervisors with as much advance as possible of the need to take PTO leave if it is foreseeable and for medically-related reasons (such as for preventative medical care issues). If the leave is not foreseeable (such as for an emergency medical issue), then the employee must give notice as soon as practicable. In this regard, an employee are expected to notify their immediate supervisor at least one (1) hour before the start of each workday that they will be absent when the leave is not foreseeable. Failure to do so may result in disciplinary action, unless the employee can demonstrate, in good faith, that it was not practicable to provide such notice. Excessive, unexcused absences may be subject to disciplinary action.

Because the PTO program offers you the flexibility to use your time to best meet your needs, it is expected that you will manage your time to plan for unforeseen illnesses or emergencies throughout the year. If you (or a child) regularly has a cold/flu each winter, you should allow for this and be sure your PTO is not depleted so it can be used as unexpected situations arise.

Unpaid time off is generally not allowed. Any exception to this requires approval from both your supervisor and the Human Resource Administrator. No unpaid time off will be allowed if paid time off is available.

Because the summer months are the busiest, supervisors have the option to limit PTO usage to a maximum of 2 weeks per person from July 1 through August 31 if PTO is being requested for vacation time or for non-medically related personal matters.

PTO is used to supplement the time you are away from your work. With supervisory approval and if scheduling permits, non-exempt employees who request to make up hours missed later in the same week rather than use PTO for those missed hours may be allowed to do so. If this is allowed, the employee will not be charged PTO time in that week and will be able to use PTO on another occasion.

Paid Time Off will not accrue during any Leave of Absence. Only regular full-time and regular full-time (30) employees are eligible for Paid Time Off (PTO). PTO is accrued per pay period from your date of hire up to the maximum number of hours allowed per year as follows:

D-000138

| Full-time Employees | Days Accrued Per Year | Hours Accrued Per Pay Period |
|---|---|---|
| • First day of work through end of year 4: | 16 days (128 hours) | 4.92 |
| • Beginning year 5 through end of year 10: | 21 days (168 hours) | 6.46 |
| • Beginning year 11: | 26 days (208 hours) | 8.00 |
| Full-time (30) Employees | | |
| • First day of work through end of year 4: | 8 days (64 hours) | 2.46 |
| • Beginning year 5 through end of year 10: | 12 days (96 hours) | 3.69 |
| • Beginning year 11: | 16 days (128 hours) | 4.92 |

PTO requests for vacation time or for non-medically related personal matters will be granted in accordance with operating requirements. Length of employment may further determine priority in scheduling PTO times for these purposes. Full-time employees who use PTO for vacation must take five (5) days' vacation consecutively unless approved by your supervisor, Senior Vice President, and Human Resource Administrator in writing.

An employee may be required to provide a doctor's note prior to returning to work when the employee has been absent for more than twenty four consecutive scheduled work hours due to illness, injury or health condition, or for preventative medical care, of the employee or his/her spouse or child or parent or parent-in-law. If a note is required, the note must state the length of the illness and (as applicable) whether the employee is able to return to full duty without restrictions, or if the employee has any restrictions, the nature of those restrictions and how long the restrictions may need to be in place. If necessary, Salisbury Bank may require the employee to see a physician paid for by the Bank to determine fitness for duty. If an employee takes more than 40 hours of PTO in any calendar year due to illness, injury or health condition, or for preventative medical care, of the employee or his/her spouse or child or parent or parent-in-law, the employee may be required to provide a health care provider's note under additional circumstances as well. Examples of additional circumstances when a note may be required include when there has been frequent or questionable absenteeism, or when the employee calls out sick the day before or after a holiday, or for absences of less than twenty four consecutively scheduled work hours. Salisbury Bank may further require a court record or documentation from a victim services organization or the police or counselor for leave taken due to family/domestic violence or sexual assault issues. PTO time can be carried over to a maximum of one week over your annual accrual from year to year (40 hours full time, and 30 hours full-time 30). All excess time will be forfeited as of 1/1. PTO hours carried over from one year to the next are always used first during the following year.

| | Maximum Hours – Carryover | |
|---|---|---|
| | Full Time | Full Time 30 |
| • First day of work through end of year 4: | 168 hours | 94 hours |
| • Beginning year 5 through end of year 10: | 208 hours | 126 hours |
| • Beginning year 11: | 248 hours | 158 hours |

Unless otherwise required by applicable state law, payment for unused Paid Time Off (PTO) upon termination will be made at 50% of the employee's current hourly rate, provided the employee has satisfied the following:
- Completed at least 6 months of service;
- Has given proper notice. Proper notice is defined as 2 weeks for Non-Exempt employees; 3 weeks for Exempt employees; and 4 weeks for Officers. PTO cannot be used in lieu of a notice period, unless approved in advance by a supervisor. Employees calling-out during a notice period will have the option to take a non-paid day or extend their notice period;
- Left the Bank for reasons other than misconduct (as determined in the Bank's sole discretion for such acts as, including without limitation: (i) theft, fraud, or dishonesty by the employee in connection with the performance of his/her duties; (ii) conduct that causes damage or injury to the Bank or a third party; (iii) the employee's repeated failure to perform his/her material duties; and (iv) conviction or plea to any crime.

D-000139

Terminal PTO Payout Procedure:

- Unless otherwise required by applicable state law, PTO that is carried over from one year to the next will not be paid on termination. On termination, the excess amount carried from the previous year will be deducted from the employee's total unused PTO Bank.

- PTO is accrued in advance, which means PTO that is added in the current year, is anticipated to be used in the following year. As a result, PTO accruing in the current year will not be paid on termination.

Unless otherwise required by applicable state law, PTO will be paid out as follows:
- o  PTO accrual balance on termination
- o  minus unused PTO carried over from previous year
- o  minus PTO accrued from January 1 to termination date in current year
- o  x 50%
- o  = PTO terminal payout

Payment for unused Paid Time Off (PTO) upon conversion to a Part Time status will be made at 100% of the employee's current hourly rate,, less unused excess PTO from previous year and accrued PTO in current year.

Full-time employees are required to take five (5) consecutive business days of time away from the Bank for purposes of vacation during each calendar year. Any exception to this policy must be in writing, approved by your Manager, Vice President, and Director of Human Resources. Employees on their mandatory time away from the Bank will not be allowed access to their work area unless escorted by their supervisor or Human Resources.

Taking time away from work is considered a good business practice, and the management team believes vacation to be a healthy mandate for full time employees. For those employees accruing 168 hours per year or more, taking two consecutive weeks together each year is strongly recommended.

Information Technology (IT) personnel may not have system administration access for two (2) consecutive weeks, and are required to take ten (10) consecutive business days for purposes of vacation during each calendar year. Any exceptions must be approved by the President and Chief Executive Officer or the Director of Human Resources. In such instances where an exception is approved, the employee may be permitted to be out of the office for five (5) consecutive days and assigned to work in another capacity for the additional five (5) consecutive days.

Salisbury Bank will not take any retaliatory or other adverse employment action or otherwise discriminate against any employees because they exercise their rights to request or use PTO leave in accordance with Bank policy and applicable law, assist others in doing so or file a complaint with the appropriate legal authorities regarding PTO issues.

PTO will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

## ATTENDANCE STANDARDS

It is expected that employees arrive ready to work for their scheduled shift. Failure to do so creates a burden on the department, your co-workers, and our customers – and we take this responsibility very seriously.

Non-exempt, hourly employees are expected to work as scheduled and are expected to minimize unscheduled absences, lateness and early departures. While it is recognized that absences will occur for any number of valid reasons, it is the expectation of Salisbury Bank that employees be responsible about their jobs and maintain excellent attendance records.

Regular attendance on the job and punctuality is an essential employee function and is important to the value of the Bank's operation and to fellow employees. Frequent or unexplained absences from work or tardiness in reporting for work or leaving work early will seriously impair the value of service to Salisbury Bank and its customers and must result in disciplinary action up to and including separation of employment. Therefore, the following attendance standards have been established for non-exempt, hourly employees to provide a

18

consistent and appropriate plan to address absenteeism issues. These standards are subject to change at the discretion of Salisbury Bank in order to respond to its business needs or to specific situations.

## DEFINITIONS

**No Call/No Show** – Any unscheduled absence when the employee fails to notify his/her supervisor prior to the start of his/her scheduled shift or reports to work after the time authorized by the supervisor after calling in late. In this regard, you must notify and directly speak with your supervisor at least one (1) hour before the start of each workday to report that you will be absent or late and to provide the reason for such absence/tardiness, unless you can demonstrate that it was not practicable to provide such notice. In cases of extreme emergency, the call may be made by a family member. You must notify your supervisor each day you are absent (or late) unless otherwise authorized by your supervisor.

**Unscheduled Absence** – Any absence taken by an employee after exhausting his/her available, approved paid time off as applicable to the absence at issue (such as PTO, holidays, jury duty leave or bereavement leave) or after exhausting any entitlement to other available, approved legally required unpaid leave time as applicable to the absence at issue (such as family and medical leave, pregnancy or other disability leave, military leave, witness and crime victim leave, family violence victim leave or emergency services personnel leave).

**Lateness** – Employees not reporting to work on time to start their scheduled shifts or not returning to their assigned work on time when returning from breaks (except if the lateness is due to taking any approved, legally required unpaid leave time or taking the first 40 hours of PTO per calendar year due to illness, injury or health condition, or for preventative medical care, of the employee or his/her spouse or child or parent or parent-in-law).

**Early Departure** – Employees leaving work prior to the end of their assigned shift (except if the early departure is due to taking any approved, legally required unpaid leave time or taking the first 40 hours of PTO per calendar year due to illness, injury or health condition, or for preventative medical care, of the employee or his/her spouse or child or parent or parent-in-law).

**Missing/Inappropriate Punches** – Employees who do not punch in or out at the start/end of their shift, punch in or out more than five minutes prior to or following their shift without the authorization of their supervisor, or do not punch in/out during the workday when on meal break or for other non-working times.Unless the Bank determines otherwise based on its business needs and/or its analysis of specific situations, the following disciplinary action will be taken in response to the total number of points received by the employee:

When an employee schedules time off and it's approved in advance, this is considered an Excused Absence, and the manager is able to plan the workflow accordingly. When an employee calls out without notice for illness or personal reasons without notice, this is considered to be an Unexcused Absence. The following guide is to assist managers in the disciplinary process:

> 3 Unexcused Incidences in a rolling twelve month period – Verbal Warning;
> 5 Unexcused Incidences in a rolling twelve month period – 1st Written Warning;
> 7 Unexcused Incidences in a rolling twelve month period – 2nd Written Warning/Suspension;
> 9 Unexcused Incidences in a rolling twelve month period – Termination.

Note: An incident is defined as single or extended injury or illness. For example, four (4) continuous days off for the same injury or illness would count as one (1) incident.

## LONG TERM ILLNESS BANK (LTIB)

Long Term Illness Bank (LTIB) is intended to give employees greater financial protection in the event of a catastrophic injury or illness in conjunction with the Short Term Disability waiting period. LTIB is available for use in the event an illness lasts more than the greater of three (3) scheduled days or greater than a total of 24 hours in three consecutive work days. Paid Time Off (PTO) will be used for the initial 24 hours. LTIB will accrue at the following rates:

| Full Time Employees: | Days Accrued Per Year | Hours Accrued Per Pay Period |
|---|---|---|
| • First day of work through end of year 5: | 1 days | .31 |
| • Beginning year 6 through end of year 10: | 3 days | .92 |
| • Beginning year 11: | 5 days | 1.54 |

D-000141

Full Time Employees (30):

| | | |
|---|---|---|
| • First day of work through end of year 5: | 1 day | .31 |
| • Beginning year 6 through end of year 10: | 2 days | .61 |
| • Beginning year 11: | 3 days | .92 |

Long Term Illness Bank hours can be carried over from year-to-year, to a maximum of five (5) days. Part Time employees will not accrue Long Term Illness Bank hours. Long Term Illness Bank hours are not paid out upon termination of employment. Long Term Illness Bank will accrue to a maximum of five (5) days.

**LTIB will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.**
**SHORT TERM ILLNESS BANK (STIB) FOR PART TIME AND TEMPORARY EMPLOYEES**

Salisbury Bank has implemented the following policy for part-time employees and temporary employees who are otherwise not eligible for PTO but who may need time off for any illness, injury or health condition of the employee or for their spouse, child, parent or parent-in-law or for preventative medical care for any of the same or to address issues of family/domestic violence or sexual assault.

**Eligibility:** Part-time or temporary employees who have worked at least 90 days after July 1, 2015 Seasonal employees who do not meet these requirements are not eligible.

**Definition:** For the purposes of this policy, a "day" is defined as an employee's regularly scheduled work hours (i.e. if an employee is scheduled to work a four (4) hour day, they would be entitled to up to four (4) hours of short term illness leave on such day). Short term illness leave will be paid at a rate equal to the employee's normal hourly rate or the minimum wage under applicable state law, whichever is greater.

**Accrual and Carryover:** Beginning January 1, 2016 and for each calendar year thereafter, short term illness leave will accrue at a rate of one hour for each 30 hours worked (regular or overtime hours) up to a maximum of 40 hours per calendar year. Prior to January 1, 2016, employees shall begin to accrue sick leave at the same rate on July 1, 2015 or on their date of hire, whichever is later.

Part-time or temporary employees may carry over up to 40 accrued short leave illness hours to the next calendar year. Employees may not use more than 40 total hours of short term illness leave in any calendar year, whether such hours have been carried over to or earned during that calendar year. Short term illness leave cannot be redeemed for cash. Should employment be terminated (either voluntarily or involuntarily), Salisbury Bank will not compensate the terminating employee for any unused accrued short term illness leave.

**Using Short Term Illness Leave:** Short term illness leave must be used in one (1) hour increments, up to an entire day as necessary. Short term illness leave can be taken for any illness, injury or health condition of the employee or for his/her spouse or child or parent or parent-in-law or for preventative medical care for any of the same. An employee who is the victim of family or domestic violence or of sexual assault (or whose dependent child is such a victim) may also take short term illness leave for medical care and for other reasons related to the family/domestic violence or sexual assault (such as to obtain services from a victim services organization; to relocate due to the violence and/or assault; or to participate in any civil or criminal proceedings related to the violence and/or assault). Employees will be subject to disciplinary action up to and including termination of employment if they use short term illness leave for any other purpose not allowed under this policy and applicable state law.

**Notice Requirements: Employees are required to make a good faith effort to provide their supervisors with as much advance as possible of the need to take PTO leave if it is foreseeable and for medically-related reasons (such as for preventative medical care issues). If the leave is not foreseeable (such as for an emergency medical issue), then the employee must give notice as soon as practicable. In this regard, an employee are expected to notify their immediate supervisor at least one (1) hour before the start of each workday that they will be absent when the leave is not foreseeable. Failure to do so may result in disciplinary action, unless the employee can demonstrate, in good faith that it was not practicable to provide such notice. Excessive, unexcused absences may be subject to disciplinary action.**

D-000142

**Return To Work:** An employee may be required to provide a doctor's note prior to returning to work when the employee has been absent for more than twenty four  consecutive scheduled work hours due to illness, injury or health condition, or for preventative medical care, of the employee or his/her spouse or child or parent or parent-in-law. If a note is required, the note must state the length of the illness and (as applicable) whether the employee is able to return to full duty without restrictions, or if the employee has any restrictions, the nature of those restrictions and how long the restrictions may need to be in place **If necessary, Salisbury Bank may require the employee to see a physician paid for by the Bank to determine fitness for duty.** Salisbury Bank may further require a court record or documentation from a victim services organization or the police or counselor for leave taken due to family/domestic violence or sexual assault issues.

**Non-Discrimination Or Retaliation:** Salisbury Bank will not take any retaliatory or other adverse employment action or otherwise discriminate against any employees because they exercise their rights to request or use short term illness leave in accordance with Bank policy and applicable law, **assist others in doing so** or file a complaint with the **appropriate legal authorities** regarding short term illness leave issues.

**STIB will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.**

## JURY DUTY

Full-time, part-time and temporary/casual employees who have regularly scheduled hours during the three month period prior proceeding the term of juror service will receive their regular wages for the first five (5) days of jury service.  Thereafter, you will be compensated the difference in your regularly scheduled SALISBURY BANK pay, and the Jury Duty pay received for the duration of your jury duty service.  All other employees summoned for jury duty will be granted an unpaid leave in order to serve.  Exempt employees may be provided time off with pay when necessary to comply with state and federal wage and hour laws.

Jury duty hours will not count when determining overtime for the week and will be paid at the employee's regular rate.  To receive paid leave for jury duty, you must notify your supervisor immediately upon receiving notice to serve so that arrangements can be made.  Employees must submit a copy of the initial jury duty form and also copies of the jury service slip(s) on an on-going basis to continue to receive pay.  If, while on jury duty, you are released for a day or any part of a day before 4:00 p.m., you are expected to report to work for the remainder of the day.  You may keep any miscellaneous fees unrelated to normal compensation for expenses incurred.

## MILITARY LEAVE

Employees who are required to fulfill military obligations in any branch of the Armed Forces of the United States or in state military service will be given the necessary time off and reinstated in accordance with federal and state law.  The time off will be unpaid, except where state law dictates otherwise.  Exempt employees may be provided time off with pay when necessary to comply with state and federal wage and hour laws.

Accrued PTO may be used for this leave if the employee chooses.  Military orders should be presented to your supervisor and arrangements for leave made as early as possible before a departure.  Employees are required to give advance notice of service obligations to their supervisor unless military necessity makes this impossible.  You must notify your supervisor of your intent to return to employment based on requirements of the law.  Your benefits may continue to accrue during the period of leave in accordance with state and federal law.

## WITNESS AND CRIME VICTIM LEAVE

Employees who are crime victims or the victim's next of kin or witnesses will be permitted reasonable time off to attend a court proceeding or participate in a police investigation or to consult with the district attorney relating to their criminal cases.  Witness and crime victim leave will be unpaid, unless the employee chooses to use any available paid PTO days for such leave or unless Salisbury Bank is otherwise required to pay for time off for such leave.  A crime victim is defined as an employee who: (a) suffers direct or threatened physical, emotional or financial harm as a result of a crime; or (b) is an immediate family member or guardian of a homicide victim or a minor, physically disabled or incompetent person who suffers such harm.  In addition, Salisbury Bank will not take adverse actions against any employee for having a restraining order issued on the employee's behalf in a

21

D-000143

domestic violence case or having a protective order issued on the employee's behalf by a court of any state. Further, Salisbury Bank will not take any adverse action against any employee because he/she obeys a legal subpoena to appear in court as a witness in any criminal proceeding or because such employee is a crime victim, provided that the employee gives the Bank reasonable notice of the need to appear in court.

Any leave time allotted under this policy runs concurrently with any leave time afforded under any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

### FAMILY VIOLENCE VICTIM LEAVE

Employees who are victims of family violence will be permitted to take up to twelve (12) days of leave during any calendar year in which the leave is reasonably needed for one or more of the following reasons: (1) to seek medical care or counseling for physical or psychological injury or disability; (2) to obtain services from a victim services organization; (3) to relocate due to the family violence; or (4) to participate in any civil or criminal proceeding related to or resulting from such family violence. Such leave will be unpaid, unless the employee chooses to use any available paid time off for such leave or the law otherwise requires payment for any such leave taken.

Employees who seek such leave will need to provide at least seven (7) days' notice of the need for such leave if foreseeable, or notice as soon as practicable if the need for such leave is not foreseeable. Salisbury Bank may require certification from the employee, and/or an agent of a victim services organization, and/or the Judicial Branch's Office of Victim Services or the Office of the Victim Advocate, and/or a licensed medical professional or other licensed professional form whom the employee has sought assistance with respect to the family violence certifying that the employee is a victim of family violence. Any such certification provided will be maintained in a confidential manner and will be only disclosed as required by law or to protect the employee's safety in the workplace, provided that the employee is given notice prior to any such disclosure. Salisbury Bank will further not discriminate or take adverse actions against any employee for being a victim of family violence or for having to attend or participate in a court proceeding related to a civil case in which the employee is a family violence victim

### BEREAVEMENT LEAVE

Full-time regular employees who have completed their Introductory Period are eligible for up to five (5) paid days upon the death of a member of your immediate family. For this policy, Salisbury Bank defines immediate family as the employee's spouse (same sex or opposite sex), son, daughter, mother, father, sister, brother, or any of the previously mentioned relations with the prefix "step-". Up to three (3) paid days will be allowed upon the death of a grandparent, great-grandparent, grandchild, great-grandchild, domestic partners and their parents, or the following in-law relations: mother, father, brother, sister, son or daughter. Up to one (1) paid day will be allowed upon the death of an aunt, uncle, cousin, or other close family member upon request and approval. Full-time 30 regular employees are eligible for bereavement pay in proportion to the number of hours they normally are scheduled to work. Requests for bereavement leave should be made to your immediate supervisor as soon as possible. The Bank reserves the right to request verification of the death and the person's relationship to the employee.

### MEDICAL INSURANCE

Eligible Regular Full-time and Regular Full-time 30 employees may enroll in either a single or a family contract on the first of the month following 60 days of employment. Information and enrollment forms as well as a booklet containing the details of the plan and eligibility requirements may be obtained from the Human Resource Administrator. To assist you with the cost of this insurance, Salisbury Bank pays a portion of a single or a family contract. You are responsible for paying the balance through payroll deduction.

Upon termination, you may be entitled to continuation or conversion of the group medical insurance plan in accordance with the terms of the policy and/or applicable state and federal law. For more information, please contact the Human Resource Administrator.

22

D-000144

## DENTAL INSURANCE

Eligible Regular Full-time and Regular Full-time 30 employees may enroll in either a single or a family contract after completing their Introductory Period. Information and enrollment forms as well as a booklet containing the details of the plan and the eligibility requirements, may be obtained from the Human Resource Administrator. To assist you with the cost of this insurance, Salisbury Bank pays a portion of a single or a family contract. You are responsible for paying the balance through payroll deduction.

Upon termination, you may be entitled to continuation or conversion of the group dental insurance plan in accordance with the terms of the policy and/or applicable state and federal law. For more information, please contact the Human Resource Administrator.

## COBRA

You and your covered dependents will have the opportunity to continue medical and dental benefits for a period of up to 18 months (36 months under certain circumstances) under the provisions of the Consolidated Omnibus Budget Reconciliation Act (COBRA) when group medical and dental coverage for you and your covered dependents would otherwise end due to your death or the following:

- Your employment terminates, for a reason other than gross misconduct
- Your employment status changes due to a reduction in hours
- Your child ceases to be a "dependent child" under the terms of the medical and dental plans
- You become divorced or legally separated
- You become entitled to Medicare

In the event of divorce, legal separation, or a child's loss of dependent status, you or a family member must notify the plan administrator within 60 days of the occurrence of the event. The plan administrator will notify the individuals eligible for continuation coverage of their right to elect COBRA continuation coverage.

## SECTION 125 PLAN

Salisbury Bank offers a pre-tax contribution option for employees. This employee benefit is known as a Section 125 Plan. A Section 125 Plan is a benefit plan that allows you to make contributions toward premiums for medical insurance, dental insurance and out-of-pocket medical expenses or dependent care expenses on a "before tax", rather than an "after tax" basis. Your qualified expenses are deducted from your gross pay before income taxes and Social Security is calculated.

To participate in this plan, complete an election form and return it to the Human Resource Administrator. Your gross pay is reduced by an amount equal to your contributions for medical insurance, dental insurance and out-of-pocket medical expenses or dependent care expenses.

You cannot make any changes to your pre-tax contributions until the next open enrollment period, unless your family status changes or you become eligible for a special enrollment period due to a loss of coverage. Family status changes include marriage, divorce, death of a spouse or child, birth or adoption of a child or termination of employment of your spouse. A change in election due to a change in family status is effective the next pay period.

## DISABILITY LEAVE

Full-time employees are eligible for a paid disability leave after completing their Introductory Period. Paid disability leave may be available for up to 180 days depending on the nature of the employee's condition and the Bank's operational needs. Employees requesting leave must provide written notice of the disability, including a doctor's certificate stating the nature of the disability and the expected date of return to work.

If the cause of the absence is work-related and covered by the workers' compensation laws, any paid disability benefits an employee might otherwise be eligible for will be reduced by any workers' compensation benefits received.

D-000145

The Bank will continue to provide health insurance benefits coverage (if applicable) during a paid disability leave of absence as long as the employee continues to pay his/her share of the applicable premiums. PTO and other employee benefits will not accrue during any paid disability leave.

The Bank will periodically require the employee to provide such supporting medical documentation on an ongoing basis during the leave of absence as may be necessary to determine continued eligibility. Prior to or upon an employee's return to work from a leave of absence, the Bank will require the employee to provide documentation establishing the employee's ability to return to work.

If your leave is covered by the Family and Medical Leave Act, we will return you to the same or an equivalent position, consistent with our policy. Otherwise, we will return you to the same or similar position you held prior to the disability leave, subject to our staffing and business requirements.

This leave will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

**Any disability leave will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.**

## FAMILY AND MEDICAL LEAVE

In accordance with the Federal Family and Medical Leave Act and any applicable state family and medical leave laws (hereinafter referred to collectively as "FMLA"), eligible employees may take a leave of absence for certain designated reasons. This policy presents a general overview of FMLA entitlements and requirements. If this policy conflicts with applicable law, applicable law controls.

### EMPLOYEE ELIGIBILITY:

- o  Employee must have worked for Salisbury Bank for a minimum of twelve (12) months, and

- o  Employee must have worked at least 1,000 hours during the 12-month period prior to the start of the FMLA leave. Only hours actually worked – regular worked time plus overtime – count towards this requirement. Paid leave (such as PTO, holidays) and unpaid leave, including FMLA leave, are not included.

Unpaid family and/or medical leaves may be granted for the following reasons:

- o  **Serious Health Condition of Employee, Employee's Child, Parent or Spouse**

  Child may be a biological child, foster child, adopted child, stepchild, legal ward or child of person standing in loco parentis (in place of parent), who is under the age of 18, or over the age of 18 and unable to care for himself/herself because of a mental or physical disability.

  Parent must be a biological parent, foster parent, adoptive parent, stepparent, legal guardian, or individual who stood in loco parentis to an eligible employee or an eligible employee's spouse.

  An eligible employee's spouse may be of the same or opposite sex.

  To be considered a serious health condition, the condition must be an illness, impairment or physical or mental condition that involves inpatient or outpatient care. Inpatient care generally involves treatment at a hospital, hospice, or residential medical care facility. Outpatient care generally requires continuing treatment by a health care provider.

- o  **Birth, Adoption or Foster Care Placement.**

  A family leave of absence will be provided upon the birth, adoption, or foster care placement of a child by an eligible employee.

24

D-000146

○ **To Serve as an Organ or Bone Marrow Donor.**

○ **Serious Injury or Illness of a Covered Service Member.**

An employee who is a spouse, son, daughter, parent or next of kin of a covered service member is eligible to take family leave to care for the serious injury or illness of such individual.

Son or daughter may be a biological child, foster child, adopted child, stepchild, legal ward or child of person standing in loco parentis (in place of parent), who is under the age of 18, or over the age of 18 and unable to care for himself/herself because of a mental or physical disability.

Parent must be a biological parent, foster parent, adoptive parent, stepparent, legal guardian, or individual who stood in loco parentis to an eligible employee or an eligible employee's spouse.

Next-of kin means the nearest blood relative of the eligible employee as specifically designated in writing by the covered service member or as otherwise identified in the order of priority under applicable law.

To be considered a covered service member, the individual must be either: (1) a current member of the Armed Forces (including a member of the National Guard or Reserves) who is undergoing medical treatment, recuperation, or therapy; or is otherwise in outpatient status; or is otherwise on the temporary disability retired list, for a serious injury or illness; or (2) a veteran who is undergoing medical treatment, recuperation, or therapy for a serious injury or illness and who was a member of the Armed Forces (including a member of the National Guard or Reserves) at any time during the five year period before the date on which the veteran undergoes such medical treatment, recuperation or therapy.

To be considered a serious injury or illness of a current member, the injury or illness must be incurred in line of duty on active duty in the Armed Forces (or existing before the beginning of the member's active duty and aggravated by service in line of duty on active duty in the Armed Forces) that may render the member medically unfit to perform the duties of the member's office, grade, rank or rating.

To be considered a serious injury or illness of a veteran, the injury or illness must be incurred in line of duty on active duty in the Armed Forces (or existing before the beginning of the member's active duty and aggravated by service in line of duty on active duty in the Armed Forces) that manifested itself before or after the member became a veteran.

Covered active duty means duty during the deployment of the member with the Armed Forces to a foreign country (for a member of a regular component of the Armed Forces) and duty during the deployment of the member with the Armed Forces to a foreign country under a call or order to active duty (for a member of a reserve component of the Armed Forces).

○ **Because of a Qualifying Exigency.**

An employee whose spouse, son, daughter or parent is on active duty (or has been notified of an impending call or order to active duty) in the Armed Forces (including a member of the National Guard or Reserves) in support of a contingency operation is eligible to take family leave for the following qualifying exigencies: (1) short-notice deployment; (2) military events and related activities; (3) childcare and school activities; (4) financial and legal arrangements; (5) counseling; (6) rest and recuperation; (7) post-deployment activities; and (8) other activities which arise out of the covered military member's active duty or call to active duty status that the employer and employee agree qualify as an exigency and agree as to the timing and duration of such leave.

Covered active duty means duty during the deployment of the member with the Armed Forces to a foreign country (for a member of a regular component of the Armed Forces) and duty during the deployment of the member with the Armed Forces to a foreign country under a call or order to active duty (for a member of a reserve component of the Armed Forces).

D-000147

**EMPLOYEE OBLIGATIONS:**

o   Employees are required to use their available accrued PTO during a family or medical leave of absence for any reason. Employees are further required to use their available LTIB before using any available accrued PTO if the reason for the leave is due to their own or another's serious health condition. That portion of the leave of absence that is used under these conditions will be with pay according to Bank policies.

o   While as stated above all accrued PTO (and/or LTIB) must be used in accordance with Bank policy before an employee is eligible to utilize any unpaid FMLA leave, an employee will not be required to utilize any such paid leave during an FMLA leave if she/he is simultaneously receiving payments under any Bank disability insurance plan or workers' compensation laws.

o   The maximum amount of family and medical leave allowed, whether it includes paid and/or unpaid leave or whether it includes time off during which an employee is receiving payments under either any Bank disability insurance plan or the workers' compensation laws, will not exceed the maximum leave entitlement as described below.

o   Since the purpose of leave under this policy is to enable employees to maintain their ability to continue employment with the Bank, an employee may not work elsewhere while on FMLA leave.

o   When planning medical treatment or seeking intermittent leave, the employee must consult with their immediate supervisor and/or the Human Resources Department and must make a reasonable effort to schedule the treatment or intermittent leave so as to avoid unduly disruptive effects on the Bank's operations.

o   Employees needing FMLA leave must, at a minimum, follow the Bank's usual and customary call-in procedures for reporting an absence, absent unusual circumstances.

o   Whenever an eligible employee's medical or family leave is foreseeable based upon an expected birth, placement for adoption or foster care, or planned medical treatment, or to care for others, the employee must provide at least thirty days advance written notice to the Human Resources Department. If such prior notice is impossible, as in the case of an unforeseen medical emergency or qualifying exigency, an eligible employee must provide notice as soon as practicable after s/he learns of the need for the leave (typically within one or two working days of learning of the need for leave). Failure to comply with these notice rules is grounds for, and may result in, deferral or denial of the requested leave.

o   All leaves due to a serious health condition of an eligible employee, or an eligible employee's son/daughter, parent or spouse, or due to a serious injury or illness of a covered service member, must be accompanied by a medical certification from the appropriate health care provider identifying, among other things, appropriate medical facts regarding the condition and its probable duration. Such medical certification must be provided before the leave begins, or in any event, within 15 days after the leave begins, unless the employee can demonstrate that it is not practicable to do so despite their good faith efforts. Failure to comply with these medical certification requirements is grounds for, and may result in, deferral or denial of the requested leave.

o   Subsequent medical re-certification will be required as necessary, but no more than once every thirty days after receipt of the initial medical certification.

o   All leaves due to a qualifying exigency must be accompanied by a certification as has been prescribed by the Secretary of Labor.

o   In response to a request for leave necessitated by the serious health condition of the employee or others, the Bank may require the employee to obtain a second opinion from a health care provider selected and paid for by the Bank.

o   While on leave, employees are, at a minimum, required to report on the 1st day of each month to

26

the Human Resource Department regarding the status of the family or medical condition(s) and their intent to return to work.

o  Under Bank policy, employees are <u>required</u> to provide at least two weeks of advance notification of the date they intend to return to work from a leave of absence.

## MAXIMUM LEAVE ENTITLEMENT:

o  The maximum FMLA leave entitlement for employees eligible under this policy is 16 weeks in the two-year period measured from **the date of the employee's first day of FMLA leave** due to: (1) the serious health condition of the employee or the employee's child, parent, parent-in-law or spouse; (2) birth, adoption or foster care placement; or (3) to serve as an organ or bone marrow donor. Employees may further be eligible for additional leave under the Federal Family and Medical Leave Act in the second year of the two-year period for reasons qualifying for leave under the Federal Family and Medical Leave Act.

o  The maximum FMLA leave entitlement for employees eligible under this policy due to a qualifying exigency is 12 weeks in the first year of the 24-month period identified above (and potentially 12 weeks in the second year of such period as well).

o  The maximum FMLA leave entitlement for employees eligible under this policy due to the serious injury or illness of a covered service member is 26 weeks in the one-year period measured from an employee's first day of FMLA leave taken.

o  The maximum amounts of FMLA leave stated herein do not afford eligible employees the ability to take more leave if they have multiple qualifying reasons than they otherwise would be entitled to take for a single qualifying reason during the applicable time period.

o  Any absences that qualify as FMLA leave runs concurrently with an absence under the Bank's disability insurance plan or workers' compensation laws or any other applicable leave policy of the Bank.

o  Any time spent performing "light duty" work does not count against an employee's FMLA leave entitlement, whether such "light duty" work has been required by the Bank or requested by the employee.  Therefore, any employee's right to restoration of his or her job is held in abeyance during the period of time (if any) the employee performs light duty (or until the end of the applicable FMLA leave period).

o  When a husband and wife  are both eligible employees of the Bank, they are each individually eligible to receive the maximum leave time allowable for their own serious health condition or the serious health condition of a son/daughter or spouse, or to serve as an organ or bone marrow donor.  For purposes of leave due to a qualifying exigency, married employees are each individually eligible to receive the maximum leave time allowable for each.  For purposes of family leave taken due to the birth, adoption or placement of a son/daughter, or for the serious health condition of a parent or parent-in-law, or due to the serious injury or illness of a covered service member (or for a combination of leave taken for this reason and any other qualifying reason), married persons are eligible for the maximum leave allowable to <u>one</u> individual eligible employee.

o  An eligible employee may take intermittent leave or leave on a reduced schedule (up to the amount of the maximum leave entitlement) when medically necessary due to the employee's own serious health condition, or the serious health condition of the employee's son/daughter, parent or spouse, or due to the serious injury or illness of a covered service member.  An eligible employee may further take intermittent leave or leave on a reduced schedule (up to the amount of the maximum leave entitlement) due to a qualifying exigency or to serve as an organ or bone marrow donor.  Employees seeking to take intermittent leave or leave on a reduced schedule are subject to the same notice, medical certification and other employee obligations identified above.  In addition, if such intermittent or reduced schedule leave is requested, the Bank reserves the right to temporarily transfer the employee to an available alternative position with equivalent pay and benefits (but not necessarily equivalent duties) that better accommodates this type of leave.

27

D-000149

o   Intermittent or reduced schedule leave may not be taken upon the birth, adoption or foster care placement of an employee's son/daughter unless agreed to by the employee and the Bank.

o   There is no obligation under the FMLA to guarantee an employee's original job or an equivalent position beyond the maximum period specified above.

**MAINTENANCE OF HEALTH BENEFITS:**

o   An eligible employee's medical benefits will continue during a leave of absence up to the maximum amount of leave afforded under this policy. While on paid leave, the Bank will continue to make payroll deductions to collect the employee's share of the medical insurance premiums. While on unpaid leave, the employee must continue to pay his/her share of the medical insurance premiums, either in person or by mail. The payment must be received as directed by the Bank. Failure of the employee to pay the premium may result in loss of coverage.

o   Employees have a 30-day grace period in which to make required premium payments. If payment is not timely made, health insurance coverage may be cancelled, if the employee has been notified in writing at least 15 days before the date that coverage would lapse. At the Bank's option, the Bank may pay the employee's share of the premiums during FMLA leave if the coverage were to lapse due to failure of the employee to make timely payments, and then recover such payments from the employee upon return to work.

o   Should an employee's health insurance lapse due to non-payment while on FMLA leave, the Bank will again provide health insurance benefits according to the applicable plans when the employee returns from the leave of absence.

o   If an employee does not return to work following FMLA leave for a reason other than: (1) the continuation, recurrence, or onset of a serious health condition (or serious injury or illness in the case of a covered service member) which would otherwise render the employee eligible for FMLA leave; or (2) other circumstances beyond the employee's control, the Bank reserves the right to seek reimbursement from the employee for its share of health insurance premiums paid on the employee's behalf during the employee's FMLA leave.

**RIGHTS UPON RETURN FROM LEAVE:**

o   Upon the conclusion of an FMLA leave (or the expiration of the maximum family or medical leave provided by law, whichever occurs first), an employee may return to work with all seniority, retirement or fringe benefits they had at the commencement of such leave. There will be no accruals of such benefits (including PTO) during an FMLA leave.

o   Upon the conclusion of an employee's FMLA leave (or the expiration of the maximum family or medical leave provided by law, whichever occurs first), an employee will be reinstated to the position s/he held prior to such leave. If the job previously held by an employee is unavailable, an equivalent position with equivalent pay, benefits, and other terms and conditions of employment will be provided. If an employee is medically unable to perform their prior job, they will be offered work suitable to their physical condition, if such work is available, at the pay rate appropriate to that job.

o   If an employee cannot return to work at the expiration of the maximum FMLA leave allowed, the Bank has no obligation under the FMLA to restore an employee to any position. An employee on leave or returning from leave has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the leave period.

**FITNESS FOR DUTY CERTIFICATION:**

o   In accordance with applicable law and Bank policy governing returns to work after a medical absence, employees returning to work after a medical leave due to their own serious health condition (other than an employee taking intermittent leave or leave on a reduced schedule) must present a fitness-for-duty certification from their health care provider to the Human

28

D-000150

Resources Department prior to their return to employment.

o   If there are any medical restrictions upon an employee's return to work, the health care provider should state these restrictions in the certificate provided. It is the employee's responsibility to notify the Human Resources Department prior to their return to work and make them aware of any restrictions.

o   Employees will not be eligible to return to work after a medical leave without being medically cleared to do so. In addition, the Bank reserves the right to have its own health care provider contact the employee's health care provider for purposes of clarification of the employee's fitness to return to work certification. Under no circumstances will an employee's direct supervisor make contact with the employee's health care provider for purposes of determining fitness for duty (or any other medical certification issue pertaining to FMLA).

## PREGNANCY DISABILITY LEAVE/ADOPTIVE PARENT LEAVE

Employees are granted a reasonable leave of absence due to a pregnancy-related disability which has been certified by a health care provider. While the length of any such pregnancy disability leave may vary depending on individual circumstances, it is generally expected to be no longer than six (6) weeks.

Because a pregnancy disability leave of absence is unpaid, employees must use any or all of their available PTO concurrently with any unpaid leave time provided. PTO so used will be counted as part of the total leave time allotted. Also, any leave time allotted under this policy runs concurrently with any leave time taken under the Bank's FMLA policy for which the employee is eligible.

The Bank will continue to provide health insurance benefits coverage (if applicable) during a pregnancy disability leave of absence as long as the employee continues to pay her share of the applicable premiums. PTO will not accrue during any pregnancy disability leave.

Employees are expected to provide the Bank with as much advance notice as possible if they intend not to return to work following their pregnancy so that appropriate staffing decisions can be made.

An employee returning from pregnancy disability leave is reinstated to her original position with equivalent pay and accumulated seniority, retirement and fringe benefits, unless Salisbury Bank's circumstances have changed which makes reinstatement impossible or unreasonable.

If you are pregnant and reasonably believe that continuing to work in your present position may cause injury to you or your fetus, you may request a temporary transfer to another position or other form of reasonable accommodation. After giving Salisbury Bank written notice of your pregnancy and request for transfer or other reasonable accommodation, Salisbury Bank will make a reasonable effort to transfer you to a suitable temporary position or to provide you with other reasonable accommodation if one is available.

Any employee who is an adoptive parent shall be provided with the same leave afforded to a pregnant employee upon the same terms at the commencement of the parent-child relationship (as that term is defined under applicable state law) for any child adopted who has not reached the age of compulsory school attendance or any child under the age of 18 who is a "hard-to-place" or "handicapped" (as those terms are defined under applicable state law).

Any leave afforded under this policy will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

### MATERNITY/PATERNITY LEAVE

**An employee is eligible for maternity/paternity leave if:**

o   **The employee has been employed for at least three consecutive months by Salisbury Bank as a full-time employee;**

o   **The employee seeks to be absent from employment for a period not exceeding eight weeks for the purpose of giving birth, adopting a child under the age of 18 or adopting a child under the age of 23 if such child is mentally or physically disabled; and**

29

D-000151

o   The employee gives Salisbury Bank at least two weeks' notice of his/her anticipated date of departure and intention to return to work.

Maternity/paternity leave under this policy may only be taken at the time of the birth or adoption, but not substantially earlier or substantially later.

Maternity/paternity leave under this policy is unpaid but an employee may voluntarily use any accrued paid time off he/she has concurrently with all or part of the maternity/paternity leave. Any leave time allotted under this policy runs concurrently with any leave time afforded under any of the Bank's other policies for which the employee may be eligible.

An employee who takes maternity/paternity leave under this policy will be restored to his/her previous or similar position upon his/her return to employment following leave, with the same status, pay and seniority as the position the employee held prior to the leave.   An employee returning from maternity/paternity leave under this policy has no greater right to reinstatement or to other benefits and conditions of employment than other employees who were continuously working during the leave period.

SMALL NECESSITIES LEAVE

Eligible employees may take up to 24 hours of leave for certain designated reasons for small necessities.

EMPLOYEE ELIGIBILITY:
o   Employee must have worked for Salisbury Bank for a minimum of twelve (12) months; and
o   Employee must have worked at least 1,250 hours during the 12-month period prior to the start of the small necessities leave.   Only hours actually worked – regular worked time plus overtime – count towards this requirement.   Paid leave (vacation, personal, sick leave, holidays) and unpaid leave are not included; and
o   Employee requesting leave must have worked in area within 75 miles of any of the Bank's worksites in which the Bank employs a total of 50 or more employees.

REASONS FOR TAKING SMALL NECESSITIES LEAVE:
o   To participate in school activities directly related to the educational advancement of a son or daughter (such as parent-teacher conferences or interviewing for a new school);
o   To accompany the son or daughter of the employee to routine medical or dental appointments, such as check-ups or vaccinations;
o   To accompany an elderly relative of the employee to routine medical or dental appointments or appointments for other professional services related to the elder's care, such as interviewing at nursing or group homes.

DEFINITIONS:
o   "Son" or "daughter" means a biological, adopted or foster child, stepchild, legal ward or child of person standing in loco parentis (in place of parent) of the eligible employee, who is under the age of 18, or over the age of 18 and unable to care for himself/herself because of a mental or physical disability.
o   "Elderly relative" means an individual of at least 60 years of age who is related by blood or marriage to the eligible employee, including a parent
o   "School" means a public or private elementary or secondary school; a Head Start program assisted under the Head Start Act; or a children's state licensed day care facility.

AMOUNT AND PERIOD OF SMALL NECESSITIES LEAVE:
o   Employees eligible for small necessities leave may take a total of 24 hours in any 12-month period measured from the date the employee's first leave begins.
o   Small necessities leave may be taken intermittently or on a reduced leave schedule.   An eligible employee need not take the entire 24 hour leave at once, but may take leave in increments of no less than one (1) hour depending on the employee's needs, as long as the total leave does not exceed 24 hours during the above-referenced 12-month period.

30

**SUBSTITUTION OF PAID LEAVE FOR SMALL NECESSITIES LEAVE:**
- Employees are required to use their available and accrued paid leave for any small necessities leave for which they are eligible. That portion of the small necessities leave that is used under these conditions will be with pay according to the Bank's policies.

**NOTICE AND CERTIFICATION REQUIREMENTS:**
- Employees are required to provide at least seven days advance notice of the need for small necessities leave if such leave is foreseeable. Notice should be provided in writing to the extent possible. If the need is not foreseeable, the employee must notify the Bank of the need for small necessities leave as soon as is practicable.
- Whether the need for small necessities leave is foreseeable or not, employees will be required to complete a signed certification form to be provided by the Bank to support any request for small necessities leave.

## VOTING LEAVE

Employees who do not have sufficient time outside of working hours in which to vote are allowed to take up to two hours of paid time off at the beginning or end of a work shift, as designated by the Bank, unless otherwise mutually agreed for another time. However, if an employee has four consecutive non-working hours in which to vote (either between the opening of the polls and the beginning of a shift or between the end of work and poll close), an employee is not entitled to paid voting leave. If eligible for the voting leave, an employee must further request the leave at least two (2) working days but not more than ten (10) working days before the day of the vote or election.

## EMERGENCY SERVICES PERSONNEL LEAVE

Salisbury Bank will allow any employee who is an active volunteer firefighter or member of a volunteer ambulance service or company to arrive late to work or to be absent from work as a result of having to respond to a fire or ambulance call prior to or during the employee's regular hours of employment. Any time off taken will be unpaid, unless otherwise required by applicable law.

Employees are required to: (a) submit to the Bank a written statement signed by the chief of the volunteer fire department or the medical director or chief administrator of the ambulance service or company, as the case may be, notifying the Bank of the employee's status as a volunteer firefighter or member of a volunteer ambulance service or company; (b) make every effort to notify their immediate supervisor that they may report to work late or be absent from work in order to respond to an emergency fire or ambulance call prior to or during their regular hours of employment; (c) if unable to provide prior notification to the Bank of a late arrival to work or an absence from work in order to respond to an emergency fire or ambulance call, provide the Bank a written statement signed by the chief of the volunteer fire department or the medical director or chief administrator of the volunteer ambulance service or company, explaining why they were unable to provide such prior notification; and (d) at the Bank's request, submit a written statement from the chief of the volunteer fire department or the medical director or chief administrator of the volunteer ambulance service or company verifying that they responded to a fire or ambulance call and specifying the date, time and duration of such response.

## BONE MARROW/BLOOD DONATION LEAVE

Employees who seek a leave of absence to undergo a medical procedure to donate bone marrow are entitled to take a leave of absence not to exceed twenty-four work hours. Salisbury Bank shall require verification by a physician for the purpose and length of each leave requested by the employee to donate bone marrow. The leave shall be unpaid, unless the employee chooses to use any available paid time off for such leave or the law otherwise requires payment for any such leave taken.

Employees who seek to donate blood off-premises from their work location will be permitted at least one leave period per calendar year of three hours duration during the employee's regular work schedule. The leave shall be unpaid, unless the employee chooses to use any available paid time off for such leave or the law otherwise requires payment for any such leave taken.

31

Any leave afforded under this policy will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

## FAMILY MILITARY LEAVE

An eligible employee who is the spouse or registered domestic partner of a member of the armed forces of the United States, National Guard, or reserves who has been deployed during a period of military conflict to combat theater or combat zone of operations, shall be allowed up to ten (10) days of unpaid leave. Such leave shall be used only when the employee's spouse or domestic partner is on leave from the armed forces of the United States, National Guard, or reserves while deployed during a period of military conflict to combat theater or combat zone of operations. To be eligible for leave under this law, the employee must work for Salisbury Bank at least 20 hours per week.

Any leave afforded under this policy will run concurrently with any leave under the Bank's Family and Medical Leave Act policy and/or any other leave policy of the Bank for which the employee is eligible and/or any other leave that may otherwise be required by applicable state and federal law.

## SOCIAL SECURITY

During your employment, you and Salisbury Bank both contribute funds to the federal government to support the Social Security Program. This program is intended to provide you with retirement benefit payments and medical coverage once you reach retirement age.

## UNEMPLOYMENT INSURANCE

Upon separation from employment, you may be entitled to state and federal unemployment insurance benefits. Information about unemployment insurance can be obtained from the Human Resource Administrator.

## WORKERS' COMPENSATION

On-the-job injuries are covered by our Workers' Compensation insurance policy. This insurance is provided at no cost to you. If you are injured on the job, no matter how slightly, report the incident immediately to the Human Resource Administrator.

Consistent with applicable state law, failure to report an injury within a reasonable period of time could jeopardize your claim. We ask for your assistance in alerting management to any condition which could lead or contribute to an employee accident.

Paid Time Off will not accrue during any leave of absence.

## 401(K) QUALIFIED RETIREMENT PLAN

Salisbury Bank provides eligible employees with a 401(K) Qualified Retirement Plan which is an excellent means of long-term savings for your retirement. Eligible employees receive a Safe Harbor contribution each pay period, and Salisbury Banks' matching contribution, if any, is determined by Salisbury Bank on an annual basis.

You can obtain a copy of the Summary Plan Description which contains the details of the plan including eligibility and benefit provisions from the Plan Administrator. In the event of any conflict in the description of the plan, the official plan documents, which are available for your review, shall govern. If you have any questions regarding this plan, see the Plan Administrator.

## EMPLOYEE STOCK OWNERSHIP PLAN (ESOP)

Salisbury Bank provides eligible employees with an Employee Stock Ownership Plan - a valuable benefit that allows employees to become owners of the Bank. A discretionary contribution in the form of Salisbury Bank Stock Shares is deposited on an annual basis.

D-000154

You can obtain a copy of the Summary Plan Description which contains the details of the plan including eligibility and benefit provisions from the Plan Administrator. In the event of any conflict in the description of the plan, the official plan documents, which are available for your review, shall govern. If you have any questions regarding this plan, see the Plan Administrator.

## EDUCATION AND TUITION SUPPORT

Continued growth and development is something we value at Salisbury Bank and therefore, we encourage you to continually expand your knowledge and education. In addition to company-wide training programs, Salisbury Bank provides financial support to assist you if you choose to pursue your education. You must receive approval from your supervisor and the HR Administrator prior to enrolling.
Education and Tuition Support Eligibility guidelines:

- You must be employed for a minimum of six months.
- You must at least be "fully meeting expectations" at the time of your most recent performance appraisal.
- Selected courses must be relevant to your job responsibilities.
- You will be responsible to prepare a written report describing the content of the seminar, course, etc. to be shared with other employees as appropriate.

No reimbursement will be made if a course is not completed or is dropped. An eligible employee must be employed by the Bank at the completion of the course and must receive a final grade of "C" or better or "Pass" if a pass/fail course.

In the event a course is billed to and prepaid for by the Bank and an employee does not complete the course, does not receive a passing grade, or terminates employment with the Bank prior to completing the course, the employee will be expected to reimburse the Bank for the full amount paid for such course.

## BANKING SERVICES

As a Regular Full-time or Regular Full-time 30 employee of Salisbury Bank, you are entitled to the following services after completing your Introductory Period (90 days) and provided you are at least "fully meeting expectations" at the time of your most recent appraisal:

- Free basic wallet-style checks for one personal checking account per year when ordered through our preferred vendor.
- You are allowed the use of a small sized safe deposit box (if available, customers are first, then employees by seniority) at no charge. If you would like a larger sized safe deposit box, you may apply the cost of a small sized box toward the larger one.
- You are eligible to receive a 50% fee reduction on wire transfers and stop payments.
- You are eligible to receive a discounted fee for Trust services. The specific discounts available are available from the Trust Department.
- Once you have successfully completed your Introductory Period, you will not be charged a processing fee should you apply for a mortgage with Salisbury Bank.
- P2P- FIRST TIME FEE REVERSED (let Customer Support know to waive your first time fee)
  - o   A convenient and safe way to send money to family, friends, or others who prefer a direct deposit payment. Salisbury Bank makes it possible to send Person to Person Payments through its TheWayiPay service. Access Person to Person payments from your Mobile Banking App or when signed on to your e-Banking account.
- My Finance- FREE
  - o   My Finance offers a real-time consolidated view of all your finances, including accounts at other banks, credit unions, investment firms and other providers all in one secure place, using just one log in. View all your balances, transactions and keep track of your investments, all while you are using our e-Banking service.
- Mobile e-Deposit- FREE
  - o   Make check deposits conveniently and securely using your mobile device.

## SERVICE RECOGNITION

Experienced, long-term employees are one of our greatest assets. Salisbury Bank formally recognizes these employees after 5 years of service and thereafter at each 5 year anniversary through the Service Recognition Program. Employees will receive an appropriate award selected by them in recognition of their dedication and service to the bank.

D-000155

## CUSTOMER SERVICE / TELEPHONE ETIQUETTE

Cultivating the goodwill of our customers requires teamwork, sensitivity, and cooperation from every department and every individual. We must first understand our customers and then strive to meet their needs. The most important part of developing good customer relationships is when we demonstrate how we can meet their banking and financial needs. This is because customer service is our main product and we are judged not by what we say but by how we actually deliver that service.

Salisbury Bank has many products and services to offer individual and business customers, many of which can be tailored to fit the customers' specific needs. You will learn about these services in your first few months, and it is an expectation that you remain current on product and service offerings so you can best serve our customers. You should have a familiarity with all services even if you do not work with them every day. You can help sell our services at any time and Salisbury Bank offers a Trust Incentive Program as a reward to you for doing so.

Good customer service means many things but there are some basic actions that are essential to good service. This would include seeking customers out instead of waiting for them to ask for help, smiling and saying hello, and addressing them by name. Be sure that you follow through on issues or find someone who can better serve the customer. Whenever possible, walk customers to another department instead of just giving directions. Finally, being truly sincere and genuine, making eye contact and really listening to our customers will speak volumes about you and Salisbury Bank.

When you receive phone calls from customers, the same service standards apply. When answering the phone, conduct yourself professionally and courteously at all times. Callers should not be left on hold for long periods of time. If you need to research a question, ask if you may call them back with the answer to help save their time. When transferring a call, wait for the next party to pick up and identify the caller being transferred. Answering the phone with a smile and genuine sincerity in your voice will be heard on the other end and you will let the caller know they are important. Give all customers, whether on the phone or in person, the respect and attention you would expect.

## EMPLOYEE ACCOUNTS

Salisbury Bank has a policy prohibiting employees from processing transactions to their own accounts. This includes deposits, withdrawals, transfers, and payments on any account where an employee has transactional authority. Inquiries are allowed. Any transaction to your own account must be processed by another employee. Supervisors of each department are responsible for verifying adherence to this policy. Our Internal Auditor will perform periodic testing on random teller numbers with processing capabilities to verify adherence to this policy. Violation of this policy will result in disciplinary action up to and including discharge.

# SECTION V: ON THE JOB

## ATTENDANCE AND PUNCTUALITY

Attendance and punctuality are important factors for your success within Salisbury Bank. We work as a team and this requires that each person be in the right place at the right time. If you are going to be late for work or absent, notify your supervisor before the start of your workday. This procedure should be utilized for each day of absence or tardiness, unless otherwise directed. When there is no notification, the absence or lateness will be considered unexcused.

D-000156

Personal issues requiring time away from your work, such as doctors' appointments or other matters, should be scheduled during your non-working hours if possible. ·

If an employee is absent for three (3) consecutive days, without communication, and without authorized approval, they shall be deemed to have resigned.

The Bank reserves the right to request medical verification of any absence due to illness and/or of the employee's fitness for return to duty following any absence totaling at least twenty-four or more hours of consecutively scheduled work.

Any deviation from this policy and/or repeated occurrences of unscheduled time off or unexcused absences could lead to disciplinary action, up to and including termination of employment.

## STANDARDS OF CONDUCT

Each employee has an obligation to observe and follow Salisbury Banks' policies and to maintain proper standards of conduct at all times. If an individual's behavior interferes with the orderly and efficient operation of a department, corrective disciplinary measures will be taken. Disciplinary action may include a verbal warning, written warning, suspension and/or discharge. The appropriate disciplinary action imposed will be determined by Salisbury Bank. Salisbury Bank does not guarantee that one form of action will necessarily precede another.

The following may result in disciplinary action, up to and including discharge: violation of Salisbury Banks' policies or safety rules; insubordination; unauthorized or illegal possession, use or sale of alcohol or controlled substances on work premises or during working hours, while engaged in company activities or in company vehicles; unauthorized possession, use or sale of weapons, firearms or explosives on work premises; theft or dishonesty; physical harassment; sexual harassment; mistreatment of fellow employees, visitors or other members of the public; performing outside work or use of company property, equipment or facilities in connection with outside work while on company time; poor attendance or poor performance. These examples are not all inclusive. We emphasize that discharge decisions will be based on an assessment of all relevant factors.

**Nothing in this policy is designed to modify our employment-at-will policy.**

## ACCESS TO PERSONNEL FILES

Upon written request, employees may inspect their own personnel files during regular business hours up to two times each year on company premises and in the presence of a Salisbury Bank Senior Officer. Inspection includes relevant employment information, with the exceptions of medical records, references from third parties and certain other documents as allowed by state law. If you disagree with information in your personnel file, you may get it removed or changed if the President of Salisbury Bank agrees, or you may file a statement explaining your position.

Upon written request, Salisbury Bank will permit the inspection of an employee's medical records during regular business hours on or reasonably near Salisbury Banks' premises by a physician chosen by the employee or by a physician chosen by Salisbury Bank with the employee's consent.

For more information, contact the Human Resource Administrator.

## CUSTOMER AND PUBLIC RELATIONS

Salisbury Bank's reputation is built on excellent service and quality work. To maintain this reputation requires the active participation of every employee. The opinions and attitudes that customers have toward Salisbury Bank may be determined for a long period of time by the actions of one employee. It is sometimes easy to take a customer for granted, but if we do, we run the risk of losing not only that customer, but his or her associates, friends or family who may also be customers or prospective customers. Each employee must be sensitive to the importance of providing courteous treatment in all working relationships.

## CHANGES IN PERSONAL DATA

D-000157

To aid you and/or your family in matters of personal emergency, we need to maintain up-to-date information. Changes in name, address, telephone number, marital status, number of dependents or changes in next of kin and/or beneficiaries should be given to the Human Resource Administrator promptly.

## PROTECTING COMPANY INFORMATION

Protecting Salisbury Bank's information is the responsibility of every employee, and we all share a common interest in making sure it is not improperly or accidentally disclosed. Do not discuss Salisbury Bank's confidential business-related information with anyone who does not work for us. All telephone calls regarding requests for a reference for a current or former employee or confirmation of their dates of employment, job title and/or salary at Salisbury Bank must be forwarded to the Human Resource Administrator. Salisbury Bank's address shall not be used for the receipt of personal mail.

## PROTECTION OF PERSONAL INFORMATION

During the course of your employment with Salisbury Bank personal information has been gathered for employment purposes. The Bank is committed to protecting the confidentiality of social security numbers as well as other personally identifiable information such as driver's license numbers, bank account numbers, credit or debit card numbers, identification cards, passport numbers, alien registration numbers and health insurance identification numbers, where such information is otherwise not lawfully made available to the general public from federal, state or local government records or widely distributed media.

Access to social security numbers and other such personally identifiable information shall be limited to those employees and others whose duties require such knowledge. Employees of the Bank are prohibited from disclosing directly or indirectly, social security numbers and other such personally identifiable information to anyone unless there is a lawful business justification for the disclosure.

Any violation of this policy will be dealt with by appropriate corrective action, up to and including termination.

Prior to disposing of documents or computer files containing social security numbers or other personally identifiable information collected in the course of business, the information will be destroyed or made unreadable or irrecoverable, such as by shredding paper documents and running a "cyberscrub" program before disposing of electronic storage media containing such information.

## CODE OF ETHICS AND CONFLICTS OF INTEREST

Salisbury Bank's reputation for integrity is its most valuable asset and is directly related to the conduct of its officers and other employees. Therefore, employees must never use their positions with Salisbury Bank, or any of its customers, for private gain, to advance personal interests or to obtain favors or benefits for themselves, members of their families or any other individuals, corporations or business entities.

Salisbury Bank adheres to the highest legal and ethical standards applicable in our business. Salisbury Bank's business is conducted in the strict observance of both the letter and spirit of all applicable laws and the integrity of each employee is of utmost importance. Whether you are at your workstation, doing your grocery shopping or playing sports, your conduct reflects not only on you personally but also on Salisbury Bank. It is important that the image you present is one that will reflect well on you and on Salisbury Bank. Therefore, it is expected that you will conduct your personal and financial affairs in such a fashion that their duties and responsibilities to Salisbury Bank are not jeopardized and/or legal questions do not arise with respect to their association or work with Salisbury Bank. You should be familiar with all of Salisbury Bank's ethical policies and are expected to follow their provisions.

For further information, please see our Code of Ethics and Conflicts of Interest Policy under E-Forms/Policies/Code of Ethics and Conflicts of Interest Policy.

## CONFIDENTIALITY

We deal with the private affairs of companies and individuals on a daily basis. Therefore, confidentiality is a vital and understood aspect of our business. Companies and individuals doing business with us have instilled their trust in us and your role in maintaining this trust is expected and necessary. You must use discretion when dealing with confidential information of any sort including but not limited to information regarding customers or proprietary business information encountered during your employment.

36

Information regarding customer accounts and dealings with Salisbury Bank must be kept strictly confidential at all times and information shared within the bank should be limited only to those persons whose duties require and permit them access. Confidential information should never be discussed outside the normal course of business. Employees must have a Business Reason for inquiring or adjusting any customer account, to include other employee accounts. Activity is monitored on a regular basis. Confidentiality violations will not be tolerated and will be subject to discipline, up to and including discharge.

For further information, please see our Customer Records Confidentiality Policy under E-Forms/Policies/Customer Records Confidentiality Policy.

### BANK BRIBERY ACT

The Bank Bribery Amendment Act of 1985 prohibits any representative (employee, officer, trustee, director, agent, or attorney) of a bank from soliciting for themselves or for a third party (other than for Salisbury Bank itself) anything of value from anyone in return for any business, service or confidential information of the bank. It also prohibits the representative from accepting anything of value (other than bona fide salary, wages, and fees) from anyone in connection with the business of Salisbury Bank, either before or after a transaction is discussed or consummated. The policy further provides that should a representative receive something of excess value or is approached by someone offering a service or benefit of excess value, that the item(s) will be returned or reduced and the incident reported to the President. In view of the foregoing, it is our policy that no Salisbury Bank representative shall accept anything of value from a customer or vendor other than:

- Gifts of a reasonable value based on a family or personal relationship where that relationship is the obvious motivating factor for the gift.
- Meals, refreshments, entertainment, accommodations, or travel arrangements, all of a reasonable value, provided they are in the course of a meeting or occasion, the purpose of which is to hold bona fide business discussions or to foster better business relations, and provided that the expense would be paid for by Salisbury Bank if not paid for by another party.
- Advertising or promotional material of reasonable value, such as pens, pencils, note pads, key chains, calendars and similar items.
- Gifts with a value of less than $50 related to commonly recognized events, such as promotion, religious holiday, wedding, or retirement.
- Discounts or rebates on merchandise or services that do not exceed those available to other customers of the merchant.
- Awards for recognition of service or accomplishment from civic, charitable, educational or religious organizations.
- Other circumstances approved in writing on a case-by-case basis where something of value is accepted in connection with Salisbury Bank's business. For this exception to apply, the approval must be based on a full written disclosure of all the relevant facts and be consistent with this policy.

### OUTSIDE ACTIVITIES / EMPLOYMENT

Salisbury Bank supports our local community in many ways and encourages employees to participate in community activities. If you wish to accept a position, with or without compensation, with a governmental agency, a for-profit or a not-for-profit organization, either as a stockholder, director, officer, sole proprietor, partner, or employee, you need to first notify the Human Resource Administrator or the President. Any potential problems may be discussed with you and the request will be reviewed to see if any conflict of interest would exist. If a conflict exists, this outside appointment or employment will not be allowed. Please remember that your first professional responsibility is to the position you have accepted here at Salisbury Bank. Salisbury Bank does not object to your accepting outside work as long as it does not (a) interfere with your regular work hours (or necessary overtime); (b) affect the efficient performance of your regular duties; (c) cause you to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest.

### PERSONAL AND FINANCIAL MATTERS

Salisbury Bank employees are expected to conduct their financial affairs in a prudent manner. The personal indebtedness of an employee must be maintained within reasonable bounds of the employee's ability to pay. All obligations should be repaid in strict accordance to the contractual terms of the debt. Late payments are not acceptable, and unresolved or multiple past due payments for a loan with Salisbury Bank my result in disciplinary action, up to and including termination of employment.

D-000159

No borrowing is permitted from customers or suppliers other than in the normal course of personal business, at an arms-length basis, pursuant to well-recognized types of credit arrangements. Salisbury Bank employees should not knowingly participate in illegal gambling or associate with individuals identified with organized crime. Personal investments in the business of any customer or supplier which has credit or other financial relations with Salisbury Bank is not permitted, except for the investment in securities which are actively traded on organized securities markets. In all such investments, the employee is expected to be aware of the possibility of conflicts of interest. Loan officers, for example, should not purchase the publicly traded securities of accounts they administer.

## ACCOUNTS PAYABLE REMITTANCE

The following applies to Salisbury Bank employees who request reimbursement for expenses/mileage, are authorized approvers, vendor managers, review invoices, and visa cardholders. You are responsible for the accuracy of the information you provide and/or review for remittance. This includes, but is not limited to, invoices, credit memos, Visa statements, mileage reimbursement forms, and expense check forms. Beyond the accuracy of the information and business purpose of the expense, you're responsible to include an accurate GL number and cost center, as appropriate. All AP Remittances must be submitted in a timely manner, as late payments can impact the preferred vendor status of the Bank or cause unnecessary delays in reimbursements. See Accounts Payable Standards for details on invoice deadlines.

All invoices and Visa statements must include detail of the product or service to include an itemized register and any taxes paid. This includes on-line purchases.

### EMPLOYEE EXPENSE REIMBURSEMENT

#### Responsibilities
It is the responsibility of the employee incurring the expense, their supervisor or department manager to monitor, review and approve all employee expenses.

All expense requests must be appropriately prepared on a timely basis and received by Accounts Payable for payment by the 15th of the month following the month in which the expenses were incurred.

#### Approval and Payment Process
The employee that has incurred the expense should complete an "Employee Expense Reimbursement Form" located on "Happenings", which will be reviewed and approved by the department manager and forwarded to ap@salisburybank.com for final approval and payment.

Employee expense reimbursements will be made via ACH through Salisbury Banks' Accounts Payable system.

#### Entertainment
When entertaining customers, potential customers, or employees - the names of the persons involved (with title, role, company name) must be included in the "Employee Expense Reimbursement Form" along with the business purpose of the event.

Entertainment purpose must meet one of these tests:
1. Company generally expects to derive income or business benefit.
2. Principal purpose is to conduct company business.
3. Recognition of employee service or to promote good employee relations.

#### Auto Expenses
Employees that are required to use their personal automobiles for business purposes, other than standard travel to and from their permanent locations, will be reimbursed for mileage in excess of twenty (20) miles at the maximum rate allowed by the IRS. Only travel in excess of 20 miles is eligible for reimbursement. (Refer to Driving on Bank Business in the Employee Handbook.) Receipts are not required for mileage reimbursements, however, detailed documentation of distance and points of travel must be included on the reimbursement request form.

D-000160

Employees will also be reimbursed for parking and toll expenses incurred for business purposes outside of their standard commuting expenses. Supporting documentation must be included with the reimbursement request form.

### Travel Arrangements

It is the responsibility of each employee to make his or her own travel arrangements. All travel arrangements should be made online or with a travel agent using prudent cost efficient planning with prior approval of the individual's Manager.

Travel expenses are the ordinary and necessary expenses incurred while traveling out of the normal geographical areas on authorized Bank business. These include:

- Car Rental
- Air Transportation
- Lodging Accommodations
- Meals and Entertainment

It is the responsibility of the employee and their manager to ensure that prudent and cost efficient controls are in place when travelling. Excessive spending on travel related costs will not be tolerated, and may result in progressive discipline, up to and including termination of employment.

### Memberships/Dues

Membership in civic, professional, trade and business organization's must be approved by a department SVP. Membership fees and annual dues are generally invoiced to Salisbury Bank, approved by the employees' supervisor and department SVP and forwarded to the ap@salisburybank.com for payment. In some instances, payment out of pocket for a last minute meeting or extra fee may be required and does not necessarily qualify as a reimbursable expense. In the case of out of pocket expenditures for organizational luncheons, the appropriate general ledger expense account should be used. Social, religious and fraternal organizations are generally not eligible for reimbursement.

### CARE OF EQUIPMENT

You are expected to demonstrate proper care when using Salisbury Bank's property and equipment. No property may be removed from the premises without the proper authorization of management. If you lose, break or damage any property, report it to your supervisor at once.

### SEVERE WEATHER

Severe weather is to be expected during the winter months. Although driving may at times be difficult, when caution is exercised, the roads are normally passable. Except in cases of severe storms, we are all expected to work our regular hours. Time taken off due to poor weather conditions while the business remains open will be paid using PTO or unpaid if PTO is not available. Exempt employees may be provided time off with pay when necessary to comply with state and federal wage and hour laws. If extreme weather conditions require the closing of the business, you will be notified by the Bank's emergency broadcast system your supervisor.

### PERSONAL TELEPHONE CALLS

It is important to keep our telephone lines free for customer calls. Although the occasional use of Salisbury Bank's telephones for a personal emergency may be necessary, routine personal calls should be kept to a minimum. Unless approved by your supervisor or needed for business purposes, personal cellular telephones must be turned off during working hours while on company premises. Excessive receiving or making of personal calls or abuse of this policy will result in disciplinary action.

D-000161

## PERSONAL MAIL

Employees are not permitted to use Salisbury Banks' addresses, envelopes, or postage for personal use. Salisbury Bank does allow personal mail to be sent from work if you have provided the envelope and stamp. Salisbury Bank letterhead may not be used for purposes other than official Salisbury bank business unless the President or senior management has approved the use. Violation of this policy will be considered theft and disciplinary action will apply as appropriate.

## YOU AND YOUR SUPERVISOR

One of your supervisor's most important responsibilities is helping you to work effectively and to challenge you to the best of your ability. Both of you share in meeting this objective. You and your supervisor are important members of the Salisbury Bank team. Trust, cooperation, and good communication are critical to this working relationship. Your supervisor should be your first resource in resolving issues or answering questions you may have. You should let your supervisor know if you feel coursework or additional training would help you do your job better. Also we encourage you to share insights and ideas you have on how we can improve efficiency or customer service. Your ideas are important! You certainly have the right to address issues with other management, the Human Resource Administrator or the President but we hope you make the first attempt at discussion with your immediate supervisor.

## PROBLEM SOLVING / GRIEVANCE RESOLUTION PROCEDURE

Salisbury bank is committed to providing the best possible working conditions for our employees. We feel honesty and openness are vital components to this process and encourage employees and supervisors to openly discuss issues, concerns, questions, or suggestions with one another. Supervisors and employees are expected to treat each other professionally at all times and to offer positive and constructive criticism as situations warrant. We believe that most issues can, and will, be successfully resolved at this level. We recognize there may be occasions when an employee feels that they still do not have a satisfactory resolution or, due to the nature of the concern, is not comfortable discussing the issue with their immediate supervisor. In these cases, employees are encouraged to bring their concerns to the Human Resource Administrator. The Human Resource Administrator will work with you to help resolve the issue or will refer you to the appropriate resource. Employees are encouraged to follow this procedure but if an employee feels it would be more appropriate to go directly to the President or another senior officer, they should feel comfortable doing so. Only through open communication can we maintain a positive work environment for all and ensure we are working as a team towards our goal of providing exceptional customer service.

## ELECTRONIC MAIL MONITORING

We recognize your need to be able to communicate efficiently with fellow employees and customers. Therefore, we have installed an internal electronic mail (email) system to facilitate the transmittal of business-related information within Salisbury Bank and with our customers. The email system is intended for business use only. Limited personal use of the Bank's email system during non-working time is permitted to the extent that such use does not interfere with the Bank's business operations or others who are working, does not cause the Bank to incur any additional expenses or interfere with the operation of the Bank's mail server, and does not otherwise violate any Bank policies or procedures or applicable laws. "Working time" for purposes of this provision and others within this handbook means the time an employee is engaged or should be engaged in performing his/her duties for Salisbury Bank. Excessive personal use of the Bank's email system is strictly forbidden.

Salisbury Bank provides the following guidelines for use of the email system by our employees:

- Employees are prohibited from the display or transmission of sexually-explicit images, messages, ethnic slurs, racial epithets or anything which could be construed as unlawful harassment or defamatory of others.
- Employees shall not use unauthorized codes or passwords to gain access to others' files.
- All email passwords must be kept confidential at all times, unless such passwords are required by the President or his designee to be disclosed in order for the Bank to properly conduct its business.

D-000162

- Programs or files from any outside source, including the internet, are not to be installed onto your computer unless authorized by your supervisor and a network administrator. This includes screen savers or "wallpaper". A virus scan must be performed prior to any type of installation.
- Unauthorized copying or removing of Salisbury Bank owned software and/or documentation is prohibited.
- Accessing, deleting, or altering files without authorization is prohibited.
- All files created should be saved to a network drive to ensure adequate backup occurs. The Information Technology Department is not responsible for any lost data that was saved locally on your computer's hard drive.
- Computers, software, files, email, and voice mail communications are the property of Salisbury Bank. No user should have expectation of privacy as to internet, computer files, email, or voice mail usage. Salisbury Bank reserves the right to review, copy, delete, or disclose internet usage and email content to monitor for misuse or to protect business interests.

Violation of this policy may result in disciplinary action, up to and including discharge. For business purposes, management reserves the right to enter, search and/or monitor the private Salisbury Bank email system and the files/transmissions of any employee without advance notice and consistent with applicable state and federal laws.

## VOICE MAIL MONITORING

We recognize your need to be able to communicate efficiently with fellow employees and customers. Therefore, we have a voice mail system to facilitate the transmittal of business-related information within Salisbury Bank and with our customers. The voice mail system is intended for business use only. Limited personal use of the Bank's voicemail system during non-working time is permitted to the extent that such use does not interfere with the Bank's business operations or others who are working, does not cause the Bank to incur any additional expenses or interfere with the operation of the Bank's equipment, and does not otherwise violate any Bank policies or procedures or applicable laws. Excessive personal use of the Bank's voicemail system is strictly forbidden. The use of Salisbury Bank's voice mail system to solicit fellow employees or distribute non job-related information to fellow employees while either employee is only working time is strictly prohibited. Employees are also prohibited from the transmission of sexually-explicit messages, ethnic slurs, racial epithets or anything which could be construed as harassment or disparaging to others.

All voice mail passwords must be kept confidential at all times, unless such passwords are required by the President or his designee to be disclosed in order for the Bank to properly conduct its business. Violation of this policy may result in disciplinary action, up to and including discharge. For business purposes, management reserves the right to enter, search and/or monitor the private Salisbury Bank voice mail system and the voice mail of any employee without advance notice and consistent with applicable state and federal laws.

## INTERNET USAGE

As a growing company, we recognize the need to stay on the cutting edge of technology. This is one of the reasons we allow employees to have access to the internet. During working time, the internet is intended for business purposes only. Limited personal use of the Bank's internet service during non-working time is permitted to the extent that such use does not interfere with the Bank's business operations or others who are working, does not cause the Bank to incur any additional expenses or interfere with the operation of the Bank's equipment, and does not otherwise violate any Bank policies or procedures or applicable laws. Excessive personal use of the Bank's internet service is strictly forbidden. The use of Salisbury Bank's internet access during working time for non-job-related solicitations including, but not limited to, religious or political causes is strictly prohibited. Employees are also prohibited from displaying, transmitting and/or downloading sexually-explicit images, messages, ethnic slurs, racial epithets or anything which could be construed as unlawful harassment or defamatory of others.

Consistent with applicable federal and state law, the time you spend on the internet is tracked through activity logs for business purposes. All abnormal usage during working time will be investigated thoroughly. Employees learning of any misuse of Salisbury Bank's internet access shall notify a member of senior management.

## SOCIAL MEDIA ACTIVITIES

"Social Media" are various forms of discussion-and information-sharing tools, including social networks, blogs, video sharing, podcasts, wikis, message boards and online forums. Technologies include picture and video sharing, wall postings, email, instant messaging, and music sharing. Examples of Social Media applications

41

include, but are not limited to, Google and Yahoo Groups; Wikipedia; MySpace and Facebook; YouTube; Flickr; Twitter; LinkedIn; and news media comment sharing/blogging. This policy covers all Social Media tools, both current and future.

Any conduct, which under the law or Bank policy is impermissible if expressed in any other format (such as through a conversation, a memo or an email), is impermissible if expressed through social media as well. Further, any employee who chooses to use social media needs to be aware of the following:

a. The personal use of social media is not allowed while employees are on working time (e.g., excluding break time, etc.), regardless of the equipment used (e.g., either using personal or Bank phones or computers).  Employees may further not use Bank equipment for personal reasons in accordance with applicable policies.

b. Employees who use social media shall not post any proprietary Bank data, documents or photographs, or any information which would violate any privacy laws applicable to the Bank (including customer information), regardless of whether the posting is done during working or non-working time.

c. Unless authorized in writing by a management representative (such as when an employee's job is to send public messages on behalf of the Bank), employees do not have permission to speak on behalf of the Bank via social media.

d. While communicating through social media, if an employee posts any content that has something to do with the work they perform for the Bank or subjects associated with the business of the Bank, employees must make clear that they are not speaking on behalf of the Bank by accompanying their posts with a disclaimer such as: "The postings on this site are my own and do not represent the Bank's positions or opinions."

e. Employees should avoid sending or accepting "friend" requests from supervisors which could result in violations of any applicable Bank policies, including without limitation policies pertaining to conflicts of interest and discrimination/harassment.

When an employee's use of any social media violates the law or Bank policies (including policies pertaining to employee misconduct or job performance), appropriate discipline up to and including termination of employment will be imposed, regardless of when the information was posted or sent and regardless of the tools or site used to post or send such information

Nothing in this policy (or any other Bank policy) will be implemented or should be interpreted in any manner so as to prohibit or inhibit employees from engaging in any lawful activities through social media, including exercising any rights they may have to engage in protected concerted activity or political activities.

**TAPE RECORDING/PHOTOS/VIDEOS**

The tape recording of any conversation in the workplace is strictly prohibited without written authorization from the Bank's President or his designee, or with the consent of all parties to the conversation.  The tape recording of any telephone conversation to or from the workplace is strictly prohibited absent the consent of the parties to the phone call obtained in accordance with applicable law.

To prevent harassment (as defined in our anti-harassment policy), maintain individual privacy, encourage open communication, avoid unnecessary distractions and protect confidential information of the Bank from being improperly disclosed, employees are prohibited from taking, distributing or posting pictures, videos or audio recordings while on working time.  Exceptions may be granted when participating in an authorized Bank activity or with permission from the President and CEO for business related purposes. For the same reasons as stated above, employees who seek to take, distribute or post pictures, videos or audio recordings of people at the Bank (such as other employees, customers or others doing business with the Bank) while on non-working time must notify and obtain permission from such other individuals first.

At no time may an employee take, distribute or post pictures, videos or audio recordings of any confidential information of the Bank (as defined in the Bank's confidentiality policy) or in violation of any other Bank policy.

**Employees also may not take pictures or make recordings of work areas at any time.  An exception to the rule concerning pictures and recordings of work areas would be if the employee were engaging in**

D-000164

any activity protected by the National Labor Relations Act including, for example, taking pictures of health, safety and/or working condition concerns, or of strike, protest and work-related issues and/or other protected concerted activities, as long as such pictures, videos or audio recordings do not disclose any confidential information of the Bank (as defined in the Bank's confidentiality policy).

## PERSONAL APPEARANCE

The way we look plays an important role in how others perceive us. Favorable personal appearance reflects a professional attitude and is often viewed as an extension of our work quality. It is an on-going expectation that all employees project a professional, business-like image to customers, prospects, and the public at all times. Management reserves the right to determine whether or not an employee's personal appearance and attire is appropriate.

If an employee's appearance does not meet the standards of the bank, they will be asked to correct the problem as soon as possible which may include being asked to go home to change. Should this occur, time away for this purpose will be unpaid.     In general, attire and appearance should be suitable for interaction with customers, regardless of the specific job responsibilities. Attire should be neat, clean and conservative. Failure to maintain proper appearance may result in disciplinary action up to and including discharge.

## DRESS CODE

In order for us to maintain a professional image in the communities which we serve, good grooming is essential, attire is to be **cleaned, pressed** and **presentable** as outlined below:

**Male Employees:** During the hours the Bank is open to the public, 9:00 am to closing, jacket and tie are required. **Your jacket will be optional during the time from Memorial Day through Columbus Day**. You will be required to wear a dress shirt and tie with your slacks during this time. You may wear either two or three piece suits or sport jackets and dress slacks with trouser socks and dress shoes. This does not include denim of any type. Earrings are not to be worn at any time.

**Female Employees:** Suits and dresses which are tasteful and no shorter than **3 inches** above the knee are acceptable, as are skirts with sweaters or blouses. Split skirts will be considered acceptable if they are no shorter than **3 inches** above the knee. Trousers must be tailored and no shorter than **3 inches** above ankle length. They may not be made of fabrics such as: spandex, knits, khaki or denim (i.e. jean style) and should only be worn with matching jackets, shirts, blouses or sweaters. Denim skirts, capri's, knee and ankle socks, and sleeveless garments will not be permitted. However, sleeveless garments if worn with a jacket or a shirt/blouse underneath will be acceptable. Hosiery is required at all times.

**All Employees:** Other than pierced ears, body piercing jewelry is unacceptable. Casual attire such as shorts, teva sandals, flip flops, toe ring slides or similar beach wear shoes, sneakers, T-shirts, sweatshirt/pants, leggings, stirrup pants, jeans of any fabric or color, leather and any other items of casual clothing are inappropriate for your work environment and will not be permitted. Exposure of midriff (belly, hips, lower back), cleavage, or undergarments is not acceptable. Tattoos are not to be visible. The extent to which existing tattoos are visible is up to the discretion of the Dress Code Committee.     The Department Supervisors will be responsible for making sure that this policy is adhered to.

Employees arriving at work dressed inappropriately will be given a warning and then any future violation will result in being sent home to change without pay for the time spent. Repeated violations of the dress code may lead to disciplinary action, up to and including termination of employment.

Violations will be kept on file and may affect an employee and supervisors review.

## DISCIPLINARY PROCEDURES

Most employees perform their work, follow policies and provide excellent customer service. Salisbury Bank appreciates this and strives to maintain an environment where these employees are recognized for their efforts. In situations where improper conduct occurs, disciplinary action may be necessary. The major purpose of any

D-000165

discipline is to correct a problem, prevent recurrence and prepare the employee for satisfactory service in the future.

When appropriate, Salisbury Bank will apply corrective discipline in a progressive manner. Therefore, whenever possible, if employee performance, attitude, work habits or personal conduct falls below a desirable level, supervisors shall inform the employee of the problem verbally and/or in writing and give counsel and assistance. If appropriate and justified, a reasonable period of time for improvement may be allowed before initiating further disciplinary action, such as a final written warning or suspension.

In some instances, however, a specific incident may justify severe disciplinary action up to and including immediate dismissal. In this regard, the determination of whether to impose discipline for unsatisfactory performance, violations of the Bank's rules, or other acts of misconduct, is the sole prerogative of the Bank's management. As such, the Bank reserves for itself the exclusive right to take disciplinary action against any employee based on its investigation and/or analysis of the situation. Any such disciplinary action may be documented and/or presented to the employee and placed in the employee's personnel file.

In the course of conducting an investigation or analyzing the conduct at issue, Salisbury Bank reserves the right to question witnesses and conduct searches as necessary. If the situation warrants, public law enforcement officials will be brought in to aid in the investigation. Remember, regardless of the situation, Salisbury Bank is an employer-at-will. These progressive steps are guidelines and Salisbury Bank may use progressive discipline at its discretion. Supervisors and the Human Resource Administrator will work together to determine the severity of the discipline on a case-by-case basis, given the particular facts and circumstances present in each instance, and what outcome would be in the best interests of the Bank.

While it is impossible to list every type of behavior or policy infraction, the following are examples of conduct that may result in disciplinary action, up to and including termination of employment:

- Unauthorized disclosure of confidential information, to include (but not limited to) nonpublic: customer information, business plans, internal investigations and internal disciplinary actions.
- Unsatisfactory performance or conduct or inability to perform assigned job duties.
- Inattentiveness or erratic behavior on the job.
- Failure to observe departmental working hours, schedules, including scheduled overtime.
- Physical, mental or verbal abuse/assault of other employees, supervisors, or customers.
- Using obscene, abusive or threatening language or threatening violence.
- Falsification of records of any kind (time cards, account or loan information, etc.).
- Excessive tardiness, absenteeism or absence without notice.
- Insubordination or refusal of work assignments.
- Violation of the drug/alcohol policy.
- Sleeping on duty.
- Disregarding safety or security procedures including horseplay or other dangerous actions.
- Unauthorized use, negligent, or conduct which damages company property, systems or equipment.
- Leaving work area without permission during working hours.
- Committing any unlawful act on company property or behavior outside the workplace that brings discredit to Salisbury Bank or that affects normal operations.
- Failure to promptly report an accident or injury while on the job or company property.
- Sexual or other unlawful or unwelcome harassment.
- Theft or inappropriate removal or possession of property other than one's own.
- Possession of dangerous or unauthorized materials, such as explosives or firearms.
- Any action that may threaten the well-being of others or the continued productivity or standards of Salisbury Bank.

## TERMINATION OF EMPLOYMENT

Should you decide to end your employment with us, we ask that non-exempt employees provide your supervisor with at least a two week advance notice, exempt employees provide your supervisor with at least a three week advance notice, and officers provide your supervisor with at least a 30 day advance notice. Providing appropriate advance notice will be noted favorably should you ever wish to reapply for employment with Salisbury Bank. Terminal payment of Paid Time Off will depend on your notice period as outlined above, and is paid at 50% of the current hourly rate if leaving in good standing, unless applicable state law requires otherwise.

44

D-000166

Failure to give proper notice may make you ineligible for rehire, and will forfeit your terminal Paid Time Off payment, unless applicable state law requires otherwise. If you choose to resign, your intentions should be submitted to your supervisor in writing. They will contact the Human Resource Administrator who will provide you with benefit and final payroll information.

Employees who are rehired following a break in service other than an approved leave of absence, must serve a new initial Introductory Period, whether or not such a period was previously completed. Such employees are considered new employees from the effective date of their reemployment for all purposes, including the purposes of measuring benefits.

Salisbury Bank does not provide a "letter of reference" to former employees. Generally, we will confirm upon request, our employees' dates of employment, salary history and job title. Supervisors are further prohibited from providing "personal references."

All company property, including this Employee Handbook, must be returned upon termination. Otherwise, Salisbury Bank may take further action to recoup any replacement costs and/or seek the return of company property through appropriate legal recourse.

You should notify Salisbury Bank if your address changes during the calendar year in which termination occurs so that your tax information will be sent to the proper address.


## EXIT INTERVIEWS

An employee leaving Salisbury Bank for any reason, whether at the decision of the Bank or of their own accord, may request an exit interview. In addition to an interview, the Human Resource Administrator may request employees complete a questionnaire indicating the reason(s) for leaving and their beliefs about how Salisbury Bank may be improved. Employees' candor in these exit interviews is greatly appreciated.


## RETURN OF BANK PROPERTY

All Salisbury Bank property must be returned to your supervisor or to the Human Resource Administrator no later than your final day of employment. This includes any keys, this Handbook, and any company equipment or property in your possession. We require that arrangements be made concerning any outstanding debts owed to Salisbury Bank, or to you, such as travel advances, mileage, tuition advances, etc., before the last day of work. Any employee checking account, overdraft protection, or other employee-based relationship will be converted to reflect a non-employee status.


# SECTION VI: SAFETY IN THE WORKPLACE

## EACH EMPLOYEE'S RESPONSIBILITY

Safety can only be achieved through teamwork at Salisbury Bank. Each employee, supervisor and manager must practice safety awareness by thinking defensively, anticipating unsafe situations and reporting unsafe conditions immediately. Please observe the following precautions:

- Notify your supervisor of any emergency situation. If you are injured or become sick at work, no matter how slightly, you must inform your supervisor immediately.
- The unauthorized use of alcoholic beverages or illegal substances during work hours will not be tolerated. The possession of alcoholic beverages or illegal substances on Salisbury bank's property is forbidden.
- Use, adjust and repair machines and equipment only if you are trained and qualified.
- Get help when lifting or pushing heavy objects.
- Understand your job fully and follow instructions. If you are not sure of the safe procedure, don't guess, just ask your supervisor.
- Know the locations, contents and use of first aid and firefighting equipment.
- Wear personal protective equipment in accordance with the job you are performing.

A violation of a safety precaution is in itself an unsafe act. A violation may lead to disciplinary action, up to and including discharge.

D-000167

## VISITORS IN THE WORKPLACE

We recognize that there may be occasions when a friend or family member stops by to visit or give you information while you are working. While we value work/life balance, these visits can distract you from your work as well as cause a disruption to your co-workers and our customers. Please be sure to use your professional discretion to be sure non-work visits are brief and infrequent. This policy does not include business development opportunities or business associates who are here to conduct valid business with Salisbury Bank. If a situation develops where a visitor refuses to leave, is harassing an employee, or appears to be dangerous, anyone witnessing the event should immediately contact a member of the management team, the Human Resource Administrator, or law enforcement officials if the situation becomes violent or life threatening.

## SECURITY

Due to the nature of the banking business, security is a crucial aspect of our work. Employees are responsible for following all security procedures related to their position and department, as instructed by their supervisor or senior management. Additionally, employees should report any suspicious behavior (customer or co-worker) to management immediately. Do not permit visitors in restricted work areas without authorization from your supervisor. Before entering or leaving the building, look for any strangers who may be loitering nearby. Make positive identification before admitting anyone during non-business hours. Always lock doors when the offices are not open for business. Your cooperation in this matter is an obligation you accept as a member of Salisbury Bank.

## DISASTER SITUATIONS

ROBBERY: Due to the nature of our business, a robbery attempt is a possibility. It is not part of your job to put yourself in the line of danger but it is important that you are always observing visitors and report any suspicious behavior immediately. Should a robbery occur, remain calm and cooperate. Do what you are told – no more, no less. Observe the robber; memorize size in relation to doors or furniture, clothing type, scars, facial features, mannerisms, speech, distinct odors, or anything else that would help identify them. Set off the alarm if it is safe to do so. After a robbery, activate the alarm again and inform the nearest officer. The officer will notify law enforcement. Do not touch anything in the robbery area and lock up all cash. Do not speak with the media but instead, refer them to the President or his representative.

BOMB THREAT: Most bomb threats are false but should always be taken seriously. If you receive a bomb threat, it will most likely be on the phone. Get as much information as possible, listen and repeat what is said to you, writing it down if possible. As soon as the caller hangs up, immediately contact management. Should an evacuation be ordered, secure all cash, gather keys and assist in guiding customers to the exits in a calm but prompt manner.

FIRE: All employees should be knowledgeable of the location and use of fire extinguishers in case a fire is localized and can be extinguished quickly. If this is not possible, calmly but promptly assist in the evacuation process and activate the fire alarm.

## SAFETY COMMITTEE

Salisbury Bank and Trust maintains a working Safety Committee comprised of Officers, Supervisors, and Front-Line Employees. The purpose of this committee is to satisfy Connecticut State requirements, identify and address safety issues, and investigate safety concerns.

## EATING AND DRINKING

We are a professional organization and need to maintain that image to our customers. Therefore, eating and drinking in customer service areas is generally not allowed while we are open to the public. Additionally, gum chewing in the presence of customers is not permitted. For areas not normally subject to customer visits, please use your professional discretion when it comes to food or beverages.

## PARKING

In each of our offices, parking facilities are provided for both employees and customers. Employees are expected to observe all parking rules established for their designated parking areas. Employees use all parking

D-000168

lots at their own risk. Salisbury Bank assumes no responsibility for any damage to, or theft of, any vehicle or personal property left in a vehicle while on company property.

## DRIVING ON BANK BUSINESS

There may be circumstances or times when you will need to use your personal vehicle for company business. Authorized travel will be reimbursed at the current rate-per-mile allowance established by Salisbury Bank. If you are asked to report to a different location other than your normal office, you may file for reimbursement for the difference between your normal commute and the additional miles provided the additional miles are in excess of twenty (20) miles of your normal commute. There may be other travel related costs that are covered such as tolls. Large expenditures such as conferences and out of town trips must be approved in advance. Please discuss with your supervisor or the Human Resource Administrator what expenses will be reimbursable before traveling or incurring expenses. While traveling on company business, it is your responsibility to drive responsibly, follow all rules of the road and be sure your drivers' license is in good standing. When you are driving on Salisbury Bank business, you are subject to all Salisbury Bank's policies as if you were at your desk. The use of cell phones while driving on bank business is strictly prohibited unless you are using a hands-free device, as allowed by the state law you're driving in.

## WORKPLACE SEARCHES

To protect the property and to ensure the safety of all employees, customers and the company, Salisbury Bank reserves the right to conduct personal searches consistent with applicable law, and to inspect any packages, parcels, purses, handbags, brief cases, lunch boxes or any other possessions or articles carried to and from Salisbury Bank's property.

In addition, Salisbury Bank reserves the right to search any employee's office, desk, files, lockers, equipment or any other area or article on our premises. In this regard, it should be noted that all offices, desks, files, lockers, equipment, etc. are the property of Salisbury Bank, and are issued for the use of employees only during their employment. Inspection may be conducted at any time at the discretion of Salisbury Bank. Should the situation warrant, public law enforcement officials would be brought in to aid in the investigation.

Persons entering the premises who refuse to cooperate in an inspection conducted pursuant to this policy may not be permitted to enter the premises. Employees working on or entering or leaving the premises who refuse to cooperate in an inspection, as well as employees who after the inspection are believed to be in possession of stolen property or illegal drugs, will be subject to disciplinary action, up to and including discharge, if upon investigation they are found to be in violation of Salisbury bank's security procedures or any other company rules and regulations.

## WORKPLACE VIOLENCE

The Bank has a ZERO TOLERANCE policy against any form of intimidation, threats or violence in the workplace. Violations of this policy include but are not limited to: participating in, provoking or otherwise contributing to any threat or violent act in the workplace; abuse, assault, battery, oral or written threats, intimidation and harassment; and possession of any firearm(s) or any other type of weapon at work.

Because it is often difficult to distinguish between a real threat and one made in jest, all threats will be treated as real and therefore even threats of violence spoken only in a joking manner are strictly prohibited by this policy. Further, foul language, fighting or interference with others through "horseplay" is not allowed.

Any employee who makes a threat, whether express or implicit, exhibits threatening behavior, or engages in any violent act or other violation of this policy on Bank property or otherwise in the course of their employment, shall be removed from the premises as quickly as safety permits, and shall remain out of work pending the outcome

47

D-000169

of an investigation. Depending on the circumstances involved, the Bank's response may include, but is not limited to, reassignment of job duties, discipline up to and including suspension and termination of employment, and/or criminal prosecution of the person(s) involved.

If you receive or overhear any threatening communications from an employee or outside third party, report it to a manager at once. Do not engage in either physical or verbal confrontation with a potentially violent individual. If you encounter· an individual who is threatening immediate harm to an employee or visitor to our premises, contact an emergency agency (such as 911) immediately.

All reports of work-related threats will be kept confidential to the extent possible, investigated and documented. Employees are expected to report and participate in an investigation of any suspected or actual cases of workplace violence. Violations of this policy, including your failure to report or fully cooperate in the company's investigation, may result in disciplinary action, up to and including immediate discharge.

## OFFICE MAINTENANCE

You are responsible for making sure that your work area is maintained in a neat, orderly, and business-like manner. At the end of the day, all areas should be cleaned and prepared for the start of the next day's work. All confidential records, cash items, and any other sensitive documents must be locked in a secure area. Report anything that needs repair or replacement to your supervisor.

## SMOKE-FREE WORKPLACE

Salisbury Bank is committed to providing a safe and healthy environment for employees and visitors. Smoking is not allowed inside Bank buildings or outside on Bank property. In addition, this policy applies while traveling on business if transporting clients or non-smoking employees. Please protect the interest and health of others by politely informing customers or visitors of our policy, as appropriate.

## CONCEALED WEAPONS

Unauthorized possession, use or sale of weapons, firearms or explosives on work premises is forbidden, in accordance with state and local laws. Violations of this policy will result in disciplinary action, up to and including discharge.

## SUBSTANCE ABUSE

Salisbury Bank has vital interests in ensuring a safe, healthy and efficient working environment for our employees, their co-workers and the customers we serve. The unlawful or improper presence or use of controlled substances or alcohol in the workplace presents a danger to everyone. For these reasons, we have established as a condition of employment and continued employment with Salisbury Bank the following substance abuse policy.

Employees are prohibited from reporting to work or working while using illegal or unauthorized drugs. Employees are prohibited from reporting to work or working when the employee uses any drugs, except when the use is pursuant to a doctor's orders and the doctor advised the employee that the substance does not adversely affect the employee's ability to safely perform his or her job duties.

In addition, employees are prohibited from engaging in the unlawful or unauthorized manufacture, distribution, sale or possession of illegal drugs and alcohol in the workplace including: on company paid time, on company premises, in company vehicles or while engaged in company activities, or while off-premises where such behavior compromises the company's business interests, or undermines the public confidence in or harms the reputation of the company, or adversely effects the employee's job performance, job safety and/or ability to fulfill company responsibilities. Employees are also prohibited from reporting for duty or remaining on duty with any alcohol in their systems. Employees are also prohibited from consuming alcohol during working hours, including meal and break periods.

48

D-000170

Your employment or continued employment with Salisbury Bank is conditioned upon your full compliance with the foregoing substance abuse policy. Any violation of this policy may result in disciplinary action, up to and including discharge. Any employee who violates this policy may further be directed at Salisbury Bank's sole discretion to participate in and successfully complete an appropriate treatment, counseling or rehabilitation program as recommended by a substance abuse professional as a condition of continued employment and in accordance with applicable laws. Salisbury Bank assures that any information concerning an individual's drug or alcohol use will remain confidential.

Salisbury Bank further maintains a policy of non-discrimination and reasonable accommodation with respect to recovering addicts and alcoholics and those having a medical history reflecting treatment for substance abuse conditions.

Salisbury Bank further reserves the right to take any and all appropriate and lawful actions necessary to enforce this substance abuse policy including, but not limited to, the inspection of company issued lockers, desks or other suspected areas of concealment, as well as an employee's personal property. An employee's refusal to consent to a search or inspection when requested by the Bank constitutes a violation of Bank policy and is grounds for disciplinary action up to and including termination.

Applicants will be asked whether they have been convicted of any crime, which would include any conviction under a federal, state or local drug statute. Existing employees are required to notify the Human Resource Manager of any federal, state or local drug conviction no later than five days after such conviction. As required, the Bank will notify the federal contracting or granting agency within ten days of receipt of any employee conviction notice and will also take appropriate disciplinary action up to and including discharge.

The Bank may also test employees for drug and alcohol use when the Bank has reasonable suspicion to believe that an employee is unable to perform or is deficient in performing their job responsibilities due to the influence of drugs or alcohol. Generally, reasonable suspicion means, but is not limited to, direct, individualized observation by a representative of the Bank of: employee use, possession, sale or distribution of controlled substances, drug paraphernalia or alcohol; abnormal behavior by an employee while at work; a noticeable or substantial change in work performance; or physical symptoms or manifestations of being under the influence of controlled substances or alcohol. Failure or refusal of an employee or applicant to comply with any portion of this policy, or to submit to or comply with any drug and alcohol testing as may be lawfully required or requested, will be grounds for disciplinary action up to and including termination or denial of employment.

D-000171

**Salisbury Bank and Trust Company**

**Employee Handbook Acknowledgement Form:**

The Employee Handbook describes important information about Salisbury Bank and Trust Company, and I understand that I should consult with the Human Resources Department regarding any questions not answered in this manual. I also understand that this manual is the property of Salisbury Bank and Trust, and can be located in the Bank's public drive, under P:\Global-RO\Employee Handbooks

I understand that this Employee Handbook outlines Salisbury Bank and Trust's employment policies and procedures. I acknowledge that this manual does not create contractual obligations, but is merely intended as a guideline of what I can expect as an employee, and what Salisbury Bank and Trust expects of me.

Furthermore, I understand that this manual is not a contract of employment. I acknowledge that I have received the manual or have access to it on Salisbury Bank's Intranet, and it is my responsibility to refer to the on-line copy as the most updated version, and that all preceding manuals are void. As a condition of my employment, it is my responsibility to read, maintain awareness of current policies and procedures, and comply with the policies contained in this manual and any revisions made to it or any of the Company policies.

I acknowledge that my employment with the company is terminable "at-will," which I understand to mean that I, or the Company, may terminate the employment relationship at any time, for any legal reason, with or without cause, with or without notice.

_____          _____
Employee's Signature                                                       Date

_____
Employee's Name
(Type or Print)

_____          _____
Witness' Name                                                              Date
(Type or Print)

Revised 01/2017

50

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM GUNNAR TRUITT, | Civil Action No.: 7:18-cv-08386-NSR-PED |
| Plaintiff, | |
| -against- | **DECLARATION OF** |
| SALISBURY BANK AND TRUST COMPANY; AND SALISBURY BANCORP, INC., | **WILLIAM GUNNAR TRUITT** |
| Defendants. | |

WILLIAM GUNNAR TRUITT, of full age, hereby declares:

The following paragraphs numbered 1-7 comprise completely false statements that appear in Salisbury's Memorandum of Law in Support Summary Judgment:

1.    "Truitt advised that he would be required to spend to spend 2-4 days per week in Albany for more than half of the year." Salisbury Br. at 1.

2.    "At no time was Truitt's employment terminated." Salisbury Br. at 1.

3.    "Truitt resigned from his position." Salisbury Br. at 1.

4.    Salisbury's contention that I announced my campaign without "Assessing Whether It Would Conflict With [My] Work For The Bank."

5.    "Truitt would be required to spend at a minimum 2-4 days per week - 60 business days – in Albany for more than half of the year." Salisbury Br. at 7.

6.    "At no time did Cahill or Cantele advise Truitt that his employment with the Bank was terminated or state that Truitt's employment would be terminated if he proceeded with his campaign." Salisbury Br. at 9.

7.      "[N]either Arthur Bassin nor any member of the Board of Directors was involved in the Bank's decision to deny Truitt's request for outside employment." Salisbury Br. at 22. I further note that paragraph 29 of my Complaint, which is cited the source for this assertion, neither relates to nor supports this completely false statement.

I also never indicated I "was going to unavailable during working hours for 2-4 days per week for a 6 month period," which Salisbury's brief improperly and strongly suggests was a statement made by me. Salisbury Br. at 2. Salisbury's "Statement of Undisputed Material Facts" also contains numerous false, misleading, and disputed statements of "fact." Paragraphs of Salisbury's statement of undisputed facts that contain false and/or misleading information, some of which are also discussed in further detail below, include without limitation paragraphs 33, 35, 38, 40, 41, 42, 47, 48, 49, 50, 51, 53, 66, 67, and 68. Due to the volume of false and misleading statements appearing in Salisbury's summary judgment submissions, I have elected to provide the following statements of fact and corrections to Salisbury's "Statement of Undisputed Material Facts":

8.      Out of an abundance of caution, before announcing my candidacy for New York State Assembly District 106, I reviewed Salisbury's Employee Handbook on more than one occasion. I specifically recall reviewing the sections regarding outside activities, outside employment, and social media usage, which clearly permitted the type of political activity I was considering, and even state that Salisbury's policies shall not be interpreted to prohibit or inhibit political activities by its employees.

9.      At the time of my termination, I had not even been endorsed by the Columbia County Republican Committee, there were still multiple Republican candidates seeking this position, and I did not know if I was going to be the Republican candidate on the ballot.

10. Sessions of the New York State Assembly often last only one to two hours, and it is unusual for them to extend beyond a half day.  In other words, Salisbury's suggestion that this Assembly position, which I was never even offered, would have required me to spend 60-65 days in Albany is false.

11. Paragraph 35 of Salisbury's "Statement of Undisputed Material Facts" alleges that "Truitt would be required to spend at a minimum 2-4 days per week - 60 business days – in Albany for more than half of the year."  That statement is false in general, unsupported by any part of my deposition testimony that Salisbury cited, and fails to note the fact that there are multiple weeks during the legislative session with zero session meetings.  To me, that indicates that Salisbury either failed to review the calendar they cite as the source for their knowledge, or choose to materially exaggerate the scope of NYS Assemblymembers role in Albany.

12. Paragraph 35 of Salisbury's "Statement of Undisputed Material Facts" alleges that "Truitt would be required to spend at a minimum 2-4 days per week - 60 business days – in Albany for more than half of the year."  That statement is false in general, unsupported by any part of my deposition testimony that Salisbury cited, and fails to note the fact that there are multiple weeks during the legislative session with zero session meetings.  To me, that indicates that Salisbury either failed to review the calendar they cite as the source for their knowledge, or choose to materially exaggerate the scope of NYS Assemblymembers role in Albany.

13. In paragraph 41 of Salisbury's "Statement of Undisputed Material Facts," Salisbury alleges that I "acknowledged that, prior to the election, [I] would engage in a campaign for the seat and that [my] campaigning would continue even after [I] would be elected."

That statement is not supported by any part of the deposition testimony Salisbury cites for support, and, as a general matter, campaigning does not continue in perpetuity and is never something that I have or would have engaged in during working hours.

14. Paragraph 51 of Salisbury's "Statement of Undisputed Material Facts" is completely false. Both Mr. Cantele and Mr. Cahill informed me that I was going to be terminated if I did not abandon my campaign for NYS Assembly.

15. Paragraph 60 of Salisbury's "Statement of Undisputed Material Facts" does correctly state that I offered to and did return Salisbury property in my possession, however, I only offered to return that property once I had been fired, and believe that my Salisbury supervisor Amy Raymond actually sent me a text message asking me to return those items.

16. I was told I would make over $150,000 per year by Salisbury's director of HR Doug Cahill during my initial interview. I also reviewed the handwritten notes that I took during that meeting with Doug, which my attorney has informed me were produced in this litigation at P000124, and my notes confirm my memory of and reflect the fact that Doug told me that Salisbury's other "2 Comm. Lenders" made "$160,000+ pay in earnings."

17. When Salisbury questioned me about my campaign for NYS Assembly, I informed them that I was an underdog who would be seriously outspent and unlikely to win.

18. It was reiterated to me many times that the position of Mortgage Loan Originator (MLO) was flexible on hours, and involved a substantial amount of business on the weekends and outside of business hours, because non-business hours frequently coincide with the

times when prospective clients and homeowners are not themselves working and available to speak with their MLO.

19.   Salisbury MLOs are not "expected to be responsive and on-call to client needs **24/7**," as Salisbury states on the second page of their Memorandum of Law.  Instead, I was told during training that I should not promise to respond to a prospective client on the same day unless I was positive that I would be able to do so, and also that I should strive to respond to prospective client inquiries within one business day.  I consistently responded to internal and external inquiries within those guidelines and, had I been elected to NYS Assembly, I would have continued to respond to prospective client inquiries within the confines of those guidelines.

20.   I was a full-time active Salisbury MLO prior to and at the time of my termination.

21.   Although Salisbury seems to have abandoned their completely false and baseless allegation that I "no notice no showed" on one or more occasion, I note that I have never failed to show up for work without notice.

22.   Although I do not believe it is necessarily material to this case, Salisbury incorrectly claims in paragraph 48 of their "Statement of Undisputed Material Facts" that I was serving a completely "new market."  Salisbury was already operating within the market that I was assigned, and had, for example, a billboard for another Salisbury MLO in the Town of North East Dutchess County that I saw on numerous occasions even before I became an active full-time Salisbury MLO.

23.   Declaration of Douglas Cahill:

Salisbury's Declaration of Douglas Cahill contains multiple false and/or misleading statements.  Paragraphs of Mr. Cahill's declaration that contain false and/or misleading

information include without limitation paragraphs 3 (no policy requires disclosure of an "intention to run for elected office"), 6, and 10.

24.    Declaration of Richard Cantele:

Salisbury's Declaration of Richard Cantele contains multiple false and/or misleading statements.  Paragraphs of Mr. Cantele's declaration that contain false and/or misleading information include without limitation paragraphs 3, 7, 8, 10, 11, 12, 13.  Regarding paragraph 13's contention that I "stated that [I] was going to unavailable during working hours for 2-4 days per week for a 6 month period," I absolutely never said that, or any remark resembling that assertion, which would not have been the case even if I were elected to NYS Assembly.  Furthermore, if the NYS Assemblymember position actually would have made me unavailable during all working hours for 2-4 days per week for a 6 month period, I never would have sought the NYS Assembly position in the first place.

Regarding the time commitment associated with a NYS Assembly position, in addition to my remarks above, I note that NYS Assemblymembers are generally connected to the internet, able to use their phones, and regularly use their computers, email, and the internet even during Assembly sessions.  Furthermore, I note that Salisbury's attorneys, Mr. Cahill, and Mr. Cantele have all informed the Court that, based on their "review" of "the state Assembly calendar provided by Mr. Truitt," they each determined that I would be required to spend 2-4 days per week in Albany for more than half of the year.  That conclusion is incorrect in every respect and unsupported by the calendar that I provided and they reference.

Pursuant to 28 U.S.C. ss 1746, I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Dated: January 10, 2020
      New York, New York

_William Gunnar Truitt_

William Gunnar Truitt

**CONFIDENTIAL**




SALISBURY BANK
enriching.

# SALISBURY BANK

# *MORTGAGE ORIGINATOR*
# PERFORMANCE APPRAISAL

**Employee Name:** Kevin Cantele

**Title:**          <u>**Mortgage Originator**</u>

**Review Period:**  <u>1/1/17 – 12/31/17</u>

### <u>GUIDELINES FOR EVALUATING PERFORMANCE</u>

**NEEDS TO IMPROVE:** The employees work is clearly below the level of acceptability. This rating describes performance, which has not kept pace with requirements, success, which have been only occasional, or performance, which as been deteriorating. It may also describe the performance of a new employee who has not yet learned the fundamentals of the job. (Individuals with ratings in this category should either move up in performance level or out of the position in a short period of time.)

**PROFICIENT:** Performance is fully acceptable and results are achieved. This rating describes performance, which demonstrates the required skills and knowledge for the position and sometimes exceeds expectations.

**COMMENDABLE:** Performance is *consistently* above requirements. This rating describes performance, which regularly exceeds expectations and demonstrates the willingness to assume additional responsibilities. This rating may be used a special recognition for extraordinary performance, which as significant impact on the organization.

## EVALUATION OF KEY RESPONSIBILITIES

*Review the employee's Job Description and Employee Agreement and evaluate performance in relation to position requirements.*

1.   **MORTGAGE PRODUCTION**

> 2017 Actual Production: 66 units     $24,361,220
> HELOC'S  41 units     $3,263,500
> Dates: 1/1/17 to 12/31/17

    ☐Needs to Improve
    ☐Proficient
XX ☐Commendable

**Comments: For 2017 Kevin surpassed his maximum volume goal of $18mil. He has done an excellent job of bringing in new business to the bank.**

> 2018 Origination Goal:     Minimum $22,000,000.00
>                                  Target $24,000,000.00
>                                  Optimal $26,000,000.00 ←
> 2018 Deposit Goal:     Minimum $150,000.00
>                                  Target $200,000.00
>                                  Optimal $250,000.00

Wealth Advisory Goal:
1 Qualified referral per quarter tied to bonus payout percentages.


6 Qualified sales calls per month to current relationships.
Including 1 New relationship call per month

Each sales call must be recorded in Synapsys (by end of each week)

- Regular on time attendance at your Department's Weekly Sales and Pipeline Meetings
- Attendance at Sales Training Meetings, (as assigned to you)
- Completion of special sales projects as assigned to you
- Timely completion of compliance trainings
- Active participation in the Regional Sales initiative
- Other duties as assigned

> Officer Initials_____
> Employee Initials_____

2.   **QUALITY OF WORK** – Completes origination paperwork, compliance and assigned duties in a consistently accurate and neat manner.

    ❏ Needs to Improve
XX❏ Proficient
    ❏ Commendable

**Comments:** Kevin has done a good job this year with his system details and submits more complete loan applications. He has a solid base of overall knowledge of lending and the guidelines in which we need to adhere to.

3.   **CUSTOMER RELATIONS** – Provides courteous and thorough service to internal and external customers.  Represents the Bank's interests in a professional manner.  Establishes and maintains good working relationships.

    ❏ Needs to Improve
XX❏ Proficient
    ❏ Commendable

**Comments:** Kevin continues to work at building relationships with his COI's. He has improved his follow up times with leads within 24 hours of receipt and has improved at acknowledging the referral. Kevin has initiated several co-calls with clients to help improve communication.

4.   **EMPLOYEE RELATIONS** – Provides prompt and cooperative support and assistance to other employees or departments.  Works with others to ensure the effectiveness of operations.

    ❏ Needs to Improve
    ❏ Proficient
XX ❏ Commendable

**Comments:** Kevin has made dedicated effort to be visible in the branch environment and build relations with his co-workers.  He goes above and beyond to help his co-workers and sales efforts with others.

5.   **TRAINING CONFERENCES**

Training attended during review period:
Various compliance related trainings within the department and ABA training completed timely.

## SPECIAL ACCOMPLISHMENTS:

*Describe any accomplishments or special achievements, which had significant impact on the department or organization.*

**Kevin did very well in attaining his 2017 goal and has continued to develop his lending knowledge nicely.**

## OFFICER COMMENTS:

*Summarize the employee's overall performance including strengths and areas for improvement.*

**Overall for the period Kevin is a pleasure to work with and an asset to the SBT team.**

## OVERALL PERFORMANCE RATING:

(Select One)

❑ Needs to Improve

XX ❑ Proficient

❑ Commendable

## EMPLOYEE COMMENTS:

*Officer's Signature:* _____   *Employee's Signature:* _____

*Date:* 2/6/15   *Date:* 2/6/18

D-000984

**Exhibit B**
**Salisbury Bank and Trust**
**Compensation of Mortgage Originators**
**Effective Jan 1, 2017 Thru Dec 31, 2017**

**New Business: 60 BPS**
You will be paid 60 basis points on total monthly closed volume for New Business. A concentrated effort should be made to establish other SBT account relationships.

**Current SBT Customers : 30 BPS**
For any loan originated that pays off a current SBT loan or Heloc compensation will be 30 basis points.

**Jumbo Loans:** For all jumbo loans in excess of $1.5 million the compensation payout will be capped at $10,000.00 per loan.

**\*A referral fee of 25 bps will be paid upon closing for properly qualified commercial loan referrals. These must be entered and complete thru CRM.**

**\* A referral fee of $50.00 per account relationship will be paid on all deposit referrals. These must be entered and completed thru CRM.**

**All SBT HELOC's** will be paid a flat origination fee of $475

FHLB XTRA is required to maintain a minimum yield of 1.375% per loan. (This means pricing and lock in periods must allow for meeting the deadline) Under the minimum yield loans will at management discretion be charged to the originator. Pair off fees may also be charged to the originator at management discretion.
Construction / Work Out loans where additional funds are needed to complete the project will be paid 30 basis points on new monies only.
In instances where bridge or short term financing is provided by SBT a six month recapture may apply.
Loans paid out at 60bps commission will be subject to a 30 bps recapture.  Loans paid out at a 30bps commission will be subject to a 15 bps recapture.
\*Recapture may be waived if a one point origination fee is collected from the borrower.
\*If any fees are not paid by the borrower they will be deducted from the originator's compensation.
For example appraisal fee, processing fee, and or credit fee.

D-000985

## Quarterly Bonus Opportunity

Each quarter you will be eligible for additional compensation bonus **based on meeting your closed volume goal for the quarter.** Quarterly volume goals will be established each year in January based on individual volume goals.

If your volume goal is reached you will be eligible for a <u>flat fee</u> compensation of 5BPS based on your quarterly goal.

For example: If you quarterly goal is $5 million you will receive an additional $2500.00 in compensation.

If your quarterly goal is $7.5 million you will receive an additional $3750.00 in compensation

**\*Bonus payout will be based on individual originators meeting their trust referral goals for the quarter. If the goal of 1 per quarter is met bonus will be paid at 100% if not bonus will be paid at 50%.**

**Monthly Compensation** will be based on closed volume production for prior month. All monthly compensation will be based on individual production numbers.

_____ Date 2/6/18

I agree to the above terms and conditions understanding this plans effective dates are listed above and agree to the terms for the above named period.

D-000986

CONFIDENTIAL





# SALISBURY BANK

enriching.

## SALISBURY BANK

## *MORTGAGE ORIGINATOR* PERFORMANCE APPRAISAL

**Employee Name:** Kevin Cantele

**Title:**  **Mortgage Originator**

**Review Period:**  **1/1/16 – 12/31/16**

### GUIDELINES FOR EVALUATING PERFORMANCE

**NEEDS TO IMPROVE:** The employees work is clearly below the level of acceptability. This rating describes performance, which has not kept pace with requirements, success, which have been only occasional, or performance, which as been deteriorating. It may also describe the performance of a new employee who has not yet learned the fundamentals of the job. (Individuals with ratings in this category should either move up in performance level or out of the position in a short period of time.)

**PROFICIENT:** Performance is fully acceptable and results are achieved. This rating describes performance, which demonstrates the required skills and knowledge for the position and sometimes exceeds expectations.

**COMMENDABLE:** Performance is *consistently* above requirements. This rating describes performance, which regularly exceeds expectations and demonstrates the willingness to assume additional responsibilities. This rating may be used a special recognition for extraordinary performance, which as significant impact on the organization.

D-000992

# EVALUATION OF KEY RESPONSIBILITIES

*Review the employee's Job Description and Employee Agreement and evaluate performance in relation to position requirements.*

## 1.   **MORTGAGE PRODUCTION**

2016 Actual Production: 52 units    $15,793,657
HELOC'S 22 units    $1,676,000
Dates: 1/1/16 to 12/31/16

❏ Needs to Improve
❏ Proficient
XX ❏ Commendable

**Comments: For 2016 Kevin surpassed his maximum volume goal of $14mil. He has done an excellent job of bringing in new business to the bank. He has shown a poised persistent presence.**

2017 Origination Goal:     Minimum $14,000,000.00
Target $16,000,000.00
Optimal $18,000,000.00
2017 Deposit Goal:     Minimum $150,000.00
Target $200,000.00
Optimal $250,000.00
2016 year end average deposits None  – *Rausch F400k  Megan Bair*
Kevin needs to focus on expanding the banking relationships with his clients. He needs to log referrals appropriately.

Wealth Advisory Goal  Qualified referral per quarter tied to bonus payout percentages.  None completed.  – *Bd/k - 2016  (AN)*

6 Qualified sales calls per month to current relationships.
Including 1 New relationship call per month

Each sales call must be recorded in Synapsys (by end of each week)

- Regular on time attendance at your Department's Weekly Sales and Pipeline Meetings
- Attendance at Sales Training Meetings, (as assigned to you)
- Completion of special sales projects as assigned to you
- Timely completion of compliance trainings
- Active participation in the Regional Sales initiative
- Other duties as assigned

Officer Initials
Employee Initials

D-000993

CONFIDENTIAL

2.  **QUALITY OF WORK** – Completes origination paperwork, compliance and assigned duties in a consistently accurate and neat manner.

> ❏ Needs to Improve
> XX ❏ Proficient
> ❏ Commendable

Comments: Kevin has done a good job this year with improving his system details and submits more complete loan applications. He is gaining more overall knowledge of lending and the guidelines in which we need to adhere to.


3.  **CUSTOMER RELATIONS** – Provides courteous and thorough service to internal and external customers.  Represents the Bank's interests in a professional manner.  Establishes and maintains good working relationships.

> XX  ❏ Needs to Improve
> ❏ Proficient
> ❏ Commendable

Comments: Kevin continues to work at building relationships and trust with his clients. Kevin continues to need to set aside time to attend more related functions for the bank. Like Chamber, Rotary and other bank sponsored events. Be "out there" more. He needs to follow up with leads within 24 hours of receipt and acknowledge the referral and give a status of "connected" to internal employees. Focus on being more accessible to clients.


4.  **EMPLOYEE RELATIONS** – Provides prompt and cooperative support and assistance to other employees or departments.  Works with others to ensure the effectiveness of operations.

> ❏ Needs to Improve
> ❏ Proficient
> XX ❏ Commendable

Comments: Kevin has made dedicated effort to be visible in the branch environment and build relations with his co-workers.  He goes above and beyond to help his co-workers and sales efforts with others.

D-000994

CONFIDENTIAL

**5.    TRAINING CONFERENCES**

Training attended during review period:
Various compliance related trainings within the department and ABA training completed timely.

Kevin should to attend the following within the next review period: complete his general banking education seminar he was signed up for in 2016.

## SPECIAL ACCOMPLISHMENTS:
*Describe any accomplishments or special achievements, which had significant impact on the department or organization.*

**Kevin did very well in attaining his 2016 goal and has continued to develop his lending knowledge nicely. He cultivated some new referral relationships in 2016.**

## OFFICER COMMENTS:
*Summarize the employee's overall performance including strengths and areas for improvement.*

**Overall for the period Kevin is a pleasure to work with. He needs to continue to improve his follow up time and lead maximization.**

## OVERALL PERFORMANCE RATING:
(Select One)
❏ Needs to Improve
XX ❏ Proficient
❏ Commendable

## EMPLOYEE COMMENTS:

*Officer's Signature:* _____   *Employee's Signature:* _____

*Date:* 1/17/17                          *Date:* 1/17/17

D-000995