UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/21/2020
```

WILLIAM GUNNAR TRUITT,

Plaintiff,

-against-

SALISBURY BANK AND TRUST COMPANY
and SALISBURY BANCORP, INC.,

Defendants.

18-cv-8386 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Plaintiff William Gunnar Truitt ("Plaintiff" or "Truitt") commenced this action against

Defendants Salisbury Bank and Trust Company and Salisbury Bancorp, Inc. ("Defendants" or the

"Bank") on or about August 21, 2018 in the Supreme Court of the State of New York, Dutchess

County. (ECF No. 1-1.) Plaintiff alleges that Defendants retaliated against him and wrongfully

terminated his employment due to his political activities, in violation of New York Labor Law

("N.Y.L.L.") § 201-d. (*Id.*) On September 14, 2018, Defendants removed this action from state

court pursuant to 28 U.S.C. §§ 1332, 1441, and 1446. (ECF No. 1.)

Before the Court is Defendants' motion for summary judgment dismissing Plaintiff's

complaint. (ECF No. 47.) For the following reason, Defendants' motion is GRANTED.

## BACKGROUND

In moving for summary judgment, Defendants submitted a Local Rule 56.1 Statement of

Undisputed Facts (the "56.1 Statement") and accompanying declarations and exhibits. (*See* Defs.'

56.1 Statement of Undisputed Facts ("Defs. 56.1"), ECF No. 47-3.) Plaintiff did not submit an

appropriate response to Defendants' 56.1 Statement, instead providing his own exhibits and a

declaration that, in part, challenges certain representations in Defendants' 56.1 Statement and their

opening memorandum of law, often without any citation to the record.  (*See* Decl. of R. Lower ("Lower Decl."), ECF No. 48-1; Lower Decl. Ex. 13 ("Truitt Decl.").)

Local Civil Rule 56.1 provides that "[u]pon any motion for summary judgment," the moving party shall annex "a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  Local Civil Rule 56.1(a).  The party opposing the motion is then to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts."  *Id.* 56.1(b).  "Each statement by the movant or opponent . . . including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible."  *Id.* 56.1(d).  If the opposing party fails to submit a responsive statement, then the facts set forth in the moving party's 56.1 statement are deemed admitted.  *Id.* 56.1(c); *see Cress v. Wilson*, No. 06 Civ. 2717(JGK), 2008 WL 5397580, at *5 (S.D.N.Y. Dec. 29, 2008) (citing *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001)).  The district court "has broad discretion to determine whether to overlook a party's failure to comply with local court rules."  *Holtz*, 258 F.3d at 73.

Because Plaintiff failed to comply with Local Rule 56.1, the Court will deem as admitted those facts set forth in Defendants' 56.1 Statement, to the extent they are supported by the record.  Nevertheless, to ensure an accurate recital of the facts, the Court engaged in its own independent review of the record, including documents, declarations, and testimony submitted by the parties.  Thus, the following facts are drawn from both Defendants' 56.1 Statement and admissible evidence and testimony in the record.  The facts are undisputed unless otherwise noted.

**A.  Truitt's Employment with the Bank**

    *1.  Truitt's Offer Letter*

On January 29, 2018, the Bank extended Truitt an offer of employment to work as a Mortgage Lending Officer ("MLO") Trainee in its Residential Lending Department.  (Defs. 56.1 ₱ 3; Decl. of Jennifer Fischer in Supp. of Defs. Mot. for Summ. J. ("Fischer Decl."), ECF No. 47-1, Ex. J.)  Truitt was classified as a full-time hourly employee during his training period, and was to be paid $16.83 per hour, based upon a 40-hour work week.  (Defs. 56.1 ₱ 4; Fischer Decl. Ex. J & Ex. K.)  He also received 6.46 hours of paid time off per pay period, with an annual accrual of 21 days.  (Defs. 56.1 ₱ 5; Fischer Decl. Ex. J.) The letter made it clear that the Bank was an "at will" employer, and that either the Bank or Truitt, "at any time and for any reasons, [could] terminate the employment relationship."  (Fischer Decl. Ex. J.)

    *2.  Truitt's Training Program and Job Expectations*

Truitt's first day of employment with the Bank was on February 26, 2018.  (Defs. 56.1 ₱ 7; Fischer Decl. Ex. J.)  As noted in a development plan provided to him on his first day, Truitt reported to Andrea MacArthur ("MacArthur"), a Mortgage Lending manager.  (Fischer Decl. Ex. L.)  The plan provided an approximately six-month timeline for his training program.  (Defs. 56.1 ₱₱ 8, 12.)  As an MLO Trainee, Truitt was to spend two to three days each week working in the Residential Credit Underwriting Department and two to three days each week working with Residential Processors.  (*Id.* ₱ 12; Fischer Decl. Ex. L.)  By September 2018, Truitt would have been eligible for a $2,500 per month draw on future commissions and would work with internal staff and centers of influence to develop relationships in Dutchess, Ulster, and Orange Counties in New York.  (Defs. 56.1 ₱₱ 13-14; Fischer Decl. Ex. L.)  And by January 2019, Truitt would have been promoted to a full-time MLO position.  (Defs. 56.1 ₱ 15; Fischer Decl. Ex. L.)

Truitt also received a job description of the MLO Trainee position on his first day.  (Defs. 56.1 ⁋ 9; Fischer Decl. Ex. M.)  The job description indicated that Truitt would "work in assigned departments throughout the Bank, developing a balanced understanding of" the Bank's essential departments.  (Fischer Decl. Ex. M. at D-000078.)  In addition to anticipating that Truitt would develop six core competencies during his training, the Bank also expected that Truitt would "[p]romote[] the best interest of the Bank whenever and wherever possible."  (*Id.* at D-000079.)

    *3.   Truitt's Prior Political Activities*

At the time of his hiring, Truitt was a Republican member of the Dutchess County Legislature and was serving in his second term, which was to end on December 31, 2019.  (Defs. 56.1 ⁋ 17; Fischer Decl. Ex. N at D-000009; Fischer Decl. Ex. B ("Truitt Dep. Tr.")[1] at 30:2-4.)  Truitt testified that, although the time commitment varied week by week, he spent approximately 15 hours a week in his role as a Dutchess County legislator.  (Truitt Dep. Tr. 32:18-25.)  This included a minimum of three evening meetings a month.  (*Id.* at 33:2-12.)  Because the meetings were held in the evening, Truitt was able to work full time at Salisbury while continuing his legislative duties.  (*Id.* at 33:13-16.)  The Bank knew of Truitt's political position, its time commitment, and his intention to "continue to hold the position" upon his hiring.  (*See id.* at 30:16-31:2, 32:11-14.)  Reflecting its approval, the Bank highlighted Truitt's legislative role to all Bank employees when welcoming him as a new hire.  (Defs. 56.1 ⁋ 20; Fischer Decl. Ex. H.)

**B.  The Bank's Policies on Outside Employment and Activities**

On his first day, Truitt received a copy of the Bank's Employee Handbook.  (Defs. 56.1 ⁋ 25; Fischer Decl. Ex. V at D-000101.)  Of relevance here, the handbook explains that, although an employee's "first professional responsibility is to the position [he or she] ha[d]

---

[1]    Portions of the Truitt Deposition transcript are also attached to the Lower Declaration as Exhibit 16.

accepted," the Bank "d[id] not object to [] accepting outside work as long as it d[id] not (a) interfere with [] regular work hours (or necessary overtime); (b) affect the efficient performance of [] regular duties; (c) cause [the employee] to be ill or accident-prone through fatigue or other condition; or (d) present a conflict of interest." (*Id.*)  Nothing in the handbook "prohibit[ed] or inhibit[ed] employees from engaging in any lawful activities," including "protected concerted activity or political activities." (Lower Decl. Ex. 12 at D-00164.)

Truitt also received a copy of the Bank's Code of Ethics on his start date. (Defs. 56.1 ¶ 27; Fischer Decl. Ex. W at D-000087.)  As it relates to outside employment, the Code of Ethics states:

> [E]mployment is a full-time career unless otherwise provided by the appropriate Board of Directors . . . .  The undivided interest and loyalty of the employees is important to the continued success of the [Bank].  Thus, employment with, or acting as a consultant to, outside firms is permitted only if it is approved in advanced by the appropriate Board of Directors . . . .

(Fischer Decl. Ex. W at D-000178.)  The Code of Ethics further provides a list of factors that would be evaluated when "determining whether to approve [] outside employment," including, *inter alia*, whether it would "interfere with work assignments or performance." (*Id.*)

The Code of Ethics also delineates provisions regarding "Political Activities." (Defs. 56.1 ¶ 29; Fischer Decl. Ex. W at D-000178.)  Notably, the Code provides that if an employee "wishes to take an active role as a political candidate for any elective public office or is considered being appointed to any governmental or civic position, [he or she] must discuss the details and receive prior approval . . . ." (Fischer Decl. Ex. W at D-000179.)

## C.  Truitt Announces His Candidacy for the New York State Assembly

### 1.  *Truitt Announces His Campaign on Facebook*

On April 12, 2018, Truitt announced on Facebook that he would be campaigning for the office of New York State Assembly District 106. (Defs. 56.1 ¶ 30; Truitt Dep. Tr. at 80:10-13.) The next day, on April 13, 2018, upon learning of Truitt's announcement, Amy Raymond

("Raymond"), Truitt's supervisor, and Doug Cahill ("Cahill"), the Vice President of Human Resources, requested to meet with him.  (*See* Defs 56.1 ❡ 32; Truitt Dep. Tr. at 81:16-82:5; Fischer Decl. Ex. E ("Cahill Dep. Tr.")[2] at 99:9-12; Cahill Decl. ❡ 4.)  As Cahill testified, Shelly Humeston, Senior Vice President and Secretary for the Bank, had notified Rick Cantele ("Cantele"), Chief Executive Officer of the Bank, of the Facebook post.  (Cahill Dep. Tr. at 99:21-24.)  Cantele then asked Cahill and Raymond to meet with Truitt to learn about the "parameters" of the campaign and the position and to assess whether there was going to be a conflict.  (*See id.* at 99:25-100:9.)

During the meeting, Truitt explained that he had been endorsed by the Dutchess County Republican committee two days prior, and that he was "in no way" an official candidate. (Truitt Dep. Tr. at 82:14-20.)  In essence, Truitt explained, he had simply been recommended to be the Republican candidate for the position.  (*Id.* at 82:19-20.)  At the end, Raymond and Cahill asked that Truitt provide a letter of explanation as to the position for which he was seeking election. (*Id.* at 88:22-89:4; Cahill Dep. Tr. at 100:5-9.)

### 2. *Truitt's Letter Regarding the Campaign and Position*

The following Monday, on April 16, 2018, Truitt emailed Cahill and Raymond his letter regarding his candidacy.  (Fischer Ex. S at D-000109.)  Truitt explained that he was "on the path to becoming a candidate for New York State's 106th State Assembly District."  (*Id.* at D-000110.) Truitt noted that the New York State Assembly was a "part-time legislature" whose sessions are held in Albany, New York, began in January, and concluded in June.  (*Id.*)  In support, Truitt attached a copy of the "New York State Legislative Session Calendar" for 2018.  (*Id.* at D-000112.) The calendar indicated that, in general, the assembly would have sessions in Albany between two

---

[2]      Portions of the Cahill Deposition transcript are also attached to the Lower Declaration as Exhibit 10.

to four days in a week.[3]  (*Id.*)  Truitt then expressed his belief that he would be able to maintain full-time work as an MLO for the Bank, noting that, if elected, he would no longer be a County Legislator and would thus "shift that time toward [his] duties at [the Bank] along with the Assembly."  (*Id.* at D-000110-111.)  He further noted that it was "very common for assemblymembers and other part-time elected officials to work in other professions full-time." (*Id.* at D-000111.)

Upon receipt of the letter, management reviewed the role with respect to (1) a potential conflict of interest and (2) the amount of time away from the Bank and the Bank's business that the role would require.  (Defs 56.1 ⁋ 34; Cahill Decl. ⁋ 6.)  From that review, the Bank concluded that Truitt would be required to spend approximately two to four days per week in Albany[4] between January through June, which amounted to a total of sixty business days.[5] (Defs. 56.1 ⁋⁋ 35-36; Truitt Dep. Tr. at 90:21-25; Cahill Dep. Tr. at 51:7-52:6; *see also* Fischer Decl. Ex. S at D-000112.)  The Bank also considered Truitt's request as an "outside employment request" because of the salary he would obtain if elected, which was significantly higher than his salary as a Dutchess County legislator.  (*See* Defs 56.1 ⁋ 40; Cahill Dep. Tr. 137:11-17.)

### D.  Truitt's Departure From the Bank

#### 1.  The Bank Decides It Will Not Approve of Truitt's Request for Outside Employment

In assessing whether to approve Truitt's pursuit of the assemblymember position, the Bank considered that Truitt would be an MLO for the Riverside Division residential lending market

---

[3]     Certain weeks, including the weeks of February 18, April 1, and April 8, 2018, had no legislative sessions scheduled.  (Fischer Decl. Ex. S at D-000112.)

[4]     If elected, Truitt would have to be in Albany during legislative sessions, and his commute from Newburgh, New York to the state capital would be approximately an hour and fifteen minutes.  (Truitt Dep. Tr. at 90:8-25, 93:11-22.)  Truitt was unsure about whether overnight stays would be necessary.  (*Id.* at 94:9-15.)

[5]     Plaintiff contends, without support, that Defendants falsely asserted that he would be required to spend "at minimum 2-4 days per week – 60 business days – in Albany," given that there are multiple weeks during the legislative session with no meetings.  (Truitt Decl. ⁋⁋ 12, 24.)  However, both the documentary evidence proffered by both parties and the depositions of Cahill and Truitt support Defendants' assertion.

upon the completion of his training.  (Decl. of Richard Cantele ("Cantele Decl."), ECF No. 47-4, ⁋ 8.)  The Riverside Division was an emerging market for the Bank, and the Bank had expected Truitt to spend considerable time working to develop business in the region.  (*Id.* ⁋ 8.)

The Bank further considered the sizable duties of an MLO, which primarily relate to sales and customer service.  (*Id.* ⁋ 9.)  As one former mortgage advisor for the Bank, Spring Burke ("Burke"), testified, MLO's would counsel customers looking to purchase and refinance homes, obtain construction loans and mortgages, and obtain land loans.  (Fischer Ex. D ("Burke Dep. Tr.") at 14:23-15:5.)  With competitors offering similar products and services, the Bank focuses on relationship building and customer service, which requires MLOs to be responsive and available to clients.  (Cantele Decl. ⁋ 9; Burke Dep. Tr. at 15:18-16:17; *see also* Fischer Decl. Ex. C at Tr. 6:2-5.)  To this point, Burke testified that the Bank would often get referrals that required quick responses, explaining that "if you are not on it, to call immediately, [the customer is] going to go to the next bank."[6]  (Burke Dep. Tr. at 18:2-21.)

Unsurprisingly, the time commitment for an MLO is substantial.  It often entails more than 50 hours per week of work.  (Cantele Decl. ⁋ 10.)  For this reason, the Bank was concerned that Truitt's job duties as an assemblymember would not permit him to adequately serve his clients at the Bank and develop the Bank's business in the Riverside Division.[7]  (Cantele Decl. ⁋⁋ 8, 10; *see also* Fischer Decl. Ex. G ("Cantele Dep. Tr.")[8] at 70:6-10.)

---

[6]     Plaintiff's dispute about whether MLOs are expected to be on-call 24/7, which relies on two performance appraisals for a non-party employee (*see* Lower Decl. Exs. 14 & 15), is a non sequitur.  Regardless, as even both those performance appraisals make clear, MLOs needed to have a high level of responsiveness to client inquiries.  (Lower Decl. Ex. 14 at D-000983; Lower Decl. Ex. 15 at D-000994.)  Truitt himself asserts that he understood the demanding requirements of the job and strived to meet that standard.  (Truitt Decl. ⁋ 19.)

[7]     Truitt testified that, after obtaining new employment in May 2018, he ended up focusing on his campaign for several months rather than working full time.  (Truitt Dep. Tr. at 139:5-141:3.)  Once the election concluded, Truitt resumed his full-time work schedule.  (*Id.* at 141:4-10.)

[8]     Portions of the Cantele Deposition transcript are also attached to the Lower Declaration as Exhibit 9.

With the above in mind, on April 26, 2018, Cahill met with Truitt and informed him that the Bank was concerned about his ability to effectively fulfill the requirements of his job while also meeting the requirements and responsibilities of an assemblymember. (Defs. 56.1 ¶ 47; Cahill Dep. 79:22-25; *see also* Cantele Dep. Tr. 117:24-118:6.)  Cahill also mentioned he had spoken with members of the board of directors, including Art Bassin ("Bassin"), who had told Cahill that he was not "comfortable with [Truitt] . . . running for this position and working for the bank."[9] (Truitt Dep. Tr. at 101:13-24.)  Specifically, Bassin had explained to Cahill that as "an elected official himself . . . he didn't think it was plausible" to both work at the bank and be an assemblymember.  (Defs 56.1 ¶ 63; Truitt Dep. Tr. at 112:4-7.)

Cahill concluded that, because of the significant hours entailed by the New York State Assembly position, management would deny Truitt's request for outside employment.  (Defs. 56.1 ¶ 47; Cahill Dep. Tr. at 79:18-80:21, 84:23-85:8.)  Cahill further explained that Truitt "needed to make a decision on whether he was going to run [for the New York State Assembly position]." (Cahill Dep. Tr. at 89:9-12.)  Cahill then requested that Truitt provide his decision by "Tuesday," *i.e.*, May 1, 2018.  (*Id.*)

---

[9]      Defendants challenge this statement as hearsay within hearsay.  (Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Mot."), ECF No. 47-2, at 22-23.)  Plaintiff, however, maintains that the statements are not hearsay under Rule 801(d)(2)(D) of the Federal Rules of Evidence.  (Pl. Mem. of Law in Opp. to Defs. Mot. for Summ. J. ("Opp."), ECF No. 48, at 9.)  "In order to introduce evidence of an out-of-court statement as nonhearsay under Rule 801(d)(2)(D), a party must lay a sufficient foundation by establishing '(1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency.'"  *Marcic v. Reinauer Transp. Cos.*, 397 F.3d 120, 128-29 (2d Cir. 2005) (quoting *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 537 (2d Cir. 1999)).  "The Second Circuit has held that admissibility under this rule should be granted freely."  *Lopez v. Ramirez*, No. 11 Civ. 0474 (PGG), 2019 WL 3779277, at *11 n.12 (S.D.N.Y. Aug. 12, 2019) (quoting *Rich v. Tee Bar Corp.*, No. 1:10-cv-1371 (MAD/CFH), 2013 WL 5442277, at *10 (N.D.N.Y. Sept. 27, 2013)).  Here, although close, the Court concludes that the statements by Cahill and Bassin qualify as out-of-court party statements under Rule 801(d)(2)(D).  Cahill and Bassin both appeared to be speaking in their representative capacity for the Bank and it regarding a matter within the scope of their work for the Bank (although, as noted below, to a significantly lesser degree for Bassin).  Accordingly, consideration of these statements on summary judgment is appropriate.

The following day, on April 27, 2018, the Bank's Board of Directors (the "Board") learned that an "employee" who was "hired as a Mortgage Director for the Riverside Division" had "announced his campaign to run for NYS Assembly." (Lower Decl. Ex. 4 at D-001127.) As detailed in the minutes for that meeting, the Board was informed by Cantele that "Management ha[d] determined that th[e] position pays approximately $80,000 per year and requires approximately 65 days per year in Albany," such that management would "speak with the employee and advise him that this would be a conflict of interest." (*Id.*) According to the Board minutes, Cantele represented that the "employee" must "make a decision whether to run for office or to continue employment with the Bank." (*Id.*)

### 2.  *Truitt Meets With Cantele*

On April 30, 2018, Truitt met with Cantele to make his case about his ability to do both jobs and to urge for reconsideration of the Bank's position. (Defs. 56.1 ¶ 49; Cantele Dep. Tr. at 26:8-10; Cahill Dep. Tr. at 89:13-17.) Cantele, however, reiterated the Bank's concern regarding Truitt's ability to fulfill his role with the Bank while also taking on a position on the New York State Assembly. (Cantele Dep. Tr. at 29:17-24.) Although Cantele acknowledged during his deposition that he did not issue an ultimatum during the meeting, he testified that Truitt was aware that he had to decide "which job he was most interested in."[10] (*See id.* at 27:16-28:10, 70:12-22.)

### 3.  *Truitt's Employment With the Bank Ends*

On May 1, 2018, Truitt emailed MacArthur and Raymond to inform them that "after multiple discussions with Doug Cahill and after meeting with Rick Cantele yesterday, it ha[d] been confirmed to [him] that [his] employment with Salisbury Bank w[ould] not be continued if [he]

---

[10]     Cantele emphasized that "it was [Truitt's] outside employment that was the issue. But really, the form of that outside employment didn't matter. It was the time commitment necessary, time commitment outside the bank necessary for that second job that we believed was going to impede his ability to . . . complete his full-time responsibilities at Salisbury." (Cantele Dep. Tr. 117:22-118:6.)

pursue[d] election to the New York State Assembly this November." (Fischer Decl. Ex. O at D-000020.)  Truitt explained that both Cahill and Cantele reiterated their primary concern that he "would not have the necessary time it takes to be a successful originator and grow [the Bank's] brand in New York." (*Id.*)  Although Truitt disagreed with the Bank's position, he "thought deeply to [him]self about the possibility of holding off on running for the Assembly" and decided he could not miss the "once in a lifetime opportunity that [his] community [was] asking [him] to pursue." (*Id.*)  Truitt emphasized that he would "truly regret looking back thinking 'what if?'" if he passed on the "chance to be the youngest Assemblyman since Teddy Roosevelt." (*Id.*)  Truitt "wish[ed] this did not have to be the outcome," but he noted that Cantele expressed his hope that Truitt would return to the Bank if he were not successful in the November election. (*Id.*)

That same day, Truitt wrote to Cahill about his "Decision." (Fischer Decl. Ex. P at D-000103.)  He indicated that he had informed Cantele that he would "continue with [his] bid for the New York State Assembly." (*Id.*)  Truitt explained that he still believed that "if given the chance, [he] would be able to prove [] that [he could] be a very successful originator . . . even if elected to the State Assembly." (*Id.*)  However, Truitt acknowledged that Cantele had explained that "there is a lot of uncertainty that comes with [Truitt's election bid] for the bank," which was a position Truitt "underst[oo]d and respect[ed]." (*Id.*)  Truitt again reiterated that he had "deeply consider[ed] and weigh[ed] [his] options over this past weekend, and came to the conclusion that [he could not] give up on a once in a life time opportunity" to become the youngest assemblyman in New York history. (*Id.*)  Truitt concluded by noting he had to return several items to the Bank. (*Id.*)

Truitt states that he never provided a formal resignation letter and was effectively forced to leave given his desire to run for office. (Truitt Decl. ¶¶ 2, 14; *see also* Lower Decl. Ex. 6 ("MacArthur Dep. Tr.") at 27:22-28:15.)  But as Truitt testified, he was never told by either Cantele

or Cahill that his employment would be terminated whether or not he ran for office.  (Supp. Decl. of Jennifer Fischer ("Fischer Supp. Decl."), ECF No. 49-1, Ex. B at Tr. 108:14-23.)   Instead, testimony in the record indicates that it was up to Truitt to decide between continuing to work at the Bank or running for office.  (*See* Cahill Dep. Tr. 84:23-85:8; Cantele Dep. Tr. at 27:22-23.)

### E.  Role of Arthur Bassin in Influencing the Bank's Position Regarding Truitt's Candidacy

As noted above, during his meeting with Cahill, Truitt was informed that Bassin was not "comfortable with Mr. Truitt being both a candidate for District 106 and an employee of the Bank." (Fischer Decl. Ex. A ⁋ 28; Truitt Dep. Tr. at 101:13-24.)  Truitt alleges in his complaint that Bassin was a long-time political and financial supporter of Didi Barrett ("Barrett"), who was the incumbent Democratic New York Assemblymember for District 106.  (Fischer Decl. Ex. A ⁋ 29.) For that reason, Truitt alleges that Bassin worked with the Bank's management to protect Barrett in her election.  (*Id.* ⁋⁋ 29, 33.)

During his deposition, Bassin confirmed that he did contribute to Barrett's campaign, and would talk with her from time to time about political issues.  (Fischer Decl. Ex. F ("Bassin Dep. Tr.")[11] at 14:4-12.)  Bassin, however, stressed that he did not "socialize" with her, nor were they "friends in the sense that [they would] have dinner with each other or . . . spend any time with each other outside the political arena."  (*Id.* at 14:6-12.)  Moreover, Bassin emphasized during his deposition that the Board did not play a role in the Bank's decision to deny Truitt's request and that he was not otherwise familiar with Truitt.  (*See id.* at 33:2-8, 35:6-8, 59:21-25, 60:19-25.)  He specifically testified that the Board does not manage personnel decisions; rather

> in the specific case of these outside employment things, the management team reviews those situations and brings to the Board's attention that situation and says here's what's going on and we don't think these are problems, but we think this is a problem and have advised the employee to that extent.  And then the Board says,

---

[11]     Portions of the Bassin Deposition transcript are also included in the Lower Declaration as Exhibit 22.

okay, that sounds fine to us.  The [HR/Compensation] committee says that sounds fine to us.

(*Id.* at 58:3-21.)

Cantele confirmed this point during his deposition, noting that although the Board receives a report regarding outside employment requests, "they do not evaluate" it.[12]  (Cantele Dep. Tr. 38:11-39:7.)  And, as it relates to those individuals involved with the decision not to grant Truitt's request for outside employment, the record indicates that none of them were involved with Barrett's campaign or provided any financial support.  (Fischer Decl. Ex. I at Resp. No. 1.)

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Thus, summary judgment will not lie where there is a "dispute[] over facts that might affect the outcome of the suit under the governing law" and "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The Supreme Court has made clear that 'at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter[.]'"  *Westinghouse Elec. Corp. v. N.Y.C. Trans. Auth.*, 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting *Anderson*, 477 U.S. at 249).  Rather, the relevant inquiry is "whether the evidence presents a sufficient

---

[12]     Cahill also testified that he had not discussed Truitt with any member of the Bank's HR/Compensation Committee, including Bassin.  (Cahill Dep. Tr. 49:4-18.)  As Truitt indicates, however, Cahill had prepared an "Outside Employment Survey" memorandum for the "HR/Compensation Committee" in which he indicated that Truitt had "informed us that he's running for the NY State Assembly in November" and that "Management [was] currently reviewing whether a conflict of interest exists.  (Lower Decl. Ex. 5.)  During his deposition, Bassin did not recall seeing the memorandum, although he did note that it is his duty to review any such memoranda that are provided to him in his role on the HR/Compensation Committee.  (Bassin Dep. Tr. 33:2-18.)  In opposing summary judgment, Plaintiff indicates that counsel for Defendants later informed him that Cahill wanted to correct his testimony to indicate he never provided the memorandum to the HR Compensation Committee.  (Opp. 15.)  To the extent a dispute of fact exists here, the dispute is not material and does not impact the outcome of the Court's decision.

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.  In deciding a motion for summary judgment, courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal citation and quotations omitted).

The moving party bears the initial burden of pointing to evidence in the record "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may also support an assertion that there is no genuine dispute by showing "that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (internal citation and quotation marks omitted).

The party asserting that a material fact is genuinely disputed must support his or her assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1).  "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).  In addition, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Defendants move for summary judgment on the basis that Plaintiff has failed to establish a *prima facie* case of discrimination under N.Y.L.L. § 201-d.  (Mot. 13-14.)  Defendants' primary

contention is that Plaintiff was not terminated and did not otherwise suffer an adverse employment action.  (*Id.* at 14-15.)  Defendants further maintain that, even if Plaintiff were terminated, the termination was not based on his political affiliation, but rather, it reflected a business determination that Plaintiff could not handle both the responsibilities of his position with the Bank and the responsibilities of being a New York State Assemblyman.  (*Id.* at 17-24.)  In response, Plaintiff contends that he was discharged in a context that gives rise to an inference of discrimination.  (Opp. 10-15.)[13]

Under N.Y.L.L. § 201-d, it is unlawful for any employer to "discharge from employment or otherwise discriminate against an individual in compensation, promotion or terms, conditions or privileges of employment" because of "an individual's political activities outside of working hours, off of the employer's premises and without use of the employer's equipment or other property."  N.Y.L.L. § 201-d(2)(a); *see also McCue v. Cty. of Westchester*, 57 A.D.3d 746, 746 (2d Dep't 2008) ("Pursuant to Labor Law § 201–d(2)(a), it is unlawful for any employer to discharge an individual from employment because of that individual's 'political activities outside of working hours.'").  "Political activities" are defined by the statute as "(i) running for public office, (ii) campaigning for a candidate for public office, or (iii) participating in fund-raising activities for the benefit of a candidate, political party or political advocacy group."  N.Y.L.L. § 201-d(1)(a); *see also Raghavendra v. Trs. of Columbia Univ.*, No. 06 Civ 6841(PAC)(HBP), 2008 WL 2696226, at *10 (S.D.N.Y. July 7, 2008) ("'Political activities' are further defined as '(i) running for public office, (ii) campaigning for a candidate for public office,

---

[13] The parties also addressed the issue of punitive damages.  Although the Court does not decide this issue, at least one court in this circuit, reviewing the legislative history of the statute, has observed that "New York Law [] would appear not to justify punitive damages for a violation of § 201–d."  *McCavitt v. Swiss Reins. Am. Corp.*, 89 F. Supp. 2d 495, 499 (S.D.N.Y. 2000) (granting motion to strike plaintiff's demand for punitive and emotional damages under N.Y.L.L. § 201-d).

or (iii) participating in fund-raising activities for the benefit of a candidate, political party or political advocacy group.'").

Courts applying New York law have held that, to establish a claim under N.Y.L.L. § 201-d, a plaintiff must demonstrate that his or her "termination was improperly based on his [or her] outside political activities." *Shabbir v. Pakistan Int'l Airlines*, No. 99 CV 5601(CLP), 2008 WL 938427, at *3 (E.D.N.Y. Apr. 7, 2008) (quoting *Baker v. City of Elmira*, 271 A.D.2d 906, 907 (3d Dep't 2000) (internal quotations omitted)).   Thereafter, the burden shifts to a defendant to come forward with "admissible evidence showing that plaintiff['s] political affiliations and activities did not play a substantial part in its decision." *Id.* (quoting *Baker*, 271 A.D.2d at 907).[14]

Inherent in the above standard is that a plaintiff must have suffered an adverse employment action.   "An adverse employment action includes *inter alia* discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand." *Jean-Gilles v. Cty. of Rockland*, 195 F.

---

[14]   Both Plaintiff and Defendants appear to agree that the *McDonnell Douglas* burden shifting framework is applicable to this case.   (Opp. 10-11; Mot. 13-14.)   The Court in its own independent research, however, has not identified any authority holding that *McDonnell Douglas*'s framework applies to N.Y.L.L. § 201-d.   The New York Court of Appeals has never addressed the statute, while the only Second Circuit authority addressing a claim under N.Y.L.L. § 201-d dealt with the "sole issue" of "whether romantic dating constitutes a 'recreational activity'" under the statute. *See McCavitt v. Swiss Reinsurance Am. Corp.*, 237 F.3d 166, 166-67 (2d Cir. 2001).   In fact, the only relevant authority is from New York's appellate divisions and federal district courts applying those cases, all of which have set forth the above-articulated standard.   To be sure, "unless [it] find[s] persuasive evidence that the New York Court of Appeals . . . would reach a different conclusion," which it has not, this Court is bound to apply the standard articulated by the New York's intermediate courts. *See id.* at 168 (quoting *Pahuta v. Massey-Ferguson Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).   Still, because of its similarities to section 201-d's standard, application of the *McDonnell Douglas* framework would seemingly make sense given the parties' agreement.   *Cf. Barry v. Town of Elma*, No. 02 CV 344, 2004 WL 2980758, at *11-12 (W.D.N.Y. Dec. 23, 2004) (applying standard under Section 1983 to N.Y.L.L. § 201-d claim on summary judgment because both parties agreed that it was the applicable standard); *Baker*, 271 A.D.2d at 907-08 (articulating standard for claims under N.Y.L.L. § 201-d by relying on *McManus v. Grippen*, 244 A.D.2d 632, 633 (3d Dep't 1997), a Section 1983 case).   Indeed, some courts have implied a connection between claims brought under federal law, which rely on *McDonnell Douglas*, and analogous claims under N.Y.L.L. § 201-d. *See, e.g.*, *Zappa v. Town of Hempstead Sanitary Dist. No. 7*, No. CV 17-39 (JMA) (ARL), 2018 WL 1702002, at *6 (E.D.N.Y. Jan. 16, 2018), *adopted by*, 2018 WL 1701949 (E.D.N.Y. Mar. 31, 2018) (denying motion to dismiss N.Y.L.L. § 201-d claim because the court had already found a causal connection between termination and political activity for the Section 1983 claim).   Ultimately, the Court need not resolve this issue at this time.   Because Plaintiff has failed to establish that he was terminated, his claim fails regardless of the framework applied (to the extent they are, in fact, different).

Supp. 2d 528, 534 (S.D.N.Y. 2002) (citing *Kaluczky v. City of White Plains*, 57 F.3d 202, 208 (2d Cir. 1995)). This definition includes constructive discharge, which is "functionally the same as an actual termination." *See Cronin v. St. Lawrence*, No. 08-CV-6346 (KMK), 2009 WL 2391861, at *4 (S.D.N.Y. Aug. 5, 2009) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 148 (2004)).

A constructive discharge occurs "when an employer 'deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation.'" *Spence v. Md. Cas. Co.*, 995 F.2d 1147, 1156 (2d Cir. 1993) (quoting *Pena v. Brattleboro Retreat*, 702 F.2d 322, 325 (2d Cir. 1983) (internal quotations omitted)); *accord Polidori v. Societe Generale Groupe*, 39 A.D.3d 404, 405 (1st Dep't 2007) ("To state a claim for constructive discharge, plaintiff must allege facts showing that defendant 'deliberately created working conditions so intolerable, difficult or unpleasant that a reasonable person would have felt compelled to resign'" (quoting *Mascola v. City Univ. of N.Y.*, 14 A.D.3d 409, 410 (1st Dep't 2005))). "This burden is not an easy one to carry." *Nicholls v. Philips Semiconductor Mfg.*, 760 F. Supp. 2d 407, 416 (S.D.N.Y. 2011) (internal quotations and citation omitted). Indeed, "constructive discharge cannot be proven merely by evidence that an employee disagreed with the employer's criticisms of the quality of his work, or did not receive a raise, or preferred not to continue working for that employer." *Spence*, 995 F.2d at 1156. "Nor is the test merely whether the employee's working conditions were difficult or unpleasant." *Id.* Instead, the evidence must establish that the conditions were so intolerable that "when, viewed as a whole, they [were] 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Terry v. Ashcroft*, 336 F.3d 128, 152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen. Life Ins.*, 92 F.3d 81, 89 (2d Cir. 1996)).

Here, Defendants maintain that Plaintiff's departure from the Bank's employment to pursue his campaign was a resignation, not a termination.  (Mot. 14-15.)  The Court agrees.  The undisputed record makes clear that Plaintiff chose to discontinue his employment with Defendants when presented with the decision between continued employment and his candidacy.

As Defendants explain, once he learned of the Bank's position regarding the assemblymember position, it was up to Plaintiff to decide "whether he was going to run" or stay at the Bank.  (Cahill Dep. Tr. at 89:9-12.)  Then after carefully assessing his options, Plaintiff chose to pursue his candidacy with full knowledge of Defendants' position regarding his ability to campaign and handle his work duties (as well as the at-will nature of his employment).  For example, his email to MacArthur and Raymond clearly establishes his decision came after he "thought deeply" about the "possibility of holding off on running for the Assembly," which he concluded was not an opportunity he could decline.  (Fischer Decl. Ex. O at D-000020; *see also* Lower Decl. Ex. 17 at Tr. 59:10-17 ("We discussed all the steps that were taken prior to receipt of his email where he expressed his decision to choose other employment.").)  And in his e-mail to Cahill, titled "Decision," Plaintiff explained that he had "informed" Cantele that he would "continue with [his] bid" to run for the New York State Assembly given that he could not "give up on [that] once in a lifetime opportunity."  (Fischer Decl. Ex. P at D-000103.)  Moreover, notwithstanding the absence of a "formal letter," Defendants' employees consistently characterized Plaintiff's departure as tantamount to a resignation.  (*See, e.g.*, Cahill Dep. Tr. at 85:20-86:5, 86:14-87:4; MacArthur Dep. Tr. at 27:4-13.)  And such views match Defendants' framing of his departure shortly after it occurred.  (*See* Fischer Decl. Ex. R (email, dated May 18, 2018, from Cahill to "EntireBank" announcing that Plaintiff "decided to pursue his political ambitions and has resigned his Mortgage Originations position").)

Conversely, aside from asserting, without support, that Defendants' contention is "false" (Truitt Decl. ¶¶ 2-3), Plaintiff points to no testimonial or documentary evidence that seriously creates a question of material fact regarding Plaintiff's decision to leave his employment with the Bank to pursue his candidacy. Accordingly, even when drawing all inferences from the record in Plaintiff's favor, his departure from the Bank is best classified as a resignation. Thus, the remaining question is whether his resignation amounted to constructive termination.

Defendants contend that any "ultimatum" Plaintiff received regarding his employment with the bank and his continued pursuit of an elected office does not rise to the level of constructive termination. (Mot. 15.) Plaintiff maintains, however, that Defendants' "ultimatum" is *prima facie* constructive termination. (Opp. 9.) The record, however, is devoid of any indication that Defendants deliberately made Plaintiff's working conditions so intolerable that a reasonable person in his position would have felt compelled to resign.

It is true that "[a] threat of termination may be evidence of a constructive discharge if it presents the employee with the choice to resign or be fired." *Monroe v. Cty. of Orange*, No. 14-CV-1957 (KMK), 2016 WL 5394745, at *18 (S.D.N.Y. Sept. 27, 2016) (internal citations and quotations omitted). But that is not the factual scenario before the Court. Rather, the undisputed evidence indicates that Defendants merely presented Plaintiff with a simple choice: continue his employment at the Bank or pursue his campaign for the New York State Assembly. (*See* Cahill Dep. Tr. 84:23-85:8, 88:17-89:12; Cantele Dep. Tr. at 27:22-23.) There is no indication that Plaintiff would be fired no matter what he decided. In fact, the record suggests that Defendants had no intention of firing Plaintiff (or otherwise altering the terms of his employment) absent his decision to pursue the assemblyman position. For example, as Plaintiff notes, employees at the Bank were "very impressed with [Plaintiff's] work." (Fischer Supp. Decl. Ex. B at Tr. 108:14-

23.)  Similarly, the Bank was even willing to have Plaintiff return following the conclusion of his campaign if he were unsuccessful.  (Fischer Decl. Ex. P at D-000103.)

Meanwhile, in opposing Defendants' motion, Plaintiff has not pointed to any evidence in the record that credibly raises a material question of fact about whether Defendants forced him to decide between termination or resignation, let alone that Defendants created an intolerable work environment that would have compelled any reasonable person in Plaintiff's position to resign.[15] To be sure, Plaintiff strongly maintains that he believed he could both work at the Bank and be an assemblymember.  (*See* Fischer Supp. Decl. Ex. B at Tr. 108:24-109:4.)  However, when assessing whether a constructive discharge occurred, the Court applies an objective standard.  Under that standard, as a matter of law, no rational juror could find that Plaintiff was constructively discharged.[16]  The Court therefore GRANTS Defendants' motion for summary judgment.

---

[15]    Plaintiff's reliance on *Kelly v. Metro-North Commuter R.R.*, No. 87 CIV. 5817 (JFK), 1989 WL 156298 (S.D.N.Y. Dec. 18, 1989) is wholly misplaced.  In *Kelly*, plaintiff had resigned from her employment with defendant using a letter that she was coerced into signing under duress and the threat of being fired.  *Id.* at *1.  She further submitted evidence that she was "[a]llegedly offered [] another position which represented a demotion" and that she would be terminated if she did not accept.  *Id.* at 82.  Conversely, here, there is no evidence of any hostile or coercive conduct that would compel a reasonable person to resign.

[16]    Assuming, *arguendo*, Plaintiff had established that he was constructively discharged (which he did not), and otherwise met his burden of establishing a *prima facie* claim under section 201-d by relying on Bassin's alleged statements (a dubious proposition, at best), summary judgment in Defendants' favor would still be warranted.  At bottom, Defendants have proffered significant testimony and evidence that establishes that the basis for their decision was that management did not feel that Plaintiff could handle the rigors of his job and a campaign for, and potential elected position within, the New York State Assembly.  (*See, e.g.*, Cahill Dep. Tr. at 137:4-17; Fischer Decl. Ex. S; Burke Dep. Tr. at 15:18-16:17.)  These concerns were seemingly contemplated by the Bank's Code of Ethics (*see* Fischer Decl. Ex. W at D-000179), and made salient by the time commitment of the MLO role and the Bank's market development goals related to the area in which Plaintiff worked (Cantele Decl. ¶ 9; Cantele Dep. Tr. at 70:6-10; Burke Dep. Tr. at 18:2-21).  For his part, Plaintiff has not pointed to any additional evidence in record—beyond unsupported conclusory assertions in his declaration and a reliance on his pleadings—that rebuts Defendants' evidentiary showing.  *See Celotex Corp.*, 477 U.S. at 324 (explaining that a "party opposing a properly brought motion for summary judgment bears the burden of going beyond the pleadings, and 'designat[ing] 'specific facts showing that there is a genuine issue for trial'").  He thus has failed to raise a material question of fact about Defendants' motivation.  Separately, to the extent Plaintiff contends that any purported falsification of Plaintiff's discharge date supports a material question of fact regarding retaliatory and discriminatory intent (*see* Opp. 15), this contention is wholly without merit.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED and

Plaintiff's complaint is DISMISSED.  The Clerk of Court is respectfully directed to terminate the

motion at ECF No. 47 and to enter judgment in favor of Defendants.

Dated: July 21, 2020                                  SO ORDERED.
White Plains, New York

                                                      _____
                                                      NELSON S. ROMÁN
                                                      United States District Judge